# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) CRIMINAL CASE NO. 1:11-CR-161-1 |
| JOHNNY REID EDWARDS | ) |
| | ) |
| | ) |

## JOHN EDWARDS' MEMORANDUM IN SUPPORT OF HIS MOTION TO DISMISS THE INDICTMENT FOR FAILURE TO ALLEGE A CRIME AND LACK OF NOTICE AS TO WHAT THE LAW PROSCRIBED
### (Motion to Dismiss No. 1)

### NATURE OF MATTER BEFORE THE COURT

Mr. Edwards moves to dismiss the Indictment because (1) the Indictment itself is unconstitutionally vague as to what is charged -- the Indictment does not reveal its theory of the charges; instead, it cites three inconsistent and mutually exclusive theories without identifying which theory is the basis for the Indictment and which theory the government will pursue at trial; (2) even if any offense was specified and accepting the facts alleged in the Indictment as true, the Indictment should be dismissed because no crime occurred under any of the theories posited by the government; and (3) the lack of constitutionally required "fair warning" that Mr. Edwards' alleged conduct would violate the campaign finance laws would preclude criminal liability in this case.

By bringing this Indictment, the government draws this Court into uncharted territory in the difficult intersection between campaign finance regulation and the First

Amendment. For this case to go forward, this Court would have to find contrary to other courts and decisions of the Federal Election Commission ("FEC") and then be the first court in the 100 years of campaign finance law to hold that the conduct, as alleged in the Indictment, would violate the Federal Election Campaign Act ("FECA" or "Act"). But even if this hurdle were overcome, the Court would then have to find that -- despite being the first court ever to have declared such conduct criminal -- Mr. Edwards had "fair warning," in advance, that his conduct would violate the law. If the Court cannot find that Mr. Edwards conduct, as alleged in the Indictment, both would violate FECA and that he was on notice that his conduct was proscribed, the government's entire case fails.

## STATEMENT OF FACTS

Mr. Edwards declared his candidacy for the Presidency on December 28, 2006, and that campaign ended on January 30, 2008. After his campaign ended, it was revealed that Senator Edwards had an extramarital affair with Person B (Rielle Hunter). The Indictment alleges that, from mid-2007 through the end of the campaign, Mr. Edwards "received" excessive "campaign contributions" in the form of money that third-party friends of Mr. Edwards -- Person C (Rachel Mellon) and Person D (Fred Baron) sent to cover living expenses, medical care, travel, and accommodations for a different third-party -- Ms. Hunter. Those payments were solicited, facilitated and/or received by Person A (Andrew Young), and there is no allegation that Mr. Edwards personally

received, deposited or spent any of those funds. The government alleges that these payments were made to conceal Mr. Edwards' extramarital affair. (Indict. ¶15.)[1]

While much can be said in questioning how Mr. Edwards conducted himself throughout this saga, the allegations in the Indictment that he violated campaign finance laws should not be among them. The distinction between a wrong and a crime is at the heart of this case. The government acknowledges that neither Mr. Edwards nor his campaign improperly received any money directly and that the campaign did not misspend any of the money it raised, including federal matching funds. Nor is there any allegation that the money was spent on anything people would ordinarily think of as campaign activities, such as buying advertising or funding campaign events.

Although the government charges that these payments were "campaign contributions," the Indictment never explains why.[2] Instead, the Indictment describes in the abstract that "campaign contributions" can arise in three distinct and mutually

---

[1]     Although it is not controlling for purposes of this motion, the Indictment fails to tell much of the story about these funds. More than half the money the Indictment identifies as having been provided by Ms. Mellon was not deposited or used until <u>after</u> Mr. Edwards' candidacy had ended (the defense also forecasts the evidence will be that Mr. Young diverted all but a fraction of the money to himself). The Indictment also ignores the fact that Mr. Baron spent several times more money on Ms. Hunter <u>after</u> the campaign as he had before it.

[2]     The statute defines a "contribution" as including, *inter alia*, "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office." 2 U.S.C. § 431(8)(A)(i).

exclusive contexts: (a) direct contributions to a candidate or campaign;[3] (b) expenditures by third-parties to support the campaign that are made in coordination with the candidate or the campaign;[4] or (c) third-party payments of a candidate's "personal use" expenses that would not have been made irrespective of the campaign (but only if the candidate's personal expenses would have existed irrespective of the campaign).[5] (Indict. ¶ 9.)

---

[3]     "Direct" contributions are the most common form of campaign contributions, but they do not appear at issue here. The Indictment contains conclusory allegations that Mr. Edwards "received" excessive campaign contributions (Indict. ¶¶ 35, 37, 39, 41), but the specific allegations of the Indictment reveal that none of the relevant money went to either Mr. Edwards or his campaign (Indict. ¶¶ 23-24, 29-30).

[4]     An "expenditure" is defined to include "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office." 2 U.S.C. § 431(9)(A)(i) (emphasis added). 2 U.S.C. §441a (which sets contribution limits for an individual to a candidate for federal office) provides that an "expenditure" by a person will be considered a "contribution" to a candidate when it is "made . . . in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents." 2 U.S.C. §441a(a)(7)(B)(i).

[5]     It is unlawful to convert campaign contributions to "personal use." See 2 U.S.C. § 439a(b)(1). Campaign funds are converted to "personal use" if they are "used to fulfill any commitment, obligation, or expense of a person that would exist irrespective of the candidate's election campaign or individual's duties as a holder of Federal office," such as the payment of a home mortgage, utilities, and vacations. 2 U.S.C. § 439a(b)(2). "Personal use" is defined as "any use of funds in a campaign account of a present or former candidate to fulfill a commitment, obligation or expense of any person that would exist irrespective of the candidate's campaign or duties as a Federal officeholder." 11 C.F.R. § 113.1(g). The FEC was concerned that limitations on contributions not be circumvented by having a donor pay a candidate's personal expenses to thereby free up the candidate's own funds for campaign purposes (e.g., a donor pays a candidate's $5,000/month mortgage so the candidate can then divert an additional $5,000/month of

These categories are mutually exclusive. A direct contribution to a candidate or his campaign cannot be a third-party expenditure. Similarly, a third-party expenditure that is undertaken in coordination with the candidate for the purpose of influencing the election cannot be the payment of a "personal use" expense because a "personal use" expense must exist "irrespective of the campaign," while a third-party expenditure must be for "the purpose of influencing" the outcome of the election.

The Indictment's discussion of the three distinct ways payments may be treated as "campaign contributions" is simply background in understanding how FECA operates. It does not give notice of the actual basis for the charge in the Indictment or the allegations Senator Edwards must defend against at trial.

The government's suggestion that third-party payments used to assist Ms. Hunter through her pregnancy and conceal an extramarital affair were for the purpose of influencing the outcome of the election is surprising. Common sense and basic human nature establish that Mr. Edwards had a number of non-campaign-related, purely personal reasons to conceal his relationship with Ms. Hunter. Like most men in his situation, he

_____

personal funds to the campaign). FEC regulations provide: "Notwithstanding that the use of funds for a particular expense would be a personal use under this section, payment of that expense by any person other than the candidate or the campaign committee shall be a contribution . . . to the candidate unless the payment would have been made irrespective of the candidacy." 11 C.F.R. § 113.1(g)(6).

naturally wanted to shield his extramarital affair from public view to avoid hurting his wife and children and to protect his reputation. Likewise, Ms. Hunter understandably wanted to carry out her pregnancy away from the stress of a scandal.[6] Those concerns would exist whether or not Mr. Edwards was a candidate.

But the government takes the extraordinary view that anything that enhances a candidate's reputation or protects the candidate's reputation during a campaign is campaign-related. In doing so, the government collapses any distinction between a person's candidacy and his private life. Because money exchanged entirely between third-parties was spent to conceal an extramarital affair that, if revealed, would have damaged Mr. Edwards' candidacy, the government creates an effect-therefore-cause theory to claim the money spent should be viewed as "campaign contributions." (Indict. ¶15.)

## QUESTION PRESENTED

1.     Does the Indictment provide constitutionally adequate notice of the illegal "campaign contribution" charges by noting that there are three mutually exclusive ways

_____

[6]     There is no allegation in the Indictment that, absent these payments, Ms. Hunter would have revealed the affair or her pregnancy to the country. Indeed, Ms. Hunter remained silent about this matter until after Mr. Edwards publicly acknowledged that he was the father of their child in January 2010. And for the personal reasons that are obvious, the funds spent would have been spent even had he not been running for office.

payments can be "campaign contributions," but then refusing to specify which one is the basis for the Indictment?

