# ATTACHMENT 3

BEFORE THE FEDERAL ELECTION COMMISSION

In the Matter of )
) MUR 6200
Senator John Ensign; Michael and )
Sharon Ensign; Ensign for Senate and )
Lisa Lisker, as treasurer; Battle Born )
Political Action Committee and Lisa )
Lisker, as treasurer )

### CERTIFICATION

I, Shawn Woodhead Werth, recording secretary for the Federal Election Commission executive session on November 16, 2010, do hereby certify that the Commission decided by a vote of 5-0 to take the following actions in MUR 6200:

1. Dismiss the complaint in MUR 6200 on the basis of prosecutorial discretion pursuant to Heckler v. Chaney, 470 U.S. 821 (1985).

2. Adopt the Statement of Reasons as previously circulated.

3. Approve the appropriate letters.

4. Close the file.

Commissioners Bauerly, Hunter, McGahn II, Petersen, and Weintraub voted affirmatively for the decision. Commissioner Walther recused himself with respect to this matter and did not vote.

Attest:

November 18, 2010
Date

_____
Shawn Woodhead Werth
Secretary and Clerk of the Commission

FEDERAL ELECTION COMMISSION

In the Matter of )
)
Senator John Ensign ) MUR 6200
Michael and Sharon Ensign )
Ensign for Senate and Lisa Lisker, )
  in her official capacity as treasurer )
Battle Born Political Action Committee )
  and Lisa Lisker, in her official capacity )
  as treasurer )

## STATEMENT OF REASONS
Chairman MATTHEW S. PETERSEN, Vice Chair CYNTHIA L. BAUERLY,
Commissioners CAROLINE C. HUNTER, DONALD F. McGAHN II,
and ELLEN L. WEINTRAUB

## I. INTRODUCTION

This matter arises out of a complaint, subsequently amended, alleging that an April 7, 2008 payment to Cynthia Hampton and her family constituted severance and was thus an excessive and unreported contribution made to, and received by, both Ensign for Senate ("the Committee"), the authorized campaign committee for Senator John Ensign, and Senator John Ensign's leadership PAC,[1] the Battle Born Political Action Committee, ("the PAC"), in violation of 2 U.S.C. §§ 434(b)(3), 441a(a), and 441a(f). Ms. Hampton was the treasurer of the Committee and the PAC at the time of the payment. Michael and Sharon Ensign ("the Ensigns"), parents of Senator John Ensign, made the payment to Ms. Hampton and her family approximately one month before she left her treasurer positions and shortly after it was disclosed to the families of Senator Ensign and Ms. Hampton that the two had had a personal relationship. Supplemental Complaint at 1-2. The payment at

---
[1] A leadership PAC is a political committee that is directly or indirectly established, financed, maintained or controlled by a candidate or an individual holding federal office, but is not an authorized committee of the candidate or officeholder and is not affiliated with an authorized committee of a candidate or officeholder. 2 U.S.C. § 434(i)(8)(B).

1  issue consists of a $96,000 check from the Ensigns' trust account made payable to

2  Cynthia Hampton, her husband Doug, and two of their three children. *See* Committee

3  Response, Exhibit A (copy of canceled $96,000 check).

4      Based on the available information and for the reasons discussed below, on

5  November 16, 2010, we voted to dismiss this matter as a matter of prosecutorial

6  discretion and closed the file. *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

7  **II.   FACTS**

8      The Complaint and Supplemental Complaint alleged that the Ensigns made a

9  payment to Cynthia Hampton's family totaling $96,000 in April 2008, before she

10  resigned her treasurer positions in May 2008. Supplemental Complaint at 1. Of this

11  $96,000, the complaint alleges that a portion was paid to Cynthia Hampton "as a

12  severance payment for the loss of her positions as treasurer," and "may constitute illegal

13  excessive in-kind contributions by the Ensigns to both Ensign for Senate and the Battle

