# ATTACHMENT 4



**FEDERAL ELECTION COMMISSION**
WASHINGTON, D.C. 20463

JUN 10 2009

Brian G. Svoboda, Esquire
Perkins Coie, LLP
607 14th Street NW, Suite 800
Washington, DC 20005

RE: MUR 6104
Montagano for Congress, Inc.
Michael Montagano

Dear Mr. Svoboda:

On October 29, 2008, the Federal Election Commission notified your clients, Montagano for Congress, Inc. and Joseph A. Montagano, in his official capacity as treasurer, ("the Committee") and Michael Montagano, of a complaint alleging violations of certain sections of the Federal Election Campaign Act of 1971, as amended ("the Act"). A copy of the complaint was forwarded to your clients at that time.

Upon further review of the allegations contained in the complaint, and information supplied by you, the Commission, on May 12, 2009, voted to dismiss this matter. The Factual and Legal Analysis, which more fully explains the Commission's decision, is enclosed for your information.

Based on information before the Commission, it appears that Michael Montagano and the Committee may have received an excessive contribution from Joseph Montagano in violation of 2 U.S.C. § 441a(f). The Commission cautions Michael Montagano and the Committee to take steps to ensure that their conduct is in compliance with the Act and the Commission's regulations.

Documents related to the case will be placed on the public record within 30 days. *See* Statement of Policy Regarding Disclosure of Closed Enforcement and Related Files, 68 Fed. Reg. 70,426 (Dec. 18, 2003). If you have any questions, please contact Audra Hale-Maddox, the attorney assigned to this matter, at (202) 694-1650.

Sincerely,

Mark Allen
Assistant General Counsel

Enclosure
Factual and Legal Analysis

FEDERAL ELECTION COMMISSION

FACTUAL AND LEGAL ANALYSIS

RESPONDENTS: Michael Montagano, Montagano for Congress Inc.,    MUR 6104
and Joseph Montagano, in his official capacity as treasurer

## I. GENERATION OF MATTER

This matter was generated by a complaint filed with the Federal Election Commission by the National Republican Congressional Committee. *See* 2 U.S.C. § 437g(a)(1).

## II. FACTUAL SUMMARY

The Complaint alleges that Joseph Montagano ("Joseph"), made excessive contributions to his son, Michael Montagano ("Montagano"), a candidate for the U.S. House of Representatives in 2008, in connection with the purchase of a house for Montagano and the payment of property taxes during his election campaign. The Complaint also questions Montagano's purchase or lease of a Hummer H3 vehicle. In addition, the Complaint alleges that Montagano's authorized committee, Montagano for Congress Inc. and Joseph Montagano, in his official capacity as treasurer, ("the Committee") failed to report these excessive contributions. ("Montagano" and "the Committee" are collectively referred to as "Respondents"). The Complaint alleges that during the campaign, Joseph made the payments for Montagano's personal automobile lease, for the house in which Montagano and his wife lived, and for the property taxes for Montagano's house, and that Joseph had no history of making such payments prior to, and irrespective of, Montagano's candidacy.[1]

---

[1] Although not specifically alleged in the complaint, FEC disclosure reports indicate that Montagano contributed $25,000 to his campaign and loaned $8,500 to his campaign in 2007. If, as the complaint contends, Montagano did not have a job or substantial assets during his candidacy, there may have been a question as to the source of these funds. However, as discussed on page 6 of this analysis, it appears that the candidate had sufficient personal funds to make the contributions and loans to his campaign.

1   Michael Montagano was the 2008 Democratic nominee for Congress in Indiana's 3rd
2   Congressional District. According to the available information, Montagano graduated from law
3   school in 2005 or 2006, joined a Lafayette, Indiana law firm during 2006, and took a leave of
4   absence from his job to run for Congress at age 27 against the 3rd District of Indiana incumbent
5   Mark Souder. Montagano filed his Statement of Candidacy with the Commission on May 3,
6   2007. He also filed a Financial Disclosure Statement with the Clerk of the U.S. House of
7   Representatives indicating that during 2006, he had earned $32,364.53 from the law firm, and
8   that through April 30, 2007, he had earned $22,666.66 from the firm (later amended to
9   $28,666.66 earned prior to his taking a leave of absence). Montagano also disclosed having
10  sold during 2006 an asset identified as Dennison Utility A valued at between $50,000 and
11  $100,000, and having a Chase bank account valued at between $15,000 - $50,000. *See*
12  Financial Disclosure Statement, Complaint Exhibit B. Montagano made two contributions to
13  the Committee, giving $1,500 on May 1, 2007, and $23,500 on June 26, 2007, and made two
14  loans, $6,500 to the Committee on June 29, 2007, and an additional $2,000 on
15  September 30, 2007, according to the Committee's disclosure reports. The Committee also
16  disclosed receiving from Joseph $2,300 for the 2008 primary and $2,300 for the 2008 general
17  election.

