# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA,   )
       )
      v.       )
       )  CRIMINAL CASE NO. 1:11-CR-161-1
JOHNNY REID EDWARDS    )
       )
       )

## JOHN EDWARDS' MEMORANDUM IN SUPPORT OF HIS MOTION TO DISMISS THE INDICTMENT AS AN ABUSE OF PROSECUTORIAL DISCRETION
### (Motion to Dismiss No. 2)

## NATURE OF MATTER BEFORE THE COURT

John Edwards moves to dismiss the Indictment as an abuse of prosecutorial discretion. This case is about politics. Mr. Edwards was a prominent Democrat who served as a Senator from North Carolina, he was the Democratic nominee for Vice President in 2004 and he entered the 2008 election as a Democrat seeking to be President of the United States. Nevertheless, Mr. Edwards' popularity plummeted when it was revealed that he had an extra-marital affair. In this prosecution, a major figure in the Democratic Party had been brought down and, as it turns out, a Republican U.S. Attorney with political ambitions of his own has used this high-profile case to his personal benefit. The investigation of this case twisted and turned for years before settling on an unprecedented theory of liability that had never been used before in any criminal proceeding. Then, just one month after securing these charges, U.S. Attorney George

Holding announced his campaign for Congress -- something he undoubtedly had been planning at the same time he was preparing the Indictment against Mr. Edwards.

Politics can be a rough-and-tumble business where partisan interests collide, but that is not supposed to be true of the criminal justice system. A hallmark of the grand jury process and one of its structural protections is "the requirement of a disinterested prosecutor." <u>Young v. United States ex rel. Vuitton Fils S.A.</u>, 481 U.S. 787, 807 (1987). "[T]he grand jury's critical task of protecting citizens from arbitrary and unreasonable prosecutions 'cannot be achieved in the absence of independent, unbiased prosecutors whose concern for justice transcends all other considerations.'" <u>United States v. Gold</u>, 470 F. Supp. 1336, 1346 (N.D. Ill. 1979) (internal citation omitted). But Mr. Holding either was not "disinterested" or "unbiased" or did not have the appearance of being disinterested. <u>Young</u>, 481 U.S. at 811 (prosecutors should avoid even "an appearance of impropriety that diminishes faith in the fairness of the criminal justice system in general"). The eventual involvement of other prosecutors cannot overcome that the case was brought, steered and ultimately signed by a U.S. Attorney who had an actual or profound appearance of a conflict of interest and whose involvement taints the process.

Prosecutors can disagree with his politics, but Senator Edwards unquestionably had a First Amendment right to advocate his political views, associate with the Democratic Party and seek elective office. By leading the prosecution against Mr. Edwards and using the case to advance his own political career, Mr. Holding engaged in

conduct the law terms a "vindictive prosecution." This warrants the dismissal of the Indictment (or at the very least, discovery related to this motion). See, e.g., United States v. Wilson, 262 F.3d 305, 314 (4th Cir. 2001) ("It is now well established that a prosecutor violates the Due Process Clause of the Fifth Amendment by exacting a price for a defendant's exercise of a clearly established right or by punishing the defendant for doing what the law plainly entitles him to do."); United States v. DeMichael, 692 F.2d 1059, 1061-62 (7th Cir. 1982) ("[T]he term 'vindictive prosecution' is ordinarily used to describe a prosecution which is vindictive in the normal sense of the word, resulting from specific animus or ill will (as the prosecution of all Democrats who violate the election laws, or all gamblers who do not make timely payoffs to the 'bagman'); or a prosecution which charges a more serious violation ('upping the ante') in retaliation for the exercise of a legal or constitutional right in connection with the original charge.").

Not even in the heat of a legal battle is it routine to raise the issues in this motion. Given all the unusual actions in and the political use of this case, however, this motion and request for this level of scrutiny are justified.

## STATEMENT OF FACTS

In April 2008, the House Judiciary Committee issued its report concerning President Bush's U.S. Attorneys scandal. U.S. House of Representatives, Judiciary Committee, Allegations of Selective Prosecution in Our Federal Criminal Justice System (2008). The report, based on an extensive investigation and testimony from bi-partisan

witnesses (including Republican Attorney General Dick Thornburgh), found that the Bush Administration put a premium on political prosecutions and that U.S. Attorneys were replaced because they failed to bring partisan political charges and that U.S. Attorneys were retained because they did bring such charges. Id. at 1-2. A Department of Justice Office of the Inspector General Report actually found that the criteria used to decide whether to retain U.S. Attorneys was whether those persons were "loyal Bushies." DOJ Office of the Inspector General Special Report, An Investigation into the Removal of 9 U.S. Attorneys in 2006 17 (2008) [hereinafter "OIG Report"]. Empirical evidence, cited in the House Report, makes clear that these sorts of political investigations and prosecutions were pervasive. Between 2001 and 2007, U.S. Attorneys working for President Bush brought 77% of public corruption cases against Democratic officeholders compared to just 17% brought against Republicans. During the same period, 80% of federal investigations targeting local officials were brought against Democrats. According to one scholar, the odds of such partisan disparity occurring randomly were less than 1 in 10,000, and ran counter to the Department's practices in preceding Republican and Democratic administrations. See Gersham, The Most Dangerous Power of the Prosecutor, 29 Pace L. Rev. 1, 26 & n.129 (2008).

Former U.S. Attorney Holding did nothing to refute the conclusions reached in the Congressional and OIG Reports. During his tenure as an Assistant U.S. Attorney and then as U.S. Attorney for the Eastern District, Mr. Holding directed high-profile investigations

4

into more than half a dozen Democratic politicians and officeholders, and these cases already have been cited as part of his campaign for Congress.  In 2008, the same year the Bush Department of Justice initiated the current investigation of Senator Edwards, Mr. Holding led a separate investigation into Michael Easley, the former Democratic Governor of North Carolina.  On the eve of state and federal elections in the fall of 2010, Mr. Holding also authorized the issuance of subpoenas against the campaign of the current Democratic Governor Beverly Perdue.

