IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:11-CR-161-1 |
| | ) | |
| JOHNNY REID EDWARDS | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS
THE INDICTMENT FOR FAILURE TO ALLEGE A CRIME AND
LACK OF NOTICE AS TO WHAT THE LAW PROSCRIBED**

The United States of America, through the undersigned attorneys, files this

Response in opposition to defendant John Edwards' Motion to Dismiss the Indictment for

Failure to Allege a Crime and Lack of Notice as to What the Law Proscribed (Motion to

Dismiss #1). For the reasons discussed in this Memorandum, the Government

respectfully submits that Edwards' Motion should be denied in its entirety.

# TABLE OF CONTENTS

INTRODUCTION

I.      Summary of the Indictment      2

II.     Overview of Facts Alleged in the Indictment      2

III.    Procedural Framework for Edwards' Motions      6

IV.    Applicable Law      8

V.     FEC Advisory Opinions      11

ARGUMENT

I.      The Indictment Is Not Unconstitutionally Vague      16

     A.     The Indictment's Reference to Various Means By Which Payments Can Constitute Contributions is Proper      18

     B.     The Various Means Alleged in the Indictment Are Not Inconsistent      25

     C.     There Is No Double Jeopardy Problem      28

II.     Edwards' Statutory Construction Argument is Meritless      29

     A.     The Government's Position      30

     B.     Edwards' Argument Should be Rejected      31

          1.     There is No Authority for Construing "For the Purpose of Influencing Any Election for Federal Office" in the Definition of "Contribution" to Mean "Unambiguously Related to a Campaign"      33

          2.     "For the Purpose of" Does Not Mean "For the Sole Purpose of"      41

          3.     There is No Danger of Content-Based Enforcement      45

          4.     Neither Caselaw Nor FEC Opinions Mandate an Objective Test      46

III.   Edwards' Claim that the Payments at Issue Cannot Be Contributions
       As a Matter of Law is Baseless                                          52

       A.    There is No Requirement for Payments to Involve Traditional
             Electioneering Activity in Order to be Contributions              52

       B.    The FEC Opinions Edwards Cites Do Not Support His Theory           54

       C.    The Delay in Depositing Some of Mellon's Checks Does Not
             Alter Their Status as Contributions                               55

       D.    The Role of Coordination                                          57

       E.    Personal Use Expenses Are Not Restricted to Those a Candidate
             is Legally Obligated to Pay                                       57

IV.    There is Constitutionally Sufficient Notice                            59

       CONCLUSION                                                              65

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:11-CR-161-1 |
| | ) | |
| JOHNNY REID EDWARDS | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS
THE INDICTMENT FOR FAILURE TO ALLEGE A CRIME AND
LACK OF NOTICE AS TO WHAT THE LAW PROSCRIBED**

The core conduct underlying each of the offenses charged in the Indictment is John Edwards' knowing and willful acceptance and receipt of over $900,000 in illegal contributions from two wealthy donors, Rachel "Bunny" Mellon and Fred Baron, during his campaign for President of the United States in 2007 and 2008.[1] As Edwards well knew, the Federal Election Campaign Act limited the amount of contributions any candidate or campaign could accept from an individual in a calendar year to $2,300. Despite his knowledge of this fundamental campaign-finance restriction, Edwards requested, accepted and received Mellon's and Baron's unlawful contributions in order to hide his involvement in an extramarital affair and thereby preserve the viability of his

---

[1] Consistent with local practice and Department of Justice policy, the Indictment uses pseudonyms for the individuals involved. However, the briefs Edwards has filed disclose the names of these individuals. Accordingly, the Government uses their names in its responses for clarity and because it cannot prevent identification of those individuals in the process of responding to Edwards' arguments.

campaign to be President and prevent the diversion of campaign resources to the task of controlling the damage that public revelation of the affair would cause.

## INTRODUCTION

### I. Summary of the Indictment

The Indictment contains six counts: Count One charges conspiracy, in violation of Title 18, United States Code, Section 371; Counts Two through Five charge acceptance and receipt of illegal campaign contributions, in violation of the Federal Election Campaign Act ("Election Act"), specifically Title 2, United States Code, Sections 441a(a)(1)(A), 441a(f), and 437g(d)(1)(A)(i); and Count Six charges false statements in the form of a scheme to conceal material facts from the Federal Election Commission ("FEC"), in violation of Title 18, United States Code, Section 1001(a)(1).

### II. Overview of Facts Alleged in the Indictment

In 2007 and 2008, John Edwards was a candidate for the Democratic Party's nomination for President of the United States. (Ind. ¶ 1). During the same time period, he was engaged in an extramarital affair with Rielle Hunter, which resulted in a pregnancy. (Ind. ¶ 3). Edwards and others believed that if the public learned of the affair, his campaign would be destroyed. (Ind. ¶ 15).

In order to maintain the viability of his candidacy, Edwards sought to conceal his extramarital affair and the pregnancy from the public. (Ind. ¶¶ 15, 18). In order to achieve this goal, Edwards and a long-time campaign staffer, Andrew Young,

-2-

approached two wealthy Edwards benefactors – Rachel "Bunny" Mellon and Fred Baron – for financial assistance. (Ind. ¶¶ 2, 16, 17, 21, 28).

Mellon had been a reliable Edwards political supporter and donor since the 2004 election. (Ind. ¶ 4). In April 2007, Mellon wrote a note to Young in response to media reports about the alleged cost of Edwards' haircuts:

> The timing of your telephone call on Friday was "witchy." I was sitting alone in a grim mood – <u>furious</u> that the press attacked Senator Edwards on the price of a haircut. But it inspired me – from now on, all haircuts, etc., that are necessary and important for his campaign – please send the bills to me . . . . It is a way to help our friend without Government restrictions. I see <u>jealousy</u> coming from somewhere in this news report.

(Ind. ¶ 21).

In or around May 2007, Edwards and Young solicited Mellon for financial support, and even though she had already contributed to Edwards the maximum amount allowed under the law, Mellon agreed to provide Edwards additional money to help him become President. (Ind. ¶¶ 21, 22). During this same time period, Hunter informed Edwards that she was pregnant with his child. (Ind. ¶ 20). Between June 2007 and January 2008, Mellon made $725,000 in contributions to Edwards via seven different personal checks, made payable to an interior-decorator friend and disguised as purchases of antique furniture. (Ind. ¶ 23). The friend, in turn, sent the checks to Young, whose wife endorsed and deposited them into the Young family's bank account. (Ind. ¶ 24).

-3-

The funds were used to finance Hunter's living and medical expenses, ensure her silence, and hide her from the national media. (Ind. ¶¶ 18, 24).

Fred Baron served as the Edwards campaign's national Finance Chair during the 2008 campaign. (Ind. ¶ 5). In October 2007, the *National Enquirer* published an article reporting that Edwards was allegedly involved in an extramarital affair. (Ind. ¶ 25). Edwards promptly (and falsely) denied it. (Ind. ¶ 25). In December 2007, Edwards convinced Young to state publicly (and falsely) that Young was the father of the child Hunter was carrying. (Ind. ¶¶ 26, 27). Also in December 2007, and in order to avoid damage to the campaign, Edwards and Young arranged for Baron to fund flying Hunter, as well as Young and Young's family, out of North Carolina by private jet to secluded locations, to escape the media. (Ind. ¶¶ 28, 29).

Over several weeks in December 2007 and January 2008, Hunter and the Youngs stayed in posh hotels in Fort Lauderdale, Aspen, and San Diego before ultimately arriving in Santa Barbara, California. (Ind. ¶ 29). Baron paid for these chartered flights and housing accommodations, including rental payments on a luxury home in Santa Barbara, to the tune of approximately $200,000, all for the benefit of Edwards' campaign. (Ind. ¶ 29). Baron also had a Federal Express envelope containing $1,000 in cash delivered to Young at one of the hotels. The envelope contained a handwritten note from Baron that stated: "Old Chinese saying: Use cash, not credit cards!" (Ind. ¶ 30). Baron

-4-

also transferred $10,000 by wire into a bank account controlled by Young. Baron made these payments for the benefit of Edwards' campaign. (Ind. ¶ 30).

On January 30, 2008, Edwards suspended his presidential campaign, but the John Edwards for President Committee remained in existence. (Ind. ¶ 31). In August 2008, Edwards appeared on ABC's *Nightline* program for an interview. (Ind. ¶ 32). In the interview, Edwards continued to falsely deny fathering the child with Hunter, and also disclaimed any knowledge of funds – that is, the contributions from Mellon and Baron – being paid to Hunter or Young. (Ind. ¶ 32).

In the summer of 2009, Edwards explored with a former campaign employee the idea of issuing a written statement in which Edwards would admit fathering the child. (Ind. ¶ 33). During that time period, Edwards made multiple statements to the employee admitting the affair, the paternity, and his knowledge of Baron's contributions that were used for the cover-up. (Ind. ¶ 33). Although initial versions of Edwards' planned statement included an admission that he knew during the campaign that Baron's funds were being used to support Hunter, he later told the employee that it was a huge issue and decided against including any admission about Baron for what he termed "legal and practical reasons." (Ind. ¶ 33).

Edwards and his conspirators sought to conceal Mellon's and Baron's prohibited contributions from the public and the FEC. (Ind. ¶¶ 19, 31). The Election Act required campaign committees to file periodic campaign finance reports with the FEC, in

-5-

order to provide a transparent public record of the amounts and sources of contributions. (Ind. ¶¶ 11, 12). Edwards, through his campaign committee, was required to and did, in fact, file these periodic reports with the FEC. (Ind. ¶ 11). However, Edwards caused his campaign committee to create and submit false and deceptive campaign finance reports that failed to report the hundreds of thousands of dollars in contributions from Mellon and Baron. (Ind. ¶¶ 31, 43).

The key questions in this case are (1) whether the money Mellon gave, and the money Baron gave and spent, were illegal contributions, and (2) whether Edwards was aware that they were illegal contributions and intentionally violated the law by accepting and failing to disclose them.

## III.    Procedural Framework for Edwards' Motions

Edwards has moved under Federal Rule of Criminal Procedure 12(b)(3) to dismiss the Indictment because, he alleges, (1) the Indictment is unconstitutionally vague as to what is charged; (2) even accepting the facts alleged in the Indictment as true, no crime occurred; and (3) the law did not provide Edwards constitutionally adequate notice that his conduct violated the campaign finance laws. (Edwards' Memorandum in Support of Motion to Dismiss #1 ("Edwards Brf. #1") at 1).

In order to prevail on a pretrial motion to dismiss an indictment for failure to allege a crime, a defendant must "demonstrate that the allegations therein, even if true, would not state an offense." *United States v. Thomas*, 367 F.3d 194, 197 (4th Cir. 2004)

-6-

(citation omitted). In assessing such a motion, the Court asks whether "the specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation." *United States v. Bergrin*, No. 10-2204, 2011 WL 1366388, at *4 (3d Cir. April 20, 2011) (citing *United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002)). In doing so, the Court must accept the facts alleged in the Indictment as true and judge it on its face. *Thomas*, 367 F.3d at 197 & n.1; *United States v. Souder*, No. 1:08cr00136-1, 2009 WL 88919, at *5 (M.D.N.C. Jan. 12, 2009) ("There is no federal criminal procedural mechanism that resembles a motion for summary judgment in the civil context.") (quoting *United States v. Yakou*, 428 F.3d 241, 246 (D.C. Cir. 2005); *Bergrin*, 2011 WL 1366388, at *4; *United States v. Salman*, 378 F.3d 1266, 1267-68 (11th Cir. 2004) (looking beyond face of indictment tantamount to improperly granting summary judgment in criminal case); *United States v. Ferro*, 252 F.3d 964, 968 (8th Cir. 2001) (criminal procedure rules do not provide for pretrial determinations of sufficiency of evidence).

