IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:11-CR-161-1 |
| | ) | |
| JOHNNY REID EDWARDS | ) | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT AS AN ABUSE OF PROSECUTORIAL DISCRETION

The United States of America, through the undersigned attorneys, files this

Response in opposition to defendant John Edwards' Motion to Dismiss the Indictment as

an Abuse of Prosecutorial Discretion (Motion to Dismiss #2). Edwards' Motion is based

entirely on speculative political theories and unfortunate attacks aimed at former United

States Attorney George Holding, and largely ignores the fact that the investigation was

conducted entirely by career prosecutors in the United States Attorney's Office and the

Public Integrity Section of the Department of Justice's Criminal Division, and that this

joint prosecution was approved by the Public Integrity Section and the Criminal Division.

Edwards' Motion should be denied in its entirety.

## INTRODUCTION

I.      **Summary of the Indictment**

The Indictment contains six counts: Count One charges conspiracy, in

violation of Title 18, United States Code, Section 371; Counts Two through Five charge

acceptance and receipt of illegal campaign contributions, in violation of the Federal

Election Campaign Act ("Election Act"), specifically Title 2, United States Code, Sections 441a(a)(1)(A), 441a(f), and 437g(d)(1)(A)(i); and Count Six charges false statements in the form of a scheme to conceal material facts from the Federal Election Commission ("FEC"), in violation of Title 18, United States Code, Section 1001(a)(1).

## II.    Overview of Facts Alleged in the Indictment[1]

In 2007 and 2008, John Edwards was a candidate for the Democratic Party's nomination for President of the United States.  (Ind. ¶ 1).  During the same time period, he was engaged in an extramarital affair with Rielle Hunter, which resulted in a pregnancy.  (Ind. ¶ 3).[2]  Edwards and others believed that if the public learned of the affair, his campaign would be destroyed.  (Ind. ¶ 15).

In order to maintain the viability of his candidacy, Edwards sought to conceal his extramarital affair and the pregnancy from the public.  (Ind. ¶¶ 15, 18).  In order to achieve this goal, Edwards and a long-time campaign staffer, Andrew Young,

---

[1]    This overview is identical to the one appearing in the Government's Response to Edwards' Motion to Dismiss #1.  We repeat it here for the Court's convenience in resolving this Motion.

[2]    Consistent with local practice and Department of Justice policy, the Indictment uses pseudonyms for the individuals involved.  However, the briefs Edwards has filed disclose the names of these individuals.  Accordingly, the Government uses their names in its responses for clarity and because it cannot prevent identification of those individuals in the process of responding to Edwards' arguments.

approached two wealthy Edwards benefactors – Rachel "Bunny" Mellon and Fred Baron – for financial assistance. (Ind. ¶¶ 2, 16, 17, 21, 28).

Mellon had been a reliable Edwards political supporter and donor since the 2004 election. (Ind. ¶ 4). In April 2007, Mellon wrote a note to Young in response to media reports about the alleged cost of Edwards' haircuts:

> The timing of your telephone call on Friday was "witchy." I was sitting alone in a grim mood – <u>furious</u> that the press attacked Senator Edwards on the price of a haircut. But it inspired me – from now on, all haircuts, etc., that are necessary and important for his campaign – please send the bills to me . . .. It is a way to help our friend without Government restrictions. I see <u>jealousy</u> coming from somewhere in this news report.

(Ind. ¶ 21).

In or around May 2007, Edwards and Young solicited Mellon for financial support, and even though she had already contributed to Edwards the maximum amount allowed under the law, Mellon agreed to provide Edwards additional money to help him become President. (Ind. ¶¶ 21, 22). During this same time period, Hunter informed Edwards that she was pregnant with his child. (Ind. ¶ 20). Between June 2007 and January 2008, Mellon made $725,000 in contributions to Edwards via seven different personal checks, made payable to an interior-decorator friend and disguised as purchases of antique furniture. (Ind. ¶ 23). The friend, in turn, sent the checks to Young, whose wife endorsed and deposited them into the Young family's bank account. (Ind. ¶ 24).

-3-

The funds were used to finance Hunter's living and medical expenses, ensure her silence, and hide her from the national media. (Ind. ¶¶ 18, 24).

