IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:11-CR-161-1 |
| | ) | |
| JOHNNY REID EDWARDS | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION
TO DISMISS COUNT ONE OF THE INDICTMENT**

The United States of America, through the undersigned attorneys, files this

Response in opposition to defendant John Edwards' Motion to Dismiss Count One of the

Indictment (Motion to Dismiss #4). In his Motion, Edwards moves the Court to dismiss

Count One for failure to properly allege a conspiracy to commit an offense against the

United States in violation of Title 18, United States Code, Section 371. Edwards claims

that the conspiracy charge contained in Count One is defective in two respects: (1) the

Government has improperly charged a "rimless wheel" conspiracy; and (2) the

Government has failed to allege that the defendant and his co-conspirators had an

agreement to commit the same crime. Edwards' claims are contradicted by the plain

language of the Indictment and are legally and factually without merit. Accordingly,

Edwards' Motion should be denied in its entirety.

**INTRODUCTION**

**I.      Summary of the Indictment**

The Indictment contains six counts:  Count One charges Edwards with a

two-object conspiracy in violation of Title 18, United States Code, Section 371. The first

object was to accept contributions in excess of the legal limit, in violation of the Federal Election Campaign Act ("Election Act"). The second was to conceal those contributions from the Federal Election Commission ("FEC") by filing false and misleading campaign finance reports, in violation of Title 18, United States Code, Section 1001(a)(1). Counts Two through Five charge acceptance and receipt of illegal campaign contributions, in violation of the Election Act, specifically Title 2, United States Code, Sections 441a(a)(1)(A), 441a(f), and 437g(d)(1)(A)(i); and Count Six charges false statements in the form of a scheme to conceal material facts from the FEC, in violation of Title 18, United States Code, Section 1001(a)(1).

Edwards was at the heart of the conspiracy charged in Count One. Here, as in most conspiracy cases, while several conspirators played different roles and engaged in multiple transactions, the conspirators shared one common goal: to get financial support to Edwards unlawfully in order to help him be elected President.

## II.     Overview of Facts Alleged in the Indictment[1]

In 2007 and 2008, John Edwards was a candidate for the Democratic Party's nomination for President of the United States. (Ind. ¶ 1). During the same time period, he was engaged in an extramarital affair with Rielle Hunter, which resulted in a

---

[1]      This overview is identical to the one appearing in the Government's Response to Edwards' Motion to Dismiss #1. We repeat it here for the Court's convenience in resolving this Motion.

pregnancy.  (Ind. ¶ 3).[2]  Edwards and others believed that if the public learned of the affair, his campaign would be destroyed.  (Ind. ¶ 15).

In order to maintain the viability of his candidacy, Edwards sought to conceal his extramarital affair and the pregnancy from the public.  (Ind. ¶¶ 15, 18).  In order to achieve this goal, Edwards and a long-time campaign staffer, Andrew Young, approached two wealthy Edwards benefactors – Rachel "Bunny" Mellon and Fred Baron – for financial assistance.  (Ind. ¶¶ 2, 16, 17, 21, 28).

Mellon had been a reliable Edwards political supporter and donor since the 2004 election.  (Ind. ¶ 4).  In April 2007, Mellon wrote a note to Young in response to media reports about the alleged cost of Edwards' haircuts:

> The timing of your telephone call on Friday was "witchy."  I was sitting alone in a grim mood – <u>furious</u> that the press attacked Senator Edwards on the price of a haircut.  But it inspired me – from now on, all haircuts, etc., that are necessary and important for his campaign – please send the bills to me . . ..  It is a way to help our friend without Government restrictions.  I see <u>jealousy</u> coming from somewhere in this news report.

(Ind. ¶ 21).

