IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:11-CR-161-1 |
| | ) | |
| JOHNNY REID EDWARDS | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION
TO DISMISS INDICTMENT ALLEGATIONS FOR CHARGING DEFECTS**

The United States of America, through the undersigned attorneys, files this

Response in opposition to defendant John Edwards' Motion to Dismiss Indictment

Allegations for Charging Defects (Motion to Dismiss #5). For the reasons discussed in

this Memorandum, the Government respectfully submits that Edwards' Motion should be

denied in its entirety.

## INTRODUCTION

**I.    Summary of Indictment**

The Indictment contains six counts:  Count One charges conspiracy, in

violation of Title 18, United States Code, Section 371; Counts Two through Five charge

acceptance and receipt of illegal campaign contributions, in violation of the Federal

Election Campaign Act ("Election Act"), specifically Title 2, United States Code,

Sections 441a(a)(1)(A), 441a(f), and 437g(d)(1)(A)(i); and Count Six charges false

statements in the form of a scheme to conceal material facts from the FEC, in violation of

Title 18, United States Code, Section 1001(a)(1).

## II.    Overview of Facts Alleged in the Indictment[1]

In 2007 and 2008, John Edwards was a candidate for the Democratic Party's nomination for President of the United States.  (Ind. ¶ 1).  During the same time period, he was engaged in an extramarital affair with Rielle Hunter, which resulted in a pregnancy.  (Ind. ¶ 3).[2]  Edwards and others believed that if the public learned of the affair, his campaign would be destroyed.  (Ind. ¶ 15).

In order to maintain the viability of his candidacy, Edwards sought to conceal his extramarital affair and the pregnancy from the public.  (Ind. ¶¶ 15, 18).  In order to achieve this goal, Edwards and a long-time campaign staffer, Andrew Young, approached two wealthy Edwards benefactors – Rachel "Bunny" Mellon and Fred Baron – for financial assistance.  (Ind. ¶¶ 2, 16, 17, 21, 28).

Mellon had been a reliable Edwards political supporter and donor since the 2004 election.  (Ind. ¶ 4).  In April 2007, Mellon wrote a note to Young in response to media reports about the alleged cost of Edwards' haircuts:

---

[1]    This overview is identical to the one appearing in the Government's Response to Edwards' Motion to Dismiss #1 ("Gov't Brf. #1").  We repeat it here for the Court's convenience in resolving this Motion.

[2]    Consistent with local practice and Department of Justice policy, the Indictment uses pseudonyms for the individuals involved.  However, the briefs Edwards has filed disclose the names of these individuals.  Accordingly, the Government uses their names in its responses for clarity and because it cannot prevent identification of those individuals in the process of responding to Edwards' arguments.

> The timing of your telephone call on Friday was "witchy." I was sitting alone in a grim mood – <u>furious</u> that the press attacked Senator Edwards on the price of a haircut. But it inspired me – from now on, all haircuts, etc., that are necessary and important for his campaign – please send the bills to me . . .. It is a way to help our friend without Government restrictions. I see <u>jealousy</u> coming from somewhere in this news report.

(Ind. ¶ 21).

In or around May 2007, Edwards and Young solicited Mellon for financial support, and even though she had already contributed to Edwards the maximum amount allowed under the law, Mellon agreed to provide Edwards additional money to help him become President. (Ind. ¶¶ 21, 22). During this same time period, Hunter informed Edwards that she was pregnant with his child. (Ind. ¶ 20). Between June 2007 and January 2008, Mellon made $725,000 in contributions to Edwards via seven different personal checks, made payable to an interior-decorator friend and disguised as purchases of antique furniture. (Ind. ¶ 23). The friend, in turn, sent the checks to Young, whose wife endorsed and deposited them into the Young family's bank account. (Ind. ¶ 24). The funds were used to finance Hunter's living and medical expenses, ensure her silence, and hide her from the national media. (Ind. ¶¶ 18, 24).

