IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:11-CR-161-1 |
| | ) | |
| JOHNNY REID EDWARDS | ) | |

**GOVERNMENT'S MOTION FOR HEARING TO INQUIRE
INTO POTENTIAL CONFLICTS OF INTEREST**

The United States of America, through the undersigned attorneys, files this Motion to bring to the Court's attention potential and/or actual conflicts of interest posed by the participation of Abbe D. Lowell, Esq.,[1] as counsel for defendant John Edwards at trial, and to request that the Court conduct a hearing to inquire into these potential conflicts. As set forth more fully below, Mr. Lowell has previously represented two individuals who are potential Government witnesses at trial. The Government respectfully requests that the Court investigate whether or not potential or actual conflicts exist in this case and take appropriate remedial action accordingly.

---

[1] On August 19, 2011, Mr. Lowell moved this Court for admission *pro hac vice* to represent defendant Edwards in this matter. On September 20, 2011, Christopher D. Man, Esq., another attorney with Mr. Lowell's firm (Chadbourne & Parke, LLP), also moved this Court for admission *pro hac vice* to represent Edwards. On September 26, 2011, this Court granted both motions.

## I. Background

### A. The Pending Indictment

The core conduct underlying each of the offenses charged in the Indictment is John Edwards' knowing and willful acceptance and receipt of over $900,000 in illegal contributions from two wealthy donors, Rachel "Bunny" Mellon and Fred Baron, during his campaign for President of the United States in 2007 and 2008.

The Indictment contains six counts: Count One charges conspiracy, in violation of Title 18, United States Code, Section 371; Counts Two through Five charge acceptance and receipt of illegal campaign contributions, in violation of the Federal Election Campaign Act ("Election Act"), specifically Title 2, United States Code, Sections 441a(a)(1)(A), 441a(f), and 437g(d)(1)(A)(i); and Count Six charges false statements in the form of a scheme to conceal material facts from the Federal Election Commission ("FEC"), in violation of Title 18, United States Code, Section 1001(a)(1).

### B. Relevant Facts Alleged in the Indictment

In 2007 and 2008, John Edwards was a candidate for the Democratic Party's nomination for President of the United States. (Ind. ¶ 1). During the same time period, he was engaged in an extramarital affair with Rielle Hunter, which resulted in a pregnancy. (Ind. ¶ 3). Edwards and others believed that if the public learned of the affair, his campaign would be destroyed. (Ind. ¶ 15).

In order to maintain the viability of his candidacy, Edwards sought to conceal his extramarital affair and the pregnancy from the public. (Ind. ¶¶ 15, 18). In order to achieve this goal, Edwards and a long-time campaign staffer, Andrew Young, approached two wealthy Edwards benefactors – Rachel "Bunny" Mellon and Fred Baron – for financial assistance. (Ind. ¶¶ 2, 16, 17, 21, 28).

In or around May 2007, Edwards and Young solicited Mellon for financial support, and even though she had already contributed to Edwards the maximum amount allowed under the law, Mellon agreed to provide Edwards additional money to help him become President. (Ind. ¶¶ 21, 22). Between June 2007 and January 2008, Mellon made $725,000 in contributions to Edwards via seven different personal checks, made payable to an interior-decorator friend and disguised as purchases of antique furniture. (Ind. ¶ 23). The friend, in turn, sent the checks to Young, whose wife endorsed and deposited them into the Young family's bank account. (Ind. ¶ 24). The funds were used to finance Hunter's living and medical expenses, ensure her silence, and hide her from the national media. (Ind. ¶¶ 18, 24).

Fred Baron served as the Edwards campaign's national Finance Chair during the 2008 campaign. (Ind. ¶ 5). In December 2007, and in order to avoid damage to the campaign, Edwards and Young arranged for Baron to fund flying Hunter, as well as Young and Young's family, out of North Carolina by private jet to secluded locations, to escape the media. (Ind. ¶¶ 28, 29).

Over several weeks in December 2007 and January 2008, Hunter and the Youngs stayed in posh hotels and homes in Fort Lauderdale, Aspen, and San Diego before ultimately arriving in Santa Barbara, California. (Ind. ¶ 29). Baron paid for these chartered flights and housing accommodations, including rental payments on a luxury home in Santa Barbara, to the tune of approximately $200,000, all for the benefit of Edwards' campaign. (Ind. ¶ 29). Baron also had a Federal Express envelope containing $1,000 in cash delivered to Young at one of the hotels. (Ind. ¶ 30). Baron also transferred $10,000 by wire into a bank account controlled by Young. Baron made these payments for the benefit of Edwards' campaign. (Ind. ¶ 30).

