

**FEDERAL ELECTION COMMISSION**
WASHINGTON, D.C. 20463

Brian G. Svoboda, Esq.
Perkins Coie LLP
607 Fourteenth Street, Northwest
Washington, DC 20005-2003

MAY 1 4 2009

RE: MUR 6020
The Honorable Nancy Pelosi
Nancy Pelosi for Congress, and Paul Pelosi,
in his official capacity as treasurer

Dear Mr. Svoboda:

On June 5, 2008, the Federal Election Commission notified your clients, the Honorable Nancy Pelosi and Nancy Pelosi for Congress, and Paul Pelosi, in his official capacity as treasurer (the "Committee"), of a complaint alleging violations of certain sections of the Federal Election Campaign Act of 1971, as amended.

Upon further review of the allegations contained in the complaint, and information submitted by your clients, the Commission, on April 15, 2009, voted to dismiss this matter. A Statement of Reasons providing a basis for the Commission's decision will follow.

Documents related to the case will be placed on the public record within 30 days. *See* Statement of Policy Regarding Disclosure of Closed Enforcement and Related Files, 68 Fed. Reg. 70,426 (Dec. 18, 2003).

If you have any questions, please contact J. Cameron Thurber, the attorney assigned to this matter at (202) 694-1650.

Sincerely,

Susan L. Lebeaux
Assistant General Counsel

2904424 2591

Case 1:11-cr-00161-CCE   Document 78-2   Filed 10/11/11   Page 1 of 14



FEDERAL ELECTION COMMISSION
WASHINGTON, D.C. 20463

**SENSITIVE**

## BEFORE THE FEDERAL ELECTION COMMISSION

| | |
|---|---|
| Nancy Pelosi for Congress and Paul Pelosi ) | |
|    in his official capacity as treasurer ) | MUR 6020 |
| Representative Nancy Pelosi ) | |
| The Alliance for Climate Protection ) | |

### STATEMENT OF REASONS OF
### CHAIRMAN STEVEN T. WALTHER,
### VICE CHAIRMAN MATTHEW S. PETERSEN,
### and COMMISSIONERS CYNTHIA L. BAUERLY,
### CAROLINE C. HUNTER AND DONALD F. McGAHN II

### I. INTRODUCTION

This matter was generated by a complaint filed with the Federal Election Commission ("Commission") by Judicial Watch and a *sua sponte* submission by the Alliance for Climate Protection (the "Alliance") pursuant to the Commission's Policy Regarding Self-Reporting of Campaign Finance Violations. *See* 2 U.S.C. § 437g(a)(1); 72 Fed. Reg. 16,695 (Apr. 5, 2007). On April 30, 2009, we rejected the Office of General Counsel's ("OGC") recommendation that (1) we find reason to believe the Respondents violated 2 U.S.C. § 441b(a) by making and accepting a prohibited in-kind corporate contribution resulting from coordinated communications, and (2) that Nancy Pelosi for Congress, and Paul Pelosi in his official capacity as treasurer, violated 2 U.S.C. § 434(b) by failing to report an in-kind contribution resulting from coordinated communications.

Even if the advertisements in issue met the payment, content, and conduct prongs of the Commission's coordinated communications regulations, under all the circumstances, the Commission determined that it would not be worthwhile to expend additional Commission resources on this matter. Accordingly, we voted to dismiss this matter in an exercise of our prosecutorial discretion. *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

## II. DISCUSSION

### A. Factual Summary

The Alliance for Climate Protection (the "Alliance") is a domestic non-profit corporation registered in the District of Columbia and organized under Section 501(c)(3) of the Internal Revenue Code (26 U.S.C. §501(c)(3)). According to its *sua sponte* submission, in 2007, the Alliance hired the Martin Agency, an advertising agency, to produce a series of advertisements featuring "unlikely pairs" of individuals appearing together "to talk about climate change and the need for action" for Alliance's "We Campaign." At 2. According to the submission, one of the pairs considered for an advertisement included Speaker of the House Pelosi and former Speaker Gingrich, who agreed to appear together to demonstrate their mutual interest in and support of the goals of the "We Campaign." *Id.* at 6.

