# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA )
)
v. )
) CRIMINAL CASE NO. 1:11-CR-161-1
JOHNNY REID EDWARDS )
)
)

## JOHN EDWARDS' REPLY BRIEF IN SUPPORT OF HIS MOTION TO DISMISS THE INDICTMENT AS AN ABUSE OF PROSECUTORIAL DISCRETION
### (Motion to Dismiss No. 2)

## INTRODUCTION

In response to Mr. Edwards' motion to dismiss the Indictment as an abuse of prosecutorial discretion, the government argues only that Mr. Edwards failed to provide "direct evidence" of Mr. Holding's animus and that the involvement of "career prosecutors" from the Department of Justice somehow cleansed the investigation of any improper motive or procession. The government's response is predictable, but does nothing more than reformulate and mischaracterize the actual motion made. The government's response fails to address the issues presented. The government does not address the fatal conflict of interest created by Mr. Holding's past campaign donations to candidates running against Senator Edwards, nor does it explain what type of "direct evidence" short of a public confession by Mr. Holding stating that he did things for improper reasons would be necessary to obtain the relief (e.g., discovery) courts have ordered. Their arguments create a bar that almost no one could meet. As such, the

government's position is irreconcilable with several cases granting at least the relief of discovery under similar circumstances, and Mr. Edwards' motion to dismiss the indictment or, in the alternative, to permit discovery should be granted. And the government's legal theory that any constitutional violation has been forgiven by involving "career prosecutors" from the Department of Justice makes too little of the influence of the U.S. Attorney and the inability to unring a bell that he had rung.

## ARGUMENT

## I. MR. EDWARDS HAS PRESENTED OBJECTIVE EVIDENCE THAT MR. HOLDING ABUSED HIS PROSECUTORIAL DISCRETION

The government begins its argument by citing the general presumption of regularity attaching to a prosecutor's pre-trial charging decisions. (Dkt. 60 at 6-7.) But "[t]he broad discretion afforded prosecutors in deciding whom to prosecute is not 'unfettered,' and a decision to prosecute may not be deliberately based upon the exercise of protected statutory rights." United States v. Adams, 870 F.2d 1140, 1145 (6th Cir. 1989).

> All power tends to corrupt, as Lord Acton reminded us, and occasional misuse of what we have termed 'the awesome power of prosecutors ...' is by no means inconceivable. It is not only the inexperienced and overly ambitious who may be tempted to misuse the prosecutorial power, although they are certainly subject to that temptation. There are times when the judgment of even the most highly qualified and virtuous of prosecutors -- perhaps especially they -- will yield to an excess of zeal.

2

Id. The general presumption of regularity attaching to prosecutorial decisions is no answer to Mr. Edwards' claim of the unique type of prosecutorial vindictiveness that results from the actions in this case. In this type of case, the presumption of regularity may be overcome when the defendant shows "that the prosecutorial conduct at issue was motivated by some form of prosecutorial animus, such as a personal stake in the outcome of the case or an attempt to seek self-vindication." United States v. Falcon, 347 F.3d 1000, 1004 (7th Cir. 2003) (internal quotation omitted). If anything, the facts as they unfolded -- changing venue, novel and untested theory of prosecution being pursued when the original basis for the investigation floundered, and the lead prosecutor's immediate run for elected office following the indictment, among others -- indicate that the only presumption is that something has gone awry.

The government next argues that Mr. Edwards' motion to dismiss the Indictment must be denied because he has failed to provide any "direct evidence" of genuine animus. (Dkt. 60 at 8-11.) The government, however, adds a new, exclusive requirement to the law and fails to explain exactly what it means by "direct evidence,"[1] and it is therefore

_____

[1] Citing Black's Law Dictionary, the government defines "direct evidence" as evidence "that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." (Dkt. 60 at 10.) The government, however, fails to apply this definition to any of the evidence of actual vindictiveness offered by Mr. Edwards or to explain why the evidence offered by Mr. Edwards is not "direct evidence." The only evidence that would categorically satisfy the government's unexplained theory of "direct evidence" would be a direct confession of animus by a prosecutor, as that is the only evidence that would prove animus "without inference or presumption." Yet, as Mr. Edwards explains more fully below, that simply cannot be the test, as no court has ever

3

unclear what Mr. Edwards must show, in the government's view, to demonstrate actual vindictiveness.

