# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA, )
                                  )
             **v.**          )
                                  ) **CRIMINAL CASE NO. 1:11-CR-161-1**
JOHNNY REID EDWARDS.   )
                                  )
                                  )

## JOHN EDWARDS' REPLY MEMORANDUM IN SUPPORT OF HIS MOTION TO DISMISS COUNT 1 -- CONSPIRACY
### (Motion to Dismiss No. 4)

## INTRODUCTION

In its response to Mr. Edwards' Motion to Dismiss the Conspiracy Count of this Indictment, the government invokes abstract principles of conspiracy law, but fails to address the defects in how the conspiracy count in <u>this</u> Indictment actually was drafted. The charge is flawed as a matter of law, even assuming the government is correct as to every fact that is alleged. Consequently, the Court should dismiss Count I. To do otherwise would defeat the purpose of and protection that is supposed to be provided by pre-trial motions.

## ARGUMENT

## I. COUNT 1 IMPROPERLY CHARGES A "RIMLESS WHEEL" CONSPIRACY

As an abstract matter, the government is correct that a determination as to whether there was a single conspiracy or multiple conspiracies <u>often</u> is a factual issue for a jury to

decide. But that does not mean it is <u>always</u> the case. (Dkt. 61 at 9-10.) Where, as here, an indictment <u>on its face</u> charges multiple conspiracies within a single conspiracy count, that charge is flawed as a matter of law -- no matter what the jury would decide as to the facts -- and it should be dismissed. <u>See, e.g.</u>, <u>Dickson v. Microsoft Corp.</u>, 309 F.3d 193, 203 (4th Cir. 2002) (affirming district court's pre-trial finding of a rimless wheel conspiracy).

### A.   It Is Not Enough That All Alleged Conspirators Share A Common Objective, The Common Objective Must Be To Commit A Crime

Count 1 alleges a conspiracy in violation of the "offense clause" of 18 U.S.C. § 371, which means the Indictment is charging that the object of the conspiracy is to violate a substantive federal criminal statute. <u>See, e.g.</u>, <u>United States v. Stavroulakis</u>, 952 F.2d 686, 690-91 (2d Cir. 1992) ("Where, as here, the indictment charges a conspiracy under the 'offense' clause of the conspiracy statute, the conspirators must have agreed to <u>commit the same offense</u> to satisfy the rule that they have agreed on the essential nature of the plan.") (emphasis added); <u>United States v. Krasovich</u>, 819 F.2d 253, 255 (9th Cir. 1987) (no conspiracy where co-conspirators "had not agreed on the same offense").[1]  This is

_____

[1]     In addition to punishing conspiracies to violate federal substantive criminal statutes under the "offense clause," Section 371 punishes conspiracies with the object "to defraud the United States."  That category reaches a broader category of conduct than what is specifically proscribed by federal criminal statutes.  <u>See, e.g.</u>, <u>United States v. Arch Trading Co.</u>, 987 F.2d 1087, 1091-92 (4th Cir. 1993).  In the context of an "offense

(Cont'd on following page)

2

where the analysis of this motion should be focused (and where the government's brief clouds the issues). For an "offense clause" conspiracy to exist, all the alleged conspirators must agree to pursue the same object, which is another way of saying to commit the same crime. It is not enough, as the government argues, that the alleged co-conspirators agreed upon something else, in this case "to effectuate the common object of a single conspiracy: to get financial support to Edwards to help him be elected President." (Dkt. 61 at 11; see id. at 11 ("their shared objective was to help the hub of the conspiracy become President of the United States").) Many people in this country sought to help Mr. Edwards get elected, but that does not mean that they shared an illegal object to get that done or committed a federal crime.