2.      Can the payments made by Ms. Mellon and Mr. Baron that were used to pay Ms. Hunter's personal expenses be treated as "campaign contributions" to Mr. Edwards under any of the various theories of liability, when neither he nor his campaign ever received the money and none of the money was spent on either core campaign activity or to satisfy a "personal use" expense of Mr. Edwards?

3.      If the payments by Ms. Mellon and Mr. Baron were "campaign contributions" to Mr. Edwards, does the absence of fair warning that he could be criminally prosecuted for "knowingly and willfully" failing to treat the payments as regulated "campaign contributions" preclude a conviction?

## ARGUMENT

The government's claim that Mr. Edwards committed a crime by not treating the money spent by Ms. Mellon and Mr. Baron on Ms. Hunter as "campaign contributions" is without precedent. Despite a century of campaign finance laws, there never has been a prosecution of this sort of crime and neither the courts nor the FEC ever has suggested that payments like those alleged in the Indictment could be federally regulated as "campaign contributions."  As Robert Lenhard and Scott Thomas, both former Chairmen

of the FEC with decades of combined experience interpreting and enforcing federal campaign finance laws, explain:

> [U]nder the law as developed by the United States courts and the Federal Election Commission, these payments would not be considered to be either campaign contributions or campaign expenditures within the meaning of the campaign finance laws …. [T]he Federal Election Commission, if asked, would conclude that these payments did not constitute a violation of the law, even as a civil matter; and …that the facts do not make out a knowing and willful violation of the campaign finance laws warranting criminal prosecution. . . . Moreover, in 2007 and 2008, a candidate would not have been on notice that the payments by Mrs. Mellon and Mr. Baron to Ms. Hunter would violate the campaign finance laws. A criminal prosecution of a candidate on these facts would be outside anything we would expect after decades of experience with the campaign finance laws.

(Ex. A, R. Lenhard and S. Thomas Ltr. of 4/26/11.)[7]

If the government wants to establish clarity in what is, at best, a gray area of election law, it can do so by statute, regulation or by providing guidance. But what the government cannot do is what it has done here, which is to extend the regulation of "campaign contributions" into a new area through criminal proceedings. Ninth Circuit Chief Judge Kozinski recently made just this point in a case involving a similarly untested theory of criminal liability, filing a separate concurrence simply to express his

---

[7] When Craig Donsanto, DOJ's own expert on election law violations, authorized the initial investigation, he did so on the theory that money actually given to the campaign was being converted to personal use. He made no mention that third-party payments of Ms. Hunter's expenses could themselves be "campaign contributions" even though he was aware of Mr. Baron's various payments. (See infra at 21).

"hope . . . that the government will be more cautious in the future."  United States v. Goyal, 629 F.3d 912, 922 (9th Cir. 2010) (concurring).  As Judge Kozinski explained: "This is just one of a string of recent cases in which courts have found that federal prosecutors overreached by trying to stretch criminal law beyond its proper bounds.  This is not the way criminal law is supposed to work.  Civil law often covers conduct that falls in a gray area of arguable legality.  But criminal law should clearly separate conduct that is criminal from conduct that is legal."  Id. (internal citations omitted).  Unfortunately, the government did not heed Judge Kozinski's admonition.

## I.     THE INDICTMENT IS UNCONSTITUTIONALLY VAGUE IN FAILING TO IDENTIFY WHICH OF THE STATUTORY BASES FOR MAKING "CAMPAIGN CONTRIBUTIONS" IS CHARGED

This case centers on whether the payments made by Ms. Mellon and Mr. Baron for Ms. Hunter's personal expenses actually were "campaign contributions" and whether Mr. Edwards "knowingly and willfully" failed to treat them as such.  Yet the Indictment never sets forth its theory as to why these payments were "campaign contributions."  The closest the Indictment comes to offering an explanation is in Paragraph 9, which explains that campaign contributions come in three distinct and mutually exclusive forms:

> The Election Act's contribution limit applied to anything of value provided for the purpose of influencing the presidential election, including (a) contributions to a candidate and his/her campaign; (b) expenditures made in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate or his/her campaign; and (c) payments for personal expenses of a candidate unless they would have been made irrespective of the candidacy.

(Indict. ¶ 9.)   But that paragraph merely provides general background as to how the Election Act defines "campaign contributions."   Although the Indictment claims the payments were illegal campaign contributions, the Indictment never alleges why this is so; that is, the Indictment never specifies whether these payments were (a) direct contributions to Mr. Edwards or his campaign; (b) expenditures made in coordination with Mr. Edwards or his campaign "made for the purpose of influencing" the election; or (c) payments for the "personal use" expenses of Mr. Edwards that would not have been made irrespective of the campaign.   This failure to select the alleged violation is fatal to the Indictment, as the mere citation to the statute is insufficient.   United States v. Hooker, 841 F.2d 1225, 1228 (4th Cir. 1988) (en banc) ("It is elementary that every ingredient of crime must be charged in the bill, a general reference to the provisions of the statute being insufficient." (internal quotation omitted)).

The failure to disclose this element of the offense creates an unfair moving target for Mr. Edwards.   If Mr. Edwards proves the payments were not direct campaign contributions under (a), then the government is free to argue (b) and, if not (b), then (c). The categories do not overlap.   Direct contributions under (a) involve money received directly by the campaign, whereas (b) involves expenditures made by third-parties to promote the campaign and (c) involves third-party payment of a candidate's "personal use" expenses rather than campaign-related expenses (i.e., expenses that would exist irrespective of the campaign).   Did the grand jury think the campaign directly received

money from Ms. Mellon and Mr. Baron?  Did the grand jury think that Ms. Mellon and

Mr. Baron paid campaign-related expenses without that money passing through the

campaign?  Or did the grand jury think that Ms. Mellon and Mr. Baron paid non-

campaign-related "personal use" expenses of Senator Edwards to free up his personal

funds for the campaign?  And, just as importantly, did the proper number of grand jurors

even agree that probable cause existed as to one of these three theories, or did the grand

jurors disagree as to the basis for the charge?  The Indictment does not answer these

questions so there is no way to know.  That renders the Indictment constitutionally

defective for a lack of notice as to what is charged.[8]

> Addressing just this sort of ambiguity, the Supreme Court explained:

> To allow the prosecutor, or the court, to make a subsequent guess as to
> what was in the minds of the grand jury at the time they returned the
> indictment would deprive the defendant of a basic protection which the
> guaranty of the intervention of a grand jury was designed to secure.  For a
> defendant could then be convicted on the basis of facts not found by, and
> perhaps not even presented to, the grand jury which indicted him.

---

[8]     Because the Indictment is constitutionally defective, a bill of particulars cannot
cure it.  "[I]t is a settled rule that a bill of particulars cannot save an invalid indictment."
Russell v. United States, 369 U.S. 749, 770 (1962); Hooker, 841 F.2d at 1227 (same).  "If
the indictment does not contain every essential element of the offense, it is invalid; and, a
bill of particulars cannot cure the defect. . . .  [T]he bill of indictment insures that a
defendant does not face incarceration except on presentment or indictment of a grand
jury; thus, if it is insufficient, a prosecutor cannot cure the defects."  United States v.
Loaza, 107 F.3d 257, 260 (4th Cir. 1997) (internal quotations and citations omitted).

_Russell_, 369 U.S. at 770; see also _id._ at 766 (noting a similar problem on appeal: "A cryptic form of indictment … requires the defendant to go to trial with the chief issue undefined. It enables his conviction to rest on one point, and the affirmance of the conviction to rest on another. It gives the prosecution free hand on appeal to fill in the gaps of proof by surmise or conjecture."). There is great unfairness in such an indictment because it leaves "the prosecution free to roam at large -- to shift its theory of criminality" to obtain an unfair advantage. _Id._ at 768.

The Fifth and Sixth Amendments require a notice of charges that "sufficiently apprises the defendant of what he must be prepared to meet" at trial. _Russell_, 369 U.S. at 763-64; see also _Hooker_, 841 F.2d at 1230 (same); _United States v. Hayes_, 775 F.2d 1279, 1282-83 (4th Cir. 1985). "Elementary principles of due process require that an accused be informed of the specific charge against him." _Stroud v. Polk_, 466 F.3d 291, 296 (4th Cir. 2006). With charges brought under "generally-worded provisions" that cover a "broad range" of conduct, such as contributions that occur through three distinct means, it is "especially important … that the indictment state with particularity the theory on which it charges." _United States v. Smolar_, 557 F.2d 13, 19 (1st Cir. 1977); see _Russell_, 369 U.S. at 765 ("[I]t is not sufficient to set forth the offence in the words of the statute, unless those words of themselves, fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished."). "Where guilt depends so crucially upon such a specific

12

<u>identification of fact</u>, our cases have uniformly held that an indictment must do more than simply repeat the language of the criminal statute." <u>Id.</u> at 764 (emphasis added).