14  Born PAC" in violation of 2 U.S.C. §§ 441a(a) and 441a(f). Supplemental Complaint at

15  2; *see also* Dan Eggen and Chris Cillizza, *Ensign's Parents Made Payments to Mistress,*

16  *Her Family*, WASHINGTON POST, July 10, 2009 (Supplemental Complaint Exhibit A);[2] Al

17  Kamen, *Hillary Clinton, Back After a Break*, WASHINGTON POST, July 15, 2009

18  (Supplemental Complaint Exhibit B). Further, the complaint notes that neither the

19  Committee nor the PAC reported receiving "any ... contributions from either Michael or

20  Sharon Ensign." Supplemental Complaint at 2. The complaint, therefore, concludes that

---

[2] This WASHINGTON POST article reported that the $96,000 was disbursed in eight separate checks of $12,000 each, citing Paul Coggins, Sen. Ensign's attorney. *Id.* That representation is contradicted by the press release Coggins issued on July 9, 2009 (referenced at Supplemental Complaint at 1) and by the Ensign for Senate Response Exhibit A (a copy of the canceled single check for $96,000).

the Committee and the PAC's failures to report the contributions were violations of 2 U.S.C. § 434(b)(3)(A).

The Committee, the PAC, and Michael Ensign each filed similar responses to the complaint. Senator Ensign and his mother, Sharon Ensign, did not respond, though each provided a sworn affidavit accompanying the other responses. The responses state that Senator Ensign's mother and father each provided four members of the Hampton family with a gift of $12,000 (i.e., the individual Hampton family members received $24,000 each, for a total of $96,000 from Michael and Sharon Ensign). Ensign for Senate Response at 2. The gift of $96,000 was made in one check dated April 7, 2008, made payable to Doug, Cynthia, and their sons, Brandon and Blake Hampton. Ensign for Senate Response at Exhibit A (copy of canceled check). The responses state that the Ensigns gave the gifts "out of concern for the well-being of long-time family friends" after the Ensigns were informed of the relationship between their son and Cynthia Hampton. Ensign for Senate Response at 2 and 3. The Ensigns wanted to give a $100,000 gift, but instead gave $96,000 because the multiple $12,000 gifts would fit within the maximum permitted tax-free gift limits under IRS gift tax rules. *Id.* at 3-4.

Both Michael and Sharon Ensign submitted sworn affidavits stating that they did not intend the gifts to the Hampton family to be severance to Cynthia Hampton, and that these gifts were part of a pattern of significant financial gifts from the Ensign family (largely from Senator Ensign and his wife, Darlene Ensign) to the Hamptons over several

1    years. *See* Parents' Affidavits at ¶¶ 5-6.[3] Michael and Sharon Ensign also state that

2    neither their son nor anyone else asked them to make these gifts, nor did the Senator or

3    anyone else suggest that these payments should function as severance to Cynthia

4    Hampton or her husband Doug. *Id.* at ¶ 8; *see also* Signed Affidavit of John Ensign, filed

5    with the Commission on August 18, 2009. The responses also assert that the allegation

6    that the payment was severance to Cynthia Hampton is "belied by the fact that the

7    amount of the gifts would equal almost two full years of Cindy Hampton's salary – an

8    excessively disproportionate amount that is not indicative of a severance package."

9    Ensign for Senate Response at 5.

10          The responses argue that the complainant was misled as to the source, amount,

11   and purpose of the payments to Cynthia Hampton by the media's reliance on an

12   anonymous statement and a misquotation of Senator Ensign's communications director,

13   Tory Mazzola. The anonymous statement indicated that someone close to the Ensign

14   family said that the Senator had disclosed the relationship to his wife and had attended

15   counseling with her, and thereafter "dismissed Ms. Hampton from his political team with

16   a severance that he paid from his own pocket." *See* Ensign for Senate Response at 5; *see

17   also* Complaint Exhibit A. Respondents state that the anonymous statement is directly

18   contradicted by the sworn affidavits of the Ensigns and Senator Ensign. *See* Ensign for

19   Senate Response at 5.

---

[3] Michael and Sharon Ensign's affidavits are essentially identical except for additional statements in Michael Ensign's affidavit regarding the method of payment from the family trust, and will be referred to as "Parents' Affidavits" collectively. The affidavits were attached unsigned as Exhibits B and C to the Ensign for Senate Response, and later filed in signed and sworn form with the Commission on August 12, 2009.