18   According to the Response, during 2007, Montagano and his wife looked for a home to
19  purchase in Indiana's 3rd District. They found a house that suited them but which was owned by
20  a trust that also owned the two adjoining lots. The trust owners required that all three properties
21  be sold together. Joseph and Montagano decided to buy the three lots and the house jointly and
22  then convey the two unimproved lots solely to Joseph. The owners of the trust wanted to move
23  quickly to sell the property, and Joseph and Montagano could not obtain a mortgage on the group

of properties by the time that the trust owners wanted to close the sale at the agreed-upon price of $326,000. Therefore, Joseph, using his own assets as collateral, obtained a $226,000 bridge loan on July 12, 2007, and put up $100,000 of his personal funds to purchase the three properties jointly with Montagano on July 13, 2007. *See* Response at 2 and Exhibit B. Montagano and Joseph then conveyed the two unimproved lots solely to Joseph on July 13, 2007. *See* Response Exhibit C.

By checks dated August 29 and September 20, 2007, each in the amount of $1,500, Montagano and his wife paid Joseph for their use of the house. *See* Response at 2 and Exhibit D. In October 2007, Joseph and Montagano obtained a joint $226,000 mortgage on the house, the proceeds of which were immediately used to pay off the bridge loan. *See* Response at 2 and Exhibits E & F. According to the Response, beginning in December 2007, Montagano and his wife have made the full monthly mortgage payments in the amount of $1,465.83 directly to Lake City Bank, the mortgage holder.[2] *See* Response at 2 and Exhibit G (copies of checks and other financial instruments).

In response to the allegation regarding Montagano's vehicle, the Response states that prior to Montagano's candidacy, on December 28, 2006, Montagano co-leased a Hummer H3 vehicle with Joseph. *See* Response at 3.

Montagano's Response acknowledges that Joseph provided security for Montagano's personal financial commitments prior to and during the time that he was a candidate for Congress by jointly purchasing the real estate and co-leasing his Hummer vehicle. Response at 3. Montagano asserts, however, that at no time during his candidacy did Joseph actually pay for Montagano's personal expenses or make any excessive contribution to Montagano. *Id.* At

---

[2] The monthly mortgage payment of $1,465.83 is similar to the earlier $1,500 payments Montagano made to his father for the bridge loan.

all times, Montagano asserts, he himself made timely payments for the home using his savings and his wife's income. *Id.* at 3. The Response, however, did not address the allegation that Joseph paid $712.46 in property taxes for Montagano's house on November 13, 2007. *See* Complaint Exhibit C.

Considering the modest amount of the possible violation, however, the Commission dismisses as a matter of prosecutorial discretion the allegations that Michael Montagano, Montagano for Congress, Inc. and Joseph Montagano, in his official capacity as treasurer, accepted and failed to report excessive contributions. *See Statement of Policy Regarding Commission Action in Matters at the Initial Stage of the Enforcement Process,* 72 Fed. Reg. 12545 (March 16, 2007); *see also Heckler v. Chaney,* 470 U.S. 821 (1985). The Commission cautions Respondents to make sure that their actions comply with the law.

### III. ANALYSIS

Under the Federal Election Campaign Act of 1971, as amended, ("the Act"), individual contributions to a candidate for Federal office were limited to $2,300 per election during the 2008 cycle. *See* 2 U.S.C. § 441a(a)(1)(A). The Committee has disclosed that Joseph contributed $2,300, the maximum allowable, for both the primary and the general election, and therefore any other contribution by Joseph to the Committee would be excessive. Generally, when a person other than the candidate pays for a candidate's personal expenses that would exist irrespective of the candidate's campaign, such as a home mortgage or rent payment and non-campaign vehicle expenses, that person makes a contribution to the candidate. *See* 11 C.F.R. § 113.1(g)(6); 2 U.S.C. § 439a(b)(2)(A). Candidates and their authorized committees are prohibited from knowingly accepting contributions in excess of the limits of Section 441a(a). 2 U.S.C. § 441a(f).