No doubt aided by the fallout of the investigation of Governor Perdue's campaign, the Republicans won control of the North Carolina General Assembly in 2010 for the first time in one hundred years.  Control of the Assembly brought with it the right to redraw North Carolina's congressional boundaries following the 2010 census.  During the redistricting process the Republicans dramatically redrew North Carolina's 13th Congressional District, tilting it heavily Republican.  Just one month after the Indictment of Mr. Edwards in this case, Mr. Holding announced his intent to run, as a Republican in that newly redrawn 13th Congressional District, and announcement articles highlighted the political cases he had brought.  And they Keep on Coming . . . George Holding Declares for 13th District, Carolina Politics Online (July 13, 2011) ("Former U.S. Attorney George E.B. Holding, who made his reputation pursuing high-profile Democrats in public corruption cases, said [July 13th] he plans to run for Congress next year.") (emphasis added).)

5

Mr. Edwards, who had been a Democratic Party front-runner for the White House in 2008, was perhaps the biggest political prize. By the time Mr. Holding took this assignment, he already had crossed political paths with Mr. Edwards. Mr. Holding began his legal career as a law clerk for the Honorable Terrence Boyle, a federal District Court Judge in the Eastern District. When Judge Boyle was nominated to the Fourth Circuit Court of Appeals in 2001, then-Senator Edwards blocked his nomination. Mr. Holding also worked for a time as an aide to Senator Jesse Helms, a vocal political opponent of Senator Edwards and his policies. And Mr. Holding contributed money to the campaign of Senator Lauch Faircloth, the Republican incumbent defeated by Mr. Edwards in 1998. Indeed, between 1997 and 2004, Mr. Holding contributed $12,000 to Republican candidates for North Carolina's two Senate seats and political action committees that supported those candidates.[1]

---

[1] In addition to contributing to Mr. Edwards' opponent in 1998, Senator Faircloth, Mr. Holding donated money to the senatorial campaigns of Republicans Jesse Helms and Elizabeth Dole, candidates who Mr. Edwards publicly opposed. During the hotly contested race for the Senate seat vacated by Mr. Edwards in 2004, Mr. Holding contributed $3,000 to the Republican candidate, Richard Burr. Senator Edwards supported the Democrat who opposed Mr. Burr. During the same election cycle Mr. Holding contributed over $5,000 to two Republican political action committees, the Leadership Circle PAC and the American Spirit PAC. Those organizations in turn contributed $24,000 to Senator Burr's campaign and $4,000 to President Bush's campaign for reelection. See Federal Election Commission, "Transaction Query by Individual Contributor," available at http://www.fec.gov/finance/disclosure/norindsea.shtml.

Despite this history of political conflict between Mr. Holding and Mr. Edwards, Mr. Holding was given the investigation, moved it from subject to subject, and steered its direction. At no time did he recuse himself nor did the Bush Administration suggest he step aside to avoid any appearance of impropriety. This actual or appearance of a conflict is now highlighted by Mr. Holding's announcement to run for office.

Mr. Holding's involvement in the Edwards investigation also was unusual not only because he had been a staunch supporter of Mr. Edwards's political foes but, as indicated above, because Mr. Holding was the U.S. Attorney for the Eastern, not the Middle District of North Carolina. According to the Preliminary Inquiry Memo sent to Mr. Holding, the targets of the initial investigation were Mr. Edwards, Ms. Hunter (doing business as Midline Groove Productions), Andrew Young and Fred Baron. None of those targets resided or conducted business in the Eastern District. Both Senator Edwards and Andrew Young resided in Chapel Hill, in the Middle District. Senator Edwards' campaign headquarters was in Chapel Hill, and all campaign finance reports were filed by staff members in Washington, D.C. Ms. Hunter was living in California at the time of the preliminary inquiry and her company, Midline Groove, operated out of New Jersey. Fred Baron was a resident of Texas. Aside from Mr. Holding's involvement, nothing

7

about the inquiry indicated that venue was appropriate in the Eastern District as opposed to the Middle District, Washington, D.C., New Jersey, California or Texas.[2]

It certainly appears the Bush Justice Department was looking for a way to get this case to Mr. Holding and not the U.S. Attorney with jurisdiction over the matter in the Middle District of North Carolina, Anna Mills Wagoner.  In the midst of selecting U.S. Attorneys to fire for political reasons, she had been placed on the Bush Administrations' initial list of U.S. Attorneys selected for firing.  OIG Report at 19 & 26; see id. at 26 n.4 (indicating she was viewed as "weak").  Instead of Ms. Wagoner, Mr. Holding who was from a different District, but had an established track record of prosecuting Democrats, got the assignment.[3]

The manner in which the case started and then was drastically expanded tells the story.  After Mr. Edwards ended his presidential campaign and publicly acknowledged

_____

[2]     Mr. Edwards has filed a separate motion to dismiss certain counts in the Indictment for lack of venue.  (MTD No. 5.)  The lack of venue in the Eastern District also necessitated a last-minute change of venue to the Middle District, which created significant irregularities in the grand jury process that are addressed in MTD No. 3.