Although Edwards pays lip service to this requirement, Edwards Brf. #1 at 1, 39, as discussed in detail below, he repeatedly disregards it throughout his brief by making factual allegations beyond the face of the Indictment and effectively asking this Court to rule on fact questions that are properly reserved to the jury.

## IV.    Applicable Law

The Federal Election Campaign Act (2 U.S.C. §§ 431-455) ("Election Act")
sets clear and strict limits on the amounts that individuals may contribute to candidates
for federal office and their campaigns.  Title 2, United States Code, Section 441a(f)
expresses the bedrock criminal violation at issue in this case: acceptance of excessive
contributions is prohibited.

> No candidate or political committee shall knowingly accept
> any contribution or make any expenditure in violation of the
> provisions of this section.  No officer or employee of a
> political committee shall knowingly accept a contribution
> made for the benefit or use of a candidate, or knowingly make
> any expenditure on behalf of a candidate, in violation of any
> limitation imposed on contributions and expenditures under
> this section.

2 U.S.C. § 441a(f).  It is thus prohibited for a presidential candidate or an agent thereof to
accept contributions in excess of the legal limit, which in 2008 was $2,300 for
individuals.  2 U.S.C. § 441a(a)(1)(A) and (f).

Criminal liability attaches through another section of the Election Act that
provides:

> Any person who knowingly and willfully commits a violation
> of any provision of this act which involves the making,
> receiving, or reporting of any contribution, donation, or
> expenditure aggregating $25,000 or more during a calendar
> year shall be fined under Title 18, or imprisoned for not more
> than 5 years, or both.

2 U.S.C. § 437g(d)(1)(A)(i).

In pertinent part, Section 431 defines "contribution" as follows:

The term "contribution" includes–

any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office.

2 U.S.C. § 431(8)(A)(i).[2]

"Expenditure" is also a defined term in the Election Act and includes, in pertinent part,

any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office.

2 U.S.C. §431(9)(A)(i).[3]  Under the Election Act, expenditures that are coordinated with a candidate are also considered contributions:

For purposes of this subsection– . . .

expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents, shall be considered a contribution to such a candidate.

---

[2]     Following this description of what the term "contribution" includes, there is a lengthy statutory description of what it does not include.  None of the exclusions applies here.

[3]     As is the case with the definition of "contribution," following the description of what the term "expenditure" includes, there is a lengthy statutory description of what it does not include.  None of the exclusions applies here.

2 U.S.C. §441a(a)(7)(B)(i).[4]

Finally, Title 11, Section 113.1(g)(6) of the Code of Federal Regulations provides that third party payment of expenses for a candidate's personal use are also contributions under the Election Act "unless the payment would have been made irrespective of the candidacy":

> Third party payments. Notwithstanding that the use of funds for a particular expense would be a personal use under this section, payment of that expense by any person other than the candidate or the campaign committee shall be a contribution . . . to the candidate unless the payment would have been made irrespective of the candidacy.[5]

In sum, the applicable law and regulation make clear that a candidate may not receive excessive contributions from individual donors, and that a candidate may not circumvent this core prohibition simply by having an individual donor make a coordinated expenditure or pay a personal expense directly. As discussed in detail below, all of the payments alleged in the Indictment fit squarely within these prohibitions.

---

[4]     These expenditures are commonly referred to in shorthand as "coordinated expenditures," even though the word "coordinated" does not appear in the definition.

[5]     Because Congress has expressly authorized the FEC to prescribe rules and regulations to carry out the provisions of the Election Act, 2 U.S.C. § 438(a)(8), such regulations must be given "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron, U.S.A., Inc. v. Nat'l Resources Defense Council, Inc.*, 467 U.S. 837, 843-44 (1984); *Suisa v. Holder*, 609 F.3d 314, 319 (4th Cir. 2010) (quoting *Chevron*).

## V.    FEC Advisory Opinions

The Federal Election Commission ("FEC") routinely applies the various provisions of the Election Act and its associated regulations to all manner of fact situations. The Commission has consistently viewed gifts or loans made to a candidate to pay his personal expenses, where such funds were given because the candidate was running for office, as contributions to his campaign. *See, e.g.*, *William E. Schluter*, Comm. Resp. Adv. Op. 1976-84 (Oct. 4, 1976) ("subsistence payments" from family member for candidate's routine living expenses deemed to be contributions); *Thomas E. Jagger*, FEC Adv. Op. 1978-40 (Sept. 1, 1978) (contribution limits apply to loans received by candidate for personal and family living expenses during period in which he was evaluating his candidacy); *Ronald R. Hein*, FEC Adv. Op. 1982-64 (Feb. 10, 1983) (contribution limits apply to post-campaign solicitation and receipt of money to repay bank loan for personal expenses incurred during campaign). The *Schluter*, *Jagger*, and *Hein* opinions are attached to this Memorandum as Exhibits A through C, respectively.[6]

---

[6]    Congress has vested in the FEC "primary and substantial responsibility for administering and enforcing the [Election] Act," and has imbued it with "extensive rulemaking and adjudicative powers." *Buckley v. Valeo*, 424 U.S. 1, 109-10 (1976). Advisory Opinions issued by the FEC provide considerable guidance in this area, and as many courts of appeals have recognized, such opinions are entitled to substantial deference. *See, e.g.*, *Federal Election Comm'n v. National Rifle Ass'n of America*, 254 F.3d 173, 182 (D.C. Cir. 2001) ("We review the Commission's interpretation of its own regulations pursuant to an exceedingly deferential standard.") (internal quotation marks and citation omitted); *Teper v. Miller*, 82 F.3d 989, 997 (11th Cir. 1996); *Federal Election Comm'n v. Ted Haley Congressional Comm.*, 852 F.2d 1111, 1115 (9th Cir.

Among the long line of such FEC opinions is *Philip D. Harvey*, FEC Adv.

Op. 2000-08 (June 14, 2000) (attached to this Memorandum as Exhibit D), which

involved circumstances very similar to this case. Philip D. Harvey is a wealthy and

successful businessman renowned for his philanthropic work implementing family

planning programs and HIV/AIDS education in third-world countries. *See*

http://en.wikipedia.org/wiki/Phil_Harvey. In 2000, Harvey requested advice from the

FEC on his desire to make a gift to a candidate for federal office. Among other things,

Harvey included the following assertions in his proposal to the Commission:

1.      the candidate was neither a personal friend nor a relative, and Harvey had

        never before given the candidate a gift;

2.      under the tax code, Harvey could make a non-taxable gift of up to $10,000

        to anyone;

---

1988) (FEC Advisory Opinions to be accepted by the court "unless demonstrably
irrational or clearly contrary to the plain meaning of the statute."). The deference
accorded FEC opinions remains the same in the context of a criminal case. *See, e.g.*, *In re
Sealed Case*, 223 F.3d 775, 779 (D.C. Cir. 2000) ("irrelevant" that FEC's prevailing
interpretation was established in context of agency enforcement, even though case at bar
was criminal); *United States v. Kanchanalak*, 192 F.3d 1037, 1047 & n.17 (D.C. Cir.
1999) (rejecting defendant's argument that in criminal case involving "soft money"
reporting to FEC, no *Chevron* deference should obtain: "That criminal liability is at issue
does not alter the fact that reasonable interpretations of the act are entitled to deference.").

3.   Harvey's purpose for the gift was his desire, as a citizen of the United States, to show his gratitude that the candidate was seeking Federal office and was willing to engage in a difficult campaign;

4.   Harvey did not always agree with the candidate's positions, and did not wish to directly support his campaign;

5.   Harvey would not make the gift to influence a Federal election, but to "express my deep appreciation to this individual for foregoing opportunities in the private sector in order to serve his country";

6.   Harvey was willing to place any necessary restrictions on the gift to preclude the candidate from using any of it to defray campaign expenses;

7.   Harvey intended the gift to be used solely for the candidate's personal expenses; and

8.   Harvey would be willing to make the gift anonymously, to avoid the appearance of attempting to curry favor with the candidate.

The FEC concluded that, even under the conditions Harvey proposed, his gift would be a contribution under the Election Act. The Commission began by recounting the definition of "contribution" in the Act. It then pointed out that candidates are permitted to make unlimited campaign expenditures from personal funds, which includes such things as salary, investment income, and gifts "of a personal nature which had been customarily received prior to candidacy." The FEC then noted the prohibition

-13-

on conversion of campaign funds to personal use, and cited to the regulation, noted above, classifying third party payment of personal expenses as contributions (11 C.F.R. § 113.1(g)(6)).

Applying those principles to Harvey's proposal, the FEC concluded that notwithstanding Harvey's *express* intention that the gift was not to "influence a Federal election," Harvey had conceded that the gift would be made, in the Commission's words, "in recognition and support of that person's desire to run for office." As a result, the Commission concluded:

> the proposed gift would not be made but for the recipient's status as a Federal candidate; it is, therefore, linked to the Federal election. Accordingly, this gift would be considered a contribution under the Act and Commission regulations.

*Harvey*, FEC Adv. Op. 2000-08, at 3.

The FEC went on to elaborate that this conclusion would hold even with the condition that the gift only be used for "personal expenses" and not for campaign expenses (citing to 11 C.F.R. § 113.1(g)(6)), and even if the gift were given anonymously (because anonymity "makes no difference" as to whether the gift was made for the purpose of influencing an election).

The parallels between *Harvey* and the present case are obvious. Indeed, the only significant difference that exists between Harvey and the donors here is that – as the evidence will show at trial – unlike Harvey, Mellon and Baron *did* agree with Edwards'

-14-

positions and not only wanted to directly support his campaign, but in fact did so, contributing the maximum allowable amount.  (Ind. ¶¶ 22, 29).  Mellon began supporting Edwards politically in 2004, and Baron was Edwards' Finance Chair in the 2008 campaign.  (Ind. ¶¶ 4, 5).  This difference makes the FEC's conclusion ***even more*** applicable to Mellon's and Baron's monies than Harvey's.

Edwards and his legal team are well aware of the line of cases discussed above, including the *Harvey* opinion, but they have failed to bring any of them to the Court's attention.[7]  But as is demonstrated by the opinions cited above – spanning nearly 25 years – the FEC's view has never wavered on this score.  As it pointed out in *Harvey*, ***even before the regulation at 11 C.F.R. § 113.1(g)(6) existed***, the Commission "consistently viewed gifts or loans made to a candidate to pay his personal expenses, where such funds were given because the candidate was running for office, as contributions to his campaign."  *Harvey*, FEC Adv. Op. 2000-08, at 3 n.4.

Furthermore, even the most recent such opinion – *Harvey* – has been around for quite some time.  Although it has not been cited in any judicial opinions since it was issued on June 14, 2000, Congress amended the Election Act later that same year

---

[7]     Edwards' failure to mention *Harvey* is particularly striking because one of the former FEC Commissioners whose opinion he touts so heavily, Scott Thomas, was among the Commissioners who voted to approve the *Harvey* opinion at the time.  *See* Certification of Vote for Advisory Opinion 2000-08, attached to this Memorandum as Exhibit E.

-15-

and in 2002, and did not modify in either amendment the portions relevant here, including

the key portion of the definition of "contribution." *See* Pub. L. 106-346 (Oct. 23, 2000);

Pub. L. 107-155 (March 27, 2002). As a result, Congress may be deemed to have

accepted the approach articulated in *Harvey* and its predecessor opinions. "'Congress is

presumed to be aware of an administrative or judicial interpretation of a statute and to

adopt that interpretation when it re-enacts a statute without change.'" *Forest Grove*

*School District v. T.A.*, ___ U.S. ___, 129 S. Ct. 2484, 2492 (2009) (quoting *Lorillard v.*

*Pons*, 434 U.S. 575, 580 (1978)).