Fred Baron served as the Edwards campaign's national Finance Chair during the 2008 campaign. (Ind. ¶ 5). In October 2007, the *National Enquirer* published an article reporting that Edwards was allegedly involved in an extramarital affair. (Ind. ¶ 25). Edwards promptly (and falsely) denied it. (Ind. ¶ 25). In December 2007, Edwards convinced Young to state publicly (and falsely) that Young was the father of the child Hunter was carrying. (Ind. ¶¶ 26, 27). Also in December 2007, and in order to avoid damage to the campaign, Edwards and Young arranged for Baron to fund flying Hunter, as well as Young and Young's family, out of North Carolina by private jet to secluded locations, to escape the media. (Ind. ¶¶ 28, 29).

Over several weeks in December 2007 and January 2008, Hunter and the Youngs stayed in posh hotels in Fort Lauderdale, Aspen, and San Diego before ultimately arriving in Santa Barbara, California. (Ind. ¶ 29). Baron paid for these chartered flights and housing accommodations, including rental payments on a luxury home in Santa Barbara, to the tune of approximately $200,000, all for the benefit of Edwards' campaign. (Ind. ¶ 29). Baron also had a Federal Express envelope containing $1,000 in cash delivered to Young at one of the hotels. The envelope contained a handwritten note from Baron that stated: "Old Chinese saying: Use cash, not credit cards!" (Ind. ¶ 30). Baron

-4-

also transferred $10,000 by wire into a bank account controlled by Young. Baron made these payments for the benefit of Edwards' campaign. (Ind. ¶ 30).

On January 30, 2008, Edwards suspended his presidential campaign, but the John Edwards for President Committee remained in existence. (Ind. ¶ 31). In August 2008, Edwards appeared on ABC's *Nightline* program for an interview. (Ind. ¶ 32). In the interview, Edwards continued to falsely deny fathering the child with Hunter, and also disclaimed any knowledge of funds – that is, the contributions from Mellon and Baron – being paid to Hunter or Young. (Ind. ¶ 32).

In the summer of 2009, Edwards explored with a former campaign employee the idea of issuing a written statement in which Edwards would admit fathering the child. (Ind. ¶ 33). During that time period, Edwards made multiple statements to the employee admitting the affair, the paternity, and his knowledge of Baron's contributions that were used for the cover-up. (Ind. ¶ 33). Although initial versions of Edwards' planned statement included an admission that he knew during the campaign that Baron's funds were being used to support Hunter, he later told the employee that it was a huge issue and decided against including any admission about Baron for what he termed "legal and practical reasons." (Ind. ¶ 33).

Edwards and his conspirators sought to conceal Mellon's and Baron's prohibited contributions from the public and the FEC. (Ind. ¶¶ 19, 31). The Election Act required campaign committees to file periodic campaign finance reports with the FEC, in

order to provide a transparent public record of the amounts and sources of contributions. (Ind. ¶¶ 11, 12).  Edwards, through his campaign committee, was required to and did, in fact, file these periodic reports with the FEC.  (Ind. ¶ 11).  However, Edwards caused his campaign committee to create and submit false and deceptive campaign finance reports that failed to report the hundreds of thousands of dollars in contributions from Mellon and Baron.  (Ind. ¶¶ 31, 43).

## ARGUMENT

### I.     Edwards Has Not Made a Credible Showing That He Has Been Vindictively Prosecuted

Edwards claims that he was vindictively selected for prosecution by a Republican United States Attorney because he was or had been engaged in the constitutionally protected activities of seeking elective office as a Democratic Party candidate, supporting other Democratic Party candidates and taking particular positions as a Democratic member of the United States Senate.  At bottom, all of Edwards' political speculation boils down to a complaint that he is a Democrat and that one of the prosecutors who approved the charges against him is a Republican.  His claim of vindictive prosecution is entirely without legal or factual support.

#### A.     A Prosecutor's Charging and Pre-Trial Decisions Are Given a Presumption of Regularity and Substantial Deference

A prosecutor's decision to seek charges against a particular defendant is accorded great deference in light of the Executive Branch's obligation and responsibility

-6-

for the enforcement of federal criminal law:

> A selective prosecution[3] claim asks a court to exercise judicial power over a "special province" of the Executive. The Attorney General and United States Attorneys retain broad discretion to enforce the Nation's criminal laws . . . . As a result, the presumption of regularity supports their prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties. In the ordinary case, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.