In or around May 2007, Edwards and Young solicited Mellon for financial support, and even though she had already contributed to Edwards the maximum amount allowed under the law, Mellon agreed to provide Edwards additional money to help him

---

[2]    Consistent with local practice and Department of Justice policy, the Indictment uses pseudonyms for the individuals involved.  However, the briefs Edwards has filed disclose the names of these individuals.  Accordingly, the Government uses their names in its responses for clarity and because it cannot prevent identification of those individuals in the process of responding to Edwards' arguments.

become President. (Ind. ¶¶ 21, 22). During this same time period, Hunter informed Edwards that she was pregnant with his child. (Ind. ¶ 20). Between June 2007 and January 2008, Mellon made $725,000 in contributions to Edwards via seven different personal checks, made payable to an interior-decorator friend and disguised as purchases of antique furniture. (Ind. ¶ 23). The friend, in turn, sent the checks to Young, whose wife endorsed and deposited them into the Young family's bank account. (Ind. ¶ 24). The funds were used to finance Hunter's living and medical expenses, ensure her silence, and hide her from the national media. (Ind. ¶¶ 18, 24).

Fred Baron served as the Edwards campaign's national Finance Chair during the 2008 campaign. (Ind. ¶ 5). In October 2007, the *National Enquirer* published an article reporting that Edwards was allegedly involved in an extramarital affair. (Ind. ¶ 25). Edwards promptly (and falsely) denied it. (Ind. ¶ 25). In December 2007, Edwards convinced Young to state publicly (and falsely) that Young was the father of the child Hunter was carrying. (Ind. ¶¶ 26, 27). Also in December 2007, and in order to avoid damage to the campaign, Edwards and Young arranged for Baron to fund flying Hunter, as well as Young and Young's family, out of North Carolina by private jet to secluded locations, to escape the media. (Ind. ¶¶ 28, 29).

Over several weeks in December 2007 and January 2008, Hunter and the Youngs stayed in posh hotels in Fort Lauderdale, Aspen, and San Diego before ultimately arriving in Santa Barbara, California. (Ind. ¶ 29). Baron paid for these chartered flights and housing accommodations, including rental payments on a luxury home in Santa

4

Barbara, to the tune of approximately $200,000, all for the benefit of Edwards' campaign. (Ind. ¶ 29). Baron also had a Federal Express envelope containing $1,000 in cash delivered to Young at one of the hotels. The envelope contained a handwritten note from Baron that stated: "Old Chinese saying: Use cash, not credit cards!" (Ind. ¶ 30). Baron also transferred $10,000 by wire into a bank account controlled by Young. Baron made these payments for the benefit of Edwards' campaign. (Ind. ¶ 30).

On January 30, 2008, Edwards suspended his presidential campaign, but the John Edwards for President Committee remained in existence. (Ind. ¶ 31). In August 2008, Edwards appeared on ABC's *Nightline* program for an interview. (Ind. ¶ 32). In the interview, Edwards continued to falsely deny fathering the child with Hunter, and also disclaimed any knowledge of funds – that is, the contributions from Mellon and Baron – being paid to Hunter or Young. (Ind. ¶ 32).

In the summer of 2009, Edwards explored with a former campaign employee the idea of issuing a written statement in which Edwards would admit fathering the child. (Ind. ¶ 33). During that time period, Edwards made multiple statements to the employee admitting the affair, the paternity, and his knowledge of Baron's contributions that were used for the cover-up. (Ind. ¶ 33). Although initial versions of Edwards' planned statement included an admission that he knew during the campaign that Baron's funds were being used to support Hunter, he later told the employee that it was a huge issue and decided against including any admission about Baron for what he termed "legal and practical reasons." (Ind. ¶ 33).

5

Edwards and his conspirators sought to conceal Mellon's and Baron's prohibited contributions from the public and the FEC. (Ind. ¶¶ 19, 31). The Election Act required campaign committees to file periodic campaign finance reports with the FEC, in order to provide a transparent public record of the amounts and sources of contributions. (Ind. ¶¶ 11, 12). Edwards, through his campaign committee, was required to and did, in fact, file these periodic reports with the FEC. (Ind. ¶ 11). However, Edwards caused his campaign committee to create and submit false and deceptive campaign finance reports that failed to report the hundreds of thousands of dollars in contributions from Mellon and Baron. (Ind. ¶¶ 31, 43).

## ARGUMENT

As a threshold matter, Edwards' Motion and supporting brief fail to specify any legal authority justifying the dismissal of Count One of the Indictment at this stage of the proceedings. Instead, Edwards generally alleges that Count One is "defective as a matter of law." (Edwards Brf. #4 at 1). Contrary to Edwards' contention, Count One is legally sufficient on its face.