Fred Baron served as the Edwards campaign's national Finance Chair during the 2008 campaign. (Ind. ¶ 5). In October 2007, the *National Enquirer* published an article reporting that Edwards was allegedly involved in an extramarital affair. (Ind. ¶

-3-

25). Edwards promptly (and falsely) denied it. (Ind. ¶ 25). In December 2007, Edwards convinced Young to state publicly (and falsely) that Young was the father of the child Hunter was carrying. (Ind. ¶¶ 26, 27). Also in December 2007, and in order to avoid damage to the campaign, Edwards and Young arranged for Baron to fund flying Hunter, as well as Young and Young's family, out of North Carolina by private jet to secluded locations, to escape the media. (Ind. ¶¶ 28, 29).

Over several weeks in December 2007 and January 2008, Hunter and the Youngs stayed in posh hotels in Fort Lauderdale, Aspen, and San Diego before ultimately arriving in Santa Barbara, California. (Ind. ¶ 29). Baron paid for these chartered flights and housing accommodations, including rental payments on a luxury home in Santa Barbara, to the tune of approximately $200,000, all for the benefit of Edwards' campaign. (Ind. ¶ 29). Baron also had a Federal Express envelope containing $1,000 in cash delivered to Young at one of the hotels. The envelope contained a handwritten note from Baron that stated: "Old Chinese saying: Use cash, not credit cards!" (Ind. ¶ 30). Baron also transferred $10,000 by wire into a bank account controlled by Young. Baron made these payments for the benefit of Edwards' campaign. (Ind. ¶ 30).

On January 30, 2008, Edwards suspended his presidential campaign, but the John Edwards for President Committee remained in existence. (Ind. ¶ 31). In August 2008, Edwards appeared on ABC's *Nightline* program for an interview. (Ind. ¶ 32). In the interview, Edwards continued to falsely deny fathering the child with Hunter, and also

-4-

disclaimed any knowledge of funds – that is, the contributions from Mellon and Baron – being paid to Hunter or Young. (Ind. ¶ 32).

In the summer of 2009, Edwards explored with a former campaign employee the idea of issuing a written statement in which Edwards would admit fathering the child. (Ind. ¶ 33). During that time period, Edwards made multiple statements to the employee admitting the affair, the paternity, and his knowledge of Baron's contributions that were used for the cover-up. (Ind. ¶ 33). Although initial versions of Edwards' planned statement included an admission that he knew during the campaign that Baron's funds were being used to support Hunter, he later told the employee that it was a huge issue and decided against including any admission about Baron for what he termed "legal and practical reasons." (Ind. ¶ 33).

Edwards and his conspirators sought to conceal Mellon's and Baron's prohibited contributions from the public and the FEC. (Ind. ¶¶ 19, 31). The Election Act required campaign committees to file periodic campaign finance reports with the FEC, in order to provide a transparent public record of the amounts and sources of contributions. (Ind. ¶¶ 11, 12). Edwards, through his campaign committee, was required to and did, in fact, file these periodic reports with the FEC. (Ind. ¶ 11). However, Edwards caused his campaign committee to create and submit false and deceptive campaign finance reports that failed to report the hundreds of thousands of dollars in contributions from Mellon and Baron. (Ind. ¶¶ 31, 43).

-5-

**ARGUMENT**

Edwards concedes that venue is proper for Counts Two and Three of the Indictment, but argues that Counts One, Four, and Five should be dismissed for lack of venue because the contributions from Baron were not "received" in the Middle District of North Carolina. (Edwards' Memorandum in Support of Motion to Dismiss #5 ("Edwards Brf. #5") at 2, 4-7).[3] Edwards' argument should be rejected.

## I.    Applicable Legal Principles

A defendant is guaranteed the right to be tried where the crime alleged was committed. U.S. Const., Art. III; § 2; U.S. Const., Amend. VI. The Framers included these provisions in the Constitution because they were "[a]ware of the unfairness and hardship to which trial in an environment alien to the accused exposes him." *United States v. Johnson*, 323 U.S. 273, 275 (1944). Today, the purpose of these provisions is to "stand as bulwarks against prosecutorial overreaching in forcing the defendant to answer accusations in a spatially distant and unfriendly environment." *United States v. Busic*, 549 F.2d 252, 253 (2d Cir. 1977) (characterizing original motivation for codification of provisions to be "revulsion for adjudication of criminal charges in a remote region, before a jury drawn from a hostile or insouciant citizenry").