C. **Additional Facts Relevant to Possible Conflicts**

The following additional facts relevant to potential conflicts have not been alleged in the Indictment. To the extent the defense was not already aware of them, these facts have been disclosed among the discovery materials the Government has already produced.

1. **Mr. Lowell's Prior Representation of Lisa Blue and Harrison Hickman**

While the Government has not definitively determined which witnesses will be called to testify at the trial of this matter, it is likely that Lisa Blue and Harrison Hickman will be among them. During investigation of this case, both witnesses have been interviewed by federal agents and Ms. Blue has testified before the grand jury. Mr.

Lowell represented both Ms. Blue and Mr. Hickman in connection with the Government's investigation.

Ms. Blue is the widow of Fred Baron, the Finance Chair of Edwards' 2008 Presidential campaign. Mr. Baron died in October 2008. During the time period from 2006 through 2008, Ms. Blue became acquainted with Ms. Hunter and, along with Mr. Baron, initiated a friendship with Ms. Hunter. Ms. Blue was also present, along with Edwards, Mrs. Edwards, Mr. Baron, and Jennifer Palmieri, for an incident in a hotel room in the fall or winter of 2007 during which Mrs. Edwards was angry and upset that Mr. Baron and Ms. Blue had been spending time with Ms. Hunter. Ms. Blue was also present for at least one conversation in her home in the Spring of 2008, among Andrew and Cheri Young and Mr. Baron concerning the Youngs' frustration with continuing to care for and hide Ms. Hunter.

Mr. Hickman is a long-time political adviser for Edwards. He met Edwards in 1997 during Edwards' campaign for United States Senate, and was hired as a pollster. The two became friends and Mr. Hickman acted as both an advisor and confidant of Edwards, in varying roles, during Edwards' tenure in the Senate and during both of Edwards' campaigns for President. During the 2008 election cycle, Mr. Hickman, as a political advisor to Edwards' campaign, was in a small circle of staff that made decisions about how Edwards and the campaign would respond to allegations in the press about Edwards' affair.

In July 2011, Mr. Lowell notified attorneys at the Justice Department's Public Integrity Section that he would be joining the defense team in this matter. At that time, the Government raised with Mr. Lowell the issue of a potential conflict of interest due to his representation of Ms. Blue and Mr. Hickman. Mr. Lowell has since indicated that he does not believe that a conflict exists, principally because (a) there is no longer any attorney-client relationship between him and either Ms. Blue or Mr. Hickman; (b) neither Ms. Blue nor Mr. Hickman is adverse to Edwards; and (c) Mr. Lowell is not in possession of any client confidences of Ms. Blue or Mr. Hickman, because neither shared any information with Mr. Lowell during their attorney-client relationship that they have not shared with him outside that relationship. Mr. Lowell has also indicated that he has never had an attorney-client relationship with Fred Baron with respect to the issues in this case, and that neither Ms. Blue, Mr. Hickman, nor Mr. Edwards objects to his representation of Edwards at trial. At the request of the Government, Mr. Lowell confirmed these facts in a letter dated August 16, 2011.

**2.    Mr. Lowell's Prior Communications With Rielle Hunter**

Among the discovery produced to the defense is a series of e-mails between Mr. Lowell and Rielle Hunter in late 2008 and early 2009 that appear to relate to Mr. Lowell's attempts to gather information from Ms. Hunter about monies Fred Baron had given her and/or expenses of hers that Mr. Baron had paid, in connection with the filing

-6-

of gift tax returns for Mr. Baron for such monies.[2]  There is also an e-mail exchange between Ms. Hunter and Mr. Lowell in January 2009 suggesting that Mr. Lowell may have been involved in putting Ms. Hunter's attorney in touch with Edwards' then-attorneys, so that arrangements could be made for Ms. Hunter's attorney to be paid.