The submission indicates that Former Vice President Al Gore, founder and Chairman of the Board of the Alliance, first contacted Speaker Pelosi by telephone about possibly appearing in the proposed advertising campaign on February 11, 2008, and she agreed to appear at that time. *Id.* at 7; Conference with Alliance counsel, Oct. 9, 2008. One other "unlikely pair" who agreed and was selected to participate in this particular advertising campaign was Reverend Pat Robertson and Reverend Al Sharpton. *Id.* at 2. The Alliance and the Martin Agency also developed and produced other advertisements for the "We Campaign" during this time period.

According to the Alliance, when Speaker Pelosi agreed to appear in the advertisements, no decisions had been made by the Alliance as to when to run any of the specific "We Campaign" advertisements. *Id.* at 6. Documents provided by the Alliance show that the Martin Agency, acting as an agent of the Alliance, made general media buys for both national print media and national network and cable television in February 2008 before any "unlikely pairs" scripts were written or advertisements produced; the print media buys were made before Speaker Pelosi had been asked to participate in the "We Campaign." *Id.* at 3.

The television buys were for blocks of time and the print media buys were for space rather than for specific advertisements because final, and in some cases even preliminary, decisions on the specific "unlikely pairs" advertisements had not yet been made. *Id.* at 2-3. The Alliance states in its *sua sponte* submission, and documents provided by the Alliance show, that it purchased only national airtime and "did not target the communications to specific states or markets." *Id.* at 6. The *sua sponte* submission states, "[t]he Alliance was responsible for all decisions regarding the production, cost and placement of the ad," as well as all media buys, although its counsel later clarified that the Alliance also delegated authority to the Martin Agency, which "drove the logistics" of and made the decisions regarding actual "ad placement and sequence" within the time slots and spaces already purchased. *Id.* at 6; Conference with Alliance counsel, Sept. 16, 2008.

The Alliance states that it and the Martin Agency communicated with Speaker Pelosi's House leadership office, where Drew Hammill was the primary contact, and did not

communicate with her district or political staff.[1] *Sua sponte* submission at 9. The Alliance further states that there was no discussion or consideration of politics, Speaker Pelosi's candidacy, or Speaker Pelosi's primary election, and that the communications with Speaker Pelosi's "Leadership office focused solely on the timing of the ad, coordination with [former] Speaker Gingrich's schedule, the content of the script, and other logistical details." *Id.* at 6.

Between February 26 and March 17, 2008, there were a number of email and telephone communications between Hammill and Carol Gordon, a Martin Agency employee, primarily concerning scheduling, although an email dated February 27, 2008 from the Martin Agency to Hammill attached an initial script. After the Martin Agency sent scripts to Speaker Pelosi and former Speaker Gingrich on March 24, 2008, Speaker Pelosi's House leadership office staff suggested revisions to include "more substance about the issue" that were discussed with the Alliance on March 31, 2008. *Id.* at 7. Hammill stated in an email to Gordon on March 31, 2008, that Speaker Pelosi "liked the first script we were shown," but that he anticipated there were some things she would want to change. These changes were included in the script on April 1, 2008.[2] *Id.* The Martin Agency forwarded the final scripts to Speaker Pelosi and former Speaker Gingrich, and they were approved on April 2, 2008.

The script for the television advertisement, which was filmed on April 3, 2008, is as follows:

> [Pelosi]: Hi, I'm Nancy Pelosi, lifelong Democrat and Speaker of the House.
> [Gingrich]: And, I'm Newt Gingrich, lifelong Republican and I used to be Speaker.
> [Pelosi]: We don't always see eye-to-eye, do we, Newt?
> [Gingrich]: No, but we do agree that our country must take action to address climate change.
> [Pelosi]: We need cleaner forms of energy and we need them fast.
> [Gingrich]: If enough of us demand action from our leaders, we can spark the innovation we need.
> [Pelosi]: Go to wecansolveit.org. Together, we can do this.