Certainly Mr. Edwards agrees with the government that to prove actual vindictiveness on the part of a prosecutor, a defendant must present objective evidence of some improper motive, "'such as evidence of a statement by the prosecutor.'" (Dkt. 60 at 8 (emphasis added) (quoting United States v. Johnson, 171 F.3d 139, 140-41 (2d Cir. 1999)).) If Mr. Holding walked down the hall one day and said, within earshot of several percipient witnesses, "I'm going to get John Edwards, I can't stand Democrats," such statements obviously would constitute a *prima facie* showing of actual vindictiveness. The same would be true of a memorandum or an email in which Mr. Holding stated that his decision to pursue criminal charges against Mr. Edwards was based on partisan differences or personal dislike. Yet no court ever has held that the only evidence that is sufficient is an admission of a bad motive by the prosecutor.

Obviously, the mere fact that evidence, "such as … a statement by the prosecutor," is necessary to support a claim of actual vindictiveness does not mean that a defendant is required to provide evidence of a direct statement by the prosecutor in every case. To the contrary, courts applying the government's "direct evidence" standard have explained that a defendant may satisfy this requirement by "showing that the decision to pursue an

_____

held that a defendant must provide a direct statement of animus by a prosecutor to establish a claim of actual vindictiveness.

4

indictment was not based on the 'usual determinative factors' a responsible prosecutor would consider before bringing charges." <u>United States v. Jarrett</u>, 447 F.3d 520, 525 (7th Cir. 2006). Other cases relied upon by the government have held that "[t]o establish a prima facie case of vindictive prosecution, [a defendant] must show either direct evidence of actual vindictiveness <u>or facts that warrant an appearance of such</u>." <u>United States v. Edmonds</u>, 103 F.3d 822, 826 (9th Cir. 1996) (internal quotation omitted; emphasis added); <u>see also</u> <u>United States v. Heidecke</u>, 900 F.2d 1155, 1159 (7th Cir. 1990) (holding that to find vindictiveness in the pre-trial context, "some kind of genuine prosecutorial animus should be directly or <u>indirectly</u> shown" (emphasis added)). If courts were to hold otherwise and declare that nothing short of a direct admission of wrongdoing by a prosecutor were required, then even the most egregious conduct by a prosecutor would be insulated from judicial review whenever the prosecutor is smart enough to keep quiet.

As Mr. Edwards argued in his original motion to dismiss (Dkt. 32 at 20-27), courts addressing claims of actual vindictiveness consider a number of factors, including whether the prosecutor had "a personal stake in the outcome of the case" or an interest in seeking "self-vindication," <u>Jarrett</u>, 447 F.3d at 525, whether the prosecutor had an actual or apparent conflict of interest warranting recusal, <u>United States v. Fieger</u>, 2008 WL 205244 at *5-*6, *8, *15-*16 (E.D. Mich. Feb 1, 2008), whether the underlying conduct at issue had previously been subject to criminal charges, <u>Adams</u>, 870 F.2d at 1145-46, and whether the decision to indict was based on "the various considerations a responsible

prosecutor in the ordinary course of things would weigh in deciding whether or not to bring a particular charge." Jarrett, 447 F.3d at 529. Presenting evidence as to each of these factors is simply one means of showing, "through objective evidence, that (1) the prosecutor acted with genuine animus toward the defendant and (2) the defendant would not have been prosecuted but for that animus." United States v. Wilson, 262 F.3d 305, 314 (4th Cir. 2001).

The government glosses over each of these factors, merely asserting that Mr. Edwards has presented "no evidence," "much less 'direct evidence,'" that his Indictment resulted from prosecutorial vindictiveness. (Dkt. 60 at 9-11.) Yet these blanket assertions simply ignore the various irregularities cited by Mr. Edwards in his original motion. The government does not explain, for example, why Mr. Holding's past campaign contributions to Mr. Edwards' opponent during his 1998 Senate race did not present a conflict of interest warranting his recusal -- particularly when, at the same time, Mr. Holding was "held over" to manage the Edwards investigation because President Obama's nominee for U.S. Attorney, Thomas Walker, had donated money to the Kerry-Edwards campaign in 2004 and was thus deemed to have a conflict. (Dkt. 32 at 6, 8 n.3, and 22-23.)