The Indictment does allege that the supposed conspiracy had the violation of two federal substantive criminal statutes as its object. First, Count 1 alleges that the conspiracy was for Mr. Edwards to "accept and receive" "contributions from Person C [Ms. Mellon] and Person D [Mr. Baron] in excess of the limits of the Election Act." (Indict. ¶ 14(A) (citing 2 U.S.C. §§ 441a(1)(1)(A), 441a(f) & 437g(d)(1)(A)(i)).) Second, Count 1 alleges that the object of the conspiracy was to conceal these contributions and thereby cause "the John Edwards for President Committee to create and file false and

---

(Cont'd from preceding page)

clause"-based conspiracy, when courts refer to the need for there to be a common goal, purpose or objective, that common goal, purpose or objective must be to violate (the same) federal substantive criminal statute. Stavroulakis, 952 F.2d at 690-91.

misleading campaign finance reports with the FEC" in violation of 18 U.S.C. § 1001(a)(1). (Indict. ¶ 14(A).)

The flaw in this conspiracy charge, though, is glossed over by the government. The flaw is that it alleges that Ms. Mellon and Mr. Baron were part of this conspiracy, even though they are not alleged to have conspired to commit the same crime and even though the government concedes they did not. (See Dkt. 61 at 11 (acknowledging that Ms. Mellon and Mr. Baron are alleged co-conspirators "as the alleged spokes in this conspiracy (*i.e.*, Mellon and Baron)").) Ms. Mellon is alleged to have paid excessive campaign contributions to Mr. Edwards and Mr. Baron is alleged to have done the same, but there is no allegation that there was any agreement between them or that they helped each other commit their alleged crime in any way. As the government concedes, its allegation is that "Mellon and Baron made illegal contributions independent of one another." (Dkt. 61 at 14 (emphasis added).) There was no agreement between them of any kind.[2]

In any presidential election, it is likely that there will be overzealous supports who may seek to make excessive campaign contributions (campaigns often discover repeat

---

[2]    To constitute a conspiracy, more is required than that they agreed upon something -- the agreement would have to be to commit the same crime. It would not matter if they both agreed that Mr. Edwards was their choice for President or to meet for ice cream after sending their allegedly illegal contributions. Rather, the agreement would have to be one to assist one another in committing the same substantive offense.

4

donors have exceeded the aggregate limits and refund the difference). The government could not plausibly take everyone across the country who criminally made excess contributions to a candidate "independent of one another" and then divide them up and charge everyone who made excess contributions to Candidate A with one conspiracy, everyone who made excess contributions to Candidate B with another conspiracy, and so forth. While they all would have acted with the same purpose, there is no conspiracy because there is no agreement among them all. It really is no different here. If a campaign received excessive or conduit contributions in the same election cycle from 100 people (even if it was 100 people at the same event), it does not support the charge that all 100 were in a conspiracy together.

Likewise, the agreement requisite to a conspiracy does not exist merely because the government alleges "the illicit payments from both were delivered in the same manner, *i.e.*, secretly." (Dkt. 61 at 14.) Unique similarities in criminal conduct may be circumstantial evidence of the existence of an agreement, but the government concedes as a matter of fact that there was no agreement between Ms. Mellon and Mr. Baron here -- their actions were "independent of one another." (Id.) If all who commit crimes in a similar manner could be deemed to join a single conspiracy on that basis alone, every pickpocket or every person who robbed a bank wearing a ski mask could be charged in a single conspiracy. This is plainly not the law. The government wants to somehow

5

suggest that the clear-cut law of conspiracy is somehow more complicated in an election law context -- it is not.

The Fourth Circuit rejected the sort of assertion the government makes here as early as United States v. Goss, 329 F.2d 180 (4th Cir. 1964). In Goss, the government claimed there was a single "archconspirator" who formed a single conspiracy with the other nine charged defendants to unlawfully distill, possess, conceal and transport whiskey. Although various alleged conspirators were charged with working together to commit specific crimes, there was no evidence of an agreement among all the alleged conspirators. The Fourth Circuit explained:

> If there were conspiracies here, the object of all the offenders, save [the archconspirator], was not the same, for the object of one group was not always the object of another. The only thing in common was the law they were breaking. Consequently, the single conspiracy of the indictment falls apart when the conduct of the defendants is seen to consist of several instead of a sole combination.

Id. Consequently, it is not enough that all co-conspirators are alleged to have conspired with a person at the center of the hub, to violate the same law and do so in the same manner. The conspiracy requires an agreement among all conspirators -- both in its hub and along its spokes -- to commit the same crime. Absent such an agreement, no "rim" exists to connect the hub and the spokes.