By leaving Mr. Edwards to guess whether the Indictment alleges an unlawful (a) direct contribution, (b) coordinated third-party expenditure, or (c) improper payment of "personal use" expenses, the Indictment fails that test. The situation is no different than a charge of assault with a deadly weapon and the naked citation to a statute declaring a deadly weapon to be a "knife, gun, arrow, sword, club or explosive," but leaving the accused to guess which deadly weapon he will be accused of using at trial. Neither situation provides the defendant with sufficient notice of the charges he will face at trial, and both permit the government to roam freely between various theories of liability -- even if the theory at trial fails to match the theory relied upon by the grand jury.[9]

_____

[9]      The vagueness of the Indictment also poses a double jeopardy problem under the Fifth Amendment. <u>See, e.g.</u>, <u>Sanabria v. United States</u>, 437 U.S. 54, 65-66 (1978) ("The precise manner in which an indictment is drawn cannot be ignored, because an important function of the indictment is to ensure that, in case any other proceedings are taken against [the defendant] for a similar offense, . . . . the record [will] sho[w] with accuracy to what extent he may plead a formal acquittal or conviction.") (internal quotation omitted; alterations in original); <u>Loaza</u>, 107 F.3d at 260 ("In order to be legally sufficient, '[a]n indictment must contain the elements of the offense charged, fairly inform a defendant of the charge, and enable the defendant to plead double jeopardy as a defense in a future prosecution for the same offense.'" (quoting <u>United States v. Daniels</u>, 973 F.2d 272, 274 (4th Cir. 1992)). Mr. Edwards could secure an acquittal the way the Indictment presently is worded, only to be subject to new charges under a different theory.

Nor can the government claim that the grand jury indicted upon all three theories because the three theories are inconsistent with one another. From the earliest days of the Republic, such indictments were dismissed as "repugnant." See, e.g., United States v. Howell, 78 U.S. 432, 437-38 (1870); United States v. Cantril, 8 U.S. 167, 167-68 (1807). Modern courts call such indictments "internally inconsistent." See, e.g., Sunderland v. United States, 19 F.2d 202, 208 (8th Cir. 1927) ("Repugnancy in a count consists in a contradiction between material allegations therein."); United States v. Conde, 309 F. Supp. 2d 510, 511 (S.D.N.Y. 2003) ("An indictment is defective if it contains logically inconsistent counts."); United States v. Cisneros, 26 F. Supp. 2d 24, 52 (D.D.C. 1998) ("A count of an indictment is 'repugnant' and must be dismissed if there is a contradiction between material allegations in the count." (internal quotation omitted)); see also United States v. Easton, 434 F. Supp. 1217, 1221 (W.D. La. 1977) (government was ordered to elect which two of three inconsistent charges to dismiss).

The government's suggestion of three possible, mutually exclusive bases for accepting illegal "campaign contributions," without an allegation as to which of the three theories forms the basis for the Indictment, is a fatal violation of the notice provisions of the Fifth and Sixth Amendments as well as the Double Jeopardy Clause of the Fifth Amendment. These violations, by themselves, warrant dismissal of the Indictment.

II.  **THE GOVERNMENT CANNOT CONSTRUE ELECTION LAWS TO REGULATE BEYOND WHAT IS "PLAINLY AND UNMISTAKABLY PROSCRIBED" AND "UNAMBIGUOUSLY RELATED TO THE CAMPAIGN"**

## A. Any Test For Establishing Which Payments Can Be Regulated As "Campaign Contributions" Must Be Narrowly And Precisely Drawn

No matter which of the three theories of criminal liability the government pursues, each must be construed narrowly to avoid criminalizing conduct in gray (and constitutionally protected) areas. Statutory language must be unmistakably clear in what it prohibits before it can serve as a basis for criminal liability; unprecedented interpretations and applications of statutes cannot provide the basis for criminal charges. As the Fourth Circuit emphasized: "It is a fundamental rule of criminal statutory construction that statutes are to be strictly construed and should not be interpreted to extend criminal liability beyond that which Congress has 'plainly and unmistakably' proscribed." United States v. Sheek, 990 F.2d 150, 153 (4th Cir. 1993) (quoting Dunn v. United States, 442 U.S. 100, 112-13 (1979)). When a statutory term, like "contribution," can be given a narrow or more expansive reading, the rule of lenity requires it to be construed narrowly. See, e.g., United States v. Santos, 553 U.S. 507, 514 (2008) ("The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them. This venerable rule not only vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed. It also places the weight of inertia upon the party that can best induce Congress to speak more clearly and keeps courts from making criminal law in Congress's stead.").

These rules of statutory construction hold even greater force in the realm of election law because freedom of speech and association are at their apex in the context of a federal election, particularly one for the Presidency. As noted by the Supreme Court, "it can hardly be doubted that the constitutional guarantee [of the First Amendment] has it fullest and most urgent application precisely to the conduct of campaigns for political office." Monitor Patriot Co. v. Roy, 401 U.S. 265, 272 (1971). While administrative agencies typically possess broad power,

> [t]he subject matter which the FEC oversees, in contrast, relates to the behavior of individuals and groups only insofar as they act, speak and associate for political purposes. The creation of such an agency raised weighty constitutional objections, and its authority to exercise control over an area where "uninhibited, robust and wide open" activity is constitutionally protected was approved by the Supreme Court only after being meticulously scrutinized and substantially restricted.

Id. at 387 (emphasis in original) (quoting Buckley v. Valeo, 424 U.S. 1 (1976)).

The Fourth Circuit has emphasized that, "after Buckley, campaign finance laws may constitutionally regulate only those actions that are 'unambiguously related to the campaign of a particular . . . candidate.'" North Carolina Right to Life, Inc. v. Leake ("NCRL"), 525 F.3d 274, 281 (4th Cir. 2008) (quoting Buckley, 424 U.S. at 80). The reason such regulations can survive at all "is because only unambiguously campaign related communications have a sufficiently close relationship to the government's acknowledged interest in preventing corruption to be constitutionally regulable." Id. Consequently, any basis for liability must be narrowly and precisely drawn.

In <u>Buckley</u>, the Supreme Court addressed a predecessor of the current Act and explained that "[t]he Act's contribution and expenditure limitations operate in an area of the most fundamental First Amendment activities."  424 U.S. at 14.  The Court explained that there is a heightened need for clarity where First Amendment interests are implicated.  "'Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.'"  <u>Id.</u> at 41 n.48 (quoting <u>NAACP v. Button</u>, 371 U.S. 415, 433 (1963)).

The Court found such clarity lacking in the statute's restriction on third-party "expenditures" because the statute, at that time, ambiguously defined regulable "expenditures" as those made "relative to" a candidate.  <u>Id.</u> at 42.  The Court solved the constitutional problem by holding the language "must be construed to apply only to expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office."  <u>Id.</u> at 44.  This reading of the statute was constitutionally adequate because it was "directed precisely to that spending that is unambiguously related to the campaign of a particular federal candidate."  <u>Id.</u> at 80.  The Court's limiting construction also created parity between the way "contributions" and "expenditures" would be treated under the Act, as the statutory definition of the term "contribution" (which the Court upheld) included only those donations "made for the purpose of influencing" a federal election.  <u>Id.</u> at 23-29.

**B.     Regulating All Payments That May Influence A Federal Election As "Contributions" Would Render The Term Unconstitutional**

In contrast to the narrow approach in Buckley and the narrow approach the FEC has taken in the past, the government in this case seems to view any spending that could influence an election in any way as having been "made for the purpose of influencing" a federal election. The government's expansive reading of the statute here would unmoor the "purpose of influencing an election" language from the narrow reading imposed by the Supreme Court in Buckley, and essentially un-do the Buckley framework by regulating any spending made "relative to" a candidate. Under such a construction, the Act would no longer be limited to matters that are "unambiguously campaign related." Id. at 80. In effect, the limiting principle that led Buckley to uphold the constitutionality to the "contribution" definition and which it read into the "expenditure" definition to save that part of the statute would be so watered-down as to no longer be any limit at all.