1   The alleged misquotation of Mazzola occurred after his effort to clarify a disputed
2   factual issue in a July 13, 2009, article in the Washington Post. The Washington Post
3   published an article on July 10, 2009, that discussed the $96,000 transfer from Ensign's
4   parents, but that also stated "[t]he disclosure comes a day after Douglas Hampton alleged
5   that Ensign gave his wife a $25,000 severance payment." Supplemental Complaint
6   Exhibit A. On July 13, a regular Washington Post column, *In the Loop*, commented that
7   "[t]here's still the matter of an alleged severance payment to Cynthia Hampton by Ensign
8   of at least $25,000. That payment was not reported, as required by law, to the Federal
9   Election Commission." Al Kamen, *The Senate's Got Talent, and Then Some*,
10  WASHINGTON POST, July 13, 2009 (Ensign for Senate Response Exhibit Q). Although
11  the responses state that Mazzola contacted the Post to dispute the assertion that there was
12  a separate severance payment, and that some portion of the $96,000 "gift" constituted a
13  severance payment, the responses assert that the Post's subsequent reporting on the issue
14  did not convey Mazzola's clarifications. *See* Ensign for Senate's Response at 6-7; Battle
15  Born PAC's Response at 6-7.
16      Respondents also assert that "the gifts to the Hamptons are entirely consistent
17  with the Ensigns' past pattern of generosity – all of which occurred while Cindy
18  Hampton served as Treasurer to the Committee." Ensign for Senate Response at 5.
19  Respondents detailed gifts and financial support from John and Darlene Ensign to the
20  Hamptons dating back to 2004, including the following: 1) a 2004 loan of $15,000 that
21  was repaid without interest; 2) a $25,000 loan in 2006 that was never repaid; 3) $15,170
22  in 2006 for private school tuition for the Hampton children; 4) $4,500 for counseling for
23  one of the Hampton children; 5) $23,970 in private school tuition in 2007; and 6) a

1     $20,000 loan that was verbally forgiven. *See* Ensign for Senate Response at 3. The

2     Responses also note that prior to the $96,000 payment, Michael and Sharon Ensign

3     included the Hamptons in a vacation via private jet to Hawaii that they valued at over

4     $30,000. *Id;* Parents' Affidavits at ¶ 5. In light of this history, the Responses assert that

5     the $96,000 payment from the Ensigns to the Hamptons was merely one in a pattern of

6     significant gifts from the Ensign family to the Hamptons. Battle Born PAC Response at

7     3.

8          However, publicly available information suggests that the Hamptons viewed the

9     $96,000 as a severance payment and not as a gift. The New York Times published an

10    article on October 1, 2009, based on interviews with the Hamptons, in which the

11    Hamptons described a plan that Mr. Hampton and Ensign worked on in late February

12    2008 under which Ensign would help Doug Hampton line up lobbying clients in

13    exchange for him leaving his job with Ensign's Senate office. *See* Eric Lichtblau and

14    Eric Lipton, *Senator's Aid After Relationship Raises Flags Over Ethics*, NEW YORK

15    TIMES, October 2, 2009 ("Lichtblau Lipton article")

16    (http://www.nytimes.com/2009/10/02/us/politics/02ensign.html?_r=1&sqp=1&sq=Ensign

17    %20Hampton&st=cse, last visited January 15, 2010). This article states that "[s]oon after

18    [working out the deal for Doug Hampton's new job], Mr. Ensign called the Hamptons

19    separately. Cynthia Hampton, he said, would have to leave her $48,000 a year campaign

20    job, while her husband would have to quit as planned. But as severance, the senator said

21    he and his wife would give the Hamptons a check for about $100,000, Ms. Hampton

22    said." *Id.* at 6.