1    Congressional candidates may make unlimited campaign expenditures from personal
2    funds.[3] *See* 11 C.F.R. § 110.10. Montagano contributed $25,000 and loaned $8,500 to his
3    campaign. If the funds for Montagano's contributions and loans to his campaign were not
4    Montagano's personal funds, or if during Montagano's candidacy Joseph began paying for
5    Montagano's living expenses, Joseph may have made an excessive contribution for which
6    Montagano and the Committee may be liable for knowingly accepting. *See* 2 U.S.C. §§ 441a(a)
7    and 441a(f).
8    The available information suggests that rather than paying for Montagano's personal
9    expenses that existed irrespective of his candidacy, and therefore making excessive
10   contributions, Joseph largely served as a surety, both as a co-purchaser of the group of properties
11   that contained Montagano's house and as a co-lessor on the automobile lease. Montagano's
12   Response provides copies of checks in support of his representation that he has made monthly
13   payments against the full cost of the house, first to Joseph while Joseph held the bridge loan, and
14   to Lake City Bank once the mortgage was obtained.[4] See Response at 2 and Exhibits D and G.
15   Montagano's Response also indicates that Joseph's role in the lease of the Hummer H3 vehicle
16   was similar to Joseph's role in the purchase of the house. *See* Response at 3. With the exception
17   of the property tax payments of $712.46, as to which Montagano provided no response, it
18   appears that Joseph's assistance to Montagano with his personal financial dealings during his

---

[3] "Personal funds" include all assets in which a candidate has legal title or an equitable interest, as well as salary and other earned income from bona fide employment; dividends and proceeds from the sale of the candidate's stocks or other investments; bequests to the candidate; income from trusts established before candidacy; income from trusts established by bequest after candidacy of which the candidate is the beneficiary; gifts of a personal nature which had been customarily received prior to candidacy; and proceeds from lotteries and similar legal games of chance. *See* 2 U.S.C. § 431(26); 11 C.F.R. § 100.33.

[4] Joseph and Montagano replaced the bridge loan with the mortgage in mid-October, and the first payment on the mortgage was not due until December 1, 2007. Thus, as discussed *supra* it appears that Montagano made payments to his father, Joseph, for the two months during which Joseph held the bridge loan, ceased making those payments once the bridge loan was paid off by the mortgage, and then began making the mortgage payments when they came due.

1  candidacy has been in the form of intangible support as a surety rather than as making payments
2  to or for Montagano. *See* 2 U.S.C. §§ 439a(b)(1) and 441a(a)(1)(A).
3     In addition, it appears from Montagano's Financial Disclosure Statement filed when he
4  declared his candidacy that he sold an asset (Dennison Utility A) during 2006 – prior to his
5  candidacy – valued at between $50,000 and $100,000. He also reported a Chase bank account
6  valued at between $15,000 and $50,000 at the time of his initial filing in May 2007, and reported
7  that the value of this account had fallen to a range between $1,000 to $15,000 during 2008. *See*
8  Financial Disclosure Statement, Complaint Exhibit B. The sale of this asset prior to the
9  declaration of Montagano's candidacy, coupled with the reduction in value of the Chase bank
10 account, could account for the funds Montagano contributed and loaned to his campaign, and the
11 Complaint offers no additional information to suggest otherwise. In sum, the Response,
12 including the documents provided and Montagano's Financial Disclosure Statements, appears to
13 adequately refute the bulk of the allegations in the Complaint. However, the $712.46 that Joseph
14 appears to have paid in property taxes on Montagano's house during his candidacy may
15 constitute an excessive contribution because Joseph contributed the maximum allowable amount
16 in connection with Montagano's primary and general election.
17    Considering the modest amount of the possible violation, however, the Commission
18 dismisses as a matter of prosecutorial discretion the allegations that Michael Montagano,
19 Montagano for Congress Inc. and Joseph Montagano, in his official capacity as treasurer,
20 accepted and failed to report excessive contributions. *See Statement of Policy Regarding*
21 *Commission Action in Matters at the Initial Stage of the Enforcement Process*, 72 Fed. Reg.
22 12545 (March 16, 2007); *see also Heckler v. Chaney*, 470 U.S. 821 (1985). The Commission
23 cautions Respondents to make sure that their actions comply with the law.