[3]     Mr. Holding was "held-over" as the U.S. Attorney for the Eastern District of North Carolina following the 2008 election of President Obama because the President's nominee for that office, Thomas Walker, made campaign contributions to several Democratic candidates, including the Kerry-Edwards ticket in 2004.  Ironically, the Department of Justice reportedly determined that such contributions created a conflict of interest for Mr. Walker.  The Department has not explained why Mr. Holding's contributions to Mr. Edwards' opponent in the 1998 Senate race did not create the same conflict of interest.

his extra-marital affair, on August 11, 2008, Craig Donsanto, in the Public Integrity Section of the Department of Justice, authorized a narrow, preliminary inquiry into the alleged receipt of actual campaign monies by Rielle Hunter. Mr. Donsanto's recommendation came on the heels of inaccurate media reports claiming that Ms. Hunter had received payments from campaign funds associated with Mr. Edwards. (MTD No. 1 Ex. B (Preliminary Inquiry Memo).) Mr. Donsanto's recommendation was forwarded to Mr. Holding, U.S. Attorney for the Eastern District of North Carolina, even though Mr. Edwards, Ms. Hunter and all meaningful subjects of the investigation were located in the Middle District. As set forth in the Preliminary Inquiry Memo, the initial purpose of Mr. Holding's investigation was to determine whether Mr. Edwards unlawfully converted campaign funds for non-political purposes to support Ms. Hunter. The specific crime to be investigated was violation of 2 U.S.C. § 439, which prohibits the conversion to personal use of money contributed to a federal candidate or his campaign. The concern was that certain moving expenses of Ms. Hunter and the Youngs had been paid by Mr. Baron and that, according to Edwards campaign finance reports, Mr. Baron had received significant reimbursements from the Edwards campaign. The memo stated that "[i]f some of the payments to BARON from EDWARDS campaign were reimbursements for relocation expenses BARON provided for the benefit of HUNTER and the YOUNGS, provisions of Title 2, U.S.C., Section 439, may have been violated."

Within days after the presidential election, the Holding-led preliminary investigation began issuing subpoenas. Within a few months, the results refuted the allegations that generated the inquiry:

1. No money from the Edwards campaign was paid to either Ms. Hunter or Midline Groove, and neither Ms. Hunter nor Midline Groove received money from any source that originated with the Edwards campaign.

2. No money from the Edwards campaign was converted by Mr. Edwards to pay his "personal use" expenses.

3. No federal matching funds (*i.e.*, taxpayer money) received by the Edwards campaign were paid to Ms. Hunter or Midline Groove, and neither Ms. Hunter nor Midline Groove received money from any source that originated with federal matching funds.

4. The only money received by Ms. Hunter came from either Ms. Mellon or Mr. Baron.

5. Both Mr. Baron's estate and Rachel Mellon paid hundreds of thousands of dollars in gift taxes for money received by Ms. Hunter and the Youngs.

6. Mr. Young was unable to account for a substantial portion of the money received from Mr. Baron and Ms. Mellon.

7. Mr. Edwards acknowledged his relationship with Ms. Hunter and the fact that he was the father of Ms. Hunter's daughter. Mr. Edwards has provided financial support to his daughter since January 2009.

The narrow preliminary investigation that Mr. Holding was authorized to undertake revealed, in other words, that <u>none</u> of the payments made by the Edwards campaign to Mr. Baron were intended to reimburse him for expenses related to Ms. Hunter, and that there was no evidence that Mr. Edwards had converted campaign funds for personal use. For this reason, none of the crimes mentioned in the Preliminary Inquiry Memo were charged in the Indictment.

If this were a normal case, the investigation would have ended when the allegations that led to the investigation were disproved. That is not what happened here. Rather than closing his investigation, Mr. Holding led an expanded and different course -- pursuing an unprecedented theory of basing a criminal case on a novel interpretation of what constitutes a "campaign contribution." It appears that neither Mr. Holding nor his prosecutors submitted their theory to the Federal Election Commission ("FEC"), the agency with "primary and substantial responsibility for administering and enforcing the [Federal Election Campaign] Act." <u>Buckley v. Valeo</u>, 424 U.S. 1, 109 (1976)[4].

If the prosecutors had asked the FEC to weigh in on their unprecedented interpretation of the term "contribution," they may well have realized that there was no way Mr. Edwards "knowingly and willfully" violated federal election laws, as a criminal prosecution requires. According to two former Chairmen of the FEC, even if Mr. Edwards directly approached Ms. Mellon and Mr. Baron and asked them to provide financial assistance to Ms. Hunter, "these payments would not be considered to be either campaign contributions or campaign expenditures within the meaning of the campaign

---

[4] The constitutional problems with pursuing this unprecedented theory in a criminal case are addressed by Mr. Edwards in a separate motion to dismiss. (MTD No. 1.)

finance laws."  (See MTD No. 1 Ex. A (Ltr. from R. Lenhard and S. Thomas).)[5]  The former FEC chairmen further stated that, in their opinion, "the Federal Election Commission, if asked, would conclude that these payments did not constitute a violation of the law, even as a civil matter," and that the facts, even viewed in the light most favorable to the theories advanced in the Indictment, "do not make out a knowing and willful violation of the campaign finance laws warranting criminal prosecution," primarily because no court opinion, agency enforcement action, or FEC advisory opinion had ever considered -- let alone adopted -- this unprecedented interpretation of the term "contribution."  (Id.)  But it appears that neither Mr. Holding nor any of his associates asked the FEC whether their interpretation of the statute was consistent with the law.

To the contrary, the scope of his investigation of Mr. Edwards expanded. Although the earlier subpoenas requested information relating only to the Edwards campaign from January 1, 2006 to August 2008, Mr. Holding and his office authorized a new round of subpoenas in October 2010 (again on the eve of state and federal elections) requesting information regarding Mr. Edwards' entire thirteen year political career, from January 1, 1997 through October 2010.  Among other things, this expanded time period covered Mr. Edwards' successful campaign against Senator Faircloth, the Republican

---

[5]     DOJ's own election law prosecutor, Craig Donsanto, never raised this theory in the Preliminary Inquiry Memo either -- even though he was aware of payments made by Mr. Baron to support Ms. Hunter.

candidate to whom Mr. Holding donated money in 1998. This expanded time-period exceeded the five-year statute of limitations for election law violations, see 2 U.S.C. § 455, meaning the prosecutors requested information about possible violations they could no longer prosecute. They found none.