## ARGUMENT

**I.      The Indictment Is Not Unconstitutionally Vague**

To meet the guarantees of the Fifth and Sixth Amendments to the United

States Constitution, an indictment is sufficient if it (1) contains the elements of the

offense charged and fairly informs a defendant of the charge against him, and (2) enables

him to plead double jeopardy as a bar to future prosecutions for the same offense. *See*

*Hamling v. United States*, 418 U.S. 87, 117 (1974).[8] An indictment that tracks the

_____

[8]      Federal Rule of Criminal Procedure 7(c)(1) put an end to rules of technical
and formalized pleading characteristic of an earlier era. *Russell v. United States*, 369 U.S.
749, 762-63 (1962). The modern trend in determining sufficiency of an indictment has
been toward a more liberal, reasonable and realistic view as embodied in this Rule.
*United States v. Matzkin*, 14 F.3d 1014, 1019-20 (4th Cir. 1994). "[T]he practice of fine
combing an indictment for verbal and technical omissions is no longer countenanced in
the courts, and . . . a substantial compliance with the purpose of an indictment to acquaint
defendant with offense of which he stands charged, so that he can prepare his defense and

-16-

statutory language is normally sufficient, if it contains all the elements and is accompanied by a statement of facts that adequately apprises the defendant of the charges against him. *See, e.g.*, *Hamling*, 418 U.S. at 117; *United States v. Lockhart*, 382 F.3d 447, 449 (4th Cir. 2004); *United States v. Bolden*, 325 F.3d 471, 490 (4th Cir. 2003); *United States v. Fogel*, 901 F.2d 23, 25 (4th Cir. 1990); *United States v. American Waste Fibers Co.*, 809 F.2d 1044, 1046-47 (4th Cir. 1987).

Each count of the Indictment in this case sets forth the elements of the offense charged, tracks the statutory language, and informs the defendant with specificity of the charges against him. This includes a detailed listing of overt acts describing with precision, among other things, the sources, timing, amounts, and purpose of the various payments constituting illegal contributions. Accordingly, the Indictment is sufficient and should not be dismissed.

Edwards grudgingly acknowledges that paragraph 9 of the Indictment sets forth the various statutory grounds by which payments can be contributions, but attacks the Indictment for not specifying which of the grounds applies to each count, claiming that this renders the Indictment unconstitutionally vague and presents double jeopardy problems. (Edwards Brf. #1 at 10). He further claims that the various grounds alleged in

protect himself against double jeopardy, is sufficient." *Risken v. United States*, 197 F.2d 959, 963 (8th Cir. 1952) (quoting *Hartwell v. United States*, 107 F.2d 359, 362 (5th Cir. 1939)).

paragraph 9 of the Indictment are "mutually exclusive," thereby rendering the Indictment

internally inconsistent and repugnant. (Edwards Brf. #1 at 4-5, 14). Edwards' arguments

are meritless, rely on inapposite caselaw, and should be rejected.

A.      The Indictment's Reference to Various Means By Which Payments
        Can Constitute Contributions is Proper

        Is is neither unusual nor improper for an indictment to allege various means

of committing a single crime in the same count. According to Federal Rule of Criminal

Procedure 7(c)(1), "[i]t may be alleged in a single count that the means by which the

defendant committed the offense are unknown or that the defendant committed it by one

or more specified means." As the Supreme Court has held:

> Our cases reflect a long-established rule of the criminal law
> that an indictment need not specify which overt act, among
> several named, was the means by which a crime was
> committed. In *Andersen v. United States*, 170 U.S. 481
> (1898), for example, we sustained a murder conviction against
> the challenge that the indictment on which the verdict was
> returned was duplicitous in charging that death occurred
> through both shooting and drowning. In holding that "the
> Government was not required to make the charge in the
> alternative," *id.*, at 504, we explained that it was immaterial
> whether death was caused by one means or the other. *Cf.*
> *Borum v. United States*, 284 U.S. 596 (1932) (upholding the
> murder conviction of three codefendants under a count that
> failed to specify which of the three did the actual killing); *St.*
> *Clair v. United States*, 154 U.S. 134, 145 (1894).

*Schad v. Arizona*, 501 U.S. 624, 631 (1991) (alternative citation forms omitted). The

Court also held that as a result, trial juries need not unanimously agree on the means the

-18-

defendant used to commit the crime.  *Schad*, 501 U.S. at 631 ("We have never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission, any more than the indictments were required to specify one alone."), 649 ("[I]t has long been the general rule that when a single crime can be committed in various ways, jurors need not agree upon the mode of commission." (Scalia, J., concurring)).

       *Schad* involved Arizona's murder statute, but its reasoning has by no means been restricted to cases involving state statutes or murder.  In *United States v. Stewart*, 433 F.3d 273 (2d Cir. 2006), the indictment alleged a violation of Title 18, United States Code, Section 1001 and included two theories of liability – concealment under Section 1001(a)(1) and making a false statement under Section 1001(a)(2) – in the same count. The defendant argued that the district court had erred in refusing to give the jury an instruction that they must unanimously agree as to which theory applied.  The court of appeals found that there was no error, because the various theories alleged in the relevant count of the indictment were "not separate offenses, as [defendant] suggests; rather they describe different means by which the statute is violated."  *Stewart*, 433 F.3d at 319 (citing *Schad*, among other cases).[9]

---

    [9]     It is worth noting that Section 1001 carries the same "knowingly and willfully" requirement that the Election Act offenses charged here do.

In *United States v. Crisci*, 273 F.3d 235 (2d Cir. 2001), the indictment charged, in the same count, bank fraud under the two theories enumerated in the statute: a scheme to defraud a financial institution (18 U.S.C. § 1344(1)) and a scheme to obtain assets of a financial institution by false pretenses (18 U.S.C. § 1344(2)). The defendant argued on appeal, as Edwards does here, that the indictment failed to give him adequate notice and presented double jeopardy problems. The court of appeals noted that Crisci's argument depended on interpreting subsections 1344(1) and 1344(2) as separate crimes, rather than two means of committing the single crime of bank fraud. The court rejected that argument, joining several other circuits (including the Fourth) in holding that the two subsections expressed two ways of committing the same crime. *Crisci*, 273 F.3d at 238-39 (citing, among other cases, *United States v. Celesia*, 945 F.2d 756, 758-59 (4th Cir. 1991)).

In *United States v. Bolden*, 325 F.3d 471 (4th Cir. 2003), the indictment charged, in the same count, money laundering under two distinct theories ("promotion money laundering" and "concealment money laundering"). *See* 18 U.S.C. § 1956(a)(1). The court of appeals noted that charging two different theories in the same count was proper. *Bolden*, 325 F.3d at 487 n.19. The court also observed that the jury instructions the trial court had given that required the jury to find the defendants guilty under ***both*** theories in order to convict were "unnecessarily favorable to them" because conviction could have been premised on proof of either theory. 325 F.3d at 487 n.20.

-20-

Another example is found in *Hedrick v. True*, 443 F.3d 342 (4th Cir. 2006). The indictment there charged the defendant with committing forcible sodomy via several different means, including oral and anal penetration. The defendant argued that his counsel had been ineffective for failing to request a jury instruction requiring unanimity on whether his penis had penetrated the victim's mouth or anus. The Fourth Circuit disagreed, observing that "unanimity as to the means of commission of a crime is not constitutionally required for conviction." *Hedrick*, 443 F.3d at 356 (citing *Schad*); *see also United States v. Hofus*, 598 F.3d 1171, 1176-77 (9th Cir. 2010) (in child enticement case, trial court's failure to instruct jury that it must unanimously agree on which particular act constituted a "substantial step" not error; jury need only unanimously agree that the "substantial step" requirement has been satisfied) (citing *Schad*).

None of the cases Edwards cites is to the contrary. Although the quotations Edwards has cherry-picked from his cases use phrases like "sufficiently apprises," "specific charge," and "state with particularity" to describe requirements for a constitutionally sufficient indictment, scratching barely below the surface of any of the cases reveals that none stands for the proposition he claims they do: that an indictment – like this one – that alleges the various means by which a defendant can commit a single crime is constitutionally infirm for failing to specify which of the various means applies.

*Russell v. United States*, 369 U.S. 749 (1962), involved charges that the defendants had unlawfully refused to answer questions before a congressional

subcommittee. The statute required that in order for criminal liability to attach, the refusal to answer must be to a question "pertinent to the question under inquiry" by the subcommittee. The indictments at issue were deficient because they did not identify – at all – the question under inquiry when the defendants refused to answer. The Court found this to be a "specific identification of fact" that was crucial to any prosecution under the statute. *Russell*, 369 U.S. at 764. There is no such issue in this case.

In *United States v. Hooker*, 841 F.2d 1225 (4th Cir. 1988) (en banc), the court held the indictment to be insufficient because it failed to allege an essential element of the crime charged – an affect on interstate commerce – that was necessary to confer federal jurisdiction. 841 F.2d at 1231-32. Similarly, *United States v. Hayes*, 775 F.2d 1279, 1282-83 (4th Cir. 1985), also involved the indictment's failure to allege an essential element of the crime – a subsequent overt act in furtherance of unlawful activity – as statutorily required by the Travel Act. No such deficiency is present here. All essential elements of the crimes charged are alleged in the Indictment.

In *Stroud v. Polk*, 466 F.3d 291 (4th Cir. 2006), the defendant, Stroud, was convicted in North Carolina state court of first degree murder. The trial judge had given the jury an instruction that they could convict Stroud if they found he had committed murder under any of three theories, including by torture, even though the indictment did not mention torture at all. The jury rendered a special verdict indicating that they convicted on the torture theory and another theory, but not the third. Stroud argued that

-22-

the indictment was flawed because it omitted an essential element of the crime by lacking any reference to the torture theory, and that his due process rights were violated because he never had notice of the torture theory. However, the Fourth Circuit rejected Stroud's claim:

> What Stroud seems to ask us to hold is that the Constitution requires the prosecution to provide a defendant notice of the first degree *murder theory* it intends to pursue. In *Hartman,* though addressing more routine circumstances, we expressly rejected this contention, explaining that "the Constitution does not require the method by which the crime was committed to be alleged in the indictment."

*Stroud*, 466 F.3d at 297 (quoting *Hartman v. Lee*, 283 F.3d 190, 194 n.3 (4th Cir. 2002)). Edwards cites *Stroud* for the sentence, "Elementary principles of due process require that an accused be informed of the specific charge against him." (Edwards Brf. #1 at 12). But the *Stroud* court drew that statement from its opinion in *Hartman*, on which it relied and in which it "took great care . . . to stress that our holding did not undermine these fundamental principles." *Stroud*, 466 F.3d at 296. *Stroud* supports the Government's position, not Edwards'.

Finally, in *United States v. Smolar*, 557 F.2d 13 (1st Cir. 1977), the trial court gave a jury instruction that effectively eliminated an allegation in the indictment, thereby shifting the basis for liability from "outright fraud" to "breach of fiduciary duty." *Smolar*, 557 F.2d at 18. The court of appeals reversed the conviction as as result. The court's reasoning illustrates that *Smolar* too supports the Government's position here, not

-23-

Edwards': "Since the court's instruction did not simply remove from the jury's consideration one of several theories of fraud alleged, but instead materially altered the theory of criminal liability set forth in the indictment, it cannot be said that the indictment sufficiently apprised appellants of the nature of the charges against them." *Smolar*, 557 F.2d at 19 (internal citation omitted). The distinction the court drew in *Smolar* between alleging several theories of fraud and alleging materially different crimes is the same distinction drawn in *Schad* and the other cases the Government has cited above, and implicitly assumes the same proposition for which those cases stand: alleging multiple means by which a defendant commits a single crime is proper.