*United States v. Armstrong*, 517 U.S. 456, 464 (1996) (footnote not in original) (internal quotation marks and citations omitted). *See also United States v. Wilson*, 262 F.3d 305, 315 (4th Cir. 2001) (quoting *Armstrong*). Thus, the Fourth Circuit cautions, courts must not unduly intrude upon the broad discretion given to prosecutors in making charging decisions. *See Wilson*, 262 F.3d at 315.

Edwards seeks to overcome the presumption of regularity by claiming that the decision to charge him was the product of personal and political animus and was brought in retaliation for past political differences. But he fails to offer any evidence to support his claim, and falls far short of satisfying the high burden required to overcome the presumption of regularity.

---

[3] This same deference applies in the context of a vindictive prosecution claim. *United States v. Wilson*, 262 F.3d 305, 315 (4th Cir. 2001).

-7-

**B.**     **Edwards Has Failed to Show, Through Objective Evidence, That He Is Being Vindictively Prosecuted**

It is a well-established principle that a prosecutor violates the Due Process Clause of the Fifth Amendment where he seeks to prosecute an individual as the result of that individual's exercise of a clearly established right. *United States v. Goodwin*, 457 U.S. 368, 372 (1982); *Wilson*, 262 F.3d at 314. Running for public office, supporting others who run for public office, and serving as a member of Congress fall squarely within that principle. And where a defendant can show a violation of that principle, he may be entitled to a remedy. However, as with any claim, there must be ***actual*** evidence of a violation before any remedy can be obtained.

To prove actual vindictiveness on the part of a prosecutor, a defendant must provide direct evidence of improper motivation, "such as evidence of a statement by the prosecutor." *United States v. Johnson*, 171 F.3d 139, 140-141 (2d Cir. 1999); *accord United States v. Jackson*, 181 F.3d 740, 745 n.4 (6th Cir. 1999); *United States v. Edmonds*, 103 F.3d 822, 826 (9th Cir. 1996); *United States v. Miller*, 948 F.2d 631, 634 (10th Cir. 1991). Such evidence will be found only in a "rare case." *Goodwin*, 457 U.S. at 384 n. 19.

In order to show actual vindictiveness, a defendant must prove (1) that the prosecutor acted with a genuine animus toward the defendant; and (2) that the defendant would not have been prosecuted but for that animus. *Goodwin*, 457 U.S. at 380 n.12

-8-

(noting that the charges must be brought "solely to 'penalize' the defendant and could not be justified as a proper exercise of prosecutorial discretion"); *Wilson*, 262 F.3d at 315.

In support of his claim of vindictive prosecution, Edwards accuses George Holding, former United States Attorney for the Eastern District of North Carolina, of depriving Edwards of his rights by seeking his indictment for (1) Holding's own personal political gain, and/or (2) in retaliation for previous political differences. However, Edwards has offered no evidence of his theories, and ignores the undisputed facts regarding how the prosecution was actually brought.

Defendant's speculative theory begins by reaching back to news articles and reports dealing with the hiring and firing of United States Attorneys during the administration of President George W. Bush. He then spins a tale in which Mr. Holding, first as an Assistant United States Attorney and then as the United States Attorney, launched a series of investigations and prosecutions exclusively targeting Democratic office holders in North Carolina for the purpose of establishing a public profile in support of his own political ambitions. These investigations and prosecutions, so the theory goes, were intended all along to create a seat in Congress for Mr. Holding. And, of course, Edwards argues, the investigation and ultimate indictment of Edwards was key to that strategy because, Edwards, as "a Democratic Party front-runner for the White House in 2008, was perhaps the biggest political prize." (Edwards' Memorandum in Support of Motion to Dismiss #2 ("Edwards Brf. #2") at 6).

-9-

None of this, however, constitutes evidence, much less "direct evidence" – that is, "[e]vidence, that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." *Black's Law Dictionary* (9th ed. 2009). These assertions demonstrate nothing more than that Mr. Holding is a Republican who served as a law clerk, an Assistant United States Attorney, and United States Attorney, and whose office prosecuted a number of prominent public officials.[4] That, without more, fails to demonstrate either "genuine animus" or that Edwards would not have been prosecuted "but for" that animus.