A sufficient indictment need only accurately state the elements of the offense charged and contain a statement of facts and circumstances sufficient to inform the defendant of the specific crime with which he has been charged. *See United States v. Loayza*, 107 F.3d 257, 260 (4th Cir. 1997); Fed. R. Crim. P. 7(c)(1) (requires indictment to be "a plain, concise and definite written statement of the essential facts constituting the offense charged"). That requirement is certainly satisfied here.

6

Count One charges that Edwards violated the federal conspiracy statute, which states, in pertinent part:

> If two or more persons conspire either to commit any offense against the United States … and one or more of such persons do any act to effect the object of the conspiracy, each shall be [guilty of a crime.]

18 U.S.C. § 371.

The charging paragraph in Count One of the Indictment states as follows:

> From in or about 2007 until in or about 2009, in the Middle District of North Carolina and elsewhere, the defendant, JOHNNY REID EDWARDS, did knowingly and willfully combine, conspire, confederate and agree with others, known and unknown, to:
>
> (A)      accept and receive, while a candidate for federal office, contributions from [Mellon] and [Baron] in excess of the limits of the Election Act, which aggregated $25,000 and more from each contributor during a calendar year, in violation of Title 2, United States Code, Sections 441a(a)(1)(A), 441a(f) and 437g(d)(1)(A)(i); and
>
> (B)      falsify, conceal, and cover up by trick, scheme, and device a material fact, in a matter within the jurisdiction of the executive branch of the United States Government, by, among other things, causing the John Edwards for President Committee to create and file false and misleading campaign finance reports with the FEC, in violation of Title 18, United States Code, Section 1001(a)(1).
>
> ...
>
> All in violation of Title 18, United States Code, Section 371.

(Ind. ¶ 14).

As illustrated by the above-quoted language, the Indictment cites the charging statute, tracks the wording of the statute, and sets forth the essential elements of

the crime.  *See United States v. Wicks*, 187 F.3d 426, 427 (4th Cir. 1999) (an indictment

is generally sufficient if it alleges an offense "in the words of the statute").  In addition,

the Indictment identifies individuals involved in the conspiracy,[3] the time span of the

conspiracy, and the unlawful objects of the conspiracy.  (Ind. ¶¶ 1-5, 14).  The Indictment

also explains the nature of the offense, and contains considerable detail regarding the

purpose of the conspiracy, the manner and means of the conspiracy, and the overt acts

allegedly committed in furtherance of the conspiracy.  (Ind. ¶¶ 7-12, 14-33).  Count One,

on its face, provides more than enough specificity to inform Edwards of the charge

against him, and therefore satisfies the lenient standard applied when evaluating the legal

sufficiency of an indictment at this early stage of the case.

## I.     The Indictment Does Not Charge A "Rimless Wheel" Conspiracy

Edwards claims that Count One is defective because it charges a "rimless

wheel conspiracy," where multiple conspiracies are charged in a single count.   (Edwards

Brf. #4 at 6).  A rimless wheel conspiracy exists where one central individual (the hub of

the wheel) is alleged to have independent relationships with a number of others (the

spokes of the wheel), who are not connected to one another.  Those individuals, in other

words, are independent spokes on a rimless wheel.  In that scenario, courts have found

that, rather than engaging in a single conspiracy, the central figure has engaged in

---

[3]     Although the Indictment does not purport to specify each or all of the co-conspirators, it is legally sufficient to simply allege that the defendant conspired with persons known and unknown.  *See United States v. American Waste Fibers Co., Inc.*, 809 F.2d 1044, 1046 (4th Cir. 1987).

separate and distinct conspiracies. *See, e.g.*, *Kotteakos v. United States*, 328 U.S. 750, 754-55 (1946). Here, Edwards argues that the Indictment alleges a rimless wheel conspiracy with him as the hub and Mellon and Baron as the spokes. (Edwards Brf. #4 at 6). Edwards is incorrect on the facts and the law.