_____

[3]    Edwards does not concede that venue is proper for Count Six, but nor does he contest it.

"When multiple counts are alleged in an indictment, venue must be proper on each count." *United States v. Robinson*, 275 F.3d 371, 378 (4th Cir. 2001); *United States v. Bowens*, 224 F.3d 302, 308 (4th Cir. 2000). If challenged, the Government must prove at trial that venue is proper, but only by a preponderance of the evidence. *United States v. Ebersole*, 411 F.3d 517, 524 (4th Cir. 2005).

In assessing whether venue is proper, "[t]he locus delicti [of the charged offense] must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Rodriguez-Moreno*, 526 U.S. 275, 278-79 (1999) (internal quotation marks and citations omitted). And although examination of the verbs used in a given statute is one method of doing so, the Fourth Circuit has recognized that "it [is] not always possible by the use of one analytical tool to discern the location of where a crime has been committed . . . examination of verbs employed in the statute is not an exclusive method and 'there are crimes where the situs is not so simple of definition.'" *United States v. Cofield*, 11 F.3d 413, 417 (4th Cir. 1993) (citing *United States v. Billups*, 692 F.2d 320, 332 (4th Cir. 1982)). In *Cofield*, the Fourth Circuit quoted approvingly from a Second Circuit opinion that stated:

> [A] review of relevant authorities demonstrates that there is no single defined policy or mechanical test to determine constitutional venue. Rather, the test is best described as a substantial contacts rule that takes into account a number of factors – the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal

conduct, and the suitability of each district for accurate
factfinding.

*Cofield*, 11 F.3d at 417 (quoting *United States v. Reed*, 773 F.2d 477, 481 (2d Cir. 1985)).

In addition, "[e]xcept as otherwise expressly provided by enactment of
Congress, any offense against the United States begun in one district and completed in
another, or committed in more than one district, may be inquired of and prosecuted in any
district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a);
*Bowens*, 224 F.3d at 309 (for some offenses, there may be "more than one appropriate
venue") (citing 18 U.S.C. § 3237(a)); *United States v. Barfield*, 969 F.2d 1554, 1557 (4th
Cir. 1992) ("Under 18 U.S.C. § 3237(a), jurisdiction over the prosecution of a continuing
offense lies in any district in which any portion of the offense occurred.").

## II.     The Indictment Properly Alleges Venue

Indictments routinely allege no more than a statement that the crime
charged occurred in a given judicial district, and there is no requirement that facts
supporting venue be alleged in an indictment. Whether the Government has proven
sufficient facts to establish venue by a preponderance of the evidence is a question for the
jury, if the charges are such that the jury could convict on the offenses charged without an
implicit finding that the acts used to establish venue had been proven. *United States v.
Osuji*, 413 Fed. App'x 603, 610-11 (4th Cir. 2011) (unpublished) (citing *United States v.*

-8-

*Martinez*, 901 F.2d 374, 376 (4th Cir. 1990)); *see also United States v. Cryar*, 232 F.3d 1318, 1323 (10th Cir. 2000) ("Venue is a fact question, normally decided by the jury.").

Because the Indictment is sufficient on its face and does not purport to lay out all of the facts the Government intends to prove at trial, "the government is entitled to present its evidence at trial and have its sufficiency tested by a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29." *United States v. Salman*, 378 F.3d 1266, 1268 (11th Cir. 2004).