**II.    Applicable Law**

A defendant has a right under the Sixth Amendment to conflict-free legal representation. *Mickens v. Taylor*, 240 F.3d 348, 355 (4th Cir. 2001) (en banc).  While the Sixth Amendment encompasses a defendant's right to be represented by the attorney of his choice, the essential aim of the Sixth Amendment's right to counsel is to ensure an effective advocate for all criminal defendants. *Wheat v. United States*, 486 U.S. 153, 159 (1988).  Thus, "[a] District Court must recognize a presumption in favor of [a defendant's] counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict." *Wheat*, 486 U.S. at 164.  A defendant's right to the lawyer of his choice is not absolute, and the Court is not required to accept a defendant's valid waiver of his lawyer's conflict of interest. *See United States v. Urutyan*, 564 F.3d 679, 686 (4th Cir. 2009) ("The

---

[2] As noted above, Mr. Lowell has indicated that he has never had an attorney-client relationship with Fred Baron concerning the issues in this case.  He has also stated that neither he nor his firm at the time (McDermott Will & Emery) ever provided any legal advice to Mr. Baron or Ms. Blue concerning the filing of gift taxes during the 2007-2009 timeframe.

-7-

Case 1:11-cr-00161-UA   Document 75   Filed 10/07/11   Page 7 of 16

paramount concern is the judiciary's 'independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.'") (quoting *Wheat*, 486 U.S. at 160); *United States v. Basham*, 561 F.3d 302, 323 (4th Cir. 2009) (same); *United States v. Williams*, 81 F.3d 1321, 1324 (4th Cir. 1996).

When a district court has been informed of the possibility of a defense counsel's conflict of interest, it has a threshold obligation to conduct an inquiry. *Mickens*, 240 F.3d at 358 ("[T]rial courts have an obligation to inquire into potential conflicts of interest when they know or reasonably should know of a particular conflict."); *United States v. Tatum*, 943 F.2d 370, 379 (4th Cir. 1991); *United States v. Akinseye*, 802 F.2d 740, 744 (4th Cir. 1986); *see also Basham*, 561 F.3d at 323 ("'[A] district court has an obligation to foresee problems over representation that might arise at trial and head them off beforehand.'") (quoting *United States v. Howard*, 115 F.3d 1151, 1155 (4th Cir. 1997)).

If the Court determines that defense counsel has an actual or potential conflict, the Court must determine whether the conflict is so severe as to disqualify the attorney, or is a lesser conflict that can be waived by the defendant at a hearing. To be valid, any such waiver must be knowing, intelligent, and voluntary. *United States v. Brown*, 202 F.3d 691, 697 (4th Cir. 2000); *Akinseye*, 802 F.2d at 744-45. In order to ensure that a defendant's waiver is proper, the Court, the Government, and the attorney in

-8-

Case 1:11-cr-00161-UA   Document 75   Filed 10/07/11   Page 8 of 16

question should "provide the defendant with as much relevant information as possible about the conflict before the court accepts a waiver of the conflict of interest." *Brown*, 202 F.3d at 697-98. At such a hearing, the Court should: (1) advise the defendant of the dangers arising from the particular conflict; (2) determine through questions that are likely to be answered in narrative form whether the defendant understands those risks and freely chooses to run them; and (3) inquire whether the defendant wishes to seek advice from independent counsel, who could be appointed free of charge, if the defendant could not afford to hire an attorney for this purpose. *See Akinseye*, 802 F.2d at 745; *United States v. Curcio*, 680 F.2d 881, 888-91 (2d Cir.1982).

The Court has substantial latitude to determine whether an attorney should be disqualified even where the Court finds that any conflict of interest is a potential, rather than actual, conflict. *See generally Wheat*, 486 U.S. at 162-63, (explaining that because "[t]he likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict . . . the district court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses."). As the Fourth Circuit has put it, the Court must have "'sufficiently broad discretion to rule without fear that it is setting itself up for reversal on appeal' if it disqualifies counsel.'" *Basham*, 561 F.3d at 323 (quoting *Williams*, 81 F.3d at 1324).