The print advertisement featured a photograph of Speaker Pelosi and former Speaker Gingrich sitting together on a small couch in front of the United States Capitol. Speaker Pelosi is identified under the photograph as "Speaker Nancy Pelosi (D)."

---

[1] Hammill is listed in the Congressional Telephone Book as an employee of the House Leadership Office, but he has also been referred to as Speaker Pelosi's "spokesman" in several news articles regarding election matters. *See, e.g.,* Cindy Sheehan Qualifies to Challenge Pelosi, The Washington Post, Aug. 11, 2008, at A5, available at http://www.washingtonpost.com/.

[2] The Alliance has been unable to locate all of the drafts of the scripts showing these revisions or provide detailed information as to the content of the revisions.

According to the Alliance, other "We Campaign" television advertisements, which were produced and "in the can" before the Pelosi/Gingrich advertisement, began running on television in early and mid-April. *Id.* at 5; Conference with Alliance counsel, Sept. 16, 2008. The Pelosi/Gingrich advertisement was "rotated in" and broadcast from April 17 through April 30, 2008 (47 days before the June 3, 2008 primary election in Speaker Pelosi's district), and was run at the same time as the Sharpton/Robertson advertisement. *Sua sponte* submission at 8; Conference with Alliance counsel, Sept. 16, 2008. The Alliance states, and email communications provided by the Alliance appear to confirm, that Speaker Pelosi's leadership office was informed that the Pelosi/Gingrich television advertisement would begin running two days before it was first broadcast. Conference with Alliance counsel, Sept. 16, 2008.

According to the Alliance, it decided to run the advertisement again on May 6, 2008, on a number of national networks because it was a "big night" for the Democratic primaries. *Id.* The Alliance hoped the advertisement would catch the attention of "political junkies" of both parties watching the returns and would draw people watching the returns to the "We Campaign." *Id.* The Alliance claims, however, that there was no consideration that the advertisement might draw people watching the returns in Speaker Pelosi's district to vote for her. *Id.*

The Alliance admits to paying for the media buys and production costs of the television advertisement. *Sua sponte* submission at 2-3. Documents provided by the Alliance disclose that the Pelosi/Gingrich advertisements ultimately constituted 12.7% of the aggregated cost of the television advertisements and 6.4% of the aggregated cost of the print media advertisements in comparison to the other advertisements for this phase of the "We Campaign," representing 9.6% of the total amount spent on television and print advertisements.

Since the television advertisement was carried nationally, its broadcast area included Speaker Pelosi's Congressional district in California, where it was broadcast within 90 days of the June 3, 2008 California Congressional primary election in which she was a candidate. Print versions of the advertisement ran in national magazines, including *People*, *Scientific American*, *the New Yorker*, *The Economist* and *Rolling Stone*, whose distribution areas included Speaker Pelosi's Congressional district, between May 5 and May 23, 2008, which was also within 90 days of the primary election.

In their joint response to the complaint, Speaker Pelosi and the Committee state they "understood that the Alliance would comply with all laws and regulations that might affect the content or placement of the ad." At 2. Their response further states that the advertisements were "distributed nationally without targeting the Speaker's district" and that the advertisements "placed her next to a famous Republican who was an anathema to her Democratic primary voters." *Id.* The response further states that neither Pelosi nor the Committee requested or suggested the advertisement or "assented to its distribution in the [Speaker's Congressional] District," and that there was "no discussion of campaign plans, projects, activities or needs." *Id.* at 3.