The government also does not explain why the investigation was referred to Mr. Holding in the first place, despite the fact that none of the targets of the investigation resided in the Eastern District of North Carolina and none of the events at issue took

6

place there.[2]  (Id. at 7-8, 14-15.)  In other pleadings, the government has gone to great lengths to emphasize its belief that "venue in this case lies squarely in the Middle District."  (Dkt. 62 at 9 (listing reasons why the Middle District is the proper venue).)  As the government emphasizes -- and knew at the outset of the investigation -- the Edwards' campaign was based in the Middle District and this is where Mr. Edwards and other key witnesses resided.  So, on what basis did the government conclude that Mr. Holding's Eastern District would be the legal and proper venue to initiate the investigation to begin with?  And why did it take years for the government to recognize its venue error before convening a grand jury in the Eastern District upon the eve of seeking the Indictment?

The government does not dispute that the conduct alleged in the Indictment "[has] not heretofore been subjected to prosecution," nor any enforcement action by the Federal Election Commission ("FEC").  Nor does it deny that the prosecutors in this case never consulted the FEC before bringing these novel campaign finance charges.  (Dkt. 32 at 23-25.)  In short, the government all but ignores each of the factors identified by the courts as relevant to determining whether a defendant has shown actual vindictiveness on the part of a prosecutor.  These factors are described in detail in Mr. Edwards' motion (Dkt.

---

[2]    As Mr. Edwards noted in his motion to dismiss, it is well documented that Anna Mills Wagoner, the U.S. Attorney for the Middle District of North Carolina at the time, had been placed on the Bush Administration's list of U.S. Attorneys to be fired because she was viewed as "weak" and not sufficiently partisan.  (Dkt. 32 at 8.)

7

32 at 20-27), but they are entirely absent from the government's brief. If the government had something helpful to say in response, it would have said so.

The government's only response to Mr. Edwards' claim in the law of actual vindictiveness seems to be that the Indictment could not possibly be tainted because "more than forty professional, career attorneys" worked in Mr. Holding's office and "career prosecutors" from the federal Department of Justice worked "side-by-side" with Mr. Holding during the investigation of Mr. Edwards. (Dkt. 60 at 10 n.4, 14.) But the mere involvement of additional prosecutors in the investigation (especially coming on to the scene afterwards) is no answer to Mr. Edwards' claims, as "even the most highly qualified and virtuous of prosecutors" may "yield to an excess of zeal." Adams, 870 F.3d at 1145. Nor does the fact that Mr. Holding met with federal prosecutors in July 2010 -- nearly two years after the investigation of Mr. Edwards began -- somehow cleanse the investigation of any vindictiveness, as there is no denying that Mr. Holding managed all aspects of the investigation and charted its course from August 2008 through indictment. What the law calls a vindictive prosecution does not become constitutional merely because the conflicted prosecutor met with federal officials to "report on the status of the case" and "seek a fuller partnership." (Dkt. 60 at 14 n.8.). The government's response makes too little of Mr. Holding's initial leadership, decision to expand the investigation, his continued role, his signing the Indictment, his being part of its publicity, and his

8

expeditious announcement to run for Congress.  Like the fruit from the poisonous tree, the charges here stem from the original conflicts that do not cleanse the fruit.

To be clear, Mr. Edwards has no quarrel with the Department opening an investigation to confirm that his campaign did not spend any money on Ms. Hunter (everyone now acknowledges that did not occur), but he does object to that investigation being handled by Mr. Holding in the Eastern District and he does object to it then being redirected into this current set of novel and untested charges after the basis for the initial investigation proved meritless.  What the record shows to be enough to question Mr. Holding's targeting of Mr. Edwards in this manner is not excused through some "ends justify the unconstitutional means" argument that sign-off by other prosecutors somehow washed away the prior sin.  Nor does the mere fact that Main Justice allowed the Indictment to go forward mean anything more than that it showed the same usual deference to a U.S. Attorney's charging decision that it ordinarily provides.  Similarly, the fact that the new Obama Administration did not choose to use any political capital and risk the adverse publicity from charges that it was trying to favor one of its own to stop the train that Mr. Holding (a hold-over Republican U.S. Attorney) started does not mean that Mr. Edwards is precluded from standing up for himself when he there is ample record evidence that he was treated differently and unfairly.[3]