**B.    The Absence Of An Agreement Between Ms. Mellon and Mr. Baron Renders The Charged Conspiracy A "Rimless Wheel"**

Count 1 is a classic example of what the Supreme Court called a "rimless wheel" conspiracy -- a flawed conspiracy charge -- in <u>Kotteakos v. United States</u>, 328 U.S. 754-55 (1946). Essentially, multiple conspiracies are charged on the face of the Indictment because, while Mr. Edwards is alleged to have conspired with Ms. Mellon and Mr. Baron, Ms. Mellon and Mr. Baron are not alleged to have conspired with each other. If the relationship were diagramed, Mr. Edwards would be at the hub with one spoke running from Mr. Edwards to Ms. Mellon and another spoke running from Mr. Edwards to Mr. Baron. But because there is no connection between Ms. Mellon and Mr. Baron, the picture would be of a "rimless wheel."

Although <u>Kotteakos</u> and its line of cases is controlling, the government seeks to distinguish <u>Kotteakos</u> because this case "involves only two individuals" and <u>Kotteakos</u> involved "32 people." That is a distinction without a difference. (Dkt. 61 at 11.) The <u>Kotteakos</u> rule is that multiple conspiracies cannot be charged as a single conspiracy. It is a bright line rule, and it is offended whether 2 or 32 conspiracies are charged as one.

The government also seeks to distinguish <u>Kotteakos</u> based on abstract principles of conspiracy law discussed in <u>Blumenthal v. United States</u>, 332 U.S. 539 (1947), that have no bearing on this case. In <u>Blumenthal</u>, the defendants were charged with a conspiracy to sell two large lots of whisky above the price-ceiling set by emergency price controls. The defendants obtained the large lots of whisky and, through a common façade company, various conspirators sold the whisky to taverns. <u>Id.</u> at 542. While the

conspirators did not all know one another or precisely what each was doing, "each knew or must have known that others unknown to them were sharing in so large a project." Id. at 558. As the Court explained: "True, each salesman aided in selling only his part. But he knew the lot to be sold was larger and thus he was aiding in a larger plan," and "[a]ll knew of and joined in the overriding scheme." Id. Blumenthal specifically distinguished Kotteakos because, in Kotteakos, "no two of those agreements were tied together as stages in the formation of a large all-inclusive combination, all directed to achieving a single unlawful end or result. On the contrary each separate agreement had its own distinct, illegal end." Id. at 558.

The distinction between the Kotteakos and Blumenthal lines of cases is well-illustrated by United States v. Kemp, 500 F.3d 257 (3d Cir. 2007). In Kemp, the government charged a single conspiracy concerning Kemp, the Treasurer of Philadelphia. The government alleged that "White acquired control over Kemp's decision-making" through bribery. Id. at 264. The government alleged that "Kemp and White were the hub" of the conspiracy, and that they conspired with Hawkins and Knight to obtain bribes in exchange for city business. Id. at 288. It also alleged that they conspired with Holck and Umbrell to extend otherwise-unavailable loans through their bank in exchange for preferential treatment. Id. at 264.

The Third Circuit concluded that the government had charged a rimless wheel conspiracy because the government failed to show Holck and Umbrell "either knew or

should have known about Knight's and Hawkins's activities." Id. at 288. The court also emphasized: "Nor is this they type of conspiracy that must have had other members; it would have been perfectly reasonable for Holck and Umbrell to have believed that they were doing business with only Kemp and White." Id. (emphasis in original). Moreover, the separate conspiracies were "neither interdependent nor mutually supportive." Id. at 289.

This case is indistinguishable from Kemp and Kotteakos, and the government's reliance on Blumenthal for the propositions that a conspiracy can include conspirators who do not know of each other's identities or involvement, or the full scope of the conspiracy, is irrelevant here. (Dkt. 61 at 13.) The conspiracy alleged in this case is not one where it could be alleged that Ms. Mellon and Mr. Baron knew or should have known of each other's activities, nor was it one where there was an overriding scheme involving them both. Further, Ms. Mellon's and Mr. Baron's actions were not interdependent and mutually supportive of each other because, as the government acknowledges, they made their allegedly "illegal contributions independent of one another." (Dkt. 61 at 14.) The Indictment alleges that Ms. Mellon wrote large checks to cover any expenses that may arise (Indict. at 7-8), and that Mr. Baron paid in full for several specific expenses, including airfare and hotel stays (Indict. at 10-11.)