Both the Supreme Court and the Fourth Circuit have rejected "'a test based on the actual effect speech will have on an election'" because such a test fails to afford candidates sufficient notice of what is proscribed and therefore chills First Amendment activity. NCRL, 525 F.3d at 284-85 (quoting FEC v. Wisconsin Right to Life, Inc., 127 S. Ct. 2652, 2666 (2007)). The statutory provision at issue in this case makes a third-party expenditure a "contribution" only when it is made for "the purpose of influencing the election." 2 U.S.C. § 431(8)(A)(i). The use of the definitive article "the" was highlighted in both Buckley and NCRL as a limiting phrase. In addition to regulating campaigns and expenditures by individuals, FECA regulates "political committees."

Buckley held that only organizations "under the control of a candidate or the major purpose of which is the nomination or election of a candidate" can be regulated as "political committees." Id. at 79 (emphasis added). This language is in parity with the requirement that only those "contributions" or "expenditures" "made for the purpose of influencing an election" can be subjected to federal regulation.

NCRL invalidated a North Carolina statute regulating political committees that strayed beyond organizations with "the major purpose" of electing candidates to reach organizations with merely "a major purpose" of electing candidates. NCRL, 525 F.3d 287-89 (emphasis added). Given "Buckley's goals . . . . it is clear that the importance the plaintiffs [organizations] attach to the definite article is correct." Id. at 287. Buckley's "the major purpose" test was designed to ensure that regulation "fell on election-related speech, rather than on protected political speech." Id. A more open-ended "a major purpose" test was invalid because it could cover political speech and "contravene both the spirit and letter of Buckley's 'unambiguously campaign related' test." Id. at 287-88. "Permitting the regulation of organizations as political committees when the goal of influencing elections is merely one of multiple 'major purposes' threatens the regulation of too much ordinary political speech to be constitutional." Id. at 288-89.

The Fourth Circuit found this error was "compounded by the statute's vagueness." Id. at 289. While "the major purpose" test is open to some interpretation, the narrowness of the phrase "the major purpose" provides sufficient "fair warning" of its scope. Id. at

289.  By contrast, there is no way to determine whether some lesser consideration would be "a major purpose," which the court compared to "handing out speeding tickets without telling anyone … the speed limit."  Id. at 290 (internal quotation omitted).  Of particular concern in this case (see MTD No. 2 raising the abuse of discretion), the Fourth Circuit noted that such a vague test is "open to the risk of partisan and ideological abuse.  This is nowhere so dangerous as when protected speech is involved. . . .  Unguided regulatory discretion and the potential for regulatory abuse are the very burdens to which political speech must never be subject."  Id.[10]  Consequently, the government's construction of the phrase -- if accepted -- would render the statute void for vagueness under the First Amendment.  See, e.g., Skilling v. United States, 130 S. Ct. 2896, 2932 (2010).

---

[10]     The Indictment reveals how vague and unpredictable this test would be.  It claims Mr. Edwards' "public image as a devoted family man" was a "centerpiece" of his campaign and cites a campaign Communications Plan stating that "[Edwards'] family comes first."   (Indict. ¶ 1.)   It is difficult to imagine how anyone reviewing the Communications Plan or following the campaign could believe the "devoted family man" image was the centerpiece of the Edwards campaign.  To be sure, the campaign wanted the public to have a fuller understanding of Mr. Edwards as a person, not just a candidate, and to like him.  But the campaign recognized that the election was about issues.  In contrast to the isolated line about "family coming first," the focus of the Communications Plan came under the heading "DEMONSTRATE CONVICTION, STRENGTH AND IDEAS THROUGH IN-DEPTH WORK ON POVERTY AND FOREIGN POLICY," and included a seven-point plan for addressing these issues.  (Ex. C to MTD No.1 at 2.)  Although most people would say the centerpiece of Mr. Edwards' campaign was addressing poverty and reconciling the "two Americas," the Indictment shows how easy it is to pull any line on any issue from a campaign and transform that into the "centerpiece" of the campaign.

There is no reason to believe the Fourth Circuit would find Buckley's emphasis on a singular "the purpose" test in the contribution context any less meaningful in this case than it found the singular "the major purpose" test in deciding what organizations can be regulated as "political committees" in NCRL. The government should not be free to search out any potential effect spending may have had on an election, or any hope that an individual donor may have had to effect an election, and then recharacterize that purpose, retrospectively, as "the purpose" of the spending. This is precisely the untenable position the Fourth Circuit rejected in NCRL, where "speakers are left to guess and wonder whether a regulator, applying supple and flexible criteria, will make a *post hoc* determination that their speech is regulable as electoral advocacy." 525 F.3d at 284.

The government knows better than to argue otherwise. When the government opened its investigation, it did so to asses whether campaign funds were used to pay Ms. Hunter's non-campaign-related expenses. In particular, the government investigated whether reimbursements by the campaign to Mr. Baron were being used to cover Ms. Hunter's personal expenses in violation of 2 U.S.C. § 439a, "which prohibits the conversion to personal use of money contributed to a federal candidate or his campaign." (Ex. D to MTD No. 1 at 2.) This restriction applies to the use of "funds in a campaign account" to pay for various personal expenses of the sort incurred by Ms. Hunter. 11 C.F.R. § 113.1 (Attachment 1). The government discovered that none of Ms. Hunter's expenses were paid by the campaign, so the prosecutors apparently recognized that no

campaign contributions had been converted to "personal use" and no charges were brought on that theory.

Ms. Hunter's personal expenses cannot suddenly become campaign-related when paid by Ms. Mellon or Mr. Baron. Regardless of who paid Ms. Hunter's personal expenses, they remain Ms. Hunter's personal expenses and they are not campaign-related. Nor can the government transform actions designed to protect a candidate's private life into regulable campaign-related activity simply because exposure would be bad for the campaign. If that were the standard, there is no end to what a candidate could do to protect his private life without it being an illegal act -- accepting use of a vacation home from a friend so the candidate could act or dress as he wanted, renting a car instead of using his own so the press would not follow him or buying curtains for a bedroom window because they could keep prying eyes out of his private life.

The dangers inherent in the government's interpretation of the Act are illustrated by the fact that the government's theory will result not only in selective enforcement but also require the same facts to be treated differently depending on the candidate, such that the test will no longer be an objective, bright-line test. The Indictment alleges that one of the central themes of Mr. Edwards' campaign was his status as a "family man," such that anything that enhanced or preserved this image as a "family man" was intended to influence the election. (Indict. ¶ 1) Had Mr. Edwards been unmarried and the image of a "family man" not been part of his campaign, then, under the government's theory, these

same actions to conceal and support Ms. Hunter would not have been made to influence the election. Nor does the analogy stop with family. Under the logic of the government's prosecution in this case, a candidate who opposes abortion commits a felony if he asks supporters to make payments to a former girlfriend to conceal the fact that he paid for an abortion, while a candidate who is pro-choice (or takes no stance on the issue) could take the same actions without violating the campaign finance laws. The vagueness of the government's theory leads effectively to content-based enforcement in violation of both due process and the First Amendment.

**C.  The "Purpose Of Influencing" An Election Test Must Be Construed Narrowly And Objectively**

To ameliorate these vagueness and First Amendment concerns, whether a payment is made for the purpose of influencing an election is decided under a narrow objective test, which both the D.C. Circuit and FEC have said may be implicitly mandated by FECA. Orloski v. FEC, 795 F.2d 156, 162 (D.C. Cir. 1986); see also Shays v. FEC, 414 F.3d 76, 99 (D.C. Cir. 2005) (noting adoption of an "objective, bright-line test . . . for 'contribution' in Orloski"). A subjective test that looked exclusively at the intent of Ms. Mellon or Mr. Baron would be unworkable in a criminal context, which focuses not on the donors' intent but on whether Mr. Edwards acted with criminal intent. The D.C. Circuit rejected such a subjective test in Orloski because it "would condition a recipient's liability for receiving . . . donations solely on the state of mind of the donor. Even if the donation did not in fact directly or indirectly influence the election, the recipient would

be liable under the Act for receiving an illegal … contribution if the [donor] intended to influence the election by making the donation." 795 F.2d at 162. It explained: a "bright-line test … is necessary to enable donees and donors to easily conform their conduct to the law and to enable the FEC to take the rapid, decisive enforcement action that is called for in the highly-charged political arena." Id. at 165. By contrast, "[a] subjective test based upon the totality of the circumstances would inevitably curtail permissible conduct" and "unduly burden the FEC with requests for advisory opinions. . . ." Id.