Linked to the online version of the Lichtblau Lipton article were images of documents that the Hamptons turned over to the New York Times. On the issue of the payment made to the Hampton family, Mr. Hampton provided what he contended were his handwritten notes from the phone call detailed above that appear to discuss possible severance payments for Doug and Cynthia Hampton. These notes, dated "4/2/08" and written on Ensign office stationery, read: "Exit strategy and severance for Cindy, Exit strategy and severance for Doug, Communication Plan for NRSC and official office, NO CONTACT WHAT SO EVER WITH CINDY!" Lichtblau Lipton article Exhibit 3, (http://documents.nytimes.com/in-wake-of-affair-senator-ensign-may-have-violated-an-ethics-law-2#p=3, last visited January 15, 2010).

Another exhibit to the online article was a page of handwritten notes entitled "Record of discussions with John Ensign." This page details what Doug Hampton represents are notes from three phone conversations with John Ensign on April 2. Notes of the first call, which was at 9:40 a.m., include information similar to that discussed above, and it appears to be the same phone call. The second call was at noon, and the notes detail further discussions of a plan for a new job for Doug Hampton, including that "[w]e discussed timing of departure JE agreed for me to stay on thru April – Better for client building." The third call was at 7:30 p.m., with the notes stating "John called asked if it was OK to share the outlines of a plan. – Doug – 2 mn. severance, continue client building; -- Cindy – 1 year salary; -- Discussed gift rules and tax law; -- Shared a plan to have both he and Darlene write ck's in various amounts equaling 96K. – He asked if the offer was OK and did I agree – I said I would need to think about [sic] and would get back with him." Lichtblau Lipton article Exhibit 5, (http://documents.nytimes.com/in-

1 wake-of-affair-senator-ensign-may-have-violated-an-ethics-law-2#p=5, last visited

2 January 15, 2010). The article continued that "Mr. Ensign's lawyer in June [2009],

3 however, called the $96,000 payment that was ultimately made a tax-free gift from Mr.

4 Ensign's parents to the Hamptons 'out of concern for the well-being of longtime family

5 friends during a difficult time.'" Lichtblau Lipton article.

6     Mr. Hampton has publicly reiterated his assertion that the $96,000 payment was a

7 severance payment, most notably in a November 23, 2009, interview on the television

8 program 'Nightline' and an accompanying article published on ABC News' website

9 (http://abcnews.go.com/print?id=9140788, last visited on January 14, 2010). In that

10 article, the payment was discussed as follows: "The Ensign family has said the $96,000

11 was a gift and not severance... Hampton told 'Nightline' the opposite, saying it was

12 'crystal clear' that the $96,000 was, in fact, severance and not a gift. 'Crystal clear,'

13 Hampton said. 'I took notes. I've shared those notes. They're well documented. They

14 were clearly what he deemed as severance.'"

15   III.   ANALYSIS

16     No person may make contributions[4] to any candidate and his or her authorized

17 political committee with respect to any election for federal office that exceed $2,000

18 (adjusted for inflation) per election.[5] 2 U.S.C. § 441a(a)(1)(A). No person may

19 contribute more than $5,000 per year to a leadership PAC, such as the Battle Born PAC.

20 2 U.S.C. § 441a(a)(1)(C). Knowing receipt of any excessive contribution is a violation of

---

[4] A contribution is any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for federal office. 2 U.S.C. § 431(8)(A)(i).

[5] During the 2008 election cycle, individuals could contribute up to $2,300 per election to Federal candidates. See Price Index Increases for Expenditure and Contribution Limitations, 72 Fed. Reg. 5294, 5295 (February 5, 2007).