The expanded scope of the investigation being led by Mr. Holding also required a corresponding increase in the vast federal resources spent on the Edwards investigation. At least 50 federal agents conducted more than 125 interviews of anyone (including interns) who had ever worked for Mr. Edwards during his political career. In many cases, federal agents showed up on the doorsteps of potential witnesses unannounced, even though the witness already had been interviewed and was represented by counsel.

The conduct of Mr. Holding's office during grand jury proceedings also raises serious questions about the judgment and good faith of his staff. Prosecutors apparently asked witnesses before the grand jury a broad range of questions that had nothing to do with alleged campaign finance violations by Mr. Edwards. Witnesses report that they were asked whether Mr. Edwards or his law firm had been sued for sexual harassment; whether they were surprised by the size of Mr. Edwards's home; and whether the house had a basketball court. Details about grand jury proceedings were also repeatedly leaked to the news media by "law enforcement officials" and "those close to the investigation" in a rather transparent attempt to convict Mr. Edwards in the court of public opinion before he ever had a chance to fight the allegations against him in court.

From the Fall of 2010 through the date of the Indictment, details of grand jury testimony, the subpoenas that were being issued, and the opinion of prosecutors that they had a "strong" case were repeatedly leaked to the media. For example, on October 8, 2010, WTVD in Raleigh reported that "[a] law enforcement source told the I-Team Wednesday that about 20 new subpoenas have been issued ordering people to testify." The report further indicated that "prosecutors in Raleigh sent the case to the Department of Justice in Washington for a review. The Justice Department then told prosecutors in Raleigh to interview more people and get more information." A report by the Associated Press on January 17, 2011, reported information from "someone with access to a subpoena" and a "person involved in the investigation"; a day later, ABC News, citing "multiple sources with knowledge of the investigation" reported that the grand jury would be making its decision "soon." On February 15, 2011, NBC News reported that "sources close to the investigation" had told them that "[p]rosecutors believe they have a strong case, but have not yet gotten a green light from the Justice Department." This report came with a video entitled: "Prosecutors Gear up to Charge Edwards in Criminal Case." On May 25, 2011, NBC News, again citing "sources close to the investigation," reported that "DOJ Green-Lights Edwards Charges."

As noted above, the choice of venue also was problematic. Mr. Holding investigated Mr. Edwards for almost three years, from August 11, 2008 until the Indictment was issued on June 3, 2011. For all but a few days of that period, Mr.

Holding led the investigation in his home district, the Eastern District, where a grand jury was convened, hundreds of exhibits were presented and thousands of pages worth of testimony were taken. Yet, Mr. Holding and all the prosecutors he now was leading undoubtedly were aware that none of the targets of his investigation resided in the Eastern District. So, literally, no more than a day or two before Mr. Edwards was indicted, the prosecutors convened a second grand jury in the Middle District. They then hastily presented the second grand jury with merely 40 or so out of hundreds of exhibits (few of which were germane to the charges), as well as a single summary witness who recounted the testimony allegedly offered to the first grand jury in a massive presentation of hearsay. Mr. Edwards addresses these abuses of the grand jury process in a separate motion to dismiss. (MTD No. 3.)

Moreover, Mr. Holding did not direct and the other prosecutors did not present the second grand jury with significant exculpatory evidence that would have cast doubt on their unprecedented theory of election law. Upon information and belief, the grand jury was not informed that at least two former Chairmen of the FEC had stated that the payments in question were not "contributions" within the meaning of the election laws and that Mr. Edwards therefore could not have "knowingly" violated the law because no court or administrative agency had ever described them as such. Upon information and belief, neither Mr. Holding nor his assistants provided the grand jury with the prior statement of Mr. Young in his book The Politician, the government's key witness, who

explained that any funds provided for Ms. Hunter by Ms. Mellon or Mr. Baron "were gifts, entirely proper, and not subject to campaign finance laws." These omissions were in direct contravention of DOJ policy: "It is the policy of the Department of Justice . . . that when a prosecutor conducting a grand jury inquiry is personally aware of substantial evidence that directly negates the guilt of a subject of the investigation, the prosecutor must present or otherwise disclose such evidence to the grand jury before seeking an indictment against such a person." United States Attorneys Manual § 9-11.233 (2008).

The second grand jury indicted Mr. Edwards on June 3, 2011; Mr. Holding left his post as United States Attorney for the Eastern District of North Carolina shortly after the Indictment; and, on July 13, 2011, Mr. Holding announced his intent to run for Congress as a Republican in North Carolina's newly redrawn 13th Congressional District.

## QUESTION PRESENTED

1.    Does the significant actual or apparent conflict of interest by the U.S. Attorney who led the investigation and signed the Indictment against Mr. Edwards warrant the dismissal of the Indictment for abuse of prosecutorial discretion?

2.    Does the significant actual or apparent conflict of interest by the U.S. Attorney who led the investigation and signed the Indictment against Mr. Edwards warrant further discovery to determine whether the Indictment should be dismissed for abuse of prosecutorial discretion?