In the present case, each of Counts Two through Five charges Edwards with a single crime: acceptance and receipt of contributions from a certain person in a specified calendar year, in excess of the limits prescribed by the Election Act. The various ways that payments can be subject to the Election Act's limits, as laid out in paragraph 9 of the Indictment (and incorporated by reference into each of Counts Two through Five), allege not separate and distinct crimes, but rather various ways that the single crime charged can be committed. Accordingly, the Indictment here is neither duplicitous nor improper and there is no requirement that the trial jury – much less the grand jury – be unanimous on the mode by which the monies at issue are "contributions."

**B.    The Various Means Alleged in the Indictment Are Not Inconsistent**

Edwards' argument that the means by which a payment can be subject to the Election Act's limit as described in the Indictment – contributions, coordinated expenditures, and third party payment of personal expenses – are mutually exclusive is based on at least two faulty premises and is logically flawed.

The first faulty premise stems from Edwards' supplying the word "direct" before "contributions" to describe his first category of allegedly inconsistent means, despite that "direct" appears nowhere in the statute or the Indictment.  (Edwards Brf. #1 at 4, 5, 10, 13).  The fact is, "contributions" simply describes the class of payments subject to regulation under the pertinent provisions of the Election Act.  Edwards' addition of the word "direct" makes it seem as though the Indictment alleges some separate category, but it does not.  Coordinated expenditures are simply a subset of contributions.  That this poses no logical inconsistency is obvious from the similarity of the statutory definitions of "contribution" and "expenditure."  In pertinent part, the Election Act defines a "contribution" as

> any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office.

2 U.S.C. § 431(8)(A)(i), and defines an "expenditure" as

> any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office.

-25-

2 U.S.C. §431(9)(A)(i). Not only are the two definitions not inconsistent, they plainly overlap. A coordinated expenditure – which the Election Act says is considered to be a contribution – is simply an expenditure that is made "in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents." 2 U.S.C. §441a(a)(7)(B)(i). Nothing about this additional requirement is logically inconsistent or mutually exclusive of the notion of a contribution. It simply defines the subset of expenditures that count as contributions.

Edwards' additional argument that coordinated expenditures are mutually exclusive of third party payments of a candidate's personal expenses is clever, but equally logically flawed. To set up his argument, Edwards points out (correctly) that in order for a payment to be an "expenditure," it must be made "for the purpose of influencing any election for Federal office." (Edwards Brf. #1 at 4 n.4, 2 U.S.C. § 431(9)(A)(i)). He also points out (correctly) that in order for a third party's payment of a candidate's personal expense to be treated as a contribution, (1) the expense must in the first instance be "personal," that is, it must exist irrespective of the campaign, and (2) the third party payment of the expense must be made not irrespective of the campaign. (Edwards Brf. #1 at 4 & n.5, 11 C.F.R. §§ 113.1(g) and 113.1(g)(6)).

The correctness of Edwards' statements ends when he tries to construct his argument, however. He argues that a coordinated expenditure – which must be made for the purpose of influencing an election – cannot be the payment of a "personal use"

-26-

expense because such expense must exist "irrespective of the campaign."  (Edwards Brf.

#1 at 5).  However, in promulgating 11 C.F.R. § 113.1(g)(6), the FEC itself considered

and rejected the exact argument Edwards makes here.  *See Contribution and Expenditure*

*Limitations and Prohibitions: Personal Use of Campaign Funds; Final Rule*, 60 Fed.

Reg. 7862, 7871 (Feb. 9, 1995) (noting receipt of comments expressing identical

argument and adopting regulation despite them).

Even had the FEC not already expressly rejected Edwards' claim, his

argument is illogical.  The flaw in Edwards' argument is that he is making the wrong

comparison.  Whether the expense ***exists*** irrespective of the campaign is a separate

question from a donor's ***purpose*** in paying the expense.[10]  When one makes the correct

comparison of the ***purposes*** required of the two types of payments in order for them to be

contributions – "for the purpose of influencing any Election" and "not irrespective of the

campaign" – there is no inconsistency whatsoever.  *See Contribution and Expenditure*

*Limitations and Prohibitions: Personal Use of Campaign Funds; Final Rule*, 60 Fed.

Reg. at 7871 ("If a third party pays for the candidate's personal expenses, but would not

ordinarily have done so if that candidate were not running for office, the third party is

effectively making the payment for the purpose of assisting that candidacy.").

---

[10]     *See also KITPAC*, FEC Adv. Op. 2008-17 (Dec. 22, 2008) (attached as Ex.
5 to Edwards Brf. #1), at 4 (discussing the distinction).

The various means included in the Indictment by which payments can be subject to the Election Act's limits are neither inconsistent nor mutually exclusive. Edwards' argument should be rejected.

### C. There Is No Double Jeopardy Problem

Edwards also argues that the Government's failure to specify by which means the various payments at issue in the case constituted contributions presents a double jeopardy problem. (Edwards Brf. #1 at 13 n.9). Edwards is wrong.

The Supreme Court has formulated the question of whether there is a double jeopardy problem for a given defendant as "in case any other proceedings are taken against him for a similar offense whether the record shows with accuracy to what extent he may plead a former acquittal or conviction." *Russell*, 369 U.S. at 764 (citing cases). In *Russell*, the Court held that this criterion had been satisfied by virtue of the specificity with which the facts and circumstances had been pled in the indictments:

> Without doubt the [double jeopardy criterion] was sufficiently met by the indictments in these cases. Since the indictments set out not only the times and places of the hearings at which the petitioners refused to testify, but also specified the precise questions which they then and there refused to answer, it can hardly be doubted that the petitioners would be fully [p]rotected from again being put in jeopardy for the same offense. . . .

369 U.S. at 764.

Similarly, the Indictment in this case lays out with specificity the sources, amounts, and dates of the illegal contributions that Edwards accepted and received. The suggestion that if a jury acquitted Edwards in this case, the Government could bring additional charges in a new indictment based on the same payments but under a different theory is nonsense. Indeed, one could argue that it is precisely ***because*** the Indictment alleges various means by which the payments could constitute contributions that Edwards is insulated from being placed in double jeopardy. If the jury acquitted Edwards on the present Indictment, he would be able to argue that the jury considered all of the various means by which the payments could be contributions and rejected them all. Edwards' argument that the Indictment presents a double jeopardy problem is baseless.

## II.    Edwards' Statutory Construction Argument is Meritless

Although the precise claim that Edwards makes in Point II of his brief is not entirely clear, he appears to argue that this Court must interpret the Election Act's contribution limits to apply only to payments that are made for a single purpose that is "unambiguously campaign related." (Edwards Brf. #1 at 14-25). He then argues that if the Court so construes the statute, the payments at issue in this case cannot be contributions as a matter of law, and therefore, the Indictment should be dismissed. (Edwards Brf. #1 at 25-32). Both halves of the argument are meritless and should be rejected.

-29-

### A.     The Government's Position

As an initial matter, and in light of Edwards' repeated mischaracterizations of the Government's position on what the statute encompasses, it is worth noting what the Government's position is.  The Government's position is that (a) any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office, is a contribution; (b) any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office, that is also made in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents, is a contribution; and (c) payment of a personal expense by any person other than the candidate or the campaign committee, that would not have been made irrespective of the candidacy, is a contribution.  Statements (b) and (c) above make it clear that a candidate may not circumvent the core contribution limitation by requesting that others pay for goods or services for his (or his campaign's) benefit, or by accepting others' payment for such things.  This position is not a Government "reading," "construction," or "interpretation." (Edwards Brf. #1 at 18, 20, 22).  It is a verbatim recitation of the relevant statutes and regulation set forth at pages 7-10 above.  Furthermore, as discussed above, the FEC has consistently viewed gifts or loans made to a candidate to pay his personal expenses,

-30-

where such funds were given because the candidate was running for office, as campaign contributions subject to the Election Act.

**B.** **Edwards' Argument Should be Rejected**

Edwards does not appear to mount a facial challenge to these provisions, nor could he – the Supreme Court has upheld the Election Act's limits on contributions and coordinated expenditures against constitutional challenges grounded in the First Amendment, and has repeatedly recognized this holding. *Buckley v. Valeo*, 424 U.S. 1, 28-29 (1976); *California Medical Assn. v. Federal Election Comm'n,* 453 U.S. 182, 193-199 (1981); *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 386-87 (2000); *Federal Election Comm'n v. Colorado Republican Federal Campaign Comm.*, 533 U.S. 431, 441-42, 455 (2001) ("*Colorado II*"); *Citizens United v. Federal Election Comm'n*, ___ U.S. ___, 130 S. Ct. 876, 901-02 (2010).

Instead, Edwards mounts a statutory construction argument that this Court must construe "for the purpose of influencing any election for Federal office" to mean "for a sole and exclusive purpose that is unambiguously related to a campaign," because any other construction would violate the First Amendment.

Before explaining why Edwards' argument is wrong, an important introductory note is in order. The Court need not resolve this statutory construction question at the pretrial stage, because even if the Court were to conclude that Edwards' reading is correct, this conclusion would not be a basis to dismiss the Indictment.

-31-

Because the Indictment on its face alleges that "after already contributing to EDWARDS the maximum amount allowable under the law, [Mellon] agreed to provide additional money to EDWARDS *to help him become President of the United States*," Ind. ¶ 22 (emphasis added), that "after already contributing to EDWARDS the maximum amount allowable under the law, [Baron] paid for the following travel and living expenses . . . *all for the benefit of EDWARDS' campaign*," Ind. ¶ 29 (emphasis added), and that "[a]fter already contributing to EDWARDS the maximum amount allowable under the law," Baron provided money "*for the benefit of EDWARDS' campaign*," Ind. ¶ 30 (emphasis added), it is plainly sufficient, even under Edwards' reading. A ruling on this issue would, in essence, amount only to a pretrial ruling relating to the jury instructions on how to evaluate whether Mellon's and Baron's payments were made "for the purpose of influencing any election for Federal office."

We turn now to the reasons why the Court should reject Edwards' proposed reading, should it choose to resolve the issue before trial. Edwards purports to base his argument on *Buckley* and *North Carolina Right to Life v. Leake*, 525 F.3d 274 (4th Cir. 2008) ("*NCRL*"), but the quotations he extracts from those opinions do not support his position.

-32-

1.    **There is No Authority for Construing "For the Purpose of Influencing Any Election for Federal Office" in the Definition of "Contribution" to Mean "Unambiguously Related to a Campaign"**

Any discussion of federal regulation of campaign finance must begin with the Supreme Court's decision in *Buckley*. Nowhere is Edwards' proclivity to cherry-pick language from an opinion on more prominent display than in his discussion of this case. For starters, it is worth listing the Court's holdings relating to regulation of contributions and expenditures. First and most importantly, in considering the constitutionality of the predecessor to the section involved in this case, the Court answered the question certified to it as follows:

> Does any statutory limitation, or do the particular limitations in the challenged statutes, on the amounts that individuals or organizations may contribute or expend in connection with elections for federal office violate the rights of one or more of the plaintiffs under the First, Fifth, or Ninth Amendment or the Due Process Clause of the Fifth Amendment of the Constitution of the United States?
>
> Does 18 U.S.C. § 608(b) (1970 ed., Supp. IV)[11] violate such rights, in that it forbids the solicitation, receipt or making of contributions on behalf of political candidates in excess of the amounts specified in 18 U.S.C. § 608(b) (1970 ed., Supp. IV)?
>
> Answer: NO.

_____

[11]    This section provided, in pertinent part, that "no person shall make contributions to any candidate with respect to any election for Federal office which, in the aggregate, exceed $1,000."