Edwards fails to offer evidence of any statement made by Mr. Holding or anyone working on this case demonstrating any type of animus toward him. Edwards fails to offer any document – despite having received more than 400,000 pages of discovery from the Government – that suggests any type of animus toward him. Edwards fails to offer any witness who can testify as to any animus toward him held by Mr. Holding or any current or former member of the prosecution team. Edwards complains about the manner in which the grand jury investigation was conducted, but he can point to no question asked of any of the 27 witnesses who appeared before the grand juries

---

[4]     Edwards fails to acknowledge that the United States Attorney's Office for the Eastern District of North Carolina, staffed by more than forty professional, career attorneys, has prosecuted individuals with allegiance to both political parties over the last ten years.

-10-

investigating this matter revealing any animus toward him.[5]  In short, he offers no

evidence in support of his claim because there is no such evidence.

**C.    Edwards Cannot Invoke the Presumption of a "Realistic Likelihood of Vindictiveness"**

Lacking any evidence of vindictiveness or improper motives, Edwards asks

the Court to presume that the decision to charge him was vindictive, and to dismiss this

case because of the "unique circumstances" surrounding it.  (Edwards Brf. #2 at 20).

This is an argument that is "rarely, if ever, . . . applied to prosecutors' pretrial decisions,"

*Wilson*, 262 F.3d at 315, and it has absolutely no place here.

Where, as here, a defendant is unable to prove an improper motive with

direct evidence, he may present evidence of circumstances from which an improper

vindictive motive may be presumed.  *Wilson*, 262 F.3d at 314.  To do so, however, the

defendant must show circumstances which "pose a realistic likelihood of

'vindictiveness.'"  *Wilson*, 262 F.3d at 314 (quoting *Blackledge v. Perry*, 417 U.S. 21, 27

(1974)).  And he must demonstrate that the presumption of vindictiveness will be

applicable to "all cases presenting the same circumstances."  *Wilson*, 262 F.3d at 315.

---

[5]         In his motion, Edwards alleges that "[p]rosecutors apparently asked
witnesses before the grand jury a broad range of questions that had nothing to do with
alleged campaign finance violations by Mr. Edwards" and "[w]itnesses report that they
were asked . . . ."  (Edwards Brf. #2 at 13).  This phrasing suggests that Edwards and his
attorneys have no idea how witnesses were questioned in the grand jury.  Of course, that
is not true.  They have been provided with the transcripts of all the testimony presented
before both of the grand juries that heard evidence in this case.

To carry his burden, Edwards must "overcome a significant barrier by advancing objective evidence tending to show the existence of prosecutorial misconduct." *Wilson*, 262 F.3d at 315. That barrier, however, is built on the "wide range of factors that may properly be considered in making pretrial prosecutorial decisions." *Id.*

As outlined above, Edwards attempts in his brief to paint a picture of an overzealous federal prosecutor determined to score prosecutorial victories against prominent members of the opposing political party to advance his own career. He describes Mr. Holding as forcing the investigation in directions it could not or should not go, ignoring important evidence, leaking information to the news media, manipulating the grand jury process and changing legal theories to achieve his goal of charging Edwards as a kind of political trophy. He fails, however, to offer any proof of these assertions (and there is none) and ignores the manner in which this matter was actually approved for prosecution, a process that is well known to defense counsel.

The investigation of this matter began in August 2008, with a referral from the Public Integrity Section of the Department of Justice's Criminal Division to the United States Attorney's Office for the Eastern District of North Carolina and the Federal Bureau of Investigation. Based upon reports in national media concerning questionable payments to Edwards' mistress' company, the Public Integrity Section asked the United States Attorney's Office to conduct a preliminary investigation in conjunction with agents of the Federal Bureau of Investigation. Upon referral, the matter was assigned to senior

-12-

career prosecutors within the United States Attorney's Office, and a determination was made that no investigative actions likely to draw public attention would be taken until after the 2008 Presidential election was concluded.[6] Thereafter, beginning in early 2009, these career prosecutors conducted that preliminary investigation and maintained regular consultative contact with career prosecutors in the Public Integrity Section, in the Department's Criminal Division, and sought appropriate approvals concerning the manner and direction of the investigation, as is required by long-standing Department policy.[7]

As the investigation moved beyond the preliminary phase and began to reveal the full scope of Edwards' illegal conduct, the United States Attorney's Office

_____

[6] Of course, by the time the referral was made to the United States Attorney's Office, Edwards was no longer a candidate for the Presidency and many facts about this matter were becoming publicly known. Nevertheless, prosecutors, including Mr. Holding, determined that any overt investigative effort might be seen as attempting to influence the outcome of the ongoing presidential election.