As an initial matter, Edwards' Motion is premature. The question of whether a single conspiracy or multiple conspiracies exists is a question of fact for the jury. *See, e.g.*, *United States v. Urbanik*, 801 F.2d 692, 695 (4th Cir. 1986). The cases Edwards cites illustrate this point. (Edwards' Memorandum in Support of Motion to Dismiss #4 ("Edwards Brf. #4") at 4-6).[4] The present case is in a pretrial stage, whereas the cases cited by Edwards dealt with situations that arose after the defendants were convicted. *See, e.g.*, *United States v. Huff*, 609 F.3d 1240, 1243 (11th Cir. 2010). The courts' rulings were based on the variance between the single conspiracy alleged in the indictment and the multiple conspiracies apparent from the proof at trial, because a showing of that variance is a prerequisite for relief. *See Kotteakos*, 328 U.S. at 755 ("The proof therefore admittedly made out a case, not of a single conspiracy, but of several, notwithstanding only one was charged in the indictment."). In the cases Edwards cites, the rulings turned on the evidence adduced at trial, not on the face of the indictment.

---

[4]     Indeed, Edwards cites only one case that dealt with a multiple conspiracy claim pretrial. *See Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002) (motion to dismiss class action for alleged antitrust conspiracy). The *Dickson* case, however, is inapposite. Unlike this case, the plaintiff in *Dickson* agreed that the complaint alleged a rimless wheel conspiracy, but argued it was sufficient for a single conspiracy in the context of the Sherman Act. *Id.* at 203.

By contrast, the limited issue before the Court at this early stage is simply to determine whether the Indictment, on its face, is legally sufficient. As outlined above, the Indictment plainly charges a single conspiracy among conspirators who shared a common goal. Edwards' claim that there is more than one conspiracy charged in a single count can only be addressed to the evidence at trial.[5]  *See United States v. Sampler*, 368 F. App'x 362, 365 (4th Cir. 2010) ("Whether there is a single conspiracy or multiple conspiracies is a factual question for the jury . . . ."). Edwards' Motion therefore should be denied without any further analysis.

However, even if the Court were inclined to look behind the allegations in the Indictment and consider Edwards' rimless wheel argument at this stage, his Motion should be denied. In support of his argument, Edwards relies heavily on the Supreme Court's decision in *Kotteakos*. In that case, an individual who had experience in obtaining loans under the National Housing Act ("NHA") acted as a broker for 32 individuals who fraudulently applied to financial institutions for NHA loans. *Kotteakos*, 328 U.S. at 752-53. The broker and the applicants were indicted for a single conspiracy to violate the NHA. However, the evidence at trial showed that each of the applicants (the spokes) had a separate agreement with the broker (the hub). *Id*. at 754-55. That is,

---

[5]  Indeed, Edwards' argument is more appropriately reserved for the charging conference. *See United States v. Nunez*, 432 F.3d 573, 578 (4th Cir. 2005) ("A multiple conspiracy instruction is not required unless the proof at trial demonstrates that appellants were involved **only** in [a] separate conspiracy **unrelated** to the overall conspiracy charged in the indictment.") (quoting *United States v. Squillacote*, 221 F.3d 542, 574 (4th Cir. 2000)). Based on the evidence the Government anticipates will be presented at trial, we do not believe a multiple conspiracy instruction will be warranted.

other than the use of the same broker, there was no other relationship or connection between the applicants. As a result, the Supreme Court concluded that multiple conspiracies existed, not a single conspiracy. *Id.* at 755.

The facts of *Kotteakos* are easily distinguishable from those here. As an initial matter, the alleged spokes in the conspiracy here include only two individuals – a far cry from the 32 people involved in the *Kotteakos* conspiracies. Moreover, as explained further below, unlike *Kotteakos*, where each of the spokes was concerned only with the success of their individual loan applications, the alleged spokes in this conspiracy (*i.e.*, Mellon and Baron) engaged in a series of transactions to effectuate the common object of a single overall conspiracy: to get financial support to Edwards to help him be elected President. That is, their shared objective was to help the hub of the conspiracy become President of the United States, and they promoted their common goal through multiple transactions.

Additionally, in contrast to *Kotteakos*, the conspiracy alleged in Count One does not consist of spokes connected only by a single person. While Edwards solicited and accepted illegal contributions from Mellon and Baron independent of one another, the Indictment makes clear that Edwards did not act alone, and Mellon and Baron knew it. As alleged in the Indictment, in addition to Edwards, Andrew Young (Edwards' long-time campaign staffer) was a central figure in the conspiracy. Together, Edwards and Young solicited and accepted illegal contributions from Mellon and Baron. (Ind. ¶¶ 16-

11

17, 20, 24, 28-30). Thus, unlike the one-man hub in *Kotteakos* (*i.e.*, the NHA loan broker), Edwards did not move from spoke to spoke alone.