## III.    Venue is Proper in this District

Even if the Court wishes to look further than the face of the Indictment and entertain Edwards' arguments regarding venue at this stage of the proceedings, the conclusion is the same:  by any measure, venue in this case lies squarely in the Middle District.  The charges focus entirely on the acceptance of unlawful and excessive campaign contributions by Edwards in his campaign for the Presidency.  There will be no dispute that the Edwards campaign was headquartered in the Middle District, and that Edwards himself resided here during the relevant period, as he continues to today.  As Edwards concedes, the activity related to Mellon's unlawful contributions took place in the Middle District, and thus venue for Counts Two and Three properly lies here.  As for the conduct underlying Counts Four and Five, the evidence will show that Edwards himself, while in the Middle District, initiated the activity that forms the basis of these counts by directing Young to approach Baron to obtain funding for the effort to hide

-9-

Hunter and the affair. This conduct is charged in paragraph 28 of the Indictment. Moreover, the evidence will show that the cross-country travel Baron financed began in the Middle District, when Young and Hunter were whisked away from the Middle District in order to conceal the affair. From start to finish, the crimes charged in the Indictment were centered here.

### A. Count One (Conspiracy)

That venue is proper on Count One need not detain the Court long. When a conspiracy is charged, venue is proper "for all defendants wherever the agreement was made or wherever *any overt act* in furtherance of the conspiracy transpires." *Bowens*, 224 F.3d at 311 n.4 (emphasis added). *See also United States v. Al-Talib*, 55 F.3d 923, 928 (4th Cir. 1995) ("[A] prosecution may be brought in any district in which any act in furtherance of the conspiracy was committed."); *United States v. Gilliam*, 975 F.2d 1050, 1057 (4th Cir. 1992) (conspiracy "may be prosecuted in any district in which the agreement was formed or in which an act in furtherance of the conspiracy was committed.").

Edwards fails to cite this black-letter law in his brief. Instead, he points to cases that do not even concern venue and attempts to reason by analogy. (Edwards Brf. #5 at 5-6). There is no need to resort to such cases when *Bowens*, *Al-Talib*, *Gilliam*, and a legion of other cases make it pellucidly clear that venue for a conspiracy charge properly lies wherever any of the overt acts was committed, by any of the conspirators. The

-10-

evidence at trial will establish that many of the overt acts alleged in Count One of the Indictment occurred in this District. Moreover, Edwards' concession that venue is proper as to Counts Two and Three is a essentially a concession that venue is proper on Count One, because the conduct charged in Counts Two and Three consists of several of the overt acts charged in Count One. Indeed, Counts Two and Three expressly incorporate the overt acts alleged in Count One. (Ind. ¶¶ 38, 40). Venue on Count One is appropriate, both from the face of the Indictment and otherwise.

### B.     Counts Four and Five (Receipt of Illegal Campaign Contributions)

With respect to Counts Four and Five, Edwards bases his argument on *United States v. Chestnut*, 533 F.2d 40 (2d Cir. 1976), but his reliance is misplaced. In that case, Chestnut, a campaign manager for Hubert Humphrey, arranged from Minnesota for a corporate donor to pay a debt the campaign owed to a vendor in New York. The payment was an unlawful contribution. The donor made out two checks to the vendor to cover the debt and sent them to Chestnut's office in Minnesota, from which they were forwarded directly to the vendor in New York. The vendor then deposited the checks in its New York bank, discharging the campaign's debt. *Chestnut*, 533 F.2d at 43-44. Chestnut was tried and convicted in the Southern District of New York of violating federal campaign finance law.

On appeal, Chestnut argued that venue in New York was improper, claiming that "the offense, if any, consisted of his actions in Minnesota." *Chestnut*, 533

-11-

F.2d at 47. Importantly, Chestnut further argued that the offense in question was not a continuing offense that could be prosecuted under Title 18, United States Code, Section 3237(a), and that venue was *only* proper in Minnesota. As to that contention, the court noted, "Since we have concluded that venue in New York was constitutionally permissible, we need not consider whether the offense defined in § 610 is a continuing offense which also might have been prosecuted in Minnesota." *Chestnut*, 533 F.2d at 47 n.5. The plain implication of this language is that if the offense at issue had been a continuing one such that Section 3237 applied, then venue would have been appropriate in Minnesota, where Chestnut had arranged the payment.