-9-

In addition to the substantial body of federal caselaw, the North Carolina Rules of Professional Conduct also can inform the Court's judgment about the presence of potential conflicts, because conduct of lawyers appearing before this Court is governed by those Rules. *See* Local Civil Rule 83.10e (incorporated by reference in Local Criminal Rule 57.1). Pursuant to North Carolina General Statute § 84-28, the North Carolina Rules of Professional Conduct ("RPC") apply to any "member of the North Carolina State Bar or any attorney admitted for limited practice."[3]

Rule of Professional Conduct 1.7 states, in part, that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest" and "[a] concurrent conflict of interest exists if: (1) the representation of one client will be directly adverse to another client; or (2) the representation of one or more clients may be materially limited by the lawyer's responsibilities to another client, a former client, or a third person . . . ." RPC 1.7(a). However, the lawyer may represent the current client, if "the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client . . . [and] each affected client gives informed consent, confirmed in writing." RPC 1.7(b).

---

[3] According to Rule of Professional Conduct 1.10(a), "[w]hile lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9 . . . ." Because Mr. Man is employed by the same firm as Mr. Lowell, any conflict, waiver thereof, or determination made by this Court concerning the representation of Edwards by Mr. Lowell should likewise apply to Mr. Man.

-10-

Subsection (c) of Rule 1.9 provides that "[a] lawyer who has formerly represented a client in a matter . . . shall not thereafter: (1) use information relating to the representation to the disadvantage of the former client except . . . when the information has become generally known." RPC 1.9(c). "A former client is not required to reveal the information learned by the lawyer to establish a substantial risk that the lawyer has information to use in the subsequent matter." RPC 1.9, cmt. 3. Instead, "[a] conclusion about the possession of such information may be based on the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services." *Id.*

In order to waive a conflict, "each affected client [must] give[] informed consent, confirmed in writing." RPC 1.7(b)(4); *see* RPC 1.9(a). "Informed consent" contemplates that "[t]he lawyer must make reasonable efforts to ensure that the client or other person possesses information reasonably adequate to make an informed decision. Ordinarily, this will require communication that includes a disclosure of the facts and circumstances giving rise to the situation, any explanation reasonably necessary to inform the client or other person of the material advantages and disadvantages of the proposed course of conduct and a discussion of the client's or other person's options and alternatives." RPC 1.0, cmt. 6; *see* RPC 1.0(f).

**III.    Discussion**

The Government emphasizes at the outset that we are in no way suggesting that Mr. Lowell has engaged in any improper conduct.  Nevertheless, his prior representation of Ms. Blue and Mr. Hickman presents distinct possibilities of potential conflicts that, in the Government's view, necessitate this Court's inquiry at a hearing and, potentially, proper advisement of the defendant, to ensure that any proffered waiver is knowing, intelligent, and voluntary.[4]

As noted above, Mr. Lowell has stated that he does not possess any confidential information from his former representation of Ms. Blue or Mr. Hickman, and that neither they nor Mr. Edwards objects to his representation of Edwards at trial.  Such representation obviously would include the prospect of Mr. Lowell cross-examining Ms. Blue or Mr. Hickman in the event either testifies for the Government at trial, and in the

---

[4]   Another potential conflict of concern to the Government has apparently been resolved.  The Government intends to introduce evidence at trial that in late 2008 or early 2009, another of Edwards' attorneys, Wade M. Smith, Esq., after speaking with Edwards, confirmed to a financial advisor for Mrs. Mellon that the money Mrs. Mellon had provided was for John Edwards personally.  (We intend to offer this evidence through testimony of the financial advisor.)  This is a significant admission by Edwards because, among other things, he has denied any knowledge of the monies being paid (Ind. ¶ 32), and taken the position that Mellon's money was not for his benefit (*see, e.g.*, Edwards' Memorandum in Support of Motion to Dismiss #1 at 29, 35).  The Government advised the defense of our concern that these facts presented a potential conflict in Mr. Smith's continued representation of Edwards at trial.  *See Howard*, 115 F.3d at 1155-56.  On October 6, 2011, the defense informed us that Mr. Smith will not represent Edwards at trial.

-12-

Government's view it is essential that Mr. Edwards be properly advised by the Court of the potential repercussions of that eventuality. Among other things, although it is always difficult to predict the exact pressures or precise fact issues that may arise at trial in the context of a given witness, Mr. Lowell's prior relationship with Ms. Blue and Mr. Hickman certainly presents a real possibility that his cross-examination of them may not be as thorough as otherwise might be the case were an independent non-conflicted counsel conducting the examination.