### B. Legal Analysis

The Federal Election Campaign Act of 1971, as amended (the "Act"), subjects contributions and expenditures to certain restrictions, limitations, and reporting requirements. *See generally* 2 U.S.C. §§ 441a, 434b. Contributions can be monetary or "in-kind." In-kind contributions include an expenditure made by any person "in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents," and are subject to the same restrictions and reporting requirements as other contributions. 2 U.S.C. § 441a(a)(7)(A), (B)(i); 11 C.F.R. §§ 100.52(d)(1), 109.21(b). The Commission's regulations at 11 C.F.R. § 109.21 provide that coordinated communications constitute in-kind contributions from the party paying for such communications to the candidate, candidate's authorized committee, or political party committee which coordinates the communication.[3]

The criteria for a coordinated communication consist of three prongs — payment by someone other than the candidate or the candidate's authorized committee (or the political party committee, where applicable); satisfaction of one or more content standards; and satisfaction of one or more conduct standards. All three prongs must be met for a communication to be considered coordinated.[4] 11 C.F.R. § 109.21.

In this matter, even if the advertisement met the coordinated communication standards, it appears to us that under all the circumstances, further pursuit of this matter would not be a prudent use of the Commission's limited resources. Speaker Pelosi agreed to participate in the advertisement months before her primary election, at a time when no decisions had been made about when or where the ads would run. The Alliance selected Speaker Pelosi and former Speaker Gingrich to appear in the nation-wide advertisement because it believed the two would fit into the Alliance's humorous ad campaign featuring "unlikely pairs" allied for a common purpose and would further of its goal of focusing public attention on a policy issue, rather than for any reason pertaining to Speaker Pelosi in her role as a candidate. Accordingly, relative to other matters on our docket, we believe this matter is a low priority and voted to dismiss this

---

[3] In *Shays v. F.E.C.* ("*Shays II*"), the U.S. District Court for the District of Columbia held that the Commission's revisions of the content and conduct standards of the coordinated communications regulation at 11 C.F.R. § 109.21(c) and (d) violated the Administrative Procedure Act; however, the court did not enjoin the Commission from enforcing the regulations. 508 F. Supp. 2d 10 (D.D.C. Sept. 12, 2007) (granting in part and denying in part the respective parties' motions for summary judgment). The D.C. Circuit affirmed the district court with respect to, *inter alia*, the current standard for public communications made before the time frames specified in the standard, and the rule for when former campaign employees and common vendors may share material information with other persons who finance public communications. *See Shays v. F.E.C.* ("*Shays III*"), No. 07-5360, 2008 WL 2388661 (D.C. Cir. June 13, 2008).

[4] The Commission's regulations at 11 C.F.R. § 109.21(g)(2) provide a safe harbor for charitable solicitations that otherwise might constitute coordinated communications. However, because Speaker Pelosi did not solicit any donations to the Alliance in the ads in question, the safe harbor is inapplicable in this matter.

matter and close the file as a matter of prosecutorial discretion.[5] *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

| | |
|---|---|
| 5/8/09 <br> Date | Steven T. Walther <br> Chairman |
| 5/11/09 <br> Date | Matthew S. Petersen <br> Vice Chairman |
| 5/7/2009 <br> Date | Cynthia L. Bauerly <br> Commissioner |
| 5/11/09 <br> Date | Caroline C. Hunter <br> Commissioner |
| 5/11/09 <br> Date | Donald F. McGahn II <br> Commissioner |

---

[5] *See* MUR 5595, Statement of Reasons of Chairman Michael E. Toner, Vice Chairman Robert D. Lenhard, and Commissioners David M. Mason, Hans A. von Spakovsky, Steven T. Walther, and Ellen L. Weintraub (dismissing as a matter of prosecutorial discretion a "technical violation" of the Act's electioneering communication and disclaimer requirements for a gun show ad referring to the "carry/Kerry permit," where the "primary purpose and effect of the advertisement was to encourage attendance at an upcoming gun show in Indianapolis").