_____

[3]      This was a win-win situation for Mr. Holding politically.  If he was allowed to indict Mr. Edwards, he could boast to his Republican base as part of his congressional campaign -- as he is doing right now -- that he was the man who indicted a once-serious

## II.   MR. EDWARDS HAS NOT ASKED THE COURT TO PRESUME VINDICTIVENESS

Next, the government argues that Mr. Edwards has not presented sufficient evidence to raise a presumption of vindictiveness. (Dkt. 60 at 11-15.) The government spends one quarter of its brief arguing that the doctrine of presumed vindictiveness does not apply because Mr. Edwards cannot show circumstances which "pose a realistic likelihood of 'vindictiveness.'" Wilson, 262 F.3d at 314 (quoting Blackledge v. Perry, 417 U.S. 21, 27 (1974)). The government's argument is completely unnecessary, as Mr. Edwards never invoked the doctrine of "presumed" vindictiveness.

The doctrine of presumed vindictiveness allows a defendant who cannot show actual vindictiveness to "present evidence of circumstances from which an improper vindictive motive may be presumed." Wilson, 262 F.3d at 314. Unlike a claim of actual vindictiveness which "necessarily turn[s] on its own facts," Adams, 870 F.2d at 1146, a

---

Democratic contender for the Presidency. If the Obama Administration would have precluded the indictment of Mr. Edwards, Mr. Holding (or those working on his behalf) surely would have turned his sights on the Administration, claiming that it was merely playing politics in protecting a fellow Democrat after Mr. Holding had spent years and millions of taxpayer dollars building a case that he would then never have to prove. Attorneys General and other DOJ official have paid dearly when they have disapproved charges requested of hold-over U.S. Attorneys. See, e.g., "Nation: Yes to Civiletti," Time (Apr. 24, 1978) (describing a 7-week delay in confirming a Deputy Attorney General and 17 days of hearings by the Senate Judiciary Committee because a Republican Committee was investigating whether a Democratic Administration fired a hold-over Republican U.S. Attorney who was investigating a Democratic Congressman). Under the circumstances, it is understandable that the Obama Administration would stay out of this fight. Now that Mr. Holding has resigned to seek a seat in Congress, he can conveniently attack Mr. Edwards but will never be held accountable for proving his claims in court.

10

claim of presumed vindictiveness is not case- or fact-specific but rather turns on the generic type of circumstances involved in the case. See Wilson, 262 F.3d at 314 (holding that a presumption of vindictiveness "is warranted only when circumstances warrant it for all cases of the type presented"). The presumption arises not because of any specific misconduct by the prosecutor in the particular case, but rather because the circumstances themselves are "sufficiently suggestive of vindictive prosecution that when similar circumstances are presented in other factual contexts, the same conclusion would be suggested." Id. at 315.[4]

The claim brought by Mr. Edwards in this case is the anti-thesis of presumed vindictiveness, as one of the many factors suggesting that the indictment of Mr. Edwards resulted from what the law calls actual vindictiveness is the fact that no one throughout the course of American history has ever been prosecuted for the conduct alleged in the Indictment. Mr. Edwards does not argue that a presumption of vindictiveness is

---

[4]     In the seminal case of Blackledge, for example, the Supreme Court held that a rebuttable presumption of vindictiveness arises whenever a prosecutor brings more serious charges against a defendant at retrial following the defendant's successful appeal of a prior conviction. The presumption was warranted not because the specific prosecutor acted with improper motives, but rather because the general circumstances presented -- a prosecutor bringing more serious charges against a defendant on the heels of a successful appeal -- suggested that the charging decision was likely vindictive. See United States v. Goodwin, 457 U.S. 368, 375-77 (1982) (explaining a general presumption of vindictiveness was necessary in Blackledge "to free defendants of apprehension of such a retaliatory motivation on the part of the prosecutor," even though there was "no evidence … that the prosecutor had acted in bad faith or with malice").

11

warranted in any "case[] of the type presented," as he could not even begin to define the "similar circumstances" that would arise in a case of this "type." Wilson, 262 F.3d at 314-15. Rather, Mr. Edwards argues that the Indictment was the result of actual vindictiveness on the part of Mr. Holding, who prosecuted this case for over two years despite a fatal conflict of interest and without regard for whether any court or administrative agency had ever applied his novel theory of campaign finance law.