Unlike in Blumenthal, where the conspirators must have known that others (perhaps unknown to them) were completing necessary tasks to further their common

9

scheme, there was no reason for Ms. Mellon or Mr. Baron to suspect that was the case nor is it alleged in the Indictment. (As a matter of fact, Mr. Young often double-dipped, asking Ms. Mellon and Mr. Baron to pay for the same expense without telling either, and kept the extra money for himself. And the amounts the government alleges each to have given are so large that there could be no reasonable assumption others were involved. In fact, the opposite is true.) Just as in Kemp, where the two spokes were alleged to have had separate corrupt dealings with a politician, this case merely alleges separate corrupt dealings with a candidate.

### C. The "Rimless Wheel" Problem Exists Regardless Of How Many Conspirators Are At The Hub

The government makes that startling assertion that a single conspiracy can exist even when all the co-conspirators are not alleged to have joined the same conspiracy. (Dkt. 11-13.) The proposition is baffling because "[t]he [Supreme] Court has repeatedly said that the essence of a conspiracy is 'an agreement to commit an unlawful act.'" United States v. Jimenez-Recio, 537 U.S. 270, 274 (2003) (extensive citations omitted). The common agreement of all conspirators "is all but synonymous with the conspiracy itself." United States v. Broce, 488 U.S. 563, 570 (1989). Indeed, "to join a conspiracy . . . is to join an agreement, rather than a group." United States v. Avila, 465 F.3d 796, 798 (7th Cir. 2006).

The government imagines that Kotteakos is irrelevant to this case because there was merely one person at the hub in that case, and here there are two -- Mr. Edwards and

Mr. Young, so "Edwards did not move from spoke to spoke alone." (Dkt. 61 at 11-12.) Yet, there is no plausible explanation of how that solves the "rimless wheel" problem. Kotteakos was not at all concerned with the relationship between the spoke and the hub -- it acknowledged that a conspiracy between them could have existed -- rather the problem was that there was no relationship from spoke to spoke. That created a multiple conspiracies problem and, no matter how many conspirators are at the hub, that problem does not go away. So long as the spokes are not connected, not everyone is part of the same conspiracy, and the wheel remains "rimless." If Mr. Young acted to carry out what is alleged to be Mr. Edwards' purpose, that just makes him an alleged agent in the hub, but has no impact on the relationship among the different spokes (e.g., a campaign asking the same bundler to go and solicit that 100 excessive contributions).

This is certainly how the Fourth Circuit (and every other court) understands the flaw in Kotteakos -- that the alleged conspiracy "made out multiple, distinct conspiracies and not a single, large one." United States v. Hickman, 626 F.3d 756, 768 (4th Cir. 2010); see Dickson, 309 F.3d at 203-04 ("[A] rimless wheel conspiracy is not a single, general conspiracy but instead amounts to multiple conspiracies between the common defendant and each of the other defendants."); Goss, 329 F.2d at 182 (reversing a "rimless wheel" conspiracy based on Kotteakos because it reflected "at best a series of separate unconnected conspiracies").

11

This very issue was raised and quickly dismissed in <u>Kemp</u> because it "lack[ed] merit." <u>Kemp</u>, 500 F.3d at 291. The Third Circuit explained that "it is of no moment that the hub of the conspiracy involved two individuals instead of one. [<u>United States v.</u>] <u>Smith</u>[,82 F.3d 1261 (3d Cir. 1996)] recognized that the inquiry must focus not on the number of individuals who make up the hub, but on the character of the agreements between the spokes." <u>Kemp</u>, 500 F.3d at 291. In <u>Smith</u>, the Third Circuit had been asked to consider whether the existence of a second person at the hub of a conspiracy would alter a "rimless wheel" finding, and the court explained that, "[w]hile we have found surprisingly little on the point, we are convinced that the answer is 'no.' Because a conspiracy is defined by the scope of commitment of its participants, the existence of a master, core conspiracy would not change the character of the agreements with the service providers." 82 F.3d at 1272.