As an objective matter, this case is clear. It was Ms. Hunter's personal expenses that were paid, and not any core campaign activities -- buying advertising, pay campaign staff, rent campaign office space, retire campaign debt, or advocate, in any way, that people should vote for Mr. Edwards. (Indict. ¶ 19.) Moreover, the fact that identical types of payments were made after the campaign ended demonstrates that the election was not the driving impetus behind the payments.

There is no basis, as a purely objective matter, for the government to charge that the payments used to support Ms. Hunter were made for "the purpose" of influencing the election, rather than to protect Mr. Edwards' family and assist Ms. Hunter. That "crosses the line from permissible inference to improper speculation," such that -- as a matter of law -- no jury could find doubt beyond a reasonable doubt. See, e.g., United States v. Ray, 61 Fed. App'x 37, 47 (4th Cir. 2003) (citing cases). That is particularly true here, where there are "alternative plausible motivations" and, under an objective test, no need

24

to weigh evidentiary factors like witness credibility.  Id. at 49.[11]  Allowing a conviction to

be based on a jury's retrospective second-guessing as to whether protecting Mr. Edwards'

candidacy, rather than his family or Ms. Hunter, was "the purpose" of the payments

would inject they very sort of vagueness and a stifling chill into First Amendment activity

that the Supreme Court and Fourth Circuit have sought to avoid.

### 1.      The Government's Position Is Foreclosed By The Caselaw

The government's view that campaign finance laws cover more than just what is

"unambiguously campaign related" and extend to virtually any spending by third-parties

that could benefit a candidate has long been rejected.  The D.C. Circuit made this point

explicitly in Emily's List v. FEC, 581 F.3d 1 (D.C. Cir. 2009).  The FEC has no

regulatory jurisdiction over state elections, but it sought to regulate advertisements by

Emily's List in support of women candidates for state legislative offices that featured

federal elected officials and candidates, such as U.S. Senator Debbie Stabenow.  Id. at 21.

---

[11]      Of the two donors, Mr. Baron is dead and Ms. Mellon is now more than 100 years
old, so it is impossible for one and very unlikely for the other to testify as to their
subjective intent.  But tellingly both Mr. Baron and Mrs. Mellon paid a gift tax on the
money - - a clear indication that neither thought they were making campaign
contributions.  And, before he died, Mr. Baron explained that he "decided independently"
to help his friends (including Ms. Hunter), that "John Edwards was not aware that
assistance was provided to anyone involved in this matter," and that he" did it of [his]
own volition and without the knowledge, instruction, or suggestion of John Edwards or
anyone else.  The assistance was offered and accepted without condition."  See Baron:  I
Provided Assistance, newsobserver.com blogs,  Aug. 8, 2008.

Although such advertising may improve a federal candidate's name recognition and portray her in a positive light, the D.C. Circuit invalidated the regulation because "[t]he FEC runs roughshod over the limits on its statutory authority when it presumes that any public communications that merely 'refer' to a federal candidate necessarily seek to influence a <u>federal</u> election." <u>Id.</u> at 20.

It also is well-established that third-parties can spend money for non-political purposes, even though that spending may benefit a candidate. In <u>Orloski</u>, the D.C. Circuit upheld the FEC's determination that a corporation had not violated the election laws through spending to support an event sponsored by an incumbent congressman shortly before an election. The event was a senior citizens' picnic sponsored by the congressman where the park was "ringed with posters urging the reelection" of the congressman and his campaign staff wore buttons supporting the candidate and passed out political literature concerning seniors' issues. 795 F.2d at 158. The corporations provided transportation and food for the senior citizens. <u>Id.</u> at 165. The D.C. Circuit upheld the FEC's determination that the company's spending, much more imbued with election activities than any spending at issue in this case, was not a campaign contribution because the senior citizens' picnic was not campaign-related. <u>Id.</u> at 167. In doing so, the D.C. Circuit acknowledged: "True, many of the uncontested facts of this case do suggest that [the congressman] sponsored the picnic before the election in order to muster support among the elderly." <u>Id.</u> And the D.C. Circuit also acknowledged that

"any favorable communication an incumbent has with his constituents necessarily influences the electorate to vote for him in the next election." Id. at 163. This was not enough to render the company's support a "campaign contribution" under the Act.

Emily's List and Orloski recognize that third-party spending does not become campaign-related simply because it has the effect of helping a candidate's electoral prospects. The spending by Ms. Mellon and Mr. Baron on Ms. Hunter's behalf plainly is farther from the line that separates personal spending from campaign spending than the facts of either Emily's List or Orloski. In all three cases, the third-parties did not engage in any express advocacy for the election of a federal candidate. But the third-party spending in Emily's List directly portrayed the federal candidate in a positive light to the public, and the third-party spending in Orloski helped ensure a successful forum where the candidate could engage with voters. By contrast, the spending by Ms. Mellon and Mr. Baron did nothing to promote Senator Edwards' campaign at all. That spending did not provide Mr. Edwards a forum to address voters, portray him in a favorable light, address the issues he believed in, or encourage anyone to vote for him. The derivative effect of not exposing Mr. Edwards to public ridicule is simply not the same as promoting his candidacy, and certainly is much less "campaign-related" than the spending in either Emily's List or Orloski.

2.    **The Government's Position Is Foreclosed By FEC Precedent**

The prosecutors also cannot advocate criminal liability in this case because its interpretation of the Act is foreclosed by FEC precedent. The FEC has the "the primary and substantial responsibility for administering and enforcing the Act." Buckley, 424 U.S. at 109. The Commission "gives ambiguous statutory terms concrete meaning through a process of case-by-case adjudication" that is binding on the federal government. In re Sealed Case, 223 F.3d 775, 780 (D.C. Cir. 2000).

For example, in the administrative proceedings underlying In re Sealed Case, the FEC rejected a finding of probable cause that a violation of the Act had occurred, but the government later opened a grand jury investigation of the same matter. Id. at 777. The D.C. Circuit concluded the FEC's finding that no crime occurred was binding on the prosecutors. Id. at 781. "It is irrelevant that the prevailing interpretation was established in the context of agency enforcement, whereas this is a criminal prosecution. Deference is due as much in a criminal context as in any other for interpretations made outside that context, such as those found in published regulations." Id. at 779. The D.C. Circuit warned: "If courts do not accord Chevron v. NRDC, 467 U.S. 837 (1984)] deference to a prevailing decision that specific conduct is not a violation, parties may be subject to criminal penalties where Congress could not have intended that result." Id. at 780.

The Commission has been quite clear that payments, like those of Ms. Mellon and Mr. Baron, are not campaign contributions. In In re Moran, MUR 5141 (Apr. 17, 2002), the FEC ruled unanimously, that a lobbyist's unsecured personal loan of $25,000 to

Congressman Moran to pay Moran's divorce lawyer was not a campaign contribution. (Attachment 2). In doing so, the FEC made clear that it does not consider all spending that helps a candidate to be campaign-related. Id. at 3 ("The facts establish that although this loan was made directly to a candidate, it was not made for use in connection with the candidate's campaign and is therefore not a contribution under the Act."); id. at 4 n.4 (rejecting the complainant's assertion "that the Commission treats all loans to candidates to cover personal expenses during a campaign as contributions under the Act" because this was "too broad a reading"). It surely was not lost upon the FEC that helping a congressman facilitate his divorce (so that it would not become a public spectacle, for example) prior to an election would be in the campaign's interest, but the FEC appropriately saw this as a personal rather than campaign-related transaction.

Mr. Edwards' conduct is farther from the line between personal and campaign-related expenses than the conduct in Moran. The third-party loan in Moran was used by the candidate himself to pay his expenses. The Congressman had a legal obligation to repay the lobbyist's loan and, in the event he had any trouble repaying the loan, he would have been at the lobbyist's mercy. By contrast, the money spent by Ms. Mellon and Mr. Baron was for the benefit of Ms. Hunter. It did not relieve Mr. Edwards of any financial

obligation, as he was not obligated to pay Ms. Hunter anything.[12]  Nor was Mr. Edwards

obligated to repay Ms. Mellon or Mr. Baron, who both declared the money as gifts on

their taxes.  The payment of Ms. Hunter's expenses is no more campaign- related than the

payment of a divorce lawyer's fees in Moran.  Given the FEC's ruling in Moran, the

prosecutors can hardly claim that the payments Ms. Mellon and Mr. Baron made on Ms.