1   2 U.S.C. § 441a(f). Failure to report receiving a contribution is a violation of 2 U.S.C.
2   § 434(b).
3   — Further, contributions accepted by a candidate may not be converted to personal
4   use by any person. 2 U.S.C. § 439a(b)(1); 11 CFR § 113.2(e). "Personal use" is defined
5   as "any use of funds in a campaign account of a present or former candidate to fulfill a
6   commitment, obligation or expense of any person that would exist irrespective of the
7   candidate's campaign or duties as a Federal officeholder." 11 CFR § 113.1(g); *see also* 2
8   U.S.C. § 439a(b)(2).
9   Under the tax code, whether a transfer is considered a "gift" or not is a question of
10  the giver's intent – a gift is any payment made "from a detached and disinterested
11  generosity, out of affection, respect, admiration, charity or like impulses." *Commissioner*
12  *v. Duberstein*, 363 U.S. 278, 285-86 (1960) (citations omitted). Here, the Ensigns'
13  affidavits support Respondents' contention that the transfer was intended as a gift and not
14  as a severance payment. In addition, both the Committee and the PAC directly deny that
15  the monies paid to the Hampton family by Senator Ensign's parents were related to
16  Cynthia Hampton's employment, "nor were they related to any expense or debt that the
17  Committee would have otherwise incurred." Ensign for Senate Response at 7; Battle
18  Born PAC Response at 7. There has also been no allegation that the Committee or the
19  PAC had an obligation to pay Ms. Hampton severance, and no source has provided any
20  information pointing to the existence of any such obligation, such as an employment
21  contract or a history of paying severance to other employees. The amount of money
22  involved, which is equal to almost two full years of Ms. Hampton's salary, would be
23  unusually large for a severance payment. If, in fact, the Committee and the PAC had

1 elected to make a severance payment to Ms. Hampton in the amount of $96,000, the

2 transfer of such a disproportionate sum would have raised personal use issues under 11

3 CFR 143.2(e). If the money the Ensigns paid to the Hamptons was not to fulfill an

4 obligation of the Committee or the PAC, and was given without regard to Ms. Hampton's

5 employment, then the payment did not constitute a contribution—excessive or

6 otherwise—to the Committee or the PAC. *See* 2 U.S.C. §§ 431(8)(A)(i); 431(b)(8)(ii).

7 Moreover, if the Ensigns' payment of money is not a contribution, then there is also no

8 resulting receipt or reporting violation attributable to the Committee or the PAC. *See*

9 2 U.S.C. §§ 441a(f) and 434(b).

10     For the reasons discussed above, whether the payment at issue in this matter is a

11 gift or an excessive contribution turns on the intent of the Ensigns in making the

12 payment. Here, the Ensigns have submitted sworn affidavits attesting that the $96,000

13 payment was a gift, and therefore not a contribution. In addition to these affidavits, the

14 Commission may consider other evidence, including the circumstances in which the

15 payment was made, to discern the Ensigns' intent. *See Commissioner v. Duberstein*, 363

16 U.S. at 286 (observing that "the donor's characterization of his action is not

17 determinative").

18     In this matter, however, the sworn affidavits submitted by the Ensigns constitute

19 the only direct evidence of their intent in making the payment. As a practical matter, it is

20 doubtful that an investigation would produce any additional evidence that would

21 contradict or outweigh this testimony. The Commission already has sworn testimony

22 from the Ensigns; seeking additional testimony from them on the same subject would be

23 duplicative and unnecessary. On the other hand, testimony from other parties, such as the

Hamptons, would be unlikely to shed any light on the subject of the Ensigns' intent. It is similarly unlikely that an investigation would uncover other circumstantial evidence – such as a writing or statement by the Ensigns to a third party – that would contradict or outweigh the evidence already before the Commission. Accordingly, we conclude that an investigation in this matter is unwarranted and would not be an efficient use of Commission resources.

We, therefore, dismiss this matter as an exercise of our prosecutorial discretion, and close the file. *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

11/17/2010
Date

Matthew S. Petersen
Chairman

11/17/2010
Date

Cynthia L. Bauerly
Vice Chair

11/17/2010
Date

Caroline C. Hunter
Commissioner

11/17/10
Date

Donald F. McGahn II
Commissioner

11/17/10
Date

Ellen L. Weintraub
Commissioner