## ARGUMENT

An impartial prosecutor is "essential to the administration of justice." In re Olson, 818 F.2d 34 43-44 (D.C. Cir. 1987). "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." Berger v. United States, 295 U.S. 78, 88 (1935) (emphasis added). The U.S. Attorney has a "responsibility that easily can be abused" and, "while he may strike hard blows, he is not at liberty to strike foul ones. Because the prosecutor wields such great power, the opportunities for him to strike foul blows are many." United States v. Diaz-Carreon, 915 F.2d 951, 956 (5th Cir. 1990). Because "the potential for abuse is so great . . . the obligation for the judiciary to protect against even the appearance of unfairness [is] correspondingly heightened." United States v. Serubo, 604 F.2d 807, 817 (3d Cir. 1979) (emphasis added).

The prosecutors' fierce efforts against Mr. Edwards (e.g., unusual amount of resources used, change in theories, offensive questions to witnesses, leaks to the press) are exacerbated by Mr. Holding's lack of impartiality or the appearance of a conflict made clear by his use of the case for his political ambitions. "It is now well established that a prosecutor violates the Due Process Clause of the Fifth Amendment by exacting a price for a defendant's exercise of a clearly established right or by punishing the defendant for doing what the law plainly entitles him to do." United States v. Wilson,

262 F.3d 305, 314 (4th Cir. 2001). The way the case was handled, the way it was leaked in violation of Rule 6(e) concerning grand jury secrecy, the way it was transferred to another district, the way it went from allegation to allegation and the use of it Mr. Holding is making in his political campaign, make a good case that Mr. Edwards was targeted for prosecution based on who he was -- a prominent candidate and then office holder in the Democratic Party who exercised his First Amendment rights to seek elective office and advocate Democratic policies -- and then to capitalize on his fall. "[F]or an agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights" in this manner is "patently unconstitutional." <u>Bordenkircher v. Hayes</u>, 434 U.S. 357, 363 (1978).

I.   **AN INDICTMENT THAT RESULTS FROM PROSECUTORIAL RETALIATION FOR THE EXERCISE OF CONSTITUTIONAL RIGHTS <u>VIOLATES THE DUE PROCESS CLAUSE</u>**

In an often-quoted speech delivered at the second annual conference of United States Attorneys more than seventy years ago, Justice Robert Jackson (then Attorney General) described the discretion of the federal prosecutor in the following terms:

> The prosecutor has more control over life, liberty, and reputation than any other person in America. His discretion is tremendous. He can have citizens investigated and, if he is that kind of person, he can have this done to the tune of public statements and veiled or unveiled intimations.... Law enforcement is not automatic. It isn't blind. One of the greatest difficulties of the position of prosecutor is that he must pick his cases, because no prosecutor can even investigate all of the cases in which he receives complaints.... If the prosecutor is obliged to choose his cases, it follows that he can choose his defendants. Therein is the most dangerous power of the prosecutor: that he will pick people that he thinks he should get, rather

than pick cases that need to be prosecuted. With the law books filled with a great assortment of crimes, a prosecutor stands a fair chance of finding at least a technical violation of some act on the part of almost anyone. In such a case, it is not a question of discovering the commission of a crime and then looking for the man who has committed it, it is a question of picking the man and then searching the law books, or putting investigators to work, to pin some offense on him. It is in this realm -- in which the prosecutor picks some person whom he dislikes or desires to embarrass, or selects some group of unpopular persons and then looks for an offense, that the greatest danger of abuse of prosecuting power lies. It is here that law enforcement becomes personal, and the real crime becomes that of being unpopular with the predominant or governing group, being attached to the wrong political views, or being personally obnoxious to or in the way of the prosecutor himself.

The Federal Prosecutor: An Address by Robert H. Jackson, 24 J. Am. Jud. Soc'y 18 (1940). Acknowledging the same potential for abuse of prosecutorial discretion as Justice Jackson, the Supreme Court repeatedly has held that an indictment resulting from what courts have termed prosecutorial vindictiveness violates due process. See Blackledge v. Perry, 417 U.S. 21, 28-29 (1974); see also United States v. Armstrong, 517 U.S. 456, 464-65; United States v. Goodwin, 457 U.S. 368, 372-80 (1982); Bordenkircher, 434 U.S. at 362-63. "Actual vindictiveness must play no part in a prosecutorial or sentencing decision and, since the fear of such vindictiveness may unconstitutionally deter a defendant's exercise of his rights, the appearance of vindictiveness must also be avoided." United States v. King, 126 F.3d 394, 397 (2d Cir. 1997) (internal quotation omitted).

"To establish prosecutorial vindictiveness, a defendant must show, through objective evidence, that (1) the prosecutor acted with genuine animus toward the

defendant and (2) the defendant would not have been prosecuted but for that animus." Wilson, 262 F.3d at 314. In other words, a defendant must demonstrate that the decision to pursue criminal charges "'could not be justified as a proper exercise of prosecutorial discretion.'" Wilson, 262 F.3d at 316 (quoting Goodwin, 457 U.S. at 380 n.12). To satisfy this burden, a defendant must present "some evidence" tending to show that the prosecution resulted from actual vindictive motives. United States v. Adams, 870 F.2d 1140, 1145-46 (6th Cir. 1989).

## II. THE UNIQUE CIRCUMSTANCES OF THIS CASE DEMONSTRATE THAT THE PROSECUTION OF MR. EDWARDS IS NOT THE PROPER EXERCISE OF PROSECUTORIAL DISCRETION

As with any claim raising the improper motives of government actors, it is a "rare case" in which a defendant can demonstrate that "the government's decision to prosecute was tainted by improper motivation." Adams, 870 F.2d at 1141; see Goodwin, 457 U.S. at 380 n. 12. Nonetheless, several courts have held that a defendant provided sufficient evidence of actual prosecutorial vindictiveness to warrant dismissal of the indictment or additional discovery. See, e.g., Adams, 870 F.2d at 1141, 1145-46; United States v. Jarrett ("Jarrett II"), No. 1:03-CR-087, 2008 WL 323411 (N.D. Ind. Feb. 4, 2008); United States v. Fieger, No. 07-CR-20414, 2008 WL 205244 (E.D. Mich. Feb. 1, 2008). The unique circumstances of this case similarly compel the conclusion that the prosecution of Mr. Edwards is another one of those "rare cases" in which the defendant can demonstrate that his indictment resulted from what the law terms "prosecutorial vindictiveness."