*Buckley*, 424 U.S. at 59 n.67.  Thus, the Court held that limitations on individual

contributions to a candidate or campaign pass constitutional muster, period.  And this was

so where the definition of "contribution" was practically identical to the definition under

the current Election Act:

> "contribution" means a gift, subscription, loan, advance, or
> deposit of money or anything of value . . ., made for the
> purpose of influencing the nomination for election, or
> election, of any person to Federal office or for the purpose of
> influencing the results of a primary held for the selection of
> delegates to a national nominating convention of a political
> party or for the expression of a preference for the nomination
> of persons for election to the office of President of the United
> States;

18 U.S.C. § 591(e)(1) (1970 ed., Supp. IV) (*see* Appendix to *Buckley*, 424 U.S. at 182).[12]

---

[12]  Edwards makes a passing reference to the rule of lenity, arguing that it requires the term "contribution" to be construed "narrowly."  (Edwards Brf. #1 at 15). But the rule of lenity applies only when a statute suffers from "grievous ambiguity or uncertainty."  *Muscarello v. United States*, 524 U.S. 125, 138 (1998) (citation omitted). As the Court has emphasized, "[t]he simple existence of some statutory ambiguity . . . is not sufficient to warrant application of [the rule], for most statutes are ambiguous to some degree."  *Id.*  Put another way, "[t]he mere possibility of articulating a narrower construction . . . does not by itself make the rule of lenity applicable."  *Smith v. United States*, 508 U.S. 223, 239 (1993).  *Buckley*'s upholding limits on contributions in the context of a statutory definition identical to the one at issue here under "rigorous" First Amendment review, *Buckley*, 424 U.S. at 29, confirms that such definition at a minimum does not contain "grievous ambiguity or uncertainty."  Furthermore, congressional intent that a statute be applied broadly counsels against application of the rule of lenity: "[W]e have always reserved lenity for those situations in which a reasonable doubt persists about a statute's intended scope even *after* resort to the language and structure, legislative history, and motivating policies of the statute."  *Moskal v. United States*, 498 U.S. 103, 108 (1990) (internal quotation and citation omitted).  Here, the plain text of the statutory definition makes clear Congress' intent that (if none of the specifically enumerated

-34-

Unlike the predecessor statute's cap on individual contributions, however,

its cap on independent expenditures did not fare well. That section provided:

> No person may make any expenditure (other than an
> expenditure made by or on behalf of a candidate within the
> meaning of subsection (c)(2)(B)) relative to a clearly
> identified candidate during a calendar year which, when
> added to all other expenditures made by such person during
> the year advocating the election or defeat of such candidate,
> exceeds $1,000.

18 U.S.C. § 608(e)(1) (1970 ed., Supp. IV) (*see* Appendix to *Buckley*, 424 U.S. at 193).

Preliminarily, the Court noted vagueness problems associated with the

meaning of "relative to" in the statute. In order to overcome them, the Court construed

the phrase "to apply only to expenditures for communications that in express terms

advocate the election or defeat of a clearly identified candidate for federal office."

*Buckley*, 424 U.S. at 44. Yet even as so construed, the Court found the predecessor

statute's ceiling on independent expenditures violated the First Amendment. *Buckley*,

424 U.S. at 45. In explaining its rationale, the Court addressed an argument advanced by

---

exceptions applied) it should sweep broadly: "***any*** gift, subscription, loan, advance, or
deposit of money or ***anything*** of value made by ***any*** person for the purpose of influencing
***any*** election for Federal office." Moreover, in discussing construction of the phrase "for
the purpose of influencing" in the context of reporting requirements, the Court recognized
the statute's broad sweep: "In enacting the legislation under review Congress addressed
broadly the problem of political campaign financing. It wished to promote full disclosure
of campaign-oriented spending to insure both the reality and the appearance of the purity
and openness of the federal election process." *Buckley*, 424 U.S. at 78. Edwards'
reference to the rule of lenity is misplaced.

proponents of the statute that invalidating it would enable candidates to circumvent the limit on individual contributions by simply having would-be contributors pay directly for campaign activities. The Court explained that such circumvention would not be possible because expenditures that are controlled by or coordinated with the candidate are treated as contributions, as to which the Court had already validated the statutory limitation:

> The parties defending § 608(e)(1) contend that it is necessary to prevent would-be contributors from avoiding the contribution limitations by the simple expedient of paying directly for media advertisements or for other portions of the candidate's campaign activities. They argue that expenditures controlled by or coordinated with the candidate and his campaign might well have virtually the same value to the candidate as a contribution and would pose similar dangers of abuse. Yet such controlled or coordinated expenditures are treated as contributions rather than expenditures under the Act. Section 608(b)'s contribution ceilings rather than § 608(e)(1)'s independent expenditure limitation prevent attempts to circumvent the Act through prearranged or coordinated expenditures amounting to disguised contributions. By contrast, § 608(e)(1) limits expenditures for express advocacy of candidates made totally independently of the candidate and his campaign.

*Buckley*, 424 U.S. at 46-47; *see also* 424 U.S. at 47 n.53.

Accordingly, Edwards' statement in his brief that the Court found a vagueness problem in the statute's "restriction on third-party expenditures," Edwards Brf. #1 at 17, is deceptive because the vagueness problem obtained only in the section capping *independent* expenditures, not ones that were controlled by or coordinated with the candidate. Edwards' further statement that the Court "solved the constitutional problem"

-36-

by narrowly construing the statute is also incorrect, since the narrowing construction did not solve the constitutional problem – even under that construction, the Court invalidated the statute's limitation on independent expenditures as violating the First Amendment.[13] The statement is also deceptive to the extent it suggests, again, that the Court held that a cap on anything other than ***independent*** expenditures must be narrowly construed.

In short, Edwards has attempted to lift language from the Court's opinion in *Buckley* concerning statutory provisions capping, or requiring reporting to the FEC of, independent expenditures – neither of which is alleged in this case – and wrongly suggest that it applies to ***all*** third-party expenditures. To the contrary, the Supreme Court expressly differentiated between independent and "coordinated or controlled" expenditures, and interpreted the predecessor statute to subsume the latter under the term "contributions," as to which it held the dollar limitations constitutional.[14]

---

[13]     Part of the confusion stems from Edwards' juxtaposition of quotes from two different sections of the *Buckley* opinion.  (Edwards Brf. #1 at 17).  The quote Edwards draws from page 44 of the opinion concerns the Court's reading of the modifying phrase "relative to a clearly identified candidate" in the portion of the predecessor statute imposing dollar limits on expenditures.  The quote Edwards draws from page 80 of the opinion (discussed in detail below) concerns the Court's reading of the phrase "for the purpose of influencing" in the definition of "expenditure" in the context of the predecessor statute's reporting and recordkeeping requirements.  Unlike the dollar limits on expenditures, the reporting and recordkeeping requirements were upheld.

[14]     All that has changed on this score since *Buckley* is that unlike the predecessor statutory scheme, which required the Court to resort to legislative history to derive its conclusion, *see* 424 U.S. at n.53, the Election Act has expressly categorized as contributions expenditures that are "made by any person in cooperation, consultation, or

Edwards' failure to distinguish between the Supreme Court's treatment of contributions and coordinated expenditures, on the one hand, and independent expenditures on the other, infects his entire argument. The phrase "unambiguously related to the campaign" that Edwards repeats throughout his brief arose in the context of independent expenditures, and it has never been applied by the Supreme Court, much less the Fourth Circuit, as a precondition to the regulability of contributions or coordinated expenditures. Edwards' claim that the Supreme Court applied that standard to "create[] parity" (Edwards Brf. #1 at 17), between the way contributions and independent expenditures are treated under the Election Act is wrong. It proceeds from a false premise – that the Supreme Court was concerned in *Buckley* with treating contributions and independent expenditures the same way. To the contrary, the Supreme Court has drawn principled distinctions of kind between contributions and independent expenditures that it has held justify treating them differently.

The Court first drew the distinction in *Buckley*, and has reiterated it repeatedly since then. *See Buckley*, 424 U.S. at 20-22; *Colorado II*, 533 U.S. at 437-38 (noting distinction but pointing out Election Act's "functional" definition of contribution

concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents." 2 U.S.C. §441a(a)(7)(B)(i). It cannot be that this more explicit, more precise formulation than the one at issue in *Buckley* somehow runs afoul of it.

-38-

included ***coordinated*** expenditures); *Shrink Missouri*, 528 U.S. at 386-88; *Federal*

*Election Comm'n v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 259-60 (1986)

("We have consistently held that restrictions on contributions require less compelling

justification than restrictions on independent spending.").  A principal reason for the

differing treatment, the Court has explained, is that First Amendment freedoms are

implicated to a greater degree by independent expenditures than by contributions.  *See*

*Colorado II*, 533 U.S. at 440 ("[E]ver since we first reviewed the 1971 Act, we have

understood that limits on political expenditures deserve closer scrutiny than restrictions

on political contributions. . . .  Restraints on expenditures generally curb more expressive

and associational activity than limits on contributions do.") (citing *Shrink Missouri*, 528

U.S. at 386-88,  *Colorado Republican Federal Campaign Comm. v. Federal Election*

*Comm'n*, 518 U.S. 604, 615 (1996) ("*Colorado I*"), and *Buckley*, 424 U.S. at 19-23).  The

Court first explained why this is so in *Buckley*:

> By contrast with a limitation upon expenditures for political
> expression, a limitation upon the amount that any one person
> or group may contribute to a candidate or political committee
> entails only a marginal restriction upon the contributor's
> ability to engage in free communication.  A contribution
> serves as a general expression of support for the candidate
> and his views, but does not communicate the underlying basis
> for the support. . . .  A limitation on the amount of money a
> person may give to a candidate or campaign organization thus
> involves little direct restraint on his political communication,
> for it permits the symbolic expression of support evidenced by
> a contribution but does not in any way infringe the
> contributor's freedom to discuss candidates and issues.

-39-

424 U.S. at 20-21.

This substantive distinction that the Court has drawn between contributions and independent expenditures explains why, in order to salvage the constitutionality of the predecessor statute's reporting requirements for expenditures, the Court needed to adopt a reading of the definition of "expenditure" in the predecessor statute directed at spending "unambiguously related to the campaign," *Buckley*, 424 U.S. at 80, that it did not need to adopt for the definition of "contribution."[15] Independent expenditures present First Amendment concerns that contributions do not. The same substantive distinction also explains why there is no basis to infer, as Edwards argues, that notwithstanding the absence of any language in *Buckley* (or any other opinion) applying the same reading to the definition of "contribution," the Court nevertheless has imposed it by implication. Edwards says that the phrase is "the limiting principle that led *Buckley* to uphold the constitutionality to the 'contribution' definition," (Edwards Brf. #1 at 18), but neither *Buckley*, nor any of the Supreme Court's opinions since, nor the Fourth Circuit's opinion in *NCRL* supports that conclusion. Edwards' argument is unsupported by the caselaw and undercut by the rationale behind it, and should be dismissed.

---

[15] In the context of reporting requirements, the definition of "expenditure" in the predecessor statute, like the one in the current Election Act, paralleled the definition of "contribution" in including the phrase "for the purpose of influencing . . . the election of any person to Federal office." 2 U.S.C. §§ 431(e) and (f) (1970 ed., Supp. IV) (*see* Appendix to *Buckley*, 424 U.S. at 145, 147).

-40-

## 2.    "For the Purpose of" Does Not Mean "For the Sole Purpose of"

Edwards places significant weight on Congress' use of the definite article "the" in the phrase "for the purpose of influencing any election for Federal office," arguing in effect that it should be interpreted as "the sole" or "the exclusive."  Neither the text nor the purpose of the Election Act supports Edwards' reading.