[7] In his motion, Edwards attempts to attach great significance to the purported "changing theories" of the Government's investigation. (Edwards Brf. #2 at 12 n.5, 17, 27). Although there is no law requiring that the Government select a single investigative theory at the beginning of an investigation and never deviate from it, the investigative theory in this case has always focused on the issue of whether or not Edwards properly raised and expended funds during the 2008 Presidential primary cycle. That the investigation did not remain focused on a suspicious $14,000 payment to his mistress' company apparently dismays and disappoints Edwards. But, like all proper investigations, the legal theory followed the evidence and not the other way around. That is how the Government uncovered the nearly $1 million in illegal contributions and expenditures Edwards had attempted to hide.

-13-

sought additional guidance and participation of the Public Integrity Section.[8]  The Public

Integrity Section then joined the investigation, and career prosecutors from the United

States Attorney's Office worked side-by-side with career prosecutors from the Public

Integrity Section to complete the investigation.  Defense counsel is well aware of this as a

result of their own direct contact with attorneys from the Public Integrity Section.

       After a thorough and complete investigation, the career attorneys from both

the United States Attorney's Office and the Public Integrity Section concluded that an

indictment should be submitted to the appropriate grand jury and sought permission to do

so.  The decision to present the Indictment was approved by Mr. Holding, the Chief of the

Public Integrity Section, and the Assistant Attorney General for the Criminal Division.[9]

---

[8]    In July 2010, Mr. Holding, along with First Assistant United States
Attorney John Stuart Bruce (currently fulfilling the role of United States Attorney for this
case) and Robert J. Higdon, Jr., Chief of the Criminal Division for the United States
Attorney's Office, met with the leadership of the Public Integrity Section to report on the
status of the case and to seek a fuller partnership with Public Integrity so that the case
could be completed and properly evaluated on its merits.

[9]    The Indictment was submitted to the grand jury sitting in the Middle
District of North Carolina.  Edwards assigns untoward motives to that decision and paints
a picture of the United States Attorney rushing the matter before that grand jury moments
before asking the jury to charge Edwards.  Of course, that is not accurate, as described
more fully in the Government's Response to Edwards' Motion to Dismiss #3.  Once a
substantial amount of evidence was gathered as part of the grand jury investigation in the
Eastern District, the career attorneys from both the United States Attorney's Office and
the Public Integrity Section carefully reviewed it to determine the proper venue for any
potential charges.  The conclusion was reached that the evidence had developed in such a
way that the Middle District was the more appropriate venue.  At that point, the matter
was transferred to the Middle District grand jury and prosecutors presented evidence to

-14-

Edwards and his lawyers are fully aware of this process. Beginning early in the investigation, defense counsel were afforded access to the United States Attorney's Office in Raleigh, met frequently with Mr. Holding and the career attorneys handling the matter, and were given an opportunity to advance legal and factual arguments supporting Edwards' request that he not be prosecuted. When the Criminal Division's Public Integrity Section joined the investigation as full partners, counsel for Edwards met repeatedly with the leadership of the Public Integrity Section and with the Assistant Attorney General and his staff, all of whom ultimately approved the prosecution.

The procedures followed in this case reflect a careful, thorough, and professional process involving many career prosecutors, whose work was reviewed and approved by the Chief of the Public Integrity Section and the Assistant Attorney General for the Criminal Division, in addition to Mr. Holding.[10] There is absolutely no basis to infer vindictiveness in the decision to indict.

---

that group for several months before presenting an indictment. As the Court is aware, this process is common and entirely lawful. *See* Fed. R. Crim. P. 6(e)(3)(C).

[10] Edwards focuses his speculative attacks on former United States Attorney Holding, but offers nothing to suggest improper motives on the part of any of the career prosecutors or other decision-makers involved. *See United States v. Hastings*, 126 F.3d 310, 314 (4th Cir. 1997) (declining to impute the unlawful biases of the investigating agents to the persons ultimately responsible for the prosecution). There were no such improper motives.