The Fourth Circuit's decision in *United States v. Hadeed*, 376 F. App'x 335 (4th Cir. 2010), underscores this point. In that case, Michael Hadeed, an immigration lawyer, was convicted of conspiracy to commit immigration fraud. *Id.* at 337. Hadeed's conviction was based on an agreement between him and Antoine Tahan (a former client of Hadeed), in which Tahan's business fraudulently employed five of Hadeed's clients so that they could obtain legal immigration status. *Id.* at 337. The *Hadeed* defendant, as here, invoked the "rimless wheel" theory from *Kotteakos* in support of his claim that the indictment charged multiple conspiracies in a single count. *Id.* at 342-43. The court in *Hadeed*, after reviewing the evidence presented at trial, rejected the defendant's claim. *Id.* at 343.

In doing so, the court distinguished *Kotteakos* by noting that the case before it was not a conspiracy with a "single-man hub" forming agreements with five individual co-conspirators. *Hadeed*, 375 F. App'x at 343. Instead, the court found that the evidence demonstrated a single agreement between Tahan and Hadeed, which formed the hub, and separate agreements with the five co-conspirators. *Id.* Tahan and Hadeed's agreement formed a single conspiracy although additional agreements were also present. *Hadeed*, 375 F. App'x at 343. *See also United States v. Ben M. Hogan Co.*, 769 F.2d 1293, 1302 n. 14 (8th Cir. 1985), *vacated on other grounds*, 478 U.S. 1016 (1986) (a single agreement may exist despite the presence of subconspiracies or subgroups).

12

As in *Hadeed*, there is no rimless wheel conspiracy here. The Indictment makes clear that, given Young's key role (akin to Tahan's role in *Hadeed*), this is not a conspiracy that merely consists of spokes connected to a single person. Like the defendant in *Hadeed*, Edwards is not a "single-man hub." Thus, the same outcome as in *Hadeed* is appropriate here. The Court should reject Edwards' rimless wheel conspiracy claim as premature and baseless in any event.

Hubs and spokes aside, the crux of Edwards' claim rings hollow. He argues that the Indictment does not charge a single conspiracy because Mellon and Baron did not know about each other's involvement in the conspiracy and had relationships with Edwards independent of one another. (Edwards Brf. #4 at 6). Even if the evidence at trial were to bear that out, it is a misstatement of the law. It is black-letter law that a single conspiracy may encompass members who neither know one another's identities nor know of one another's involvement. *See Blumenthal v. United States*, 332 U.S. 539, 556-57 (1947). Further, a member of a conspiracy need not know the entire scope or all the details of the conspiracy, participate in all the activities of the conspiracy, or have joined the conspiracy from its inception. *See United States v. Banks*, 10 F.3d 1044, 1054 (4th Cir. 1993) ("It is of course elementary that one may be a member of a conspiracy without knowing its full scope, or all its members, and without taking part in the full range of its activities or over the whole period of its existence.").

In considering whether a single conspiracy exists, courts often look to whether there is an "overlap of key actors, methods, and goals." *United States v. Leavis*,

853 F.2d 215, 218 (4th Cir. 1988). That is certainly the case here, in contrast to the example described in Edwards' brief of a number of unlawful conduit contributions where the only commonality between the conduits is that their unlawful contributions went to the same candidate. (Edwards Brf. #4 at 7). Edwards and Young, as outlined above, were key actors in the charged conspiracy who not only worked together but also coordinated their efforts with Baron and Mellon to achieve the conspiracy's unlawful objectives.

It is equally clear from the Indictment that the conspiracy is defined by common methods and a shared goal. For example, while Mellon and Baron made illegal contributions independent of one another, the illicit payments from both were delivered in the same manner, *i.e.*, secretly. Mellon made contributions to Edwards via personal checks, made payable to an interior-decorator friend and disguised as purchases of antique furniture (Ind. ¶ 23), while Baron had a Federal Express envelope containing cash delivered to Young with a handwritten note that stated: "Old Chinese saying: Use cash, not credit cards!" (Ind. ¶ 30). Moreoever, the payments from both Mellon and Baron were used to cover the same category of expenses (*i.e.*, those required to hide and maintain Rielle Hunter).