The contention that Chestnut disclaimed is the precise one that applies here: the crime charged in Counts Four and Five is a continuing offense that was begun and completed in the Middle District. The offense charged is acceptance of illegal contributions aggregating in excess of $25,000 over the course of a calendar year, in violation of 2 U.S.C. § 437g(d)(1)(A)(i). Because both the statute and the Indictment define the relevant timeframe during which illegal contributions must be aggregated to be a "calendar year," the offense is plainly a continuing one. *See Ebersole*, 411 F.3d at 527 (venue proper in multiple districts because charged crime, wire fraud, is a continuing offense); *United States v. Blecker*, 657 F.2d 629, 632 (4th Cir. 1981) (recognizing, in case involving submission of false claims to Government agency, that "when the crime is composed of distinct parts or is begun in one district and completed in another, venue

-12-

may be proper in more than one district"). As a result, venue is appropriate "in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). As described above, the evidence at trial will show, among other things, that the conduct underlying Counts Four and Five was initiated by Edwards himself in the Middle District, and that is where the offense was "begun." This is entirely consistent with the court's opinion in *Chestnut*, which noted in footnote 5 that, although the court expressly did not decide whether the offense at issue there was a continuing one, it suggested that if it were, venue would ***also*** have been appropriate in Minnesota. *Chestnut*, 533 F.2d at 47 n.5.

This result is also consistent with the Fourth Circuit's holding in *United States v. Grossman*, 400 F.2d 951 (4th Cir. 1968). There, the defendant was charged in the Middle District of North Carolina with the payment of a kickback, despite the fact that the delivery of stock certificates that constituted the kickback took place outside the district. The court found that venue was proper in the Middle District because the entire purpose of the transaction involving this intangible property was to benefit the recipient (one Walter Clitherow) in the Middle District, and that the specific acts of delivery of the certificates outside the district "were but steps in a continuing transaction." *Grossman*, 400 F.2d at 954. The court's analysis rings true here:

> Because the whole purpose of the transaction was to vest ownership of the stock in Clitherow in Winston Salem, in the Middle District of North Carolina, and to place the stock certificates in his physical possession in that state and since that overall purpose was accomplished, we think that

-13-

"payment" proscribed by the statute was made in the Middle
District of North Carolina and that the nice questions of
jurisdiction and venue do not then depend upon technical
considerations of the exact time and place that title passed to
Clitherow.

*Grossman*, 400 F.2d at 954. Likewise, in this case, the entire purpose of the transactions

was to benefit the candidate and his campaign – both of which were located in the Middle

District – and the individual transactions that occurred outside the district "were but steps

in a continuing transaction." *Grossman*, 400 F.2d at 954.

Additionally, Edwards' culpability under Title 18, United States Code,

Section 2 provides an alternative basis for venue. As discussed below, Edwards is

punishable as a principal for an offense if he "aids, abets, counsels, commands, induces or

procures its commission," or if he "willfully causes an act to be done which if directly

performed by him or another would be an offense against the United States." 18 U.S.C. §

2(a), (b). "Venue is proper where the defendant's accessorial acts were committed *or*

where the underlying crime occurred." *United States v. Smith*, 198 F.3d 377, 383 (2d Cir.

2000); *see also Bowens*, 224 F.3d at 311 n.4 (citing *Smith*); *United States v. Delia*, 944

F.2d 1010, 1014 (2d Cir. 1991).[4] Edwards' directing Young to approach Baron to arrange

---

[4]      To the extent the court's opinion in *Chestnut*, 533 F.2d at 47, suggests in
*dicta* that venue based on accessorial acts cannot be appropriate, the suggestion has been
erased by the Second Circuit's actual holdings in *Smith* and *Delia*.

-14-

the illegal contributions could make him guilty under either prong of Section 2 and accordingly, venue is appropriate in this District.

In short, not only the policy behind the venue rules, but also "the site of the defendant's acts, the elements and nature of the crimes charged, the locus of the effect of the criminal conduct, and the suitability of each district for accurate factfinding" all point to this District as proper venue. *Cofield*, 11 F.3d at 417. There is utterly no support for pretrial dismissal of any part of the Indictment based on venue. Edwards' Motion should be denied.