The Fourth Circuit has upheld a district court's disqualification of an attorney who earlier represented a key witness in the Government's case notwithstanding the defendant's express waiver, in part because of the threat the prior representation posed to effective and fair cross-examination of the witness. *See Williams*, 81 F.3d at 1324-25. As it noted in *Williams*, the Court of Appeals has also gone so far as to reverse as an abuse of discretion a district court's refusal, because of the defendant's waiver, to disqualify an attorney in a similar situation. *See Hoffman v. Leeke*, 903 F.2d 280, 288 (4th Cir. 1990). To be clear, the Government is not suggesting that either Ms. Blue or Mr. Hickman in this case rises to the level of importance of the witnesses in *Williams* (prior client was defendant's ex-wife and key Government witness) or *Hoffman* (prior client was "star" witness for the Government). We bring these cases to the Court's attention only to emphasize the importance of this type of potential conflict.

Mr. Lowell's prior communications with Ms. Hunter do not present a conflicts problem in the classic sense, because (a) Mr. Lowell never represented her, and (b) based on Mr. Lowell's representations, the Government does not believe there is any likelihood that Mr. Lowell would be a sworn or unsworn witness concerning the subjects of said communications. Still, the fact of Mr. Lowell's prior communications with Ms. Hunter on subjects (payments by Mr. Baron, Hunter's desire that Edwards pay her legal expenses) that will be relevant to the case make for the possibility that his name will come up during testimony by Ms. Hunter or another possible Government witness, Ms. Cheryl Bump (Fred Baron's longtime assistant). Again, although this does not present a conflict in the classic sense, the Government believes that the Court should advise Edwards of the possibility that his current lawyer could be the subject of testimony by witnesses against him, concerning the lawyer's activities and conduct prior to representing Edwards.

## **CONCLUSION**

For these reasons, the Government respectfully requests that the Court conduct a hearing to inquire into the potential conflicts of interest that may exist involving Edwards' representation at trial by Mr. Lowell, and take any appropriate remedial action, including, if necessary, examination of the defendant to determine

whether he will waive conflicts of interest presented by Mr. Lowell's representation (if the Court determines that any such conflicts are waivable).[5]

Dated: October 7, 2011

Respectfully submitted,

| | |
|---|---|
| JOHN STUART BRUCE | JACK SMITH |
| Attorney for the United States | Chief, Public Integrity Section |
| Acting under authority | Criminal Division |
| conferred by 28 U.S.C. § 515 | U.S. Department of Justice |
| | |
| By: /s/ Robert J. Higdon, Jr. | By: /s/ David V. Harbach, II |
|    Robert J. Higdon, Jr. |    David V. Harbach, II |
|    Brian S. Meyers |    Justin V. Shur |
|    Special Attorneys |    Jeffrey E. Tsai |
|    U.S. Attorney's Office |    Trial Attorneys |
|    310 New Bern Ave., Suite 800 |    Public Integrity Section |
|    Raleigh, NC 27601-1461 |    Criminal Division |
|    Tel: (919) 856-4103 |    U.S. Department of Justice |
|    Fax: (919) 856-4887 |    1400 New York Ave., N.W., Ste. 12100 |
|    bobby.higdon@usdoj.gov |    Washington, DC 20005 |
|    State Bar No. 17229 |    Tel: (202) 514-1412 |
| |    Fax: (202) 514-3003 |
| |    david.harbach@usdoj.gov |

---

[5] The Government attaches to this Motion as Exhibit A a series of proposed questions for the Court's examination of Edwards concerning the conflicts at issue, should the Court determine that they are waivable.

-15-

# CERTIFICATE OF SERVICE

This is to certify that on October 7, 2011, I filed the foregoing document on the Court's CM/ECF system, which will transmit a copy to the following counsel of record in this case:

Wade Marvin Smith
Tharrington Smith, LLP
209 Fayetteville Street
P.O. Box 1151
Raleigh, NC 27602-1151

Abbe David Lowell
Chadbourne & Parke, LLP
1200 New Hampshire Avenue, N.W.
Washington, DC 20036

James P. Cooney, III
Womble Carlyle Sandridge & Rice, PLLC
One Wells Fargo Center
301 South College Street, Suite 3500
Charlotte, North Carolina 28202-6037

    /s/ David V. Harbach, II
Trial Attorney
Public Integrity Section
Criminal Division
U.S. Department of Justice
1400 New York Ave., N.W., Ste. 12100
Washington, DC 20005
Tel: (202) 514-1412
Fax: (202) 514-3003
david.harbach@usdoj.gov