FEDERAL ELECTION COMMISSION
WASHINGTON, D.C. 20463

## BEFORE THE FEDERAL ELECTION COMMISSION

| | |
|---|---|
| Nancy Pelosi for Congress and Paul Pelosi ) | |
| in his official capacity as treasurer ) | MUR 6020 |
| Representative Nancy Pelosi ) | |
| The Alliance for Climate Protection ) | |

### STATEMENT OF REASONS
### Vice Chairman MATTHEW S. PETERSEN and
### Commissioners CAROLINE C. HUNTER and DONALD F. McGAHN

### I. INTRODUCTION

As explained in our joint Statement of Reasons with Chairman Steven T. Walther and Commissioner Cynthia L. Bauerly, this matter involved alleged violations stemming from television and newspaper ads featuring U.S. House of Representatives Speaker Nancy Pelosi that the Alliance for Climate Protection (the "Alliance") created, produced, and financed. On May 5, 2009, we rejected the Office of General Counsel's ("OGC") recommendation that (1) we find reason to believe the Respondents violated 2 U.S.C. § 441b(a) by making and accepting a prohibited in-kind corporate contribution resulting from coordinated communications, and (2) that Nancy Pelosi for Congress, and Paul Pelosi in his official capacity as treasurer, violated 2 U.S.C. § 434(b) by failing to report an in-kind contribution resulting from coordinated communications.

For the reasons set forth in our joint Statement of Reasons, we joined with our colleagues in voting to dismiss this matter in an exercise of our prosecutorial discretion.[1] However, without prejudging the Commission's revisions to the coordinated communications regulations pursuant to the *Shays III* ruling,[2] we write separately to explain why we may recommend that the Commission propose and seek public comment on a safe harbor addressing the types of activities at issue in this matter. Furthermore, any violation in this matter was, at most, technical in nature.

---

[1] *See Heckler v. Chaney*, 470 U.S. 821, 831 (1995).
[2] *See infra* note 8.

## II. <u>DISCUSSION</u>

The Federal Election Campaign Act of 1971, as amended (the "Act"), subjects contributions and expenditures to certain restrictions, limitations, and reporting requirements.[3] A contribution is defined, in relevant part, as "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person *for the purpose of influencing any election for Federal office.*"[4] An expenditure is defined, in relevant part, as "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person *for the purpose of influencing any election for Federal office.*"[5]

The response from Speaker Pelosi and Nancy Pelosi for Congress states:

> The facts show that the Alliance's ad had no purpose of influencing any election. It was sponsored by a charity prohibited from partisan political intervention. It was distributed nationally without targeting the Speaker's district. It placed her next to a famous Republican who was anathema to her Democratic primary voters, and who continues publicly to criticize their supposed views. It was distributed before an election that she won with nearly ninety percent of the vote, as part of an ongoing, nationwide campaign.[6]

Assuming *arguendo* that the ads in question had some purpose of influencing an election, they may constitute in-kind contributions, which include an expenditure made by any person "in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents," and are subject to the same restrictions and reporting requirements as other contributions.[7] The Commission's regulations at 11 C.F.R. 109.21 provide that coordinated communications constitute in-kind contributions from the party paying for such communications to the candidate, candidate's authorized committee, or political party committee which coordinates the communication.[8]

---

[3] *See generally* 2 U.S.C. §§ 441a, 434b.
[4] 2 U.S.C. § 431a(8)(A) (emphasis added).
[5] 2 U.S.C. § 431a(9)(A) (emphasis added).
[6] MUR 6020, Response of Nancy Pelosi, Nancy Pelosi for Congress, and Paul Pelosi, Treasurer at 2.
[7] 2 U.S.C. § 441a(a)(7)(A), (B)(i); 11 C.F.R. 100.52(d)(1), 109.21(b).
[8] In *Shays v. F.E.C.* ("*Shays III*"), the U.S. District Court for the District of Columbia held that the Commission's revisions of the content and conduct standards of the coordinated communications regulation at 11 C.F.R. 109.21(c) and (d) violated the Administrative Procedure Act; however, the court did not enjoin the Commission from enforcing the regulations. 508 F. Supp. 2d 10 (D.D.C. Sept. 12, 2007) (granting in part and denying in part the respective parties' motions for summary judgment). The D.C. Circuit affirmed the district court with respect to, *inter alia*, the current standard for public communications made before the time frames specified in the standard, and the rule for when former campaign employees and common vendors may share material information with other persons who finance public communications. *See Shays III*, No. 07-5360, 2008 WL 2388661 (D.C. Cir. June 13, 2008).