The government appears to have mistaken Mr. Edwards' argument that "the unique circumstances of this case" compel the conclusion that the prosecution resulted from actual vindictiveness with an argument based on presumed vindictiveness. (Compare Dkt. 32 at 20 (discussing "actual prosecutorial vindictiveness") with Dkt. 60 at 11 (stating that Mr. Edwards "asks the Court to presume that the decision to charge him was vindictive" and citing page 20 of Mr. Edwards' brief).) But what the law describes as actual and presumed vindictiveness are in fact two separate doctrines, see Goodwin, 457 U.S. at 380-81 (distinguishing between "actual vindictiveness" and "a presumption of vindictiveness … applicable in all cases" (emphasis in original)), and even those courts that have refused to apply a presumption of vindictiveness to a prosecutor's pre-trial charging decisions have expressly avoided "foreclos[ing] the possibility that a defendant in an appropriate case might prove objectively that the prosecutor's charging decision was motivated by a desire to punish him for doing something that the law plainly allowed him to do." Id. at 384; see also id. at 380 n.12 (explaining that the Supreme Court's decision

12

in <u>Bordenkircher v. Hayes</u>, 434 U.S. 357 (1978), "did not foreclose the possibility that a defendant might prove through objective evidence an improper prosecutorial motive"); <u>United States v. Miller</u>, 948 F.2d 631, 634 (10th Cir. 1991) (same). The government's lengthy discussion of presumed vindictiveness thus accomplishes little more than further muddying the waters, as the doctrine of presumed vindictiveness has nothing to do with the legal claim of actual vindictiveness presented in Mr. Edwards' motion to dismiss the indictment.

III. **MR. EDWARDS IS ENTITLED TO DISCOVERY ON HIS CLAIMS OF ABUSE OF PROSECUTORIAL DISCRETION**

In his motion to dismiss the Indictment, Mr. Edwards also requested discovery of any materials related to Mr. Holding's decision to seek an indictment in this case. (Dkt. 32 at 27-30.) In response, the government objects to what it characterizes as a "transparent attempt to discover the work product of Government attorneys" while, at the same time, assuring the Court that "there are no documents in the possession of the Government that show vindictiveness on the part of Mr. Holding or anyone else involved in this prosecution." (Dkt. 60 at 17, 20.) As Mr. Edwards explains in greater detail below, discovery is warranted in this case for two separate reasons.

A. **Mr. Edwards Has Presented "Some Evidence" Of Actual Vindictiveness**

First, Mr. Edwards is entitled to discovery because he has met the standards put forward by courts by presenting some objective evidence "tending to show the existence

of prosecutorial misconduct." Wilson, 262 F.3d at 315; see also Adams, 870 F.2d at 1146 (holding that to warrant discovery a defendant must show "some evidence tending to show the existence of the essential elements of the defense"); United States v. Sanders, 211 F.3d 711, 717 (2d Cir. 2000) (same). As Mr. Edwards argued in his original motion, the obvious conflict of interest created by Mr. Holding's past campaign contributions, the pattern of partisan investigations launched by Mr. Holding against prominent Democrats, the use of the Edwards Indictment in Mr. Holding's congressional campaign materials, the lack of any past prosecutions for the same conduct in this jurisdiction and the various irregularities identified by Mr. Edwards in the investigation itself all constitute "some evidence tending to show the existence of prosecutorial misconduct." Like Adams, this is one of those "rare cases" in which discovery is warranted because "there is enough smoke here" to raise serious concerns about the propriety and motives underlying the decision to indict Mr. Edwards.

The government does not appear to disagree with the standard of proof required to obtain discovery on a claim of actual vindictiveness, stating only that a defendant must present "clear evidence" and make a "credible showing" of vindictiveness to warrant discovery. (Dkt. 60 at 17-18.) As with its theory of "direct evidence," however, the government does not explain what it means by "clear evidence" or a "credible showing." By necessity, the standard of proof required to obtain discovery must be lower than that required to establish a claim of actual vindictiveness as a matter of law; otherwise,

discovery would never be necessary. See Heidecke, 900 F.2d at 1158-59 (discussing the applicable standard). But the government never explains why the evidence presented by Mr. Edwards, even if insufficient to establish a dispositive claim of actual vindictiveness, also fails to satisfy the "some evidence" standard applicable to requests for discovery.