Other courts have found the distinction immaterial. For example, in <u>United States</u> <u>v. Butler</u>, 494 F.2d 1246 (10th Cir. 1974), the Tenth Circuit rejected the existence of a twenty-three defendant conspiracy with two defendants at the hub. <u>Id.</u> at 1255. Despite the two-man hub, the court reversed a conviction because "one general conspiracy has been alleged, while the evidence can support the existence of no fewer than three." <u>Id.</u> at 1255.

The only authority the government has for its proposition comes from an unpublished -- and non-precedential -- opinion in <u>United States v. Hadeed</u>, 376 Fed.

12

Appx. 335 (4th Cir. 2010). While there is language in <u>Hadeed</u> that seems to support the government's position, that only highlights the danger in relying upon unpublished opinions. <u>Hadded</u> does not cite any authority to support its position or explain how the existence of a two-man hub would solve the "rimless wheel," separate conspiracies problem. And the government offers no explanation either. Nor does <u>Hadeed</u> address the fact that its decision would create a circuit split, or that it is flatly inconsistent with every prior (and subsequent) Fourth Circuit case addressing the "rimless wheel" problem. While it should not be lightly assumed that the panel intended to cause a circuit split or abrogate prior Fourth Circuit precedent -- particularly in an unpublished opinion -- it could not have done so. "[I]t is quite well settled that a panel of this circuit cannot overrule a prior panel. Only the <u>en banc</u> can do that." <u>Olatani v. Ashcroft</u>, 387 F.3d 383, 401 (4th Cir. 2004). Consequently, the Court should follow the actual (and thus published) precedents of the Fourth Circuit.

When there is a multiple conspiracy or two-man hub conspiracy, the issue becomes one of how to draft the Indictment. Multiple conspiracies can be charged and a conspiracy among the two men at the hub can be charged, but what cannot be done is to charge multiple conspiracies as a single conspiracy. It is not enough for the government to prove that some conspiracy has occurred; it must prove the conspiracy charged in the Indictment. As the Supreme Court has made clear: "The precise manner in which an

indictment is drafted cannot be ignored. . . ."  <u>Sanabria v. United States</u>, 437 U.S. 54, 65-66 (1978).

## II.     DONORS AND ACCEPTERS DO NOT CONSPIRE TO COMMIT THE SAME OFFENSE

As explained above, the law is clear that a conspiracy is an agreement to commit <u>the same crime</u> and, as even the government must recognize, the crimes of making and accepting illegal campaign contributions are distinct.  (Dkt. 61 at 19 ("making an illegal contribution and accepting an illegal contribution are two separate offenses").) Consequently, Ms. Mellon and Mr. Baron could not have conspired to "accept" the very alleged campaign contributions they are charged with making to Mr. Edwards.

The government falls back upon that same argument addressed above that a conspiracy is an agreement "to break the law" -- without appreciating that a conspiracy is an agreement among <u>all</u> alleged conspirators to break the <u>same</u> law.  It is not sufficient that all the alleged conspirators agreed with some other alleged conspirator (but not all conspirators) to break some law.

Even the cases the government cites stand against it.  For example, the government cites <u>United States v. Guinta</u>, 925 F.2d 758, 764 (4th Cir. 1991), for the proposition that "the critical inquiry is whether the Government has proven an 'agreement between at least two persons to take concerted action.'"  (Dkt 61 at 19.)  But <u>Guinta</u> makes clear that it did not intend "concerted action" to be as broad as the government suggests.  "Because conspiracy requires agreement between at least two persons to take

14

concerted action, if the purposes of alleged co-conspirators are different, though both are aimed at unlawful goals, there is no conspiracy." Guinta, 925 F.2d at 764 (considering an alleged conspiracy with two distinct objects, importation and distribution). Thus, in a circumstance like the present case, where the Indictment specifically alleges that some alleged conspirators aimed to "make" illegal campaign contributions and other aimed to "accept" them, there is no agreement, as a matter of law, to the take the same concerted action.