Hunter's behalf are "'plainly and unmistakably' proscribed,"  Sheek, 990 F.2d at 153, or

"unambiguously campaign related,"  NCRL, 525 F.3d at 281.  To the contrary, they are

not proscribed and are not at all campaign-related.

        Similarly, in In re Ensign, MUR 6200 (Nov. 17, 2010), the FEC unanimously

dismissed a complaint alleging that Senator Ensign's parents made an unlawful campaign

contribution by sending nearly $100,000 in severance to a campaign worker with whom

the Senator had an affair. (Attachment 3).  The FEC dismissed the complaint because

neither Senator Ensign nor the campaign was obligated to pay the money, and Senator

Ensign's parents made the payment as a gift out of concern for the woman after they

learned of the affair, rather than as a payment for any political purpose.  Id. at 3, 9-10.

        Ensign demonstrates the FEC's narrow view of the statute and its reluctance to

wade into the thicket of having to decide whether payments to a mistress are made for

_____

[12]     Mr. Edwards would only owe Ms. Hunter child support later, after his child was
born, but the child was not born until after Mr. Edwards withdrew his candidacy.

personal or campaign-related reasons, even where -- as in <u>Ensign</u>, but not in this case -- the woman with whom the Senator had an affair is on the campaign's payroll. That approach is the correct one, as it would be difficult to ever characterize such payments as "unambiguously campaign related" or "plainly and unmistakably proscribed."

### 3. The Timing Of The Deposits Demonstrates The Payments Were Not "Campaign <u>Contributions</u>"

Viewed objectively, the generosity Ms. Mellon and Mr. Baron showed Ms. Hunter could not have been campaign expenditures "for the purpose of influencing any election for Federal office," 2 U.S.C. § 431(9)(A)(i), because much of the money deposited by Mr. Young was accepted <u>after</u> Mr. Edwards ended his candidacy. Mr. Edwards' campaign ended on January 30, 2008 (Indict. ¶ 31), but the government charges that a crime took place with checks that were not deposited until months later (Indict. ¶ 23). Indeed, more than half the money Ms. Mellon provided was in the form of checks that were not deposited until <u>after</u> the campaign ended: A December 2007 check for $175,000 was not deposited until February 2008, and a January 2008 check for $200,000 was not deposited until April 2008. (<u>See</u> MTD No. 5).

It is a well-recognized principle of campaign finance law that a campaign contribution is not accepted until it is deposited. <u>See, e.g.</u>, <u>United States v. Chestnut</u>, 533 F.2d 40, 48 (2d Cir. 1976) ("Until the checks were deposited, the campaign debt was not discharged and no unlawful contribution had been received."). In explaining the rule in <u>Chestnut</u>, Judge Garth explained:

[T]he court was not convinced that a crime had been committed until it could be satisfied that the contribution had been accepted: '[u]ntil the checks were deposited, the campaign debt was not discharged and no unlawful contribution had been received.' Prior to that time, the payment could have been revoked or the contribution rejected, thereby avoiding criminal liability. Thus, <u>Chestnut</u> stands for the proposition that, for the purposes of establishing criminal liability, a campaign contribution, regardless of when it is physically delivered and regardless of when it is physically received, only comes into being when it is unequivocally accepted. . . . [A]cceptance marks the completion of the crime with the fact and the date of deposit evidencing proof of acceptance.

<u>United States v. Hankin</u>, 607 F.2d 611, 619-20 (3d Cir. 1979) (Garth, J., dissenting).

Although <u>Hankin</u> held that "making" an illegal contribution could occur prior to the deposit of a check, it did not dispute that the <u>Chestnut</u> Rule correctly defines the crime at issue in this case -- "receiving" an unlawful contribution. <u>Id.</u> at 613. In that case, the government, represented by now-Attorney General Eric Holder, argued the <u>Chestnut</u> rule is correct and should apply to both "making" and "receiving" a contribution. <u>Id.</u>

That most of Ms. Mellon's money was not accepted until after the campaign ended is conclusive evidence these payments were not campaign-related. The government also does not mention that the vast majority of the money Mr. Baron spent to assist Ms. Hunter was spent after the election, until he died in late October 2008. That Mr. Edwards' friends continued to assist Ms. Hunter well after the campaign ended demonstrates that the purpose of their spending was not to get Mr. Edwards elected, but rather to help Ms. Hunter through her pregnancy and to protect Mr. Edwards' home life.

## III. THE MONEY MS. MELLON AND MR. BARON SPENT ON MS. HUNTER WAS NOT A COORDINATED EXPENDITURE

In addition to "direct" contributions, which do not appear implicated here because no money is alleged to have been given directly to Mr. Edwards or his campaign, the Indictment indentifies a second circumstance in which a campaign "contribution" might arise involving an expenditure by a third-party made ""in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents." 2 U.S.C. § 441a(a)(7)(B). An "expenditure" is defined to include "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person <u>for the purpose of influencing any election for Federal office.</u>" 2 U.S.C. § 431(9)(A)(i) (emphasis added). As discussed above in Sections II, the money at issue in this case was not spent for the purpose of influencing the election, nor was it unambiguously related to the campaign. The payments by Ms. Mellon and Mr. Baron therefore do not constitute "expenditures" under the Act.

Alleging that Ms. Mellon and Mr. Baron gave funds to support Ms. Hunter in coordination with Mr. Edwards or his political aide, Mr. Young, is insufficient to transform personal donations into campaign-related expenditures. The spending at issue in <u>Orloski</u>, <u>Ensign</u> and <u>Moran</u> was certainly coordinated, but that did not transform non-campaign-related spending into either an "expenditure" or a "campaign contribution." <u>See</u> <u>Orloski</u>, 795 F.2d at 162 ("There is no doubt in this case that [the candidate] and his agents consented to the disputed corporate donations."); <u>Ensign</u>, MUR 6200 at 4 (recipient of money was on campaign payroll); <u>Moran</u>, MUR 5141 at 3 n.3 ("This

involvement of a campaign staff member" in arranging a personal loan to pay divorce lawyer's fees "would not transform the candidate's personal activity into campaign activity.").

Indeed, if this were the government's theory of liability in this case, it would not make much sense. Presidents often call upon people to give money. President Roosevelt told Americans to buy war bonds, President Bush encouraged people to donate money to help the victims of Hurricane Katrina, and President Obama asked people to donate money to help the victims of the recent tsunami in Japan. There is no question that each of these pleas portrayed the candidate in a positive light and helped his campaign in some way. FDR would have had a difficult time seeking reelection had WWII not gone well, President Bush faced extensive criticism for his handling of Hurricane Katrina and President Obama's appeal helped quell any criticism that he was not sufficiently compassionate. Yet, it would be ludicrous to suggest that these candidates would have to list the money they raised for these efforts as "campaign contributions" or, worse yet, ask people to limit their contributions to avoid exceeding the cap on contributions. By the same token, the fact that the money Ms. Mellon and Mr. Baron spent was used to help a woman of limited means through her pregnancy would not become political spending even if Mr. Edwards knew about it, encouraged it or benefitted from it in some way.

**IV.    THE PAYMENTS BY MS. MELLON AND MR. BARON WERE NOT "PERSONAL USE" EXPENSES OF SENATOR EDWARDS**

Although the statute only proscribes converting campaign funds to the personal use of the candidate, see 2 U.S.C. § 439a(b), the FEC treats third-party spending to pay a personal expense of a candidate as a contribution unless "the payment would have been made irrespective of the candidacy." 11 C.F.R. § 113.1(g)(6). Unlike a campaign expense, a "personal use" expense is "any use of funds … to fulfill a commitment, obligation or expense of any person that would exist irrespective of the candidate's campaign or duties as a Federal officeholder," id. § 113.1(g), such as the payment of the candidate's home mortgage or utilities, id. § 113.1(g)(1)(i)(E). Thus, to convict Mr. Edwards on this theory, the government must allege and prove (1) that the expenditures were used to pay Mr. Edwards' personal expenses that would have existed "irrespective" of the campaign, and (2) that the third-party payments of those expenses would not have been made "irrespective" of the campaign. The Indictment fails on both prongs.