### A. It Now Appears The Lead Prosecutor Had A Personal Political Stake In The Indictment Of Mr. Edwards

Among the factors that the courts have considered in applying the law of prosecutorial vindictiveness is whether there is any evidence that the prosecutor had "a personal stake in the outcome of the case" or an interest in seeking "self-vindication." United States v. Jarrett, 447 F.3d 520, 525 (7th Cir. 2006). To demonstrate actual vindictiveness in this manner, a defendant must present "direct evidence" of genuine animus, such as "a statement by the prosecutor," United States v. Johnson, 171 F.3d 139, 140 (2d Cir. 1999), a "document that might establish bad motives on the part of the government," Jarrett, 447 F.3d at 527, or a conflict of interest warranting recusal of the prosecutor, Fieger, 2008 WL 205244 at *5-*6, *8, *15-*16. Absent such direct evidence, the claim fails. See Wilson, 262 F.3d at 317 (noting that defendant failed to present any evidence that prosecutors "acted with any purpose of … vindicating any personal interest"); Johnson, 171 F.3d at 141 (same).

In this case, there is ample evidence to warrant this Court finding prosecutorial vindictiveness. As noted above, Mr. Holding crossed political paths with Senator Edwards several times in the past and made campaign contributions to the Republican candidate running against Senator Edwards in 1998. In addition, Mr. Holding has a long history (noted in his campaign materials) of launching high-profile criminal investigations of high-ranking North Carolina Democrats. This Indictment, which generated tremendous publicity, was returned just days before Mr. Holding announced

his own candidacy for Congress. Mr. Holding therefore had both a "personal stake in the outcome of the case" and an interest in seeking "self-vindication."[6]

Mr. Holding's political contributions to Mr. Edwards' opponent and political foes also created an actual or profound appearance of a conflict of interest warranting recusal.[7] Such a conflict of interest denies a defendant "the possibility of fair minded exercise of the prosecutor's discretion" and violates the Due Process Clause. Ganger v. Peyton, 379 F.2d 709, 712, 714 (4th Cir. 1967); see also Jones v. Richards, 776 F.2d 1244, 1247 (4th Cir. 1985) ("The thrust of Ganger is that the criminal defendant is entitled to an impartial prosecutor, who can make an unbiased use of all the options available to the prosecutor's office."); In re November 1979 Grand Jury, 616 F.2d 1021, 1027 (7th Cir. 1980) (noting

_____

[6]    At some point, prosecutors from Washington, D.C. joined the investigation. By then, however, the toothpaste could not be put back in the tube: Mr. Holding had started the case; changed its direction; expanded it; supervised the case during all the leaks; and spent vast resources that had to be vindicated. Indeed, Mr. Holding never recused himself and it is his name on the actual Indictment. Having spent more than three years pursuing the case in full view of the public, Mr. Holding (then a hold-over Republican) put the new Democratic Administration in a difficult position. If the new Administration would have prevented Mr. Holding from obtaining the Indictment, the Administration itself would be the one accused of playing politics by protecting one of its own. Thus, whether Senator Edwards was indicted or not, Mr. Holding could score political points.

[7]    Indeed, as noted above, Mr. Holding was held-over because President Obama's nominee for U.S. Attorney had donated money to the Kerry-Edwards campaign in 2004. It is difficult to imagine how a donation in support of the campaign could render someone conflicted, but not a donation against the same candidate.

that a prior case dismissing an indictment was motivated by "a concern that a biased and errant prosecutor had improperly manipulated the grand jury investigation in order to reach a predetermined result"). The actual or appearance of a conflict of interest created by Mr. Holding's Republican political activity thus serves as additional evidence of what the law deems to be genuine animus. See Fieger, 2008 WL 205244 at *15-*16 (holding that basis for recusal of top three lawyers in U.S. Attorney's Office was relevant to Mr. Fieger's claim that his indictment for campaign finance violations was the result of prosecutorial vindictiveness).

### B. Mr. Holding Relied On A Novel Legal Theory That Had Never Been Applied In This District Or In Any Other

Courts evaluating claims of prosecutorial vindictiveness also consider whether the decision to pursue an indictment in a particular case strayed from normal practice within the jurisdiction. In Adams, the Sixth Circuit noted that defendants in Ms. Adams' position "have not heretofore been subjected to prosecution," bolstering her claim that she had been indicted in retaliation for filing a sexual harassment lawsuit against the government. Adams, 870 F.2d at 1145-46. Similarly, in Fieger, a case involving the Bush Administration's earlier investigation of individual donors to Mr. Edwards' 2004 presidential campaign, the court noted that the campaign finance charges brought against Mr. Fieger represented "the first such prosecution ever brought by the Detroit [U.S. Attorney's Office]," further supporting his claim that the indictment was politically-motivated. Fieger, 2008 WL 205244 at *4, *16. In both cases, the court concluded that

defendants had presented "some evidence" of actual prosecutorial vindictiveness.  See Adams, 870 F.2d at 1146; Fieger, 2008 WL 205244 at *15.