To make his argument, Edwards relies on a portion of the Fourth Circuit's opinion in *NCRL* that dealt with whether the definition of "political committee" in a North Carolina state campaign finance law was constitutional.  The controversial portion of the definition stated that a group that "[h]as as a major purpose to support or oppose the nomination or election of one or more clearly identified candidates" was a political committee.  *NCRL*, 525 F.3d at 286.  The Fourth Circuit agreed with the plaintiffs in *NCRL* that its conclusion was controlled by the Supreme Court's statement in *Buckley* that only those organizations "under the control of a candidate or the major purpose of which is the nomination or election of a candidate" are regulable as political committees. *Buckley*, 424 U.S. at 79.  The Fourth Circuit found that, when viewed in light of *Buckley*'s goal of ensuring governmental regulation of elections is adequately tailored so as not to violate the First Amendment, the Supreme Court's use of the definite article in the phrase "the major purpose" was critical.  *NCRL*, 525 F.3d at 287.  As a result, the definition of "political committee" in the North Carolina law, which purported to regulate groups with only "a major purpose" to support or oppose a candidate did not pass

-41-

constitutional muster. Edwards tries mightily to analogize from *NCRL* and boldly states that "[t]here is no reason to believe" that the Fourth Circuit would reject his reading of the statute. (Edwards Brf. #1 at 21).

To the contrary, there are plenty of reasons why the Fourth Circuit would reject his reading, and why this Court should as well. To begin with, as a textual matter, the linguistic import of the definite article in "the major purpose of which" is different than it is in "for the purpose of." This is apparent in the opinions of several circuit courts of appeal that have refused to construe the identical phrase "for the purpose of" in other federal statutes to mean "for the sole purpose of." For example, in *United States v. Banks*, 514 F.3d 959 (9th Cir. 2008), the Ninth Circuit considered the phrase in Title 18, United States Code, Section 1959(a), which lists one way of committing a violent crime in aid of racketeering ("VICAR") as "for the purpose of gaining entrance to" the racketeering enterprise. The defendant argued, just as Edwards does here, that the statute's use of the definite article "the" conclusively established that Congress meant "for the ***sole*** purpose of. . .." The court disagreed, and its explanation applies equally well to this case:

> [A]n unforced, natural reading of the plain text provides no support for the interpretation Banks proposes. *See Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004) (stating that courts look to "ordinary or natural meaning" (internal quotations omitted)). The provision itself contains no reference to the defendant's "sole" or "exclusive" or "primary" purpose. . . . Moreover, the language Banks proposes that Congress could have used if

it had intended VICAR to apply to defendants acting from multiple motives – "for *a* purpose" – does violence to ordinary usage, and the awkwardness of his proposed revision demonstrates the implausibility of his argument.  A more natural reading would recognize that "[i]n ordinary usage, doing X 'for the purpose of' Y does not imply that Y is the exclusive purpose."  Indeed, if Congress had meant for VICAR to apply only to defendants acting solely (or primarily) for the purpose of entering a gang or maintaining or enhancing their position within it, it could easily – and much more naturally – have adopted language referring to "the *sole* (or exclusive, or primary) purpose" of the defendant. In sum, "the use of the word 'the' does not bear the weight that [Banks] gives it."

*Banks*, 514 F.3d at 966 (quoting *United States v. Hughes*, 282 F.3d 1228, 1231 (9th Cir. 2002) (rejecting defendant's argument that "for the purpose of" in sentencing guideline provision relating to child exploitation means "for the sole purpose of") (citations omitted)); *see also Banks*, 514 F.3d at 966 n.2 (noting cases similarly interpreting "for the purpose of" in pre-1986 version of Mann Act, including *Dingess v. United States*, 315 F.2d 238, 240 n.2 (4th Cir. 1963)); *United States v. Veazey*, 491 F.3d 700, 706-07 (7th Cir. 2007) (adopting reasoning of *Hughes* in similarly construing child exploitation guideline); *United States v. Heilman*, 377 Fed. App'x 157, 206-07 (3d Cir. 2010) (unpublished) (in VICAR prosecution, district court's instruction to jury that it "need not . . . find that these purposes were the defendant's sole or even principal motive" held proper, citing *Banks*).

-43-

The Fourth Circuit's reasoning in NCRL is not at all inconsistent with these authorities. Unlike "for a purpose of," which, as the Banks court found, does violence to ordinary usage, the phrase "a major purpose of which" does no violence to ordinary usage. Therefore, it is not improper, in construing that phrase, so infer some meaning from substitution of the definite article "the" for the indefinite article, just as the Fourth Circuit did in *NCRL*.[16]

Textual reasons aside, Edwards' reading does not follow from *Buckley*'s goal of ensuring that regulation does not trample freedom of political expression. Edwards cannot plausibly claim that his reading of "the" to mean "the sole" is compelled by the First Amendment. (Edwards Brf. #1 at 20). To be sure, the First Amendment is implicated by campaign contributions. However, the simple act of spending money is ordinarily not speech protected by the First Amendment. The source of a contribution's First Amendment protection derives from its being made for the purpose of influencing an election.[17] This is true regardless of whether a contribution is made solely for the

---

[16]  In footnote 10 of his brief, Edwards recites the Indictment's allegation that "A centerpiece of EDWARDS' campaign was his public image as a devoted family man." (Ind. ¶ 1). He then pretends the Indictment alleges that his image as a family man was "the" centerpiece of the campaign and attacks that characterization. Of course, the Indictment only alleges that it was "a" centerpiece of the campaign, but it is telling that Edwards engages in this sleight of hand in the very portion of his brief emphasizing the distinction between the indefinite article "a" and the definite article "the."

[17] The speech component, while undeniably present, is slight: "the expression rests solely on the undifferentiated, symbolic act of contributing." *Buckley*, 424 U.S. at 21.

purpose of influencing an election or for that purpose among multiple others. The Supreme Court upheld contribution limits in *Buckley* not because the First Amendment does not apply to contributions, but because the Court concluded that ***notwithstanding*** their First Amendment protection, Congress' interest in regulating elections was sufficient to justify the limits. By contrast, a payment that is not made for the purpose of influencing an election is obviously not a contribution under the Election Act, but for reasons that have nothing to do with the First Amendment: the payment would not fall within the statutory definition. Therefore, there is no basis in logic for Edwards to argue that the First Amendment compels his reading. Construing the phrase "in light of *Buckley*'s goals," *NCRL*, 525 F.3d at 287, does not affect the correctness of the straightforward, natural reading of "for the purpose of" adopted in the circuit court opinions discussed above.

Those courts rejected the identical argument Edwards makes here, in construing the identical phrase at issue here, and Edwards' argument that his interpretation is compelled by the First Amendment makes no sense. This Court should reject his arguments as well.

### 3. There is No Danger of Content-Based Enforcement

Perhaps Edwards' biggest stretch in this part of his brief is his claim that "the Government's theory leads to content-based enforcement." (Edwards Brf. #1 at 23). Edwards bases this argument on a one-sentence factual allegation in the Indictment ("A

-45-

centerpiece of EDWARDS' candidacy was his public image as a devoted family man."
(Ind. ¶ 1)). This is a simple allegation of fact supporting the Indictment's theory of
motive for soliciting and accepting the illegal contributions – no more and no less. And
although a donor's motive is plainly implicated in whether a payment is made "for the
purpose of influencing an election," the candidate's motive in accepting illegal
contributions is not an element of the crime. There is no basis for Edwards to contort, as
he does, the Indictment's factual allegation into a "Government theory" that a *sine qua
non* of a payment being made "for the purpose of influencing any election for Federal
office" is that it relate to an official part of the a candidate's platform. If Edwards
knowingly and willfully accepted excessive payments made for the purpose of
influencing his election, then he is guilty, regardless of his motive for accepting them, and
regardless of his campaign platform.

4. **Neither Caselaw Nor FEC Opinions Mandate an Objective Test**

Edwards argues that an "objective test" must be used in evaluating whether
Mellon's and Baron's payments were "contributions" under the Election Act, and that
according to the FEC, the Election Act "implicitly mandate[s]" such a test.[18] (Edwards
Brf. #1 at 23-25). For this argument, Edwards relies principally on *Orloski v. Federal
Election Comm'n*, 795 F.2d 156 (D.C. Cir. 1986), but he makes a similar argument later

---

[18]    Edwards never specifies what the "objective test" is, however.

in his brief purporting to be based on the FEC's opinion *In the Matter of Moran*, Statement of Reasons for MUR 5141 (Apr. 17, 2002). (Edwards Brf. #1 at 37-39).

Edwards' reliance on *Orloski* is flawed for several reasons. First and most importantly, it ignores *Harvey*. *Harvey* postdates *Orloski* by some fourteen years, and given the dearth of judicial opinions in this area, the FEC was surely aware of it when it issued *Harvey*. It also ignores the FEC's opinion in *Matter of Ensign*, Statement of Reasons for MUR 6200 (March 31, 2010), on which Edwards relies so heavily elsewhere in his brief, and in which the FEC expressly applied a subjective test to ascertain a donor's intent. *Ensign* Statement of Reasons at 9.

Second, any argument that *Orloski* and *Harvey/Ensign* are in tension pales considerably when one scratches barely below the surface. *Orloski* involved corporate sponsorship of an event (namely, paying for hot dogs and bussing services for a senior citizens' picnic at which a candidate for Congress spoke), and the FEC issued an opinion employing an objective test focused on the nature of the sponsored event (*i.e.*, whether it was political or non-political) in order to assess whether the corporate sponsorship was for the purpose of influencing the election. *Orloski*, 795 F.2d at 160-61. The court held that the FEC's approach was reasonable and entitled to deference. *Orloski* did not involve individual contributions but rather contributions of a corporation, and in that context an objective test to ascertain a donor's purpose makes more sense – ascertaining the "subjective" intent of a corporation would be problematic. Finally, in view of the

-47-

historically consistent position the FEC has taken (both before and after *Orloski*) with respect to an ***individual's*** gifts to a candidate to pay his personal expenses, Edwards cannot plausibly argue that *Orloski* even muddles the law, much less that it mandates application of an objective test.

Edwards also argues that a subjective test "would be unworkable in a criminal context, which focuses not on the donors' intent but on whether [the recipient] acted with criminal intent."  (Edwards Brf. #1 at 23).  But Edwards has conflated two issues: whether a payment is a contribution in the first instance, and whether a recipient is criminally liable for accepting it.  As to the former, a subjective test applies, for the reasons outlined above.  As to the latter, use of a subjective test to determine whether a payment is a contribution does not offend due process because the required *mens rea* for accepting illegal contributions is that it be done knowingly and willfully.

Edwards' reliance on *Moran* to argue that an objective test must apply is similarly unavailing.  *Moran* involved a $25,000 loan to Rep. James Moran, then a candidate for the House of Representatives, to help pay for legal expenses associated with his divorce.  The source of the loan was the candidate's friend for more than 25 years, the check was endorsed upon receipt directly to a law firm representing the candidate in the divorce, the loan was made well before the next election, and there were no facts alleged that the loan was for use in connection with the campaign.  The FEC concluded that the loan was not made in connection with the candidate's campaign, and that the donor would

-48-

have made the loan irrespective of Moran's candidacy. In the course of its opinion, the FEC referred to several examples of factors that the Commission has considered when assessing third-party payments. Edwards treats this list of examples as "conditions" that the FEC "required to be met" in order for an payment to be considered a contribution, and argues that in listing them, the FEC "reject[ed] a standard that relied on the subjective intent of the putative donor." (Edwards Brf. #1 at 38).

The *Moran* opinion simply does not support this reading. The opinion makes it plain, just as those in *Harvey* and *Ensign* do, that the subjective intent of the donor is crucial. *See Moran* Statement of Reasons at 3 (noting among the first "factual circumstances" that "the source of the personal loan, the candidate's friend for more than 25 years, asserts that it was made for no such purpose.").[19]

Of course, as noted above, whether a subjective or objective test applies does not affect whether the Indictment should be dismissed. This is abundantly clear at page 24 of Edwards' brief, where he assumes an (unspecified) objective test applies and

---

[19] The point, of course, is not that such an assertion is conclusive, but simply that subjective donor intent is important. Not even the *Orloski* opinion goes as far as Edwards does. *See Orloski*, 795 F.2d at 162 ("[C]learly the test adopted in this case does not ignore the state of mind of the donor. It is a common legal practice to infer intent from underlying circumstances. In this case, the FEC's objective test is used to infer the probable intent of both the donor and the donee."). However the test is characterized, the payments here were made "for the purpose of influencing any election for Federal office." 2 U.S.C. §§ 431(8)(A)(i), (9)(A)(i). That is what the statute requires, what the Indictment alleges, and what the evidence at trial will show.