-15-

### D.    The Decision to Bring the Indictment Is a Proper Exercise of Prosecutorial Discretion

Throughout his motion, Edwards argues that his case is based on a "novel legal theory" and unusual "determinative factors" and, therefore, represents an improper exercise of prosecutorial discretion.  This is not true.

Making decisions based upon a wide range of factors is at the heart of the professional judgment and discretion that is conferred on and expected from prosecutors. *United States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996) (citing *McCleskey v. Kemp*, 481 U.S. 279 (1987)).

The facts alleged in the Indictment establish that this case is a proper exercise of prosecutorial discretion.  Edwards was a candidate for the Presidency of the United States. In that capacity he was required to solicit, accept, and spend political contributions within the parameters set by the Federal Election Campaign Act.  Among those requirements, as Edwards well knew, was a strict limit on contributions from any single individual.  Edwards, in an effort to conceal an extramarital affair which threatened to destroy his campaign and divert its resources, solicited and accepted funds far in excess of the legal limit from two donors.  The funds were solicited, provided, and spent with the purpose of protecting and advancing Edwards' candidacy for President.  And he solicited and received those funds in a manner clearly designed to conceal those funds from the public and from the Federal Election Commission.

-16-

As discussed fully in the Government's Response to Edwards' Motion to Dismiss #1, filed contemporaneously with this Response, Edwards' conduct violated the core prohibitions of the Election Act.

## II. Because Edwards Has Made No Credible Showing of Vindictive Prosecution, He is Not Entitled to Discovery of the Government's Work Product

Following his rank speculation regarding political motives, Edwards proposes to cast a wide net in the Government's files in search of some evidence to support his theory. In a transparent attempt to discover the work product of Government attorneys, Edwards requests production of "pre-indictment notes, emails, memoranda, and correspondence with investigating agencies relating to [the] indictment[,] . . . [a]ll correspondence with attorneys for the government's key witnesses[, a]ny other documents in the possession of the Government that relate to the decision to prosecute . . . correspondence between and among the prosecutors and staff concerning: (1) the merits of the case, (2) requests for resource [*sic*], (3) contacts with the media, (4) contact with the FEC, and (5) . . . . . [*sic*]." Edwards Brf. #2 at 29-30. Edwards provides no basis for such a dramatic intrusion into the deliberative process of the Government in this case.

A defendant must demonstrate clear evidence of vindictiveness before he is entitled to discovery. The threshold requirement for obtaining discovery "should itself be a significant barrier." *Armstrong*, 517 U.S. at 464. The burden imposed by the *Armstrong* decision is intended to be "demanding" and "rigorous." *Olvis*, 97 F.3d at 743.

-17-

The defendant bears the burden of "making a credible showing of 'some evidence' on each element [of the defense]." *Olvis*, 97 F.3d at 746.

Allowing discovery to a defendant who has not met his burden would ignore the presumption of regularity and threaten "the performance of a core executive constitutional function." *United States v. Bass*, 536 U.S. 862, 864 (2002) (reversing decision of district court to grant discovery on claim of selective prosecution based on nationwide statistics showing racial disparity in prosecutions); *United States v. Wayte*, 470 U.S. 598, 607 (1985) ("examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement . . . and may undermine prosecutorial effectiveness . . . .").

In support of his request for discovery, Edwards relies upon three cases where some measure of discovery was permitted on the question of vindictiveness. These cases are fundamentally distinguishable from the present case. First, in *United States v. Fieger*, No. 07-CR-20414, 2008 WL 205244 (E.D. Mich. Feb. 1, 2008), the district court was troubled by the failure of the United States Attorney's Office to consult with the Public Integrity Section at the outset of the investigation, which is required by Department of Justice policy. That failure by the United States Attorneys Office was particularly troubling to the district court because the early investigation included allegations related to the campaign for local office by the former United States Attorney from the district, which ultimately led to the recusal of that office's senior management.

-18-

*Id.* at *5-6. Based on those unique concerns, the court ordered very limited discovery, which focused largely on the reasons for the recusal. Here, by contrast, it is undisputed that the United States Attorney's Office followed Department policy – indeed, the investigation was commenced by a referral *from* the Public Integrity Section – consulted with the Department regularly, and ultimately partnered with attorneys from the Public Integrity Section to complete the investigation and bring the Indictment against Edwards.