In addition, the Indictment alleges that all the conspirators had a common goal: to get financial support to Edwards unlawfully to help him be elected President. (Ind. ¶¶ 4, 5, 15, 16-18, 21, 28-30). Under these facts and the governing legal principles,

it is clear that Mellon's and Baron's ignorance of what the other was doing should have no effect on the validity of the conspiracy charge.

This conclusion is further supported by the drug analogy referenced in Edwards' brief. By comparing this case to a drug distribution network in which a manufacturer uses different parties to distribute the drugs, the defendant suggests that a single conspiracy did not exist merely because Baron and Mellon were involved in different transactions. (Edwards Brf. #4 at 7-8). If Edwards' analysis were correct, conspirators who entered into a single agreement could never be charged with a single overall conspiracy so long as one person involved in the commission of each crime did not play a role in the commission of other crimes. Such a result is both illogical and contrary to well-established precedent. *See, e.g.*, *Banks*, 10 F.3d at 1054 (members of a conspiracy need not participate in the "full range of its activities").

The fact that conspirators may not be tied to each and every transaction may impact the scope of the conspiracy, but it does not negate the existence of a single, overall conspiracy. *See Banks*, 10 F.3d at 1054; *United States v. Champion*, 813 F.2d 1154, 1166-67 (11th Cir. 1987) (upholding the sufficiency of a single conspiracy where the defendant was the only defendant linked to eighteen shipments of drugs covering a three-year period, as the goal of the conspiracy – to import drugs – did not change throughout that period). Indeed, it is possible for members of a single conspiracy to work in parallel positions, or even to compete against one another, without becoming a separate or additional conspiracy. *See Blumenthal v. United States*, 332 U.S. at 557.

Thus, while Mellon and Baron were involved in separate transactions (all of which involved Edwards and Young), those transactions do not constitute separate conspiracies. Rather, Count One alleges the existence of a single conspiracy, which was carried out through multiple transactions.

## II. The Indictment Alleges an Agreement to Commit the Same Crime

Edwards also argues that Count One is legally defective because it fails to allege that all the conspirators agreed to commit the same crime. (Edwards Brf. #4 at 8.) A conspiracy charge must allege that the participants agreed to commit one or more of the same offenses. *See* 18 U.S.C. § 371; *Braverman v. United States*, 317 U.S. 49, 53 (1942). The plain language of the Indictment, as outlined above, makes clear that Edwards and his co-conspirators agreed to commit the same two substantive crimes: (1) accept unlawful contributions in violation of the Election Act; and (2) make false statements in violation of Title 18, United States Code, Section 1001(a)(1). The Court need not look further.

Nonetheless, Edwards claims that because Mellon and Baron *made* illegal contributions, it is legally impossible for them to have done so as part of an agreement with Edwards to *accept* those contributions. Notably, Edwards cites no authority for this proposition. That is because his claim is wholly unfounded.

As an initial matter, even if, as Edwards suggests, Mellon and Baron could not have conspired with him to accept unlawful contributions, his argument fails because it ignores that Mellon and Baron were not Edwards' only conspirators. As described

16

above, the Indictment alleges that Young, too, conspired with Edwards.  In doing so, in coordination with Edwards, Young caused the *acceptance* of illegal contributions.  Thus, irrespective of whether Mellon or Baron conspired with Edwards, the Indictment is legally sufficient as Count One alleges that "two or more persons [*i.e.*, Edwards and Young] conspire[d]" to accept illegal contributions.  *See* 18 U.S.C. § 371.