## IV.     Title 18, United States Code, Section 2 Provides no Basis for Dismissal

Edwards argues that because Counts Two through Five of the Indictment include references to Title 18, United States Code, Section 2, and because, according to Edwards, he "cannot have assisted himself in receiving an illegal contribution," Counts Two through Five must be dismissed. (Edwards Brf. #5 at 8). Edwards' argument is baseless.

It is well established that Section 2 is applicable to the entire criminal code, and every statute should be read and construed as if that provision were a part of it. *Pigford v. United States*, 518 F.2d 831, 834 (4th Cir. 1975); *United States v. Rector*, 538 F.2d 223, 225 (8th Cir. 1976)*; Breeze v. United States*, 398 F.2d 178, 192 (10th Cir. 1968). And "since Section 2 applies implicitly to all federal offenses, all indictments and informations are to be read as if the alternative[s] provided for in Section 2 were

-15-

embodied in each count thereof." *Pigford*, 518 F.2d at 834 (citing *United States v. Lester*, 363 F.2d 68, 72 (6th Cir. 1966)); *see also United States v. Duke*, 409 F.2d 669, 671 (4th Cir. 1969); *United States v. Sanchez*, 917 F.2d 607, 611 (1st Cir. 1990).

The Indictment's express inclusion of a provision that is implied in every indictment or information cannot be a basis for its dismissal. In other words, the Indictment is proper on its face.[5] Edwards' claims are more properly reserved for the charging conference.

Nevertheless, Edwards' argument is flawed for two fundamental reasons. First, the statute makes punishable as a principal not only those who "assist" in the commission of an offense, but also those who "counsel, command, induce, or procure" its commission. 18 U.S.C. § 2(a). This rule has existed in the law since even before Section 2 was enacted. *See, e.g., Clinton Cotton Mills v. United States*, 164 F.2d 173, 177 (4th Cir. 1947) ("One who commands or procures a crime to be committed, is guilty himself as a principal. . . ."). Edwards' directing Young to approach Baron and arrange the illegal payments at issue here plainly fits within that description.

Second, Edwards' "impossibility" argument is premised on the contention that "[i]t is only a crime for a ***candidate*** to accept illegal campaign contributions and Mr.

---

[5]      In view of this body of law, Edwards' acerbic commentary that "the prosecutors threw in a single line at the end of each Count" alleging Section 2 liability is puzzling, since in doing so the Government simply made explicit what otherwise would exist only by implication. (Edwards Brf. #5 at 7-8).

Edwards is the only candidate alleged to have done so." (Edwards Brf. #5 at 8). But Edwards ignores Section 2(b), which makes punishable as a principal one who "willfully causes an act to be done which if directly performed by him or another would be an offense against the United States." 18 U.S.C. § 2(b). Under this section, a defendant may be convicted "even though the agent willfully caused to do the criminal act is himself guiltless of any crime." *United States v. Smith*, 584 F.2d 731, 734 (5th Cir. 1978); *see also United States v. Ordner*, 554 F.2d 24, 29 (2d Cir. 1977) ("It is . . . well recognized that the guilt or innocence of the intermediary under a § 2(b) charge is irrelevant."). And since the entirety of Section 2 is read into every indictment, a court may properly instruct a jury on both prongs of Section 2. *See, e.g., Ordner*, 554 F.2d at 29 n.6 (noting that district court had incorporated both subsections in jury charge).

Finally, Edwards' claim that dismissal is appropriate because the grand jury did not specify whether Edwards was charged "as a principal or as an aider and abetter," Edwards Brf. #5 at 8, is ill-founded. There is no general requirement that even a trial jury specify whether they convict on an aiding and abetting theory. *See United States v. Horton*, 921 F.2d 540, 545 & n.1 (4th Cir. 1990) (although declining to hold that a unanimity instruction could never be necessary); *United States v. Ferguson*, No. 08-6211-cr, 2011 WL 3251464 at *11 (2d Cir. Aug. 1, 2011); *United States v. Garcia*, 400 F.3d 816, 820 (9th Cir. 2005).