As discussed below, these ads fell just short of the coordinated communications safe harbor for charitable solicitations. Without prejudging the rulemaking, we may recommend that the Commission, in its Notice of Proposed Rulemaking ("NPRM") for *Shays III*,[9] propose and seek public comment on expanding that provision to permit the types of advertisements at issue in this matter.

### A. The Conduct Prong

In this matter, Respondents arguably satisfied the conduct prong under either the "assent to suggestion" or the "material involvement" standards.

First, the conduct prong is satisfied if a candidate or candidate's committee assents to a suggestion that the public communication be created, produced, or distributed, and that suggestion came from the person paying for the communication.[10] The Commission has explained that "this second way of satisfying the conduct standard is intended to prevent circumvention of the statutory 'request or suggestion' test (2 U.S.C. § 441a(a)(7)(B)(i), (ii)) by, for example, the expedient of implicit understandings without a formal request or suggestion."[11] In other words, 11 C.F.R. 109.21(d)(1)(ii) is intended to prevent circumvention of 11 C.F.R. 109.21(d)(1)(i) (*i.e.*, the first way of satisfying the conduct standard), which governs cases in which *the candidate or candidate's committee* requests or suggests *to the person paying for the communication* that the public communication be created, produced, or distributed.

Here, the Alliance's *sua sponte* submission states that Al Gore, in his capacity as Chairman of the Alliance, "telephone[d] Speaker Pelosi and [former] Speaker Gingrich to invite them to participate in the We Campaign advertisement," and Speaker Pelosi "agreed to appear in [her] official capacit[y]."[12] The Alliance also produced an email dated February 27, 2008 from a Martin Agency representative Gordon to Drew Hammill, the contact for Speaker Pelosi, confirming that Speaker Pelosi "agreed to participate in [the advertisements] via her conversation with Al Gore earlier this month." In their joint response, Speaker Pelosi and the Committee state "she agreed to appear . . . in a national television advertisement sponsored by the Alliance . . . ."[13]

As these facts indicate, there was no evidence that Speaker Pelosi or her campaign committee ever requested or suggested the ad to the Alliance, or that there was any implicit, covert understanding that the Alliance would create, produce, and distribute the ad to benefit Speaker Pelosi's candidacy, or that there was any effort by Speaker Pelosi or

---

[9] *See supra* note 8.
[10] 11 C.F.R. 109.21(d)(1)(ii).
[11] Explanation and Justification for Coordinated and Independent Expenditures ("E&J"), 68 Fed. Reg. 421, 432 (Jan. 3, 2003).
[12] Pre-MUR 472 / MUR 6191, *Sua sponte submission* of the Alliance for Climate Protection at 3, 4.
[13] *Id.* at 2.

the Alliance to circumvent 11 C.F.R. 109.21(d)(1)(i) with a "wink or nod."[14] Rather, the Alliance and its media agency proposed the ad because they believed Speaker Pelosi, by virtue of who she was and her contrast to former Speaker Gingrich, would benefit the Alliance's message. Nonetheless, on the face of 11 C.F.R. 109.21(d)(1)(ii), Respondents arguably met this conduct standard, even though the provision was really meant to prevent circumvention of the rule governing situations in which a candidate requests or suggests that an outside group run an ad for the candidate's own political benefit – a situation not present here.

Alternatively, the conduct prong also may be satisfied if Speaker Pelosi was materially involved in decisions regarding the content, intended audience, means or mode, or the size, prominence, or duration of the advertisement.[15] The Commission has not foreclosed altogether the possibility that a candidate could appear in an ad without being materially involved.[16] The Commission also has stated that the material involvement factor is meant to "protect against overbreadth" and to "safeguard against the

---

[14] *McConnell v. FEC*, 540 U.S. 93, 221-22 (2003) ("[E]xpenditures made after a 'wink or nod' often will be 'as useful to the candidate as cash.' For that reason, Congress has always treated expenditures made 'at the request or suggestion of' a candidate as coordinated.") (internal citations omitted).