Instead, the government attempts to distinguish those cases cited by Mr. Edwards in which a defendant's request for discovery was granted. (Dkt. 60 at 18-20.) The government notes, for example, that the district court in Fieger was particularly concerned by the prosecutors' failure to consult with Public Integrity prior to initiating a campaign finance investigation, id. at 18-19, and that the Sixth Circuit's decision in Adams relied in part on an affidavit from a former government employee who stated that, in his opinion, the criminal charges involved in that case were brought in retaliation for defendant's filing of a civil suit against the government. Id. at 19-20. The government also notes that the district court in Jarrett ultimately concluded that the defendant in that case had not provided any evidence of actual vindictiveness. Id. at 19.

These arguments miss the mark, for one simple reason -- none of the government's attempted distinctions undermines the basic premise for which these cases are cited, namely that a defendant is entitled to discovery on a claim of actual vindictiveness if he presents "some evidence" tending to show an improper prosecutorial motive. In Fieger, for example, the district court relied not just on the prosecutors' failure to consult Public Integrity before initiating the investigation, but also on evidence demonstrating that (1)

15

defendant's indictment represented "the first such prosecution ever brought" in that jurisdiction, (2) seven months into the investigation, the top three attorneys in the local U.S. Attorney's Office were recused based on an apparent conflict of interest, (3) grand jury proceedings "went beyond inquiring into Federal election campaign finance violations" to examine unrelated state and local campaign activities, (4) the government devoted an "extensive amount of FBI resources" to its investigation of a non-violent felony, and (5) a local television station was "tipped off" about a search related to the investigation. Fieger, 2008 WL 205244 at *4-*7, *15-*16. After reviewing all of these factors, the court concluded that the defendant had presented "some evidence" of vindictive prosecution and was therefore entitled to discovery. Id. at *15. Mr. Edwards has presented essentially the same evidence as Mr. Fieger, demonstrating that the charges against him represent "the first such prosecution ever brought" based on Mr. Holding's novel theory of campaign finance law, that Mr. Holding's past campaign contributions rendered him fatally conflicted, that prosecutors asked questions of witnesses before the grand jury wholly unrelated to the conduct at issue,[5] that the government devoted an

---

[5]     The government chides Mr. Edwards for not identifying these questions and claims that Mr. Edwards was provided "transcripts of all the testimony presented." (Dkt. 60 at 11 n.5.)  But Mr. Edwards did not identify the specific questions that grand jury witness were asked about irrelevant factors because he did not want to disclose sealed grand jury proceedings, which the government has indicated it wants to remain sealed. Moreover, the government has now acknowledged that the defense has not been provided transcripts of any witness testimony before the Eastern District aside from a single summary witness.

"extensive amount" of resources to this case, and that Mr. Holding's investigation was plagued by a series of leaks throughout the grand jury process.[6]

     The government's attempt to distinguish the Sixth Circuit's decision in <u>Adams</u> is similarly unavailing. In that case, the court granted discovery not just because a former government employee stated that, in his opinion, charges were brought in retaliation for the filing of a civil lawsuit against the government (Dkt. 60 at 19-20), but also because a former IRS agent stated that criminal tax proceedings would not "'ordinarily' be instituted" based on the conduct alleged in the indictment and the record demonstrated that the conduct at issue had "not heretofore been subjected to prosecution" in that jurisdiction. <u>Adams</u>, 870 F.2d at 1145-46. Mr. Edwards presented similar evidence in this case. Two former Chairmen of the Federal Election Commission have stated that "the conduct at issue in the Edwards matter, or even conduct substantially similar to it," has never before been held to violate federal election laws by any court or administrative

---

[6]    The government makes much of the fact that the discovery granted by the court in <u>Fieger</u> "focused largely on the reasons for the recusal" of three senior prosecutors. (Dkt. 60 at 18-19.) This is a curious position for the government to take, as one of Mr. Edwards' central arguments is that Mr. Holding's past campaign contributions to candidates running against Mr. Edwards, as well as Mr. Holding's own plans to run for elective office as a Republican, created an obvious conflict of interest warranting recusal. In <u>Fieger,</u> the district court granted discovery even though the three prosecutors in that case were recused well before the indictment issued. 2008 WL 205244 at *5, *11. The need for discovery is all the more apparent in this case, in which the prosecutor at the helm of the investigation refused to recuse himself throughout these proceedings, secured an indictment, and then promptly left office to launch a congressional campaign heralding his investigation of Mr. Edwards.