The government's analogy to buy-sell transactions may be apt, but it is not helpful to its claim. The Fourth Circuit, among others, holds that in a drug transaction the person who agrees to sell the drugs and the person who agrees to buy them may have an "agreement," but there is no conspiracy to commit the same offense. See, e.g., United States v. Mills, 995 F.2d 480, 484-85 (4th Cir. 1993). The government disingenuously suggests that "buy-sell transactions can, in fact, support a finding of conspiracy." (Dkt 61 at 19 (emphasis added.) The truth is that the Fourth Circuit (and so far as we are aware, every court to have considered such issues) has held that the existence of a buy-sell transaction alone is not enough to establish a conspiracy.

In Mills, the Fourth Circuit upheld the conspiracy, not because there was a buy-sell transaction, but instead distinguished the general rule because the buyer "was far more than a mere buyer." 995 F.2d at 485. He "bought and sold cocaine," and "assisted [the seller] in both housing cocaine and in travelling to North Carolina to sell cocaine."

Id. Likewise, in United States v. Cornwell, 418 Fed. Appx. 224 (4th Cir. 2011), the Fourth Circuit did not make a blanket holding that a buy-sell relationship could prove a conspiracy. Rather, citing to Mills, the Fourth Circuit explained: "Evidence of a buy-sell transaction involving a substantial quantity of drugs, repeated transactions, and continuing relationships can support a finding of a conspiracy." Id. at 226. The rule addressed in Mills and Cornwell can perhaps better be expressed by saying that, when two people have conspired to commit the same offense, they cannot insulate themselves from a conspiracy count by also engaging in a buy-sell transaction. Here there is no allegation that Ms. Mellon or Mr. Baron were anything but the equivalent of "mere buyers" -- they were "mere donors." They never took any action on the other side of the transactions.

The government also attempts to justify its decision by distinguishing a World War II era case from the Eighth Circuit, which refused to find a conspiracy in a buy-sell drug transaction. (Dkt. 61 at 19 (citing Nigro v. United States, 117 F.2d 624 (8th Cir. 1941).) The government reads the case for the proposition that no conspiracy was found between the seller of illegal drugs and the purchaser because Congress only punished the selling but not the purchasing of drugs, and a conspiracy charge would eliminate the immunity for the buyer that Congress created. (Id.) The government extrapolates from this that because modern drug laws have disparate penalties for buyers and sellers, this is the basis for the general rule prohibiting a conspiracy charge in the buy-sell context. The

16

government then argues that the parity in penalties for the separate offenses of making and accepting illegal campaign contributions eliminates the need for a bar precluding a conspiracy charge in this context.

There are many great leaps of logic in the government's argument, and it falters at every step. First, the government understates the holding in <u>Nigro</u>. While it is true that the Eighth Circuit made the point about disparities between buyers and sellers, it was a secondary consideration made to "[f]urther" the central holding that the "[buyer] did not conspire to sell drugs . . . [a]nd his steps in effecting his purchases" did not violate the statute. <u>Nigro</u>, 117 F.2d at 628. The critical consideration is that the buyer and seller did not commit the same offense.

More fundamentally, the government's theory that a conspiracy charge cannot be added in the context of buy-sell transactions in the drug context due to disparate penalties as to the substantive counts makes no sense. A buyer and seller of drugs will still be charged with the substantive offense of buying or selling and, upon conviction, be sentenced accordingly. A conspiracy count is an additional charge, applicable when two or more people conspire to commit the same crime, and the penalty is the same for a conspiracy to violate either provision (i.e., a conspiracy for two or more to buy or two or more to sell). An added conspiracy count is not charged because the buyer and seller do not conspire to commit the same offense. But even if the conspiracy count were added

17

and both were sentenced the same for that crime, they still would face potentially disparate sentences on the substantive counts just as Congress intended.