There is no doubt the payments by Ms. Mellon and Mr. Baron covered Ms. Hunter's personal expenses, not Mr. Edwards' "personal use" expenses. As such these cannot be "personal use" expenses of Mr. Edwards that would have existed irrespective of the campaign; in fact, the Indictment fails to allege this at all. In promulgating this regulation, the FEC identified examples of expenses that would exist "irrespective" of a campaign. These include expenses such as a candidate's home mortgage or utilities. 11 C.F.R. § 113.1(g)(1)(i)(E). Significantly, each example is an expense that a person has a legal obligation to pay - - that is, "personal use" expenses are those expenses which a

candidate would be legally obligated to pay regardless of whether he or she were seeking a federal office. Mr. Edwards had no obligation to financially support Ms. Hunter in any way prior to the birth of their child (and even now is limited to supporting their child), which occurred after Mr. Edwards' candidacy had ended. Consequently, this is simply a matter of one third-party paying another third-party's expenses. The situation is similar to the complaint rejected by the FEC in Ensign. See Ensign, MUR 6200 at 9-10 (rejecting personal use claim). Because campaign funds were not used to pay the personal expenses of Ms. Hunter and the third-party payments did not relieve Mr. Edwards of any financial obligation, the personal use regulation was not violated.

Nor is a contrary interpretation supported by the FEC's own law. In In re Montagano, MUR 6105 (June 10, 2009), the FEC considered a complaint in which a congressional candidate's father "stood as surety" for loans to purchase a home within the congressional district and an automobile and paid the candidate's property taxes. (Attachment 4). The FEC found that was not the payment of a personal expense by a third-party. But the payment of the property taxes -- a legal obligation incurred by the candidate that would have existed irrespective of his candidacy -- violated the prohibition against third-parties paying for "personal use" expenses of the candidate.

The FEC also discussed the "personal use" regulation in Advisory Opinion 2008-17, concerning payments made to the co-author of a book promoting Senator Bond's policy views. In that case, the FEC held that payments made to the co-author by a third-

party did not violate the "personal use" regulation because such payments would have been made regardless of Senator Bond's candidacy and the Senator was under no legal obligation to pay his co-author. See FEC Advisory Opinion 2008-17 (Dec. 22, 2008) (Attachment 5).

Put simply, Ms. Hunter's living and medical expenses were her own personal expenses and Mr. Edwards had no obligation to pay them; indeed, there is no allegation in the Indictment claiming otherwise. Consequently, the Indictment on its face shows that Ms. Hunter's personal and medical expenses were not "personal use" expenses of Mr. Edwards that he was obligated to pay "irrespective" of the campaign.

In addition, any claim by the government that the payments by Ms. Mellon and Mr. Baron would not have been made "irrespective" of the campaign ignores the limitation on the meaning of these words imposed by the FEC in Moran. As noted above, Moran involved a $25,000 loan from a lobbyist to the Congressman to satisfy legal fees in connection with his divorce.[13] The complaint against Congressman Moran was that this loan was an illegal donation in part because it constituted the payment of personal expenses (attorneys' fees) by a third-party that would not have been made irrespective of

---

[13] The federal election laws do not distinguish between loans and gifts -- both are equally prohibited if they are deemed "contributions" above the prescribed limit. See 2 U.S.C. §431(8)(A)(i) (defining "contribution" as "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office").

the campaign, as demonstrated by the involvement of the Congressman's campaign manager in arranging the loan. Before such an expenditure could be considered a contribution that would not have been made "irrespective" of the election, the FEC required a number of conditions to be met. See MUR 5141 at 3-4. First, the Commission imposed an objective test to make this determination, rejecting a standard that relied on the subjective intent of the putative donor, just as it had done in Orloski. Second, the FEC indicated that the objective test hinged on several factors, including whether there had been a prior relationship between the third-party and the candidate, whether the payment freed up the candidate's personal funds for use on the campaign, whether the campaign was adequately funded, and whether the payment enabled the candidate to spend more time campaigning by effectively substituting as a salary for the candidate.

None of these factors is alleged or even mentioned in the Indictment, and with good reason -- none applies in this matter. Both Ms. Mellon and Mr. Baron had a relationship with Mr. Edwards before his candidacy. The payment of Ms. Hunter's expenses did not free up any personal money for the campaign, nor did it enable Mr. Edwards to spend more time campaigning by freeing him up from earning a living. Mr. Edwards received public matching funds and, throughout the course of his campaign, the campaign was fully funded and ended with a surplus. As noted above, the vast majority of the money Mr. Baron spent on Ms. Hunter was paid after the election and payments continued until his death in October 2008. The fact that Mr. Baron continued to pay for

the personal expenses of Ms. Hunter even after the campaign ended is definitive proof that the payments would have been made "irrespective" of the campaign; indeed, that is exactly what happened once the campaign ended.

## V.  DUE PROCESS PRECLUDES APPLYING UNPRECEDENTED APPLICATIONS OF A STATUTE IN A CRIMINAL CASE

Although the foregoing arguments should convince the Court that Senator Edwards did not violate the election laws, even if every fact alleged in the Indictment is assumed to be true, the Court does not have to reach that question to find that this case must be dismissed. Each of Mr. Edwards' foregoing arguments as to why he did not violate the Act in fact should, at the very least, establish that the law did not clearly proscribe his conduct as a felony. Thus, even if the Court were to break new ground and hold the conduct alleged did violate FECA, the absence of "fair warning" would prevent the Court from applying such a holding retroactively to Mr. Edwards.

There is a well-settled principle "that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." Bouie v. City of Columbia, 378 U.S. 347, 351 (1964). As Justice Holmes emphasized, Congress should provide "fair warning . . . in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear." McBoyle v. United States, 283 U.S. 25, 27 (1931). "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its

application violates the first essential of due process of law." Connally v. Gen. Constr. Co., 269 U.S. 385, 391 (1926). Given the complexity of campaign finance law, the government's own prosecutor's manual acknowledges that "any situation when the application of the law to the facts is unclear does not easily produce a prosecutable crime." DOJ, Federal Prosecution of Election Offenses 135 (2007).

While the campaign finance laws provide clear notice of what is prohibited in many contexts, none of Mr. Edwards' alleged conduct was clearly proscribed under any of the government's three theories of liability. Criminal campaign finance cases have been pursued in the past only where the criminality was obvious, such as delivering bags of cash to candidates who failed to report such contributions, having third-parties directly pay substantial campaign expenses to avoid disclosure, or using "straw donors" to disguise the source of donations and evade contribution limits. By contrast, there is neither criminal nor civil case law to support the notion that third-party spending on a candidate's paramour could result in a campaign finance violation. The fact that former Chairmen of the FEC find the government's suggestion of criminal liability flawed and without precedent makes plain that Mr. Edwards could not have been on notice that his conduct "knowingly and willfully" violated the campaign finance laws.

The Supreme Court has made clear: "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." United States v. Lanier, 520

U.S. 259, 266 (1997); see Marks v. United States, 430 U.S. 188 (1977) (refusing to apply a new construction of a statute retroactively); Bouie, 378 U.S. at 362 (same); Rabe v. Washington, 405 U.S. 313 (1972) (same). Marks involved a sweeping statute that barred obscenity, but its reach had been constrained by evolving First Amendment caselaw. 430 U.S. at 195. Although the Supreme Court adopted a First Amendment test under which the defendant's speech could be banned as obscene, the Court nevertheless reversed defendant's conviction because no prior First Amendment case provided defendant with notice that the statute could be applied in such a manner. Id. at 196. Conversely, Bouie involved a specific statute which had been applied more broadly than would reasonably have been anticipated, and the Supreme Court held that such a novel construction of the statute could only be applied prospectively. 378 U.S. at 362. As in Marks and Bouie, even if this Court were to construe the campaign finance laws to reach Senator Edwards' conduct in this case, it would be unfair to impose that ruling retroactively against him.

The Fourth Circuit also has rejected novel theories of criminal liability in contexts that require a defendant to be aware that his conduct violated the law. For nearly forty years, the court has consistently held: "It is settled that when the law is vague or highly debatable, a defendant -- actually or imputedly -- lacks the requisite intent to violate it." United States v. Critzer, 498 F.2d 1160, 1162 (4th Cir. 1974). Critzer reversed a conviction in a criminal tax case, explaining:

> As a matter of law, defendant cannot be guilty of willfully evading and defeating income taxes on income, the taxability of which is so uncertain

that even co-ordinate branches of the United States Government plausibly reach directly opposing conclusions. <u>As a matter of law</u>, the requisite intent to evade and defeat income taxes is missing. The obligation to pay is so problematical that <u>defendant's actual intent is irrelevant</u>. Even if she had consulted the law and sought to guide herself accordingly, she could have no certainty as to what the law required.