Like Adams and Fieger, the charges against Mr. Edwards in this case have also "not heretofore been subjected to prosecution," as this is the first time that this strained interpretation of the term "contribution" has been applied in any enforcement action (civil or criminal) in any jurisdiction (state or federal).  As two former FEC Chairmen stated, a thorough review of all reported cases, agency enforcement actions, and FEC advisory opinions revealed not a single case in which "the conduct at issue in the Edwards matter, or even conduct substantially similar to it," was held to violate the federal election statute.  (Ex. A.)  The lack of any similar prosecutions in the 100-year history of campaign finance law, let alone in the Middle District of North Carolina, provides further evidence for the Court to conclude that the indictment of Mr. Edwards amounts to prosecutorial vindictiveness.  See Adams, 870 F.2d at 1146 (noting that unless two former government officials were "perjuring themselves," their affidavits stating that criminal charges were not "ordinarily" pursued in similar cases "raise[d] a significant question as to why this particular prosecution was undertaken").[8]

_____

[8]      The lack of any similar prosecutions in this District also distinguishes this case from Wilson, in which the local U.S. Attorney's Office had a policy of prosecuting all violations of the type charged in that case.  See Wilson, 262 F.3d at 316.

**C.** **The Decision To Prosecute Mr. Edwards Was Not Based On The Factors Typically Used To Determine Whether To Initiate A Criminal Prosecution**

Finally, a defendant may also show actual prosecutorial vindictiveness by presenting evidence "that the decision to pursue an indictment was not based on the usual determinative factors a responsible prosecutor would consider before bringing charges." Jarrett, 447 F.3d at 525 (internal quotation omitted); see also Fieger, 2008 WL 205244 at *4, *15-*16 (holding that failure of prosecutors to follow DOJ manual provided some evidence of vindictiveness). The term "usual determinative factors" means "the various considerations a responsible prosecutor in the ordinary course of things would weigh in deciding whether or not to bring a particular charge." Jarrett, 447 F.3d at 529. Mr. Holding and those he supervised or work besides failed to take several relevant factors into consideration when he decided to pursue the high-profile indictment of Mr. Edwards. They failed to consult the FEC as to the established meaning of the term "contribution" under federal election laws, choosing instead to pursue criminal charges based upon their own unprecedented and untested interpretation of that term. They apparently overlooked the requirement that they prove a "knowing" violation of the statute by Mr. Edwards, a task that is all but impossible as not even the former FEC Chairmen charged with interpreting election laws "knew" (or now believe) the term "contribution" encompassed the conduct at issue. Cf. Wilson, 262 F.3d at 316-17 (holding that defendant failed to show vindictiveness because the government presented "strong" evidence of a "knowing" violation of the statute).

25

Other details of the investigation Mr. Holding led compel the conclusion that the decision to prosecute Mr. Edwards was not based on "the usual determinative factors." Grand jury witnesses apparently were asked offensive questions that had nothing to do with whether Mr. Edwards knowingly violated federal election laws, but rather were designed to inflame the grand jury pool and ensure a high-profile Indictment. Courts have found such tactics to evidence vindictiveness. See United States v. Samango, 607 F.2d 877, 883 (9th Cir. 1979) (dismissing indictment based in part on prosecutor's "gratuitous," "prejudicial," and "totally irrelevant" question that "served no other purpose than calculated prejudice"); United States v. Hogan, 712 F.2d 757, (2d Cir. 1983) (dismissing indictment because prosecutors, inter alia, asked series of questions regarding unrelated acts designed "not to support additional charges, but … to depict [defendants] as bad persons and thereby obtain an indictment); Fieger, 2008 WL 205244 at *6 (holding grand jury proceedings that "went beyond inquiring into Federal election campaign finance violations" provided further evidence of prosecutorial vindictiveness); United States v. DiGrazia, 213 F. Supp. 232, 235 (N.D. Ill. 1963) (dismissing indictment based on prosecutor's use of irrelevant questions that were "clearly prejudicial and could only be calculated to discredit and impugn [defendant] in the eyes of the jurors"); id. ("It is the duty of a prosecutor presenting a case to a Grand Jury not to inflame or otherwise improperly influence the jurors against any person."); see also U.S. Attorneys' Manual § 9-11.010 ("The prosecutor's responsibility is to advise the grand jury on the law and to

present evidence for its consideration. In discharging these responsibilities, the prosecutor must be scrupulously fair to all witnesses and must do nothing to inflame or otherwise improperly influence the grand jurors.").

Moreover, the sheer size of the federal task force employed by Mr. Holding to investigate a non-violent felony raises questions about the motivations of the prosecutors. Even after they determined that <u>none</u> of the alleged violations described in the Preliminary Inquiry Memo had been committed, the prosecutors assembled a team of at least 56 federal agents to conduct 150 witness interviews in search of a new theory for an indictment. There is simply no explanation for a taxpayer-funded investigation of this scope unless the intent was to dig up anything and everything possible on Mr. Edwards. After vesting so many resources over so many years, and having generated so much publicity about the investigation, Mr. Holding could ill afford a decision not to bring charges. This is precisely what Justice Jackson warned against, a prosecutor who investigates a man in search of a crime, rather than a prosecutor who investigates a crime in search of a culprit. The "extensive amount of FBI resources devoted to this case" is additional evidence of actual vindictiveness. <u>See</u> <u>Fieger</u>, 2008 WL 205244 at *7.

## III. MR. EDWARDS HAS PRESENTED SUFFICIENT EVIDENCE TO WARRANT DISCOVERY ON HIS CLAIM OF PROSECUTORIAL <u>VINDICTIVENESS</u>

The existing record is strong enough to warrant dismissal, but the Court ought to allow additional discovery to consider the prosecutorial vindictiveness claim. "[T]o

obtain discovery into a vindictive prosecution allegation a defendant need only present a 'colorable basis' for the claim." Jarrett II, 2008 WL 323411 at *2. A "colorable basis" means "some evidence tending to show the essential elements of the claim." Id. (internal quotation omitted); see also Wilson, 262 F.3d at 315 (to obtain discovery the defendant must present "objective evidence tending to show the existence of prosecutorial misconduct"). Discovery is appropriate when the defendant "[could not] have gone much father than they did without the benefit of discovery on the process through which [the challenged] prosecution was initiated." Adams, 870 F.2d at 1146. "It may well be that no fire will be discovered under all the smoke, but there is enough smoke here … to warrant the unusual step of letting the defendants find out how this unusual prosecution came about." Id.