-49-

then argues that "[a]s an objective matter," the payments at issue cannot be contributions as a matter of law because (a) it was Hunter's expenses that were paid, not Edwards' or the campaign's, (b) the payments that came in after Edwards suspended his campaign "demonstrate[] that the election was not the driving impetus behind the payments," and (c) there is "no basis" for the Government to charge that the payments were made for the purpose of influencing the election, rather than to protect Edwards' family and assist Hunter. These are plainly jury arguments. The factual record has yet to be developed at trial, and the Government will not waste the Court's time elaborating here on all of the evidence to be presented at trial that will support the allegations in the Indictment.

Similarly, Edwards' argument that the result in *Moran* compels a result here that Mellon's and Baron's payments are not contributions as a matter of law is meritless. (Edwards Brf.#1 at 37-39). In *Moran*, the FEC indicated that its position was consistent with the same advisory opinions that it had stated in *Harvey* were consistent with its holding there. *See Moran* Statement of Reasons at 4 n.4.[20] That *Moran*, *Harvey*, and those other opinions are consistent amply demonstrates – utterly unsurprisingly – that the

---

[20]      Referring to *William E. Schluter*, Comm. Resp. Adv. Op. 1976-84 (Oct. 4, 1976) ("subsistence payments" from family member for candidate's routine living expenses deemed to be contributions); *Thomas E. Jagger*, FEC Adv. Op. 1978-40 (Sept. 1, 1978) (contribution limits apply to loans received by candidate for personal and family living expenses during period in which he was evaluating his candidacy); *Ronald R. Hein*, FEC Adv. Op. 1982-64 (Feb. 10, 1983) (contribution limits apply to post-campaign solicitation and receipt of money to repay bank loan for personal expenses incurred during campaign).

-50-

questions of whether or not a payment is made "for the purpose of influencing an election," or whether or not a payment is made "irrespective of a campaign" are highly fact-specific. Indeed, the Commission said as much in *Moran*: "[t]he basis for this determination is the context of the transaction's surrounding circumstances." *Moran* Statement of Reasons at 3.

Again, this is obvious based on what Edwards is forced to do to tie up his argument: supply unsubstantiated "facts" from outside the scope of the Indictment. (Edwards Brf. #1 at 38).[21] As to the last such "fact," namely that Baron continued to make payments after Edwards suspended his campaign, Edwards pronounces it "definitive proof" that the payments were made irrespective of the campaign. The Court should spend no time indulging these arguments.[22] Unlike in *Moran*, where the complainant *alleged no facts* that the loan was for use in connection with the campaign, the Indictment here alleges that the payments at issue here plainly were made to benefit

_____

[21]     Edwards alleges, for example, that Mellon and Baron "had a relationship with Mr. Edwards" before his candidacy; that the payment of expenses "did not free up any personal money for the campaign"; and that "the campaign was fully funded and ended with a surplus."

[22]     Although it should not bear on the Court's resolution of this Motion, the Government feels compelled to point out that the evidence at trial will establish that the reason Baron continued to make payments after Edwards suspended his campaign was because both men continued to hope, well into 2008, that Edwards would be named Attorney General of the United States, thus continuing the need to keep the truth about the affair a secret.

-51-

Edwards' presidential campaign, and that Edwards knew it.  Because the Indictment is

sufficient on its face, "the government is entitled to present its evidence at trial and have

its sufficiency tested by a motion for acquittal pursuant to Federal Rule of Criminal

Procedure 29."  *Salman*, 378 F.3d at 1268.[23]

## III.    Edwards' Claim that the Payments at Issue Cannot Be Contributions As a Matter of Law is Baseless

Edwards claims, in essence, that Mellon's and Baron's payments in this

case cannot constitute "contributions" as a matter of law, and lays out his argument along

several fronts.  (Edwards Brf. #1 at 25-38).  None has any merit.

### A.    There is No Requirement for Payments to Involve Traditional Electioneering Activity in Order to be Contributions

Edwards' first theory argues, in essence, that payments that do not support

traditional electioneering activity cannot be contributions.  To make his argument,

Edwards sets up one of multiple straw men he uses in this portion of his brief, and then

attempts to knock it down using two cases, neither of which even does that job.  The

straw man is Edwards' claim that "the government's view" is that the Election Act

"extend[s] to virtually any spending by third-parties that could benefit a candidate."

---

[23]    Edwards' citation of *United States v. Ray*, 61 Fed. App'x 37 (4th Cir. 2003), to argue that the Court should dismiss the Indictment on these grounds before trial is so misplaced as to be pointless.  The court in *Ray* was considering **on appeal** whether a **jury verdict** could be sustained.  The suggestion that it provides authority for this Court to dismiss the Indictment before trial is totally unfounded.

(Edwards Brf. #1 at 25). Like so many of his characterizations of the Government's position, this one also misses the mark. First of all, unlike Edwards, the Government distinguishes between (a) third-party expenditures that are coordinated with the candidate or that are for personal expenses and are made not irrespective of the candidacy; and (b) independent third-party expenditures that do not fall within 11 C.F.R. § 113.1(g)(6). We do so because the statutes and the Supreme Court of the United States do so. Under those authorities, the former are contributions, but the latter are not.

Second, neither the Government nor the statutes involved state that in assessing whether coordinated expenditures are made "for the purpose of influencing any election for Federal office," the assessment should simply be of whether the spending "could benefit a candidate." (Edwards Brf. #1 at 25). This is, in essence, an attempt by Edwards to back-door another jury argument. The Indictment charges that Mellon's and Baron's payments were contributions. Edwards, in this section of his brief, says they are no more than payments that "could benefit" Edwards. This is one of the questions the jury will have to answer. In the context of a pretrial motion to dismiss, Edwards should not be heard to characterize the payments as he sees them, ascribe that characterization to the Government, and then claim as a matter of law that under the "government's view" the Indictment should be dismissed.

Third, Edwards simply goes a bridge too far in claiming that *Emily's List v. Federal Election Comm'n*, 581 F.3d 1 (D.C. Cir. 2009), and *Orloski* compel the result he

urges.  *Emily's List* involved a non-profit organization's challenge to an FEC regulation that required non-profits to use hard money for public communications that even "refer" to a federal candidate.  *Emily's List*, 581 F.3d at 20.  The court struck down the regulation, concluding that communications that simply refer to a federal candidate do not necessarily seek to influence a federal election.  However, the court plainly was considering situations involving independent expenditures by a nonprofit organization, and had no occasion to consider situations that – like the charges in this case – involve coordinated expenditures or third-party payment of personal expenses by individuals.  Edwards reads too much into the *Emily's List* court's unremarkable conclusion.  As for *Orloski*, as discussed above, it was decided long before the regulation at 11 C.F.R. § 113.1(g)(6) even came into existence.  Any reasoning by analogy from its result thus crumbles when applied to payments within the regulation's scope.

**B.    The FEC Opinions Edwards Cites Do Not Support His Theory**

Edwards argues that the FEC has been "quite clear" that Mellon's and Baron's payments are not contributions.  (Edwards Brf. #1 at 28).  In doing so, he relies on *Moran* and *Ensign*.  Obviously, his argument again ignores *Harvey* and its associated line of FEC opinions "consistently view[ing] gifts or loans made to a candidate to pay his personal expenses, where such funds were given because the candidate was running for office, as contributions to his campaign."  *Harvey*, FEC Adv. Op. 2000-08, at 3 n.4.

But even leaving aside that Edwards ignores that line of opinions, the *Moran* and *Ensign* opinions do not bear the weight Edwards places on them. As discussed elsewhere in this memorandum (pp. 47, 49), the reasoning of each is consistent with the FEC's reasoning in *Harvey* and its predecessor opinions, and each involves facts that are easily distinguishable from the facts of this case. As a result, neither opinion provides any authority to conclude that, as a matter of law, the payments at issue cannot constitute contributions.

### C. The Delay in Depositing Some of Mellon's Checks Does Not Alter Their Status as Contributions

Edwards argues that because Bunny Mellon's December 12, 2007, check for $175,000 (Ind. ¶ 23f) was not deposited until February 2008, it cannot be a contribution as a matter of law because by February 2008, Edwards had "suspended" his campaign. He makes the same argument with respect to Mellon's January 23, 2008, check for $200,000 (Ind. ¶ 23g), which was deposited in April 2008. Edwards' argument need not detain the Court long. Edwards cites *United States v. Chestnut*, 533 F.2d 40 (2d Cir. 1976), for the proposition that the offense of receipt of an illegal campaign contribution does not occur until the check is deposited. His argument misses the point. Whether payments are contributions depends on whether they were "***made*** . . . for the purpose of influencing any election for Federal office." 2 U.S.C. § 431(8)(A)(I) (emphasis added). Accordingly, the relevant time at which the purpose of the checks

-55-

should be assessed is the time the payments were made, not the time they were deposited. *See United States v. Hankin*, 607 F.2d 611, 613-15 (3d Cir. 1979) ("making" an illegal contribution can occur before deposit of a check). According to the Indictment, Mellon wrote the two checks in question on December 12, 2007, and January 23, 2008, respectively. The evidence at trial will show that she mailed them both before Edwards "suspended" his campaign on January 30, 2008.[24] The timing of the ***deposits*** simply has no bearing on whether Mellon's checks were contributions in the first instance.

Finally, Edwards claims that Baron's continued financial support in the months following "suspension" of the campaign demonstrates that the purpose of his spending was "not to get Mr. Edwards elected, but rather to help Ms. Hunter through her pregnancy and to protect Mr. Edwards' home life." (Edwards Brf. #1 at 32).[25] This is another naked jury argument, and the Government will not respond in kind in the context of a pretrial motion to dismiss.

---

[24] The evidence at trial will also show that this time period was critical to the campaign and encompassed several early primaries, including Iowa, New Hampshire, and South Carolina, Edwards' native state.

[25] Edwards' chastisement of the Government for not including in the Indictment that "the vast majority of the money Mr. Baron spent" occurred after suspension of the campaign, Edwards Brf. #1 at 32, is puzzling, because in another brief he argues (albeit wrongly) that the Indictment's ***inclusion*** of monies from Mellon that were deposited after suspension of the campaign is grounds for its ***dismissal***. (Edwards Brf. #5 at 8-9).

**D.     The Role of Coordination**

The argument Edwards makes in Point III of his brief is another straw man. (Edwards Brf. #1 at 32-34).  Edwards suggests that the Government is claiming that payments that otherwise are not given for the purpose of influencing an election *automatically* become regulable if they are coordinated with the candidate or the campaign.  The statutes and regulation do not say that, and as far as the Government is aware, the FEC has never held as much.  However, in view of Edwards' overreaching elsewhere in his brief, we emphasize that it does not at all follow that coordination is irrelevant to or cannot inform the question of whether a payment is made for the purpose of influencing an election in the first instance.

**E.     Personal Use Expenses Are Not Restricted to Those a Candidate is Legally Obligated to Pay**

Edwards claims that the regulation at 11 C.F.R. 113.1(g)(6) cannot apply to the payments at issue because the payments were not "personal use" expenses as a matter of law.  He claims that only expenses that a candidate is "legally obligated to pay" can constitute personal expenses under the regulation.  He then argues that since Edwards (at the time) did not have a legal obligation to support Hunter, the monies provided to him could not be considered a contribution.  (Edwards Brf. #1 at 35-37).[26]  To make this

---

[26]     This argument is curious, in light of Edwards' statement elsewhere in his brief that the restriction at 2 U.S.C. § 439a, prohibiting conversion to personal use of money contributed to a campaign, "applies to the use of 'funds in a campaign account' to

argument, Edwards purports to rely on the text of the regulation and various FEC opinions. Those sources do not remotely support his position.