Second, in *United States v. Jarrett*, No. 1:03-CR-087, 2008 WL 323411 (N.D. Ind. Feb. 4, 2008), the district court ordered discovery based upon its concern that the United States Attorney's Office had received allegations against an attorney, but waited more than two years to indict him and then only did so to force his recusal from representing a defendant in a high-profile case being prosecuted by that same United States Attorney's Office. There is nothing remotely similar here. Morever, even under the facts in *Jarrett*, the Seventh Circuit reversed the district court's initial finding of vindictiveness, *United States v. Jarrett*, 447 F.3d 520, 522-524 (7th Cir. 2006), and the district court itself later concluded that there was no evidence of vindictiveness. *United States v. Jarrett*, No. 1:03-CR-087, 2011 WL 53174, at *6-7 (N.D. Ind. Jan. 7, 2011).

Finally, in *United States v. Adams*, 870 F.2d 1140 (6th Cir. 1989), the court of appeals reversed a district court decision and ordered discovery where the district court record contained, among other things, an affidavit of the former director of the Equal Employment Opportunity Commission alleging that the criminal prosecution was, in his

-19-

opinion, instituted in retaliation for the defendant's filing of an EEO complaint against that agency. *Adams*, 870 F.2d at 1145-1146. No such evidence exists in the instant case. There is no statement, document, or other evidence which evinces any type of animus toward Edwards whatsoever.

The speculation and argument offered by Edwards is clearly insufficient to satisfy the substantial burden of showing the he is entitled to discovery in this instance. As established above, no presumption of vindictiveness is applicable in this case, and Edwards has failed to offer any direct evidence of actual vindictiveness on the part of Mr. Holding or any person involved in the investigation or prosecution of this matter. Accordingly, Edwards is not entitled to the discovery he seeks. Moreover, there are no documents in the possession of the Government that show vindictiveness on the part of Mr. Holding or anyone else involved in this prosecution. They do not exist because no animus toward Edwards was involved in the prosecution to investigate or prosecute Edwards. Edwards' request for discovery is baseless and should be denied.

## CONCLUSION

For these reasons, the Government respectfully submits that Edwards'

Motion and his request for discovery contained therein should be denied in their entirety.

Dated:  September 26, 2011

Respectfully submitted,

JOHN STUART BRUCE
Attorney for the United States
Acting under authority
conferred by 28 U.S.C. § 515

JACK SMITH
Chief, Public Integrity Section
Criminal Division
U.S. Department of Justice

By: /s/ Robert J. Higdon, Jr.
    Robert J. Higdon, Jr.
    Brian S. Meyers
    Special Attorneys
    U.S. Attorney's Office
    310 New Bern Ave., Suite 800
    Raleigh, NC 27601-1461
    Tel: (919) 856-4103
    Fax: (919) 856-4887
    bobby.higdon@usdoj.gov
    State Bar No. 17229

By: /s/ David V. Harbach, II
    David V. Harbach, II
    Justin V. Shur
    Jeffrey E. Tsai
    Trial Attorneys
    Public Integrity Section
    Criminal Division
    U.S. Department of Justice
    1400 New York Ave., N.W., Ste. 12100
    Washington, DC 20005
    Tel: (202) 514-1412
    Fax: (202) 514-3003
    david.harbach@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on September 26, 2011, I filed the foregoing

document on the Court's CM/ECF system, which will transmit a copy to the following

counsel of record in this case:

Wade Marvin Smith
Tharrington Smith, LLP
209 Fayetteville Street
P.O. Box 1151
Raleigh, NC 27602-1151

Abbe David Lowell
Chadbourne & Parke, LLP
1200 New Hampshire Avenue, N.W.
Washington, DC 20036

James P. Cooney, III
Womble Carlyle Sandridge & Rice, PLLC
One Wells Fargo Center
301 South College Street, Suite 3500
Charlotte, North Carolina 28202-6037

/s/ David V. Harbach, II
Trial Attorney
Public Integrity Section
Criminal Division
U.S. Department of Justice
1400 New York Ave., N.W., Ste. 12100
Washington, DC 20005
Tel: (202) 514-1412
Fax: (202) 514-3003
david.harbach@usdoj.gov

-22-