In addition, Edwards' claim that Mellon and Baron cannot be members of the alleged conspiracy is inherently flawed because it wrongly assumes that Mellon and Baron, as donors, cannot be liable for accepting illegal contributions.  (Edwards Brf. #4 at 8).  That is another misstatement of the law.  While neither Mellon nor Baron is charged in the Indictment, a donor, as in this case, who makes a contribution in excess of the legal limit can be liable for the substantive crime of *causing* the acceptance of an illegal contribution.  *See* 18 U.S.C. § 2 (providing for aider and abettor liability); *United States v. Akinkoye*, 185 F.3d 192, 201 (4th Cir. 1999) ("Aiders and abettors are liable to the same extent as the principal."); *United States v. Pino-Perez*, 870 F.2d 1230, 1233 (7th Cir. 1989) (As a general rule, "[t]he aiding and abetting provision . . . is applicable to the entire criminal code.") (quoting *United States v. Jones*, 678 F.2d 102, 105 (9th Cir. 1982)); *United States v. Chestnut*, 533 F.2d 40 (2d Cir. 1976) (affirming defendant's conviction for causing another to accept and receive an illegal corporate contribution under a theory of aiding and abetting); *see also United States v. Ashley*, 606 F.3d 135, 142-43 (4th Cir. 2010) ("The *Pinkerton* doctrine makes a person liable for substantive

17

offenses committed by a co-conspirator when their commission is reasonably foreseeable and in furtherance of the conspiracy.").

Further, Edwards' reliance on the distinction between the substantive offense of *making* an illegal contribution and the substantive offense of *accepting* an illegal contribution is entirely misplaced. The defendant argues that Mellon and Baron (who made the contributions) and Edwards (who received them) could not have conspired to commit the same crime because those two offenses occur at different points in time, *i.e.*, the defendant alleges that the crime of making a contribution is complete when the payment is sent, but the crime of accepting a contribution occurs later when the payment is deposited. (Edwards Brf. #4 at 8). Edwards' argument, once again, misses the point.

Count One charges Edwards with the crime of conspiracy, not with making or accepting an illegal contribution. As made clear by the statutory language, the crime of conspiracy is an *agreement* between two or more persons to break the law. The conspiracy alleged here is the unlawful agreement among Edwards, Mellon, Baron and others. While the object of that agreement is to accept illegal contributions, the crime is the illicit agreement itself. *See Braverman*, 317 U.S. at 54 (the crime is the conspiratorial agreement itself, not "the crime which [the agreement] contemplates . . . ."); *Frohwerk v. United States*, 249 U.S. 204, 210 (U.S. 1919) ("The conspiracy is the crime, and that is one, however diverse its objects."). Thus, despite Edwards' contention, the fact that the substantive crime of making an illegal contribution and the substantive crime of

18

accepting an illegal contribution may occur at different points in time is of no consequence.

Edwards points to cases holding that a drug buyer cannot be charged with conspiracy with a drug distributor, but his analogy fails for two reasons. First, the Fourth Circuit has recognized that buy-sell transactions can, in fact, support a finding of a conspiracy. *See, e.g.*, *United States v. Cornwell*, 418 F. App'x 224, 226 (4th Cir. 2011). Moreover, the disparate treatment of drug users and sellers results from the fact that the law provides heavier penalties for drug sellers than for buyers. *See* 21 U.S.C. § 841. Since a lesser punishment is authorized for mere possession of drugs than for distribution, at least one court has held that a person who received drugs for personal use should not be charged with conspiring to distribute the drugs which he received. *See Nigro v. United States*, 117 F.2d 624, 629 (8th Cir. 1941). This rationale does not apply here. While making an illegal contribution and accepting an illegal contribution are two separate offenses, the punishment for a violation of those offenses is the same. *See* 2 U.S.C. § 437g(d)(1)(A).

As the Fourth Circuit has observed in drug conspiracy cases, the critical inquiry is whether the Government has proven an "agreement between at least two persons to take concerted action." *United States v. Guinta*, 925 F.2d 758, 764 (4th Cir. 1991), *overruled on other grounds by United States v. Burgos*, 94 F.3d 849 (4th Cir. 1996). Thus, where a buyer-seller relationship involves a one-off transaction without any planning or coordination among the alleged co-conspirators, a conspiracy may not exist.