-17-

**V.      The Timing of the Deposits of Two of Mellon's Checks Does Not Warrant Dismissal of Any Counts**

In his Brief #1, Edwards argues that because two of Mellon's checks were not deposited until after January 30, 2008, the date Edwards suspended his campaign, they cannot be contributions.  (Edwards Brf. #1 at 31-32).  For reasons explained elsewhere, that argument is ill-conceived and wrong.  (*See* Gov't Brf. #1 at 55-56).  In a variation on the same theme, Edwards argues here that even assuming the checks are contributions, there can be no crime of receipt of them "because the campaign had ended," and at the time Mellon's checks were deposited, "while a transfer of money between private citizens may be governed by other laws, the federal election laws do not apply because Mr. Edwards was no longer a candidate for a federal office."  (Edwards Brf. #5 at 9).  As a result, Edwards argues, Counts One through Three of the Indictment must be dismissed.  Edwards' argument here is no less flawed than his argument in Brief #1.

According to the Election Act, "[a] political committee may terminate only when such a committee files a written statement, in accordance with section 432(g) of this title, that it will no longer receive any contributions or make any disbursements and that such committee has no outstanding debts or obligations."  2 U.S.C. § 433(d)(1).  As a result, Edwards' mere announcement on January 30, 2008, that he was "suspending" his campaign does not mark the "end" of the campaign for purposes of the Election Act, and

-18-

Edwards' statement in his brief that "the federal election laws do not apply because Mr. Edwards was no longer a candidate for a federal office," Edwards Brf. #5 at 9, is manifestly wrong. This only makes sense. On Edwards' theory, any checks from supporters received and deposited by the campaign after January 30, 2008, became mere "transfers of money between private citizens" and were no longer contributions under the Election Act. That is plainly not the law.[6]

---

[6] To be clear, as discussed elsewhere, the fact that Edwards had publicly suspended his campaign arguably does impact the analysis of whether payments *made* after that date were made "for the purpose of influencing an election," but this factor does not apply to Mellon's checks because they were written and sent when the campaign was in full swing. (*See* Gov't Brf. #1 at 55-56 & n.24).

## CONCLUSION

For these reasons, the Government respectfully submits that Edwards'

Motion should be denied in its entirety.

Dated:  September 26, 2011

Respectfully submitted,

JOHN STUART BRUCE
Attorney for the United States
Acting under authority
conferred by 28 U.S.C. § 515

JACK SMITH
Chief, Public Integrity Section
Criminal Division
U.S. Department of Justice


By: /s/ Robert J. Higdon, Jr.
    Robert J. Higdon, Jr.
    Brian S. Meyers
    Special Attorneys
    U.S. Attorney's Office
    310 New Bern Ave., Suite 800
    Raleigh, NC 27601-1461
    Tel: (919) 856-4103
    Fax: (919) 856-4887
    bobby.higdon@usdoj.gov
    State Bar No. 17229

By: /s/ David V. Harbach, II
    David V. Harbach, II
    Justin V. Shur
    Jeffrey E. Tsai
    Trial Attorneys
    Public Integrity Section
    Criminal Division
    U.S. Department of Justice
    1400 New York Ave., N.W., Ste. 12100
    Washington, DC 20005
    Tel: (202) 514-1412
    Fax: (202) 514-3003
    david.harbach@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on September 26, 2011, I filed the foregoing

document on the Court's CM/ECF system, which will transmit a copy to the following

counsel of record in this case:

Wade Marvin Smith                    Abbe David Lowell
Tharrington Smith, LLP               Chadbourne & Parke, LLP
209 Fayetteville Street              1200 New Hampshire Avenue, N.W.
P.O. Box 1151                        Washington, DC 20036
Raleigh, NC 27602-1151

James P. Cooney, III
Womble Carlyle Sandridge & Rice, PLLC
One Wells Fargo Center
301 South College Street, Suite 3500
Charlotte, North Carolina 28202-6037

                         /s/ David V. Harbach, II
                         Trial Attorney
                         Public Integrity Section
                         Criminal Division
                         U.S. Department of Justice
                         1400 New York Ave., N.W., Ste. 12100
                         Washington, DC 20005
                         Tel: (202) 514-1412
                         Fax: (202) 514-3003
                         david.harbach@usdoj.gov

-21-