[15] 11 C.F.R. 109.21(d)(2).

[16] In prior advisory opinions which OGC cited in this matter, the Commission has suggested that a candidate's appearance in an advertisement may constitute material involvement. Without judging whether these opinions were decided properly, we note first that it is improper for the Commission to use advisory opinions as swords instead of as shields. Under the Act, advisory opinions may not promulgate "any rule of law" that then becomes the basis of an enforcement action. 2 U.S.C. § 437f(b). The purpose of advisory opinions is to *protect* any party involved in a specific transaction or activity that is indistinguishable in all material aspects from the subject of the advisory opinon from being subject to any sanction. 2 U.S.C. § 437f(c). Additionally, the prior advisory opinions arguably are distinguishable from the facts in this matter. In Advisory Opinion 2003-25 (Weinzapfel), the Commission suggested that a federal candidate's appearance in an advertisement endorsing a state candidate could constitute material involvement, where the candidate reviewed the script "for appropriateness," but did not conclude that a candidate's mere appearance in an advertisement constitutes material involvement *per se*. Moreover, the Commission's statement in Weinzapfel was *dicta*, because the ad at issue otherwise would not have been a coordinated communication anyway, due to the content prong not being met. In Advisory Opinion 2004-1 (Forgy Kerr), the Commission again suggested that an appearance by a federal candidate (in this case the president) in an advertisement endorsing a state candidate could constitute material involvement where the president's agents extensively reviewed the ad script for "consistency with the President's position and any content that distracts from or distorts the 'endorsement' message that the President wishes to convey." In contrast to those AOs, which indicated some not insignificant level of review by the federal candidate of the ad scripts, here, the Alliance's response indicated that Speaker Pelosi's congressional leadership office staff reviewed generally "the content of the script," while Speaker Pelosi's response contended that she "delivered a script conceived by the Alliance for its own purposes." MUR 6020, Response of the Alliance for Climate Protection at 6; Response of Nancy Pelosi, Nancy Pelosi for Congress, and Paul Pelosi, Treasurer at 3. Thus, even assuming *arguendo* that a candidate's review of an ad script in which she appears may determine whether the conduct prong is met, in this case, it does not appear that the review by Speaker Pelosi's congressional leadership staff was as extensive as that at issue in AOs 2004-1 and 2004-29. We note these differences not to suggest that any of them are material in determining whether the coordinated communication conduct prong is met by a candidate's mere appearance in an ad, but rather to note the factual distinctions in this matter, assuming *arguendo* that those advisory opinions have any affirmative force of law or bearing whatsoever here.

inclusion of incidental participation that is not important to, or does not influence, decisions regarding a communication," and that material involvement must be determined "on a case-by-case basis."[17]

The *sua sponte* submission reflects that Speaker Pelosi and her leadership office staff were shown and made changes to the scripts between March 24 and April 2, 2008, and the Alliance admits that communications with her leadership office staff included discussions concerning "the content of the script."[18] Based on the record available to us, at no time did any Alliance agents communicate with anyone on Speaker Pelosi's campaign staff, and there is no suggestion or evidence that they had any involvement whatsoever in the ads' intended audience, means or mode of transmission, or their size, prominence, or duration.[19]

Again, on the face of 11 C.F.R. 109.21(d)(2), Speaker Pelosi's appearance in the ads and her staff's input into their content may have been extensive enough to constitute "material involvement" for the purposes of the conduct prong. However, to mechanically apply the material involvement factor on these facts could constitute the type of overbreadth the Commission cautioned against in the E&J, and ignores its admonition to apply the rule on a "case-by-case basis." Additionally, Speaker Pelosi's congressional leadership office staffers presumably were not acting on behalf of her campaign committee in their communications with the Alliance.[20]

### B. Safe Harbor For Charitable Solicitations

The Commission's regulations provide a safe harbor for charitable solicitations that otherwise might constitute coordinated communications:

> A public communication in which a candidate for Federal office solicits funds for another candidate for Federal or non-Federal office, a political committee, or organizations as permitted by 11 CFR 300.65, is not a coordinated communication with respect to the soliciting Federal candidate unless the public communication promotes, supports, attacks, or opposes the soliciting candidate or another candidate who seeks election to the same office as the soliciting candidate.[21]

---

[17] E&J at 433.
[18] Pre-MUR 472 / MUR 6191, *Sua sponte submission* of the Alliance for Climate Protection at 6-7.
[19] *Id.*
[20] *See* "House Ethics Manual," Committee on Standards of Official Conduct, 110th Cong., 2008 ed. at 123 ("[O]fficial resources of the House must, as a general rule, be used for the performance of official business of the House, and hence those resources may not be used for campaign or political purposes . . . Accordingly, among the resources that generally may not be used for campaign or political purposes are . . . congressional staff time.").
[21] 11 C.F.R. 109.21(g)(2).

11 C.F.R. 300.65 permits solicitations by Federal candidates and officeholders for tax-exempt organizations described in 26 U.S.C. § 501(c).

Although the Commission has not defined what it means to "promote, support, attack, or oppose" ("PASO"), neither the complaint, nor the *sua sponte* submission, nor OGC alleged that the Alliance ads PASO Speaker Pelosi or her opponents for her House seat. Accordingly, because the Alliance is a 501(c)(3) organization, had Speaker Pelosi merely added an explicit solicitation for donations to the Alliance at the end of the ads in question, the safe harbor would apply.

We find it somewhat incongruous that ads, such as the ones in question, which clearly focus on a public policy issue and promote support for a non-profit organization, would constitute prohibited coordinated communications with a Federal candidate, whereas the same exact ads would fall under the safe harbor if the Federal candidate had merely taken the additional step of asking for money for the organization.

The ads' primary purpose was to focus public attention on a policy issue. Accordingly, without prejudging the rulemaking, we may recommend that the Commission propose and seek public comment on revising the safe harbor in the *Shays III* rulemaking to include *bona fide* public service announcements such as the ones at issue here.

### III. CONCLUSION

Without prejudging the rulemaking, in the Commission's revised rulemaking on coordinated communications, we may recommend that it propose and seek comment on expanding the safe harbor to permit activities such as those at issue in this matter.[22] Pending that rulemaking, the Respondents' activity was, at most, a technical violation,[23] and we determined that pursuit of this matter would not be a prudent use of Commission resources. For these reasons, we voted to dismiss this matter pursuant to *Heckler v. Chaney*.[24]

---

[22] *See, e.g.*, MUR 5718, in which OGC recommended, and the Commission voted unanimously to approve, dismissing as a matter of prosecutorial discretion allegations that Rep. Jesse L. Jackson, Jr. violated the coordinated communications regulations for activity that, although not protected under the regulations at the time, subsequently was protected by the safe harbor at 11 C.F.R. 109.21(g). MUR 5718, First General Counsel's Report at 7 and Certification, Nov. 28, 2006.

[23] *See* MUR 5595, Statement of Reasons of Chairman Michael E. Toner, Vice Chairman Robert D. Lenhard, and Commissioners David M. Mason, Hans A. von Spakovsky, Steven T. Walther, and Ellen L. Weintraub (dismissing as a matter of prosecutorial discretion a "technical violation" of the Act's electioneering communications and disclaimer requirements for a gun show ad referring to the "carry/Kerry permit," where the "primary purpose and effect of the advertisement was to encourage attendance at an upcoming gun show in Indianapolis").

[24] Accordingly, we need not consider whether the communications at issue constituted an impermissible corporate in-kind contribution made by the Alliance, and whether Speaker Pelosi, Pelosi for Congress, and Paul Pelosi in his official capacity as treasurer accepted and failed to report such contribution.

6/11/2009
Date

_____
Matthew S. Petersen
Vice Chairman

6/11/09
Date

_____
Caroline C. Hunter
Commissioner

6/11/09
Date

_____
Donald F. McGahn II
Commissioner