17

agency. (Dkt. 30, Ex. A.) This is exactly the type of evidence presented to the court in Adams, which granted defendants' request for discovery because it was "hard to see, indeed, how the defendants could have gone much farther than they did without the benefit of discovery on the process through which this prosecution was initiated." Adams, 870 F.2d at 1146.

The government attempts to distinguish Fieger and Adams by pointing to specific pieces of evidence allegedly present in those cases that are not present in this case. (Dkt. 60 at 18-20.) But nothing in Fieger indicates that the prosecutors' failure to consult Public Integrity at the outset of the investigation was the determinative factor in granting discovery, nor does Adams specify that the personal opinion of the affiant was central to its holding. To the contrary, Adams specifically notes that "[e]ach situation of this sort will necessarily turn on its own facts," and the key inquiry is whether -- in light of all the evidence presented -- the defendant has shown "some evidence tending to show the existence of the essential elements of the defense." Adams, 870 F.2d at 1146. Pointing to specific differences in the evidence presented in these cases simply does not address whether discovery should be granted in this case, as it is hardly surprising that Mr. Edwards has not presented the exact same evidence as defendants in other cases involving separate crimes and different circumstances.

Moreover, the government completely misunderstands the significance of Jarrett, the third case relied upon by Mr. Edwards in his initial request for discovery. Although

18

the government correctly notes that the district court in that case "later concluded that there was no evidence of vindictiveness" (Dkt. 60 at 19), the government glosses over the fact that the district court reached this conclusion only after granting defendant's request for discovery. See United States v. Jarrett, 2008 WL 323411 (N.D. Ind. Feb. 4, 2008) (granting defendant's request for discovery); United States v. Jarrett, 2011 WL 53174 at *6 (N.D. Ind. Jan. 7, 2011) (holding, after in camera review, that none of the documents produced by the government "could be deemed 'clear and objective' evidence of vindictiveness"). After the Seventh Circuit reversed the district court's earlier decision dismissing the indictment on the basis of actual vindictiveness, see 447 F.3d 520, the district court in fact ordered the government to produce "(1) All pre-indictment notes, emails, memoranda, and correspondence with investigatory agencies relating to [defendant's] indictment; (2) All correspondence with attorneys for [the cooperating witnesses] pertaining to [defendant's] indictment; and (3) Any other documents in the possession of the Government that relate to the decision to prosecute [defendant]." 2008 WL 323411 at *3.

Of particular significance to this case, the district court ordered the production of these materials despite the government's claim of various privileges (deliberative process, attorney-client, and attorney work product), holding that those privileges must yield "in an instance such as this where the sole way for a defendant to prove his allegation of government misconduct (absent a public statement from the government) is through its

19

recordkeeping and documents typically protected by the privilege." <u>United States v.</u> <u>Jarrett</u>, 2010 WL 1577670 at *4 (N.D. Ind. April 20, 2010). <u>Jarrett</u> thus provides no support for the government's claim that granting discovery in this case would signal "a dramatic intrusion into the deliberative process of the Government." (Dkt. 60 at 17.)

## B. The Government's Assertions That All Is Well In This Case Is A Waiver of Any Claim to Privilege

Presumably to forego any further scrutiny of what happened in this investigation, the government in its opposition asserted that "there are no documents in the possession of the Government that show vindictiveness on the part of Mr. Holding or anyone else involved in this prosecution." (Dkt. 60 at 20.) This bald assertion is now allowed to be tested.

It is well established that when a party "attempts to make a testimonial use" of materials normally subject to a privilege, the privilege is waived and "the normal rules of evidence come into play with respect to cross-examination and production of documents." <u>United States v. Nobles</u>, 422 U.S. 225, 240 n.14 (1975); <u>see</u> <u>also</u> <u>In re</u> <u>Martin Marietta Corp.</u>, 856 F.2d 619, 624 (4th Cir. 1988). "The privilege which protects attorney-client communications may not be used both as a sword and a shield. Where a party raises a claim which in fairness requires disclosure of the protected communication, the privilege may be implicitly waived." <u>Kaiser Found. Health Plan, Inc. v. Abbott Labs.,</u> <u>Inc.</u>, 552 F.3d 1033, 1042 (9th Cir. 2009). This rule applies specifically to assertions, such as the one made by the government in this case, that "there is no evidence" to

20

support a particular legal claim[7].  See In re Martin Marietta Corp., 856 F.2d at 623.  Such an assertion waives attorney-client and work product protection with respect to any documents or communications relevant to determining whether such evidence does or does not exist.  Id. at 623-25.