Nor does the existence of aiding and abetting liability change this result. In Guinta, for example, the Fourth Circuit held that merely assisting a drug dealer in finding a buyer would not constitute a conspiracy. Id. at 767. In United States v. Mills, 995 F.2d 480, 484 (4th Cir. 1993) -- another case cited by the government (Dkt. 61 at 20) -- the Fourth Circuit described the rejection of the conspiracy in Guinta by saying: "At most, such conduct would amount to aiding and abetting possession with intent to distribute." So, plainly the government cannot transform an aiding and abetting charge into a conspiracy count -- even if it could establish aiding and abetting.

But here, the government cannot even establish aiding and abetting because "making" and "accepting" illegal campaign contributions are separate crimes. A person who "accepts" an offer does not aid and abet the offer in being made anymore than a person who "makes" an offer aids and abets the acceptance of the offer. A person, like Andrew Young, who is alleged to have solicited illegal campaign contributions and accepted them on Mr. Edwards' behalf, could be charged with aiding and abetting, but not the donors. United States v. Chestnut, 533 F.2d 40 (2d Cir. 1976) (affirming conviction of a campaign manager who caused an illegal coordinated expenditure to be made). The donor's conduct does nothing to aid the acceptance of the donation.

18

To rule otherwise, would create significant double jeopardy issues. If by merely committing a single act -- offering a bribe -- a person could be guilty of two crimes -- offering a bribe <u>and</u> aiding and abetting receipt of the same bribe -- that would result in double punishment for the same conduct. That cannot be what Congress had in mind and not what the Constitution would allow.

## CONCLUSION

The government has improperly charged a "rimless wheel" conspiracy where not all conspirators are alleged to have agreed to commit the same offense, and has improperly charged in a single conspiracy that different conspirators conspired to break different laws (some "making" and others "accepting" illegal campaign contributions). Because the conspiracy charge is not viable on its face, it must be dismissed.

Dated: October 11, 2011


/s/ James P. Cooney III
James P. Cooney III, N.C. Bar No. 12140
jcooney@wcsr.com
WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
One Wells Fargo Center
Suite 3500, 301 South College Street
Charlotte, NC 28202-6037
(704) 331-4980 (phone)
(704) 338-7838 (fax)

/s/ Abbe David Lowell
Abbe David Lowell, *pro hac vice*
ADLowell@Chadbourne.com
Christopher D. Man, *pro hac vice*
CMan@Chadbourne.com
CHADBOURNE & PARKE LLP
1200 New Hampshire Ave., NW
Washington, DC 20036
(202) 2974-5600 (phone)
(202) 974-5602 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2011, I electronically filed the foregoing **Reply Brief to Opposition to Dismiss Conspiracy** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Brian Scott Meyers
U.S. Attorney's Office – EDNC
Terry Sanford Federal Building
310 New Bern Avenue, Suite 800
Raleigh, NC 27601-1461
Telephone:  (919) 856-4530
Fax:  (919) 856-4487
Email:  brian.s.meyers@usdoj.gov

David V. Harbach
U.S. Department of Justice
Public Integrity Section
1400 New York Avenue, NW, Suite 1800
Washington, DC 20005
Telephone:  (202) 262-7597
Fax:  (202) 514-3003
Email:  david.harbach@usdoj.gov

Jeffrey E. Tsai
U.S. Department of Justice
Public Integrity Section
1400 New York Avenue, N.W., Suite 1800
Washington, DC 20005
Telephone: (202) 307-0933
Fax:  (202) 514-3003
Email:  jeffrey.tsai@usdoj.gov

Robert J. Higdon
U.S. Attorney's Office – EDNC
Terry Sanford Federal Building
310 New Bern Avenue, Suite 800
Raleigh, NC 27601-1461
Telephone:  (919) 856-4530
Fax:  (919) 856-4487
Email:  bobby.higdon@usdoj.gov

/s/ James P. Cooney III
James P. Cooney III (NCSB # 12140)
Womble Carlyle Sandridge & Rice, PLLC
One Wells Fargo Center
Suite 3500, 301 South College Street
Charlotte, NC 28202
Telephone:  (704) 331-4980
Email:  jcooney@wcsr.com

*Attorney for Defendant*