<u>Id.</u> (emphasis added).

The Fourth Circuit reached a similar conclusion in <u>United States v. Mallas</u>, 762 F.2d 361 (4th Cir. 1985), reversing the conviction in a criminal tax case:

We find that [defendants'] contested business practices raise novel questions of tax liability to which governing law offers no clear guidance. Because the defendants therefore could not have ascertained the legal standards applicable to their conduct, criminal proceedings may not be used to define and punish an alleged failure to conform to those standards.

<u>Id.</u> at 361. Regardless of whether the government's statutory interpretation was correct, the court rejected criminal liability because the "present authority in support of the theory is far too tenuous and competing interpretations of the applicable law far too reasonable to justify these convictions." <u>Id.</u> at 363; <u>see also</u> <u>id.</u> at 364 n.4 ("The uncertainty of a tax law, like all questions of vagueness, is decided by the court as an issue of law.").

Courts have recognized this principle in the context of election law. <u>See, e.g.</u>, <u>United States v. Kanchanalak</u>, 192 F.3d 1037, 1046 (D.C. Cir. 1999). In <u>Kanchanalak</u>, 192 F.3d 1037 (D.C. Cir. 1999), the D.C. Circuit upheld the FEC's construction of a campaign finance disclosure law but explained that, in a criminal case, merely finding the government's interpretation of the Act reasonable "does not end the matter." <u>Id.</u> at 1046.

> For to support a criminal prosecution, [a statute] must give fair notice to the subject of what conduct is forbidden. The Due Process Clause of the Fifth Amendment prohibits punishing a criminal defendant for conduct "which he could not reasonably understand to be proscribed." The Supreme Court has held this "fair warning" requirement prohibits application of a criminal statute to a defendant unless it was reasonably clear at the time of the alleged action that defendants' actions were criminal.

Id. (internal citations omitted).

That lack of notice issues arise in campaign finance law is not surprising, as "the law of campaign finance is quite complicated and in some flux" and constitutes "difficult terrain." NCRL, 525 F.3d at 277. The Fourth Circuit has explained that "[c]ampaign finance regulation has been termed 'baffling and conflicted.'" Id. at 296 (quoting Majors v. Abell, 361 F.3d 349, 355 (7th Cir. 2004)); see also FEC v. Colo. Repub. Fed. Campaign Comm., 533 U.S. 431, 443 (2001) (noting that while some spending is easy to describe as a "contribution" or "expenditure," other sorts of spending are "harder to classify"). For example, the Supreme Court recently noted: "Campaign finance regulations now impose unique and complex rules on 71 distinct entities. These entities are subject to separate rules for 33 different types of political speech. The FEC has adopted 568 pages of regulations, 1,278 pages of explanations and justifications for those regulations, and 1,771 advisory opinions since 1975." Citizens United v. FEC, 130 S. Ct. 876, 895 (2010) (internal quotations omitted). Although not a prior restraint on speech in "the strict sense of that term," the Supreme Court has explained that, "[a]s a practical matter, … given the complexity of the regulations and the deference the courts show to

43

administrative determinations, a speaker who wants to avoid threats of criminal liability and the heavy costs of defending against FEC enforcement must ask a governmental agency for prior permission to speak." Id. at 895-96. At times, the Fourth Circuit has described the lack of specificity in campaign finance law as analogous to "handing out speeding tickets without telling anyone . . . the speed limit." NCRL, 525 F.3d at 290.

The Fourth Circuit cautioned against campaign finance laws that invite *ad hoc* enforcement, as such an "approach provides neither fair warning to speakers that their speech will be regulated nor sufficient direction to regulators as to what constitutes political speech." Id. at 283. There is a special concern that enforcement made on "unannounced criteria" leave campaign finance laws "open to the risk of partisan or ideological abuse. This is nowhere so dangerous as when protected speech is involved." Id. at 290. Limiting new applications of the law to prospective applications eliminates the potential for political enemies to pursue one another improperly with criminal charges. (Cf. MTD No. 3 (addressing for improper political reasons for this Indictment).)

Finally, the Fourth Circuit has expressed alarm that "impossible complexity may take root" in the campaign finance laws, forcing candidates to hire the "best team of lawyers" just to "figure out the myriad relevant rulings with any degree of assurance that they will escape civil and criminal sanctions for their speech." NCRL, 525 F.3d at 296. Of course, even if Mr. Edwards had sought out the "best team of lawyers" such as former FEC Chairmen Lenhard and Thomas during his campaign, they would have assured him

that his conduct was legal and that any payments made by third-parties to support Ms. Hunter fell outside the scope of federal campaign finance laws. Again, even the DOJ's most experienced election law prosecutor did not include this novel theory in his memorandum authorizing an investigation. (See supra at 21.) And that is the problem with this case. If former FEC Chairmen who are among the nation's foremost experts on campaign finance law (and DOJ's own expert) cannot discern a criminal violation based on the facts presented in this case, how are political candidates and their contributors supposed to have "fair notice" that such conduct is, in fact, criminal? To ask such an obvious question is to answer it. When experts review the law and see no crime, or even when there is a battle of experts over what the law requires, there is no fair notice as to what conduct is "'plainly and unmistakably' proscribed." Sheek, 990 F.2d at 153. Absent such notice, any subsequent criminal indictment violates due process.

## CONCLUSION

The Indictment in this case is constitutionally deficient because the Indictment fails to choose a theory for the offense, none of the theories of liability is viable and Mr. Edwards had no notice his conduct was proscribed.

Dated: September 6, 2011


/s/ James P. Cooney III                /s/ Abbe David Lowell

James P. Cooney III, N.C. Bar No. 12140    Abbe David Lowell, *pro hac vice*
jcooney@wcsr.com                    ADLowell@Chadbourne.com
WOMBLE CARLYLE SANDRIDGE & RICE, PLLC  Christopher D. Man, *pro hac vice*

One Wells Fargo Center
Suite 3500, 301 South College Street
Charlotte, NC 28202-6037
(704) 331-4980 (phone)
(704) 338-7838 (fax)

CMan@Chadbourne.com
CHADBOURNE & PARKE LLP
1200 New Hampshire Ave., NW
Washington, DC 20036
(202) 2974-5600 (phone)
(202) 974-5602 (fax)

/s/ Wade M. Smith
Wade M. Smith, N.C. Bar No. 4075
THARRINGTON SMITH LLP
209 Fayetteville Street Mall
Raleigh, NC 27602
Email:  WSmith@tharringtonsmith.com
(919) 821-4711 (phone)
(919) 829-1583 (fax)

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 6, 2011, I electronically filed the foregoing **MEMORANDUM IN SUPPORT OF HIS MOTION TO DISMISS THE INDICTMENT FOR FAILURE TO ALLEGE A CRIME AND LACK OF NOTICE AS TO WHAT THE LAW PROSCRIBED (Motion to Dismiss No. 1)** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Brian Scott Meyers
U.S. Attorney's Office – EDNC
Terry Sanford Federal Building
310 New Bern Avneue, Suite 800
Raleigh, NC 27601-1461
Telephone:  (919) 856-4530
Fax:  (919) 856-4487
Email:  brian.s.meyers@usdoj.gov

David V. Harbach
U.S. Department of Justice
Public Integrity Section
1400 New York Avenue, NW, Suite 1800
Washington, DC 20005
Telephone:  (202) 262-7597
Fax:  (202) 514-3003
Email:  david.harbach@usdoj.gov

Jeffrey E. Tsai
U.S. Department of Justice
Public Integrity Section
1400 New York Avenue, N.W., Suite 1800
Washington, DC 20005
Telephone: (202) 307-0933
Fax:  (202) 514-3003
Email:  jeffrey.tsai@usdoj.gov

1

Robert J. Higdon
U.S. Attorney's Office – EDNC
Terry Sanford Federal Building
310 New Bern Avenue, Suite 800
Raleigh, NC 27601-1461
Telephone:  (919) 856-4530
Fax:  (919) 856-4487
Email:  bobby.higdon@usdoj.gov

/s/ James P. Cooney III
James P. Cooney III (NCSB # 12140)
Womble Carlyle Sandridge & Rice, PLLC
One Wells Fargo Center
Suite 3500, 301 South College Street
Charlotte, NC 28202
Telephone:  (704) 331-4980
Email:  jcooney@wcsr.com

*Attorney for Defendant*

Date:  September 6, 2011