Mr. Edwards has presented at least a "colorable basis" that the Indictment results from prosecutorial vindictiveness for all of the reasons provided in Section II above.[9]

_____

[9] In addition, prosecutors, through Mr. Young, obtained Mr. Edwards' confidential deposition from a separate civil action between Ms. Hunter and Mr. Young, which involves matters distinct from this case. Despite Protective Orders making the deposition confidential, prohibiting the parties from providing it to third parties, and requiring notice of any effort by third parties to obtain the materials, the government issued a secret subpoena and obtained secret federal court orders regarding the deposition. The result was that it secretly got the deposition. Around the same time, Mr. Young filed a motion to compel regarding Mr. Edwards, seeking additional sworn testimony in that civil case on matters related exclusively to this criminal action. Although the full degree of interaction between the prosecutors and their cooperating witness, Mr. Young, on these

The prosecutor, Mr. Holding, had both a "personal stake in the outcome of the case" and an interest in seeking "self-vindication" by publicly embarrassing Mr. Edwards. Were there any question of that before he announced for Congress to capitalize personally and politically from this case, there can be little now. The decision to prosecute Mr. Edwards was based on a strained reading of federal election laws that had never been applied in a criminal proceeding in this District or anywhere else. The Indictment was not based on the "usual determinative factors a responsible prosecutor would consider before bringing criminal charges," and the scope of the investigation -- in terms of both manpower and the questions asked of witnesses before the grand jury -- strayed well beyond what was necessary to investigate a non-violent felony.

In any discovery the Court order, Mr. Edwards requests production of the following: "(1) All pre-indictment notes, emails, memoranda, and correspondence with investigatory agencies relating to [Mr. Edwards'] indictment; (2) All correspondence with attorneys for [the government's key witnesses, including Andrew Young]; and (3) Any other documents in the possession of the Government that relate to the decision to

---

points is not yet clear, it would be highly improper for the government to seek to use a civil action to secretly obtain what it could never get in this criminal case—a deposition of Mr. Edwards on the issues in this case. At a minimum, discovery is warranted on these issues.

prosecute [Mr. Edwards]." <u>See</u> <u>Jarrett II</u>, 2008 WL 323411 at *3.  Among these documents should be correspondence between and among the prosecutors and staff concerning: (1) the merits of the case, (2) requests for resource, (3) contacts with the media, (4) contact with the FEC, and (5) . . . . .

## <u>CONCLUSION</u>

Because this Indictment was obtained through an abuse of prosecutorial discretion, it must be dismissed.

Dated:  September 6, 2011

/s/ James P. Cooney III
James P. Cooney III, N.C. Bar No. 12140
jcooney@wcsr.com
WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
One Wells Fargo Center
Suite 3500, 301 South College Street
Charlotte, NC 28202-6037
(704) 331-4980 (phone)
(704) 338-7838 (fax)


/s/ Wade M. Smith
Wade M. Smith, N.C. Bar No. 4075
THARRINGTON SMITH LLP
209 Fayetteville Street Mall
Raleigh, NC 27602
Email:  WSmith@tharringtonsmith.com
(919) 821-4711 (phone)
(919) 829-1583 (fax)

/s/ Abbe David Lowell
Abbe David Lowell, *pro hac vice*
ADLowell@Chadbourne.com
Christopher D. Man, *pro hac vice*
CMan@Chadbourne.com
CHADBOURNE & PARKE LLP
1200 New Hampshire Ave., NW
Washington, DC 20036
(202) 2974-5600 (phone)
(202) 974-5602 (fax)

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 6, 2011, I electronically filed the foregoing **MEMORANDUM IN SUPPORT OF HIS MOTION TO DISMISS THE INDICTMENT AS AN ABUSE OF PROSECUTORIAL DISCRETION (Motion to Dismiss No. 2)** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Brian Scott Meyers
U.S. Attorney's Office – EDNC
Terry Sanford Federal Building
310 New Bern Avneue, Suite 800
Raleigh, NC 27601-1461
Telephone:  (919) 856-4530
Fax:  (919) 856-4487
Email:  brian.s.meyers@usdoj.gov

David V. Harbach
U.S. Department of Justice
Public Integrity Section
1400 New York Avenue, NW, Suite 1800
Washington, DC 20005
Telephone:  (202) 262-7597
Fax:  (202) 514-3003
Email:  david.harbach@usdoj.gov

Jeffrey E. Tsai
U.S. Department of Justice
Public Integrity Section
1400 New York Avenue, N.W., Suite 1800
Washington, DC 20005
Telephone: (202) 307-0933
Fax:  (202) 514-3003
Email:  jeffrey.tsai@usdoj.gov

Robert J. Higdon
U.S. Attorney's Office – EDNC
Terry Sanford Federal Building
310 New Bern Avenue, Suite 800
Raleigh, NC 27601-1461
Telephone:  (919) 856-4530
Fax:  (919) 856-4487
Email:  bobby.higdon@usdoj.gov

/s/ James P. Cooney III
James P. Cooney III (NCSB # 12140)
Womble Carlyle Sandridge & Rice, PLLC
One Wells Fargo Center
Suite 3500, 301 South College Street
Charlotte, NC 28202
Telephone:  (704) 331-4980
Email:  jcooney@wcsr.com

*Attorney for Defendant*

Date:  September 6, 2011