First, Edwards points out the regulation's list of examples of *per se* personal expenses. He then states, "[s]ignificantly, each example is an expense that a person has a legal obligation to pay . . . ." (Edwards Brf. #1 at 35). The Government does not know which regulation Edwards was looking at, but the one we have enumerates in that list "household food items," "clothing," "admission to a sporting event," "dues . . . at a country club," and "a vacation." 11 C.F.R. § 113.1(g)(1)(i)(A), (C), (F), (G), and (J). Edwards' argument that the regulation itself limits "personal use" expenses to those that a candidate is legally obligated to pay is at best meritless, and at worst an outright misrepresentation.

Edwards also relies on *Montagano*, Factual and Legal Analysis for MUR 6104 (June 10, 2009) (candidate's father's intangible support as a surety, for a purchase of real property and of a car, did not constitute a "contribution," although father's payment of property taxes for candidate did); and *Ensign* (payment by a candidate's parents to the candidate's mistress/former employee, where parents had a history of giving substantial gifts to mistress's family, deemed to be gift, not a severance payment, and therefore not a contribution) to try to make out his claim. From these two opinions,

_____

pay for various personal expenses of the sort incurred by Ms. Hunter." (Edwards Brf. #1 at 21).

Edwards attempts to discern a "rule" that in order for a contribution to be prohibited as funding a personal expense, that expense must be one that the candidate is legally obligated to pay (like a tax bill or a severance payment).

Edwards' argument is baseless. *Montagano* and *Ensign* yield no such principle. The reasoning in neither had anything to do with whether the alleged contribution was used for a discretionary expense or a legal obligation. In *Montagano*, the Commission focused on the fact that the alleged contribution was "intangible support as a surety," and in *Ensign*, the Commission focused on the fact that the payments to the mistress were made in the context of a history of gifts from the donating family to the mistress's family. Second, even were one to indulge the defense's claim that their "rule" can be wrung out of the reasoning of *Montagano* and *Ensign*, those opinions do not exist in a vacuum. The opinions cited in footnote 20 above, as well as *Harvey*, utterly dispel the existence of any such notion.[27]

## IV.  There is Constitutionally Sufficient Notice

Edwards' lawyers argue that even if they are wrong about the correct interpretation of the law, Edwards did not have notice that his conduct was criminal. This

---

[27]     Edwards' passing citation to *KITPAC* is also unavailing. Although the Commission there indicated unremarkably that a personal expense being an obligation could affect the analysis of whether a payment for it was made irrespective of the candidacy, the opinion in no way stands for the proposition that expenses must be obligations in order to be "personal use" in the first instance.

argument should be rejected for several reasons. First, although in general a law must clearly prohibit the relevant conduct in order for a finding of criminal intent to be possible, the requirement that Edwards' conduct be knowing and willful in order to result in conviction eliminates the problem in this case. As the Supreme Court has observed,

> [T]he requirement of a specific intent to do a prohibited act may avoid those consequences to the accused which may otherwise render a vague or indefinite statute invalid. . . . The requirement that the act must be willful or purposeful may not render certain, for all purposes, a statutory definition of the crime which is in some respects uncertain. ***But it does relieve the statute of the objection that it punishes without warning an offense of which the accused was unaware.***

*Colautti v. Franklin*, 439 U.S. 379, 395 n.13 (1979) (quoting *Screws v. United States*, 325 U.S. 91, 101-102, 65 S.Ct. 1031, 1035-1036, 89 L.Ed. 1495 (1945) (plurality opinion)) (emphasis added).

Edwards has submitted affidavits to the Court from two former FEC Commissioners, Robert Lenhard and Scott Thomas, in part in an effort to establish that Edwards lacked notice that his conduct constituted a crime.[28] But in a context where the Government will have to prove at trial beyond a reasonable doubt that the defendant knew his conduct violated the law, Edwards' proffered "expert" opinions have no place. *See*

---

[28] Lenhard's statement in his affidavit that "a person familiar with the federal campaign finance law in 2007 and 2008, or today, would not have understood these payments to have been in clear violation of those laws" is at bottom just a different way of saying that *he* does not believe that they violated the law. The same is true of Thomas' similar statement.

-60-

Fed. R. Evid. 704 ("No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.").

Furthermore, it is well settled that expert testimony amounting to legal analysis is not admissible, because each trial court already possesses its own legal expert: the judge. *See, e.g.*, *United States v. Wilson*, 133 F.3d 251, 265 (4th Cir. 1997); *Estate of Sowell v. United States*, 198 F.3d 169, 171-72 (5th Cir. 1999). An expert who offers legal conclusions not only usurps the judge's duty to set forth the law but the jury's duty to apply this law to the evidence. Thus, on many occasions, circuit courts have affirmed a trial court's decision to exclude the testimony of purported "experts" espousing legal conclusions or conclusions about how the law should apply to particular facts. *See, e.g.*, *Wilson*, 133 F.3d at 265; *Snap-Drape, Inc. v. Commissioner of Internal Revenue*, 98 F.3d 194, 198 (5th Cir. 1996) (whether certain dividends are deductible under the Internal Revenue Code in calculating "adjusted current earnings" for purposes of the corporate alternative minimum tax); *Farmland Indus. v. Frazier-Parrot Commodities, Inc.*, 871 F.2d 1402, 1409 (8th Cir. 1989) (whether requirements of commodities regulations had been met).

The jury will make the determination whether Edwards knew his conduct violated the law. Edwards' proffered affidavits essentially invite this Court to conclude that it would have been ***impossible*** for someone in Edwards' position to know that he violated the law. That finding, like so many of the others that Edwards asks this Court to make, is simply improper in the pretrial context.

Nevertheless, as elsewhere, in the interest of being thorough, we turn to the substance of Edwards' argument. In addition to the statutory text, courts may consider regulations and case law in deciding whether the law was sufficiently clear. *United States v. George,* 420 F.3d 991, 996 (9th Cir. 2005); *United States v. Mallas*, 762 F.2d 361, 364 (4th Cir. 1985) ("In the absence of explicit language in the regulation, potential liability might alternatively be announced by 'authoritative constructions sufficiently illuminating the contours of an otherwise vague prohibition[.]'") (quoting *Dombrowski v. Pfister*, 380 U.S. 479, 490-91 (1965)).

Furthermore, although Edwards repeatedly attacks the Government for pursuing a "novel" theory, there is nothing novel about the theory: accepting contributions in excess of the legal limit and hiding those contributions from the FEC are prohibited. What is novel here is the fact pattern. What is unprecedented is a candidate for President of the United States secretly obtaining and using hundreds of thousands of dollars in contributions from two wealthy donors to conceal his extramarital affair and resultant pregnancy, all in order to protect his candidacy. (*See* Ind. ¶ 15). But "a lack of

prior appellate rulings on the topic does not render the law vague, nor does a lack of previously litigated fact patterns deprive [defendants] of fair notice." *George,* 420 F.3d at 995-96. *See also United States v. Ingredient Technology Corp.*, 698 F.2d 88, 96 (2d Cir. 1983) (in assessing whether law is sufficiently clear to satisfy due process, "it is immaterial that there is no litigated fact pattern precisely in point") (internal quotation marks omitted).

Here, the Election Act provision at issue plainly prohibits acceptance of contributions above the legal limit. The underlying law is nowhere near as arcane as the tax laws at issue in the cases Edwards cites. (For example, the question in *Mallas* concerned whether annual advance minimum royalties that are recoupable from warranted coal reserves acquired after execution of a lease, but before payment of the royalty, may be deducted from gross income. *Mallas*, 762 F.2d at 363.) And although Edwards strings together quotations from several opinions expressing various forms of dismay over the complexity of certain areas of campaign finance law, none of the cases he cites concerns individual contributions, individual coordinated expenditures, or third party payment of a candidate's personal expenses.

To the extent there is any vagueness in what is meant by "for the purpose of influencing any election for Federal office," it evaporates as applied to Edwards because, as alleged in the Indictment, Edwards plainly knew that Mellon's and Baron's payments were being made for that purpose. (Ind. ¶¶ 21 (alleging Edwards was read a note from

-63-

Mellon indicating her desire to pay for "all haircuts, etc., that are necessary and important for his campaign"), 28 (alleging Edwards arranged for Baron to make payments "in order to avoid damage to EDWARDS' campaign")).[29] Furthermore, there is an FEC Advisory Opinion regarding a "gift" that strikingly resembles the payments at issue here, that flatly and unambiguously holds that such a "gift" is subject to the Election Act's limitations.

In sum, the statute and regulation are written in plain English and are not difficult to understand, and longstanding FEC opinions confirm their straightforward meaning.[30] Together, these provide ample notice of the law to allow criminal prosecution, especially where, as here, the Government will have to prove a knowing and willful violation to convict. For a court to hold otherwise would prevent the prosecution of knowing and willful violations of a statute the Supreme Court has repeatedly upheld against constitutional challenge, even where there are an applicable on-the-books regulation and published advisory opinions directly on point.

---

[29]    As discussed above (p. 31), Edwards does not make out a facial challenge to the statute, nor could he.

[30]    Indeed, a major purpose of FEC Advisory Opinions is to clarify candidates' obligations to the public. *See* 2 U.S.C. § 437f(d).

-64-

## CONCLUSION

For these reasons, the Government respectfully submits that Edwards'

Motion should be denied in its entirety.

Dated: September 26, 2011

Respectfully submitted,

| | |
|---|---|
| JOHN STUART BRUCE | JACK SMITH |
| Attorney for the United States | Chief, Public Integrity Section |
| Acting under authority | Criminal Division |
| conferred by 28 U.S.C. § 515 | U.S. Department of Justice |

By: /s/ Robert J. Higdon, Jr.

    Robert J. Higdon, Jr.
    Brian S. Meyers
    Special Attorneys
    U.S. Attorney's Office
    310 New Bern Ave., Suite 800
    Raleigh, NC 27601-1461
    Tel: (919) 856-4103
    Fax: (919) 856-4887
    bobby.higdon@usdoj.gov
    State Bar No. 17229

By: /s/ David V. Harbach, II

    David V. Harbach, II
    Justin V. Shur
    Jeffrey E. Tsai
    Trial Attorneys
    Public Integrity Section
    Criminal Division
    U.S. Department of Justice
    1400 New York Ave., N.W., Ste. 12100
    Washington, DC 20005
    Tel: (202) 514-1412
    Fax: (202) 514-3003
    david.harbach@usdoj.gov

## CERTIFICATE OF SERVICE

This is to certify that on September 26, 2011, I filed the foregoing document on the Court's CM/ECF system, which will transmit a copy to the following counsel of record in this case:

Wade Marvin Smith
Tharrington Smith, LLP
209 Fayetteville Street
P.O. Box 1151
Raleigh, NC 27602-1151

Abbe David Lowell
Chadbourne & Parke, LLP
1200 New Hampshire Avenue, N.W.
Washington, DC 20036

James P. Cooney, III
Womble Carlyle Sandridge & Rice, PLLC
One Wells Fargo Center
301 South College Street, Suite 3500
Charlotte, North Carolina 28202-6037

/s/ David V. Harbach, II
Trial Attorney
Public Integrity Section
Criminal Division
U.S. Department of Justice
1400 New York Ave., N.W., Ste. 12100
Washington, DC 20005
Tel: (202) 514-1412
Fax: (202) 514-3003
david.harbach@usdoj.gov

-66-