19

The facts alleged in the Indictment clearly show much more than a one-off transaction. As described above, it alleges that Mellon and Baron planned and coordinated multiple transactions with Edwards and Young over a period of months (*e.g.*, Mellon attempted to carefully circumvent detection by disguising contributions as furniture purchases and Baron secretly funneled cash to Young and Hunter for housing and living expenses). Further, unlike in a casual buy-sell transaction, where the purposes of the participants may be different, here, as the Indictment makes clear, the conspirators shared a common conspiratorial purpose. *See United States v. Mills*, 995 F.2d 480, 485 (4th Cir. 1993) (affirming drug conspiracy conviction where there was proof of a "common conspiratorial purpose").

   The flaw in Edwards' theory is further illustrated by a recent conspiracy case in which Edwards' counsel unsuccessfully advanced this same argument. *See United States v. Bravo-Fernandez*, 756 F. Supp. 2d 184 (D. P.R. 2010). In that case, just as in this case, the conspiracy charge in the indictment was claimed to be defective because the Government failed to allege that the defendants conspired to commit the same crime. *Id.* at 201. The object of the conspiracy in that case was to violate the federal program bribery statute, Title 18, United States Code, Section 666. *Id.* at 190. Counsel argued that because the private individual ***offered*** a bribe and the public official ***accepted*** a bribe, the two could not agree to commit the same crime. *Id.* at 201.

   In *Bravo-Fernandez*, the unlawful agreement was between a private citizen and a sitting public official; here it is between private citizens and a candidate for public

office.  There the payments were unlawful bribes; here the payments were unlawful campaign contributions.  But as the Puerto Rico court held, the fact that the donors and the recipient are on opposite sides of the same criminal transaction does not bar the existence of a conspiracy between them.  *Bravo-Fernandez*, 756 F. Supp. 2d at 201; *United States v. Langford*, 647 F.3d 1309 (11th Cir. 2001) (holding that a narrow common law exception providing that a defendant cannot be punished both for conspiracy and the underlying substantive offense, known as Wharton's Rule, does not apply to bribery).  The court flatly rejected the defendant's argument in *Bravo-Fernandez*, finding that it was advanced without "any legal support."  *Bravo-Fernandez*, 756 F. Supp. 2d at 201.  The argument is equally unpersuasive here.

## **CONCLUSION**

For these reasons, the Government respectfully submits that Edwards'

Motion should be denied in its entirety.

Dated: September 26, 2011

Respectfully submitted,

JOHN STUART BRUCE
Attorney for the United States
Acting under authority
conferred by 28 U.S.C. § 515

JACK SMITH
Chief, Public Integrity Section
Criminal Division
U.S. Department of Justice

By: /s/ Robert J. Higdon, Jr.
    Robert J. Higdon, Jr.
    Brian S. Meyers
    Special Attorneys
    U.S. Attorney's Office
    310 New Bern Ave., Suite 800
    Raleigh, NC 27601-1461
    Tel: (919) 856-4103
    Fax: (919) 856-4887
    bobby.higdon@usdoj.gov
    State Bar No. 17229

By: /s/ Justin V. Shur
    David V. Harbach, II
    Justin V. Shur
    Jeffrey E. Tsai
    Trial Attorneys
    Public Integrity Section
    Criminal Division
    U.S. Department of Justice
    1400 New York Ave., N.W., Ste. 12100
    Washington, DC 20005
    Tel: (202) 514-1412
    Fax: (202) 514-3003
    david.harbach@usdoj.gov

## CERTIFICATE OF SERVICE

This is to certify that on September 26, 2011, I filed the foregoing

document on the Court's CM/ECF system, which will transmit a copy to the following

counsel of record in this case:

Wade Marvin Smith                    Abbe David Lowell
Tharrington Smith                    Chadbourne & Parke, LLP
209 Fayetteville Street              1200 New Hampshire Avenue, N.W.
P.O. Box 1151                        Washington, DC 20036
Raleigh, NC 27602-1151

James P. Cooney, III
Womble Carlyle Sandridge & Rice, PLLC
One Wells Fargo Center
301 South College Street, Suite 3500
Charlotte, North Carolina 28202-6037

                    /s/ David V. Harbach, II
                    Trial Attorney
                    Public Integrity Section
                    Criminal Division
                    U.S. Department of Justice
                    1400 New York Ave., N.W., Ste. 12100
                    Washington, DC 20005
                    Tel: (202) 514-1412
                    Fax: (202) 514-3003
                    david.harbach@usdoj.gov