In this case, the government specifically asserts that "there are no documents in the possession of the Government that show vindictiveness on the part of Mr. Holding or anyone else" while, at the same time, objecting to the production of these documents on the basis of the deliberative process and attorney work product doctrines.  (Dkt. 60 at 19-20.)  This is the very action that courts disapprove -- the government representing that it has reviewed the evidence and then essentially dictate to the Court what that evidence proves, without ever permitting the defendant (or the Court) any opportunity to contest or even so much as review the evidence the government has relied upon.  This is the prohibited use of a privilege as both a "sword" and a "shield."  "[I]n fairness," any such claims to privilege have therefore been "implicitly waived."  Kaiser Found. Health Plan, Inc., 552 F.3d at 1042.

---

[7]     Here it remains unclear what the government's assertion means -- for example -- no documents exist, the documents that exist do not contain a confession of a bad motive, or perhaps, the documents that exist are not possible to be seen by an objective person as indicating the irregularities set out in the motion?

21

## CONCLUSION

Mr. Edwards has presented objective evidence demonstrating that his Indictment resulted from actual vindictiveness (e.g., a profound conflict of interest, a radical charge, a curious investigation venue, various other irregularities, and a launch for political office). Because the Indictment resulted from actual vindictiveness, it must be dismissed. If the record is insufficient for dismissal, it crosses the threshold for discovery on the claim of actual vindictiveness, because the motion has presented "some evidence tending to show" improper motives, irregular conduct, novel theories and because the government has tried to avert scrutiny of its decisions by a self-serving statement of propriety while hiding behind a claim of privilege to tests its assertion.

Dated: October 11, 2011


/s/ James P. Cooney III
James P. Cooney III, N.C. Bar No. 12140
jcooney@wcsr.com
WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
One Wells Fargo Center
Suite 3500, 301 South College Street
Charlotte, NC 28202-6037
(704) 331-4980 (phone)
(704) 338-7838 (fax)

/s/ Abbe David Lowell
Abbe David Lowell, *pro hac vice*
ADLowell@Chadbourne.com
Christopher D. Man, *pro hac vice*
CMan@Chadbourne.com
CHADBOURNE & PARKE LLP
1200 New Hampshire Ave., NW
Washington, DC 20036
(202) 2974-5600 (phone)
(202) 974-5602 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2011, I electronically filed the foregoing **Reply Brief-Abuse of Discretion** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Brian Scott Meyers
U.S. Attorney's Office – EDNC
Terry Sanford Federal Building
310 New Bern Avenue, Suite 800
Raleigh, NC 27601-1461
Telephone: (919) 856-4530
Fax: (919) 856-4487
Email: brian.s.meyers@usdoj.gov

David V. Harbach
U.S. Department of Justice
Public Integrity Section
1400 New York Avenue, NW, Suite 1800
Washington, DC 20005
Telephone: (202) 262-7597
Fax: (202) 514-3003
Email: david.harbach@usdoj.gov

Jeffrey E. Tsai
U.S. Department of Justice
Public Integrity Section
1400 New York Avenue, N.W., Suite 1800
Washington, DC 20005
Telephone: (202) 307-0933
Fax: (202) 514-3003
Email: jeffrey.tsai@usdoj.gov

Robert J. Higdon
U.S. Attorney's Office – EDNC
Terry Sanford Federal Building
310 New Bern Avenue, Suite 800
Raleigh, NC 27601-1461
Telephone: (919) 856-4530
Fax: (919) 856-4487
Email: bobby.higdon@usdoj.gov

/s/ James P. Cooney III
James P. Cooney III (NCSB # 12140)
WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
One Wells Fargo Center
Suite 3500, 301 South College Street
Charlotte, NC 28202
Telephone: (704) 331-4980
Email: jcooney@wcsr.com

